No. 26-1783

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

DAVID M. SCANLAN, New Hampshire Secretary of State; STATE OF NEW
HAMPSHIRE; NEAL KURK; ROBERT PERRY; LOUISE SPENCER;
CHRISTOPHER COLE,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

BRIEF FOR THE UNITED STATES AS APPELLANT

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 532-3803

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES..............................................................3

STATEMENT OF THE CASE ................................................................3

SUMMARY OF THE ARGUMENT ......................................................12

STANDARD OF REVIEW....................................................................14

ARGUMENT

    I.    The DOJ's demand for an electronic, unredacted
    copy of New Hampshire's SVRL satisfied Title III's
    requirements. ........................................................................15

        A.    New Hampshire's SVRL is a record or paper
        that Title III requires the State to retain and
        preserve and to produce upon the Attorney
        General's demand. ........................................................16

        B.    The DOJ adequately stated the basis of its
        demand for New Hampshire's SVRL. ..........................33

            1.    Courts play a limited role in assessing
            the Attorney General's demand under
            Title III.................................................................34

            2.    The DOJ's demand stated an adequate
            basis..................................................................37

**TABLE OF CONTENTS (continued):**                    **PAGE**

C.    The DOJ's stated purpose of ascertaining
New Hampshire's compliance with HAVA
was sufficient. .............................................................40

II.    The DOJ's demand for an electronic, unredacted
copy of New Hampshire's SVRL does not violate
federal or state privacy laws...................................................52

A.    The DOJ's demand complied with the Privacy
Act.............................................................................53

B.    The E-Government Act does not prevent the
DOJ from obtaining data supporting its HAVA
claim. .......................................................................56

C.    Federal law preempts any contrary New
Hampshire privacy law.................................................60

CONCLUSION .......................................................................64

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alabama ex rel. Gallion v. Rogers,*
187 F. Supp. 848 (M.D. Ala. 1960),
*aff'd sub nom. Dinkens v. Attorney General of the U.S.,*
285 F.2d 430 (5th Cir. 1961) ........................................................34

*American Oversight v. United States Dep't of Just.,*
45 F.4th 579 (2d Cir. 2022)..........................................................55

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013) ..........................................................................63

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...................................................14

*Brnovich v. Democratic Nat'l Comm.,* 594 U.S. 647 (2021) ..............45, 56

*Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) ..............63

*Cablevision of Bos., Inc. v. Public Improvement Comm'n,*
184 F.3d 88 (1st Cir. 1999)...........................................................43

*Clemente Props., Inc. v. Pierluisi-Urrutia,*
165 F.4th 1 (1st Cir. 2026),
*petition for cert. pending,* No. 25-1426 ...................................14, 50

*Coleman v. Kennedy,*
313 F.2d 867 (5th Cir. 1963) (per curiam)...............................37, 44

*Commissioner v. Tellier,* 383 U.S. 687 (1966) .......................................48

*Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000) ...........61

*Dean v. United States,* 556 U.S. 568 (2009) ...........................................43

**CASES (continued):**                                              **PAGE**

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
      601 U.S. 42 (2024) ...................................................................47

*Doe v. Chao*, 540 U.S. 614 (2004) ...........................................53

*Donaldson v. United States*, 400 U.S. 517 (1971),
      *superseded by statute on other grounds*,
      Tax Reform Act of 1976, Pub. L. No. 94-455,
      90 Stat. 1520 ..........................................................................36

*Electronic Privacy Info. Ctr. v. United States Dep't of Com.*,
      356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded on
      other grounds*, 928 F.3d 95 (D.C. Cir. 2019) ............................58-59

*Ex Parte Siebold*, 100 U.S. 371 (1879) ....................................61

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
      529 U.S. 120 (2000) ................................................................46

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019)..............18

*Foster v. Love*, 522 U.S. 67 (1997)......................................................60-61

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) .....18

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)...............................43

*Heckler v. Chaney*, 470 U.S. 821 (1985)................................................37

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)..............................34, 37

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)..............................*passim*

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ............17

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) .......................17

**CASES (continued):**                                                **PAGE**

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ........................................................... 43

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*,
587 U.S. 601 (2019) ........................................................... 47

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ................ 48

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) ............ 48

*Public Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ........................................... 20-21

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) .............................. 45

*Reynolds v. Sims*, 377 U.S. 533 (1964) ...................................... 45

*Russello v. United States*, 464 U.S. 16 (1983) ............................. 26

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................ 3, 5

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) .................. 59

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470 (6th Cir. 2026),
*petition for reh'g en banc pending*, No. 26-1225 ................... *passim*

*United States v. Comley*, 890 F.2d 539 (1st Cir. 1989) ...................... 51

*United States v. Fausto*, 484 U.S. 439 (1988) ............................... 46

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ..................... 34, 36

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ................... 52

*United States v. Mississippi*, 380 U.S. 128 (1965) .......................... 17

**CASES (continued):**                                                          **PAGE**

*United States v. Trahan*, 111 F.4th 185 (1st Cir. 2024),
    *cert. denied*, 145 S. Ct. 1206 (2025) ................................................ 17

*United States v. Winczuk*, 67 F.4th 11 (1st Cir. 2023) ........................... 17

*United States Dep't of Just. v. Tax Analysts*,
    492 U.S. 136 (1989) ................................................................ 20, 24

*Voter Reference Found., LLC v. Torrez*,
    160 F.4th 1068 (10th Cir. 2025) ...................................................... 32

*Webster v. Doe*, 486 U.S. 592 (1988) ...................................................... 37

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1 ...................................................................... 60

U.S. Const. Art. VI, Cl. 2 .......................................................................... 63

**STATUTES:**

Civil Rights Act of 1960 (CRA)
    52 U.S.C. 20701 *et seq.* ............................................................... 1, 3
    52 U.S.C. 20701 ...................................................................... *passim*
    52 U.S.C. 20701-20706 ...................................................................... 43
    52 U.S.C. 20703 ...................................................................... *passim*
    52 U.S.C. 20704 .................................................................... 4, 9, 62
    52 U.S.C. 20705 .................................................................... 5, 16, 63
    Pub. L. No. 86-449, § 601, 74 Stat. 90 ............................................ 44

Civil Rights Cold Case Records Collection Act of 2018
    Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 .............................. 19

E-Government Act of 2002
    § 201 ................................................................................................ 57-58
    § 208(b)(1)(A)(ii) .......................................................................... 57, 60

**STATUTES (continued):**                                    **PAGE**

§ 208(b)(1)(B)(i)...........................................................57-58
Pub. L. No. 107-347, 116 Stat. 2899 ...........................................57

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 20901 *et seq.* ..............................................................1
52 U.S.C. 21083(a)...................................................................60
52 U.S.C. 21083(a)(1)(A) ...................................................6, 59-60
52 U.S.C. 21083(a)(1)(A)(i).........................................................30
52 U.S.C. 21083(a)(1)(A)(ii)........................................................30
52 U.S.C. 21083(a)(1)(A)(iv).......................................................30
52 U.S.C. 21083(a)(1)(A)(vi).......................................................31
52 U.S.C. 21083(a)(1)(A)(viii)..................................................30,33
52 U.S.C. 21083(a)(2)(A) .......................................................6-7, 41
52 U.S.C. 21083(a)(2)(A)(i)........................................................42
52 U.S.C. 21083(a)(2)(A)(i)-(iii).....................................................6
52 U.S.C. 21083(a)(2)(A)(ii).......................................................42
52 U.S.C. 21083(a)(2)(A)(iii)..................................................7, 41-42
52 U.S.C. 21083(a)(4) ..........................................................42, 62
52 U.S.C. 21083(a)(5)(A)(i).......................................................6, 49
52 U.S.C. 21083(a)(5)(A)(i)-(ii) .....................................................6
52 U.S.C. 21083(a)(5)(A)(iii).........................................................6
52 U.S.C. 21111 ........................................................46, 53-54, 63
Pub. L. No. 107-252, 116 Stat. 1666 (2002)...............................44-45

John F. Kennedy Assassination Records Collection Act of 1992
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444...................................19

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501(b)(3) .................................................................5
52 U.S.C. 20503(b)(2) .............................................................5, 41
52 U.S.C. 20507(a)(3)(B) ...........................................................42
52 U.S.C. 20507(a)(4) .................................................................5
52 U.S.C. 20507(a)(4)(A) ...........................................................42
52 U.S.C. 20507(a)(4)(A)-(B) .........................................................5
52 U.S.C. 20507(c)(2)(A)............................................................41
52 U.S.C. 20507(d)...................................................................42

**STATUTES (continued):**                                               **PAGE**

52 U.S.C. 20507(i)(1) ........................................................... 5

Privacy Act of 1974
5 U.S.C. 552a(e)(4) ............................................................ 54
5 U.S.C. 552a(e)(4)(B) ....................................................... 55
5 U.S.C. 552a(e)(7) ............................................................ 53
Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896 .................... 53

Voting Rights Act of 1965 (VRA)
52 U.S.C. 10101 ........................................................... 31, 44
52 U.S.C. 10101(a)(1) ........................................................ 31
52 U.S.C. 10101(c) ............................................................. 31

8 U.S.C. 1445(f) ...................................................................... 26

8 U.S.C. 1449 .......................................................................... 26

8 U.S.C. 1454(a) ............................................................... 25-26

10 U.S.C. 130c(d)(2)(C) ......................................................... 23

13 U.S.C. 214 .......................................................................... 23

28 U.S.C. 1291 .......................................................................... 2

28 U.S.C. 1331 .......................................................................... 2

28 U.S.C. 1343 .......................................................................... 2

30 U.S.C. 1732(b) ................................................................... 23

31 U.S.C. 5314(a) ................................................................... 57

44 U.S.C. 3502 .................................................................. 57-58

44 U.S.C. 3502(3)(A)(i) ..................................................... 58, 60

**STATUTES (continued):**                                                      **PAGE**

44 U.S.C. 3502(3)(B) ...................................................................................58

44 U.S.C. 3502(10) .....................................................................................57

44 U.S.C. 3518(c)(1)(B) ..............................................................................58

44 U.S.C. 3572(f) ........................................................................................23

44 U.S.C. 3601 .......................................................................................57-59

N.H. Rev. Stat. Ann. § 654:36-a (2026) ...................................................43

**RULES:**

Fed. R. App. P.
    2.......................................................................................................64-65
    40(d)(1) ...............................................................................................65
    41(b) ....................................................................................................64

Fed. R. Civ. P. 12(b)(6) .......................................................................... 10, 14

**REGULATIONS:**

28 C.F.R. 0.50(a) ........................................................................................55

68 Fed. Reg. 47,610 (Aug. 11, 2003) ....................................................54-56

70 Fed. Reg. 43,904 (July 29, 2005) ..........................................................54

82 Fed. Reg. 24,147 (May 25, 2017) ..........................................................54

**LEGISLATIVE HISTORY:**                                          **PAGE**

106 Cong. Rec. 7767 (1960) ........................................................................44

*Civil Rights—1959: Hearings Before the Subcomm. on
      Constitutional Rights of the S. Comm. on the Judiciary,*
      86th Cong., 1st Sess. (1959) ...........................................................51

**MISCELLANEOUS:**

Authority to Obtain & Share Statewide Voter Roll Data,
      50 Op. O.L.C.,
      https://www.justice.gov/olc/media/1440346/dl ........................ 19, 58

*Merriam-Webster's Collegiate Dictionary* (10th ed. 2002) ......................59

Report of the United States Commission on Civil Rights (1959),
      https://www.usccr.gov/files/historical/1959/
      59-001-U.pdf) ....................................................................27-28, 62

*The American College Dictionary* (1959) .................................................33

*The American Heritage College Dictionary* (4th ed. 2002) ....................59

*The Oxford Universal Dictionary* (3d ed. 1955) ................................18-19

U.S. Dep't of Just., Civil Rights Division, Voting Section,
      https://www.justice.gov/crt/voting-section
      (last visited Aug. 3, 2026) ...............................................................55

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020) .........................56

U.S. Election Assistance Comm'n,
      *Celebrating 20 Years of HAVA* 1,
      https://www.eac.gov/sites/default/files/HelpAmerica
      VoteDay/HAVA_1-Pager_10-27 22_508.pdf .................................45

**MISCELLANEOUS (continued):**                                   **PAGE**

*Webster's New World Dictionary of the American Language*
     (8th coll. ed. 1960) ............................................................ 18

*Webster's Third New International Dictionary*
     (1966 unabridg.) ................................................... 22, 33

## INTRODUCTION

The United States Department of Justice (DOJ or Department) brought this case against New Hampshire Secretary of State David M. Scanlan and the State of New Hampshire (collectively, New Hampshire) alleging, *inter alia*, that New Hampshire violated Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. 20701 *et seq.*, which entitles the federal government to demand certain records pertaining to elections for federal office. Specifically, the DOJ alleged that New Hampshire violated the CRA by refusing the Attorney General's written demand for an electronic, unredacted copy of New Hampshire's Statewide Voter Registration List (SVRL) to determine the State's compliance with the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq.*

The district court granted New Hampshire's and intervenors' (collectively, defendants) Motions to Dismiss the DOJ's Title III claim and denied the United States' Motion to Compel Production, concluding that (1) the SVRL is not a record or paper that Title III requires the Secretary to retain and preserve and to produce upon the DOJ's written demand, *see* 52 U.S.C. 20701; and (2) the DOJ failed to provide an adequate basis of the demand, *see* 52 U.S.C. 20703. Because neither of

these reasons for granting the Motions to Dismiss and denying the Motion to Compel Production has merit, this Court should reverse the district court's Judgment and remand with instructions for the district court to order New Hampshire to produce the requested SVRL.[1]

## STATEMENT OF JURISDICTION

This appeal is from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343. That court entered a Memorandum Order granting defendants' Motions to Dismiss and denying as moot the United States' Motion to Compel Production on June 29, 2026, and a Final Judgment on June 30, 2026. Add. 1-26.[2] The United States filed a timely Notice of Appeal. App. 189. This Court has jurisdiction under 28 U.S.C. 1291.

---

[1] This appeal raises substantially similar issues to those in *United States v. Amore*, No. 26-1665 (1st Cir.); *United States v. Galvin*, No. 26-1657 (1st Cir.); and *United States v. Bellows*, No. 26-1676 (1st Cir.), in which the United States filed its opening Briefs on July 17, 2026. The United States respectfully requests that this Court "coordinate resolution of [th]is appeal[]" with the resolution of those appeals "to the extent practicable and appropriate." Order, *Galvin*, *supra* (July 6, 2026).

[2] "Doc. __, at __" refers to the docket number and internal page numbers on the district court docket sheet, No. 1:25cv371 (D.N.H.). "Add. __" refers to page numbers in the Addendum to this Brief. "App. __" refers to page numbers of the Appendix filed with this Brief.

## STATEMENT OF THE ISSUES

1. Whether New Hampshire's SVRL is a record or paper that Title III of the CRA requires the State to retain and preserve and to produce upon the Attorney General's written demand.

2. Whether the DOJ adequately stated the basis and purpose of its demand for an electronic, unredacted copy of New Hampshire's SVRL under Title III of the CRA.

3. Whether federal or state privacy laws prevent the DOJ from demanding an electronic, unredacted copy of New Hampshire's SVRL.

## STATEMENT OF THE CASE

1.a. The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

- 3 -

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so

demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted additional laws that affect what "records and papers which come into [election officers'] possession," 52 U.S.C. 20701. Relevant here are the NVRA and the HAVA, which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3).

While the NVRA "does not apply" to States like New Hampshire that have, since the NVRA's passage, continuously allowed voters to "register . . . at the polling place at the time of voting in a general election for Federal office," 52 U.S.C. 20503(b)(2), it is important in this context because the HAVA builds upon the requirements of the NVRA. The NVRA's requirements include recordkeeping obligations, 52 U.S.C. 20507(i)(1), and the duty to make reasonable efforts to maintain lists of eligible voters that do not include the names of ineligible voters, 52 U.S.C. 20507(a)(4)(A)-(B).

HAVA requires States to implement a single centralized computerized SVRL, and mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters," who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

HAVA also imposes various protocols that must be followed prior to removing individuals from an SVRL but exempts from these protocols States like New Hampshire that, for the reasons described above, are

exempt from not just the requirements, but also the protections for registrants included in the NVRA. 52 U.S.C. 21083(a)(2)(A). For these exempt States like New Hampshire, to protect registrants from improper removal from voter rolls, removal must be done "in accordance with State law." 52 U.S.C. 21083(a)(2)(A)(iii).

2. On June 25, 2025, the DOJ sent a letter to Secretary of State Scanlan requesting responses to questions regarding New Hampshire's compliance with HAVA and demanding New Hampshire's SVRL, including both active and non-active voters. App. 40-42. By letter dated July 25, 2025, Secretary Scanlan responded to the DOJ's questions but declined its request for New Hampshire's SVRL on the ground that "New Hampshire law authorizes the Secretary of State to release the statewide voter registration list in limited circumstances not [present] here." App. 44-51. Scanlan advised the DOJ that it could obtain each municipality's public checklist from their respective supervisors or clerks. App. 51.

On August 18, 2025, the Department sent Secretary Scanlan a second letter (the August 18 Letter) reiterating its demand for a complete copy of New Hampshire's SVRL. App. 53-54. The letter informed the Secretary of New Hampshire's obligations under 52 U.S.C. 20701 and

20703 and stated that the latter was the basis for its demand. App. 53. The letter further explained that "[t]he purpose of this request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C.§ 21083(b)(4)(A) and (B)," and stated that the SVRL "is to include all fields, including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i)." App. 53.

The letter informed Secretary Scanlan that neither state law nor federal privacy law precluded the DOJ's demand and that "[i]n charging the Attorney General with enforcement of the VRL maintenance requirements in [HAVA], Congress plainly intended that the Justice Department be able to conduct an independent review of each state's list." App. 53-54. In response to any federal privacy concerns the Secretary had with the requested information, the DOJ cited Section 304 of the CRA, which precludes, with limited exceptions, the Attorney General, his representatives, and DOJ employees from "disclos[ing] any record or

paper . . . or any reproduction or copy" produced pursuant to the DOJ's demand. App. 54 (quoting Section 304 of the CRA (52 U.S.C. 20704)).

Secretary Scanlan again refused the DOJ's demand by letter dated August 28, 2025. App. 56. The response reiterated the Secretary's position that "New Hampshire law prohibits the sharing of this information with the United States Department of Justice in the manner you request." App. 56. Secretary Scanlan explained that after consulting with legal counsel, "there does not appear to be any provision under federal law that compels the production of voter registration data superseding the provisions of New Hampshire statutes that I must follow." App. 56. The response repeated Secretary Scanlan's advice that the DOJ could obtain each municipality's most recent public checklist from their supervisors or clerks. App. 56. The response further stated that, in the alternative, Secretary Scanlan's office could provide the DOJ with copies of the marked paper checklists from the 2024 general and/or primary federal elections, which are public records. App. 56.

On September 25, 2025, the DOJ sued Secretary Scanlan and the State of New Hampshire, alleging, *inter alia*, that the Secretary's refusal to provide the United States an electronic, unredacted copy of

New Hampshire's SVRL violated Title III of the CRA, and a Motion to Compel Production of the SVRL. App. 22-38; Doc. 31. New Hampshire, along with intervenor-defendants Neil Kurk, Robert "Bob" Perry, Louise Spencer, and Christopher Cole, moved to dismiss the DOJ's Complaint under Federal Rule of Civil Procedure 12(b)(6). Docs. 32, 32-1 (New Hampshire); Docs. 37, 37-1 (intervenors). New Hampshire argued that the SVRL is not a record subject to production under 52 U.S.C. 20703, that the DOJ's demand letter did not contain a sufficiently stated basis and purpose as Section 20703 requires, and that the DOJ's demand violated state and federal privacy laws. Add. 7, 25 n.39.

3. On June 29, 2026, the district court entered a Memorandum Order dismissing the DOJ's Complaint and denying as moot the DOJ's Motion to Compel Production. Add. 1-26. The court subsequently issued a Final Judgment in accordance with the Memorandum Order. Add. 27.

As a threshold matter, the district court rejected the United States' argument that its CRA claim should be evaluated under a summary enforcement standard. Add. 2 n.2. The court reasoned that the United States brought its CRA claim alongside its HAVA claim, which does

not confer administrative subpoena authority. Add. 2 n.2.

On the merits, the district court first held that Title III does not include the SRVL among the records and papers subject to the retention and preservation requirements of 52 U.S.C. 20701, and thus the SVRL was not subject to the Attorney General's demand under 52 U.S.C. 20703. Add. 7-14. The court interpreted the phrase "come into [an officer's] possession" in Section 20701 to refer "only to records that election officials obtain from outside sources—i.e., prospective voters—and not to records that they themselves have created and thus have always possessed." Add. 9-10. The court concluded that applying Section 20701 to an SVRL "could produce absurd results" because it "would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit"—a mandate that is "impractical to the point of impossible." Add. 10-11.

The court next determined, in the alternative, that the Attorney General's demand for New Hampshire's SVRL failed because it lacked a sufficient basis as 52 U.S.C. 20703 requires. Add. 14-20. The court concluded that the demand must contain both a purpose and a basis, and

that the latter is the "evidentiary or factual predicate giving rise to the demand in the first place" because "[a] statute that requires the Attorney General to identify the legal authority under which he acts would not naturally be phrased as one requiring a 'statement of the basis and the purpose.'" Add. 15-16. The court then held that the DOJ's demand failed to satisfy Section 20703's basis requirement because it "does not identify any factual anomalies in New Hampshire's voter registration data, nor does it point to any complaint or pattern suggesting noncompliance with HAVA or the CRA." Add. 18.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing the DOJ's Title III claim on the grounds that (1) the SVRL is not a record or paper subject to Title III's preservation and demand requirements and (2) the DOJ failed to state an adequate basis of its demand for an electronic, unredacted copy of New Hampshire's SVRL.

First, the district court erred in holding that an SVRL falls outside the scope of the CRA because it is a self-generated document that does not "come into [an officer's] possession." The CRA's text does not exclude self-generated documents. At most, the distinction between records

- 12 -

"com[ing] into [one's] possession" and being "in [one's] possession," is a temporal one—not a distinction between obtaining records from an outside source and through self-generation. Thus, the Attorney General, or his representative, is entitled to reproduction and copying of a state's SVRL through the CRA to assess a state's compliance with HAVA.

Second, DOJ's assertion that it was trying to ascertain New Hampshire's compliance with HAVA sufficiently stated the basis of its demand. The DOJ was not required to allege specific facts to explain why it believed that HAVA may have been violated and why New Hampshire's unredacted SVRL was necessary for its investigation. This assertion also sufficiently stated a proper purpose of the DOJ's demand, as HAVA is a voting-related statute.

While the district court did not reach defendants' various privacy-related arguments, this Court should now reject these arguments as meritless. The demand did not violate the Privacy Act because the DOJ has an applicable System of Records Notice. The demand also did not violate the E-Government Act because it did not initiate a new collection of information and so did not trigger any need for a privacy impact

assessment. Finally, the CRA preempts any contrary New Hampshire privacy law under the Constitution and Supreme Court precedent.

## STANDARD OF REVIEW

This Court "review[s] the grant of a motion to dismiss for failure to state a claim under [Federal] Rule [of Civil Procedure] 12(b)(6) de novo, taking the well-pleaded facts in the complaint as true and drawing all reasonable inferences in favor of the plaintiffs." *Clemente Props., Inc. v. Pierluisi-Urrutia*, 165 F.4th 1, 11 (1st Cir.), *petition for cert. pending*, No. 25-1426 (filed June 25, 2026). "To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ibid.* (alteration and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679.

## ARGUMENT

**I.   The DOJ's demand for an electronic, unredacted copy of New Hampshire's SVRL satisfied Title III's requirements.**

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Those same records or papers are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703. Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the State election officer has rejected it, the Attorney General may seek an order from the federal court

"with jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the ground that New Hampshire's SVRL is not a record or paper subject to the retention and preservation requirements of 52 U.S.C. 20701 because it did not "come into [an officer's] possession," and thus was not subject to the Attorney General's demand under 52 U.S.C. 20703. Add. 7-14. The court held, in the alternative, that the DOJ's demand for an electronic, unredacted copy of New Hampshire's SVRL failed to state a sufficient basis. Add. 14-20. Both conclusions were erroneous.

## A. New Hampshire's SVRL is a record or paper that Title III requires the State to retain and preserve and to produce upon the Attorney General's demand.

Section 301 of the CRA requires an election official to "retain and preserve, for a period of twenty-two months from the date of any" covered election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Those same records or papers

are subject to demand by the Attorney General or his representative. 52 U.S.C. 20703.

1. The "sweeping" retention provision applies to New Hampshire's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

"[T]he phrase 'relating to' has a broadening effect," *United States v. Trahan*, 111 F.4th 185, 197 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1206 (2025), and typically should be read "expansively," *United States v. Winczuk*, 67 F.4th 11, 17 (1st Cir. 2023) (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). In Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. 52 U.S.C. 20701. The SVRL is a record that relates to voter registration.

- 17 -

Furthermore, any officer in possession of the SVRL came into possession of the SVRL at a distinct point in time. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own."). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))); *see The Oxford Universal Dictionary* 17 (3d

ed. 1955) (defining "acquire" similarly). Congress likely used the term "comes into his possession" precisely because it is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C., at 8-9 (2026), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself").[3]

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in

---

[3] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018 Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ("was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

the agency's possession at the time of a records request. *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (citation and internal quotation marks omitted; emphasis added). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *See id.* at 145.

2. According to the district court, the SVRL is not a covered "record" or "paper" under Title III because it "is not a document that arrived at the Secretary's office from prospective voters or any other external source at an identifiable moment of time" and therefore does not "come[] into [the] possession" of election officials. Add. 14; 52 U.S.C. 20701. In the district court's view, Section 20701 "refer[s] only to records that election officials obtain from outside sources—i.e., prospective voters—and not to records that they themselves have created and thus have always possessed." Add. 10. This was error for several reasons.

a. This Court has already rejected similar attempts to limit the scope of voting records under other statutes. *See Public Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). In *Public Interest Legal Foundation*, this Court held that Section 8(i)(1) of the NVRA applies to

the state voter file because it was as electronic report generated from the central voter registration system, and it reflects the additions and changes made by state election officials in carrying out voter list registration and maintenance activities. *See id.* at 49.

b. For the reasons explained above (*see* pp. 18-19, *supra*), the district court's requirement that election officers receive the relevant records or papers from voters or some other outside source (Add. 14) is not the most natural reading of the statutory phrase "come into his possession." *See United States v. Benson*, 179 F.4th 470, 485 n.3, 486 n.7 (6th Cir.) (*Benson II*) (Nalbandian, J., dissenting), *petition for reh'g en banc pending* (filed July 8, 2026). Election officers in New Hampshire acquired the relevant records from individual voters in the course of carrying out their duties. When election officers in New Hampshire aggregated individual records into one new, simple record—the SVRL— they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *See id.* at 484. And even assuming that the example documents listed in Section 301 are all "records that election officials *receive,* rather than *create*" (Add. 10 (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 769 (W.D. Mich.) (*Benson I*), *aff'd,*

179 F.4th 470 (6th Cir. 2026), *petition for reh'g en banc pending* (filed July 8, 2026))), the statutory text goes well beyond those example documents by requiring retention and preservation of all records and papers "*relating to*" any of the examples. 52 U.S.C. 20701 (emphasis added).

Contrary to the district court's conclusion, the word "come" cannot create a carve-out for self-generated documents. *See* Add. 13-14 (contrasting "come into possession" with "in the possession of"). Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through*

- 22 -

*improper means* or to trigger duties to act based on acquiring information or property *at a particular time*.[4]

Following this focus on the *how* and *when* an individual gains possession of a record or paper, 52 U.S.C. 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. Thus, the phrase "come into his possession" "cabins an election official's liability to documents she received during her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting). The distinction between records "com[ing] into [one's] possession" and being "in[] [one's] possession," then, is a "temporal" one. *Id.* at 486 n.7.

That temporal requirement satisfies the district court's view that there must be "a prior state when election officials did not have the record

---

[4] *See, e.g.*, 44 U.S.C. 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. 214 (similar); 30 U.S.C. 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

or paper, and a transition that changed that." Add. 9. The district court's conclusion that, because an election officer "created" the SVRL, every election officer has "always possessed" the SVRL is wrong for at least two reasons. Add. 10. First, the moment of the SVRL's creation is one relevant moment of "transition" (Add. 9); after that moment, the creating officer possesses a new document that he or she previously did not have possession of. *See Tax Analysts*, 492 U.S. at 144-145. Second, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. *See* 52 U.S.C. 20701; *cf.* Add. 14 (emphasis added) (stating that "*New Hampshire* has built, updated, and controlled" the SVRL). Even assuming every single election officer collectively generated the SVRL at one time after the HAVA's passage (which the district court never found), every new election officer who has since gained control over the SVRL did not previously possess the SVRL and has instead "come into . . . possession" thereof at a later time. *See Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting).

In rejecting this interpretation, the district court placed undue emphasis on the fact that Congress could have, but did not, use the phrase "in the possession of." Add. 13-14. But the district court dismissed

the relevance of a statutory provision that uses variations of both phrases and shows that any distinction between the two is, at most, temporal—not one between self-generated and non-self-generated records. Add. 12-13.

Section 1454(a) of Title 8 imposes dual obligations: if a certificate of naturalization or declaration of intention is lost, "the applicant or any other person *who shall have*" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . *may come into possession of* it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a) (emphasis added).[5] Thus, the phrase "come into possession" implies a temporal change in circumstances: someone who "shall [not] have" the document at first but then "come[s] into possession of it" later. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person,"

---

[5] The district court referred to 8 U.S.C. 1445(a), but this appears to have been a typographical error. *See* Add. 12-13.

8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.[6]

Then the district court pointed to the NVRA's complete lack of any "possession" language in its public-inspection provision. Add. 13. Unlike the CRA, the NVRA's public-inspection provision imposes no *personal* liability—only a state government's obligation—so there is less reason to cabin when and how the duty to retain and preserve attaches. In any event, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute." *Russello v. United States*, 464 U.S. 16, 25 (1983). Indeed, under the district court's own logic, it would appear that States are obligated under the NVRA to make available even those "records" that are *not* in their possession—a result that makes little sense—because the NVRA does not use the word "possession" whereas the CRA does. *See* Add. 13.

---

[6] The district court read the statute as supporting its own reading because "neither the applicant nor any third party who subsequently acquires [the certificate] has created it." Add. 13. But that statement fails to acknowledge the dual use of "shall have" and "may come into possession of" in one statutory provision; the only distinction between the two that makes sense is a temporal one and not a distinction between self-generated documents and those from outside sources.

c. Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights (1959) (1959 CCR Report) at 93, https://www.usccr.gov/files/historical/1959/59-001-U.pdf). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Ibid.* (citation omitted). These indices would be government-created records, but once an index was "passed . . . up the ladder," the receiving "state official came into possession of the index." *Ibid.*

The indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138. The

- 27 -

Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. *Id.* at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88. Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic SVRL as required by HAVA.

Consider also the implication of the district court's interpretation. That reading would exclude from the reach of Sections 20701 and 20703 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

3. Even accepting the district court's requirement that the SVRL must come from some "external source," that requirement was satisfied.[7] The SVRL "c[a]me into" Secretary Scanlan's "possession" when he received it from someone else in his office. *Benson II*, 179 F.4th at 486-487 (citation omitted) (Nalbandian, J., dissenting). As noted previously, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession. The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if Secretary Scanlan's employees created the SVRL—"and therefore didn't 'come into . . . possession' of the

---

[7] At one point, the district court's Order could be read to suggest that the "external source" must be "prospective voters." Add. 11; *but see* Add. 14. However, the only conceivable textual basis for that particular source limitation would be the list of example documents in Section 301 (which the district court described as documents submitted by voters). As explained above (*see* p. 17, *supra*), Section 301's plain text extends beyond those documents.

list themselves" under the district court's reading—Scanlan "nonetheless 'c[a]me into . . . possession' of the [SVRL] when [h]is employees sent it to [h]im." *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701).

4. Construing Title III to not include the SVRL itself would paralyze the United States' ability to enforce various federal voting laws. The SVRL is the only statewide federally mandated record of voters required to conduct every election. HAVA states "[t]he computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii).

It is not just *any* record "requisite to voting," 52 U.S.C. 20701, in an election. Without the SVRL, federal elections cannot occur. The SVRL must "serve as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The SVRL must contain "the name and registration information of every legally registered voter in the State." 52 U.S.C. 21083(a)(1)(A)(ii). The SVRL must be "coordinated with other agency databases within the State," 52 U.S.C. 21083(a)(1)(A)(iv), and "[a]ll voter registration information obtained by any local election official in the State shall be

- 30 -

electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." 52 U.S.C. 21083(a)(1)(A)(vi). Absent this record, conducting federal elections is simply not possible.

Consequently, to investigate whether a jurisdiction engages in practices that violate the CRA, Uniformed and Overseas Citizens Absentee Voting Act, NVRA, HAVA, or Voting Rights Act of 1965, 52 U.S.C. 10101 (VRA),[8] for example, the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL, so as to assure himself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See Lynd II*, 306 F.2d at 228. The district court's reading would effectively carve out vast numbers of federal election records, including SVRLs, which was plainly not the

---

[8] The VRA provides that "all citizens of the United States who are otherwise qualified by law to vote at any election . . . shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude." 52 U.S.C. 10101(a)(1). It provides that when "reasonable grounds" exist to "believe that any person is about to engage in any act or practice" in violation of the VRA, the Attorney General may institute an action for relief. 52 U.S.C. 10101(c).

intention of Congress in passing such "sweeping" legislation. *Lynd II*, 306 F.2d at 226.

By contrast, the harm that the district court identified to the *State* from the United States' interpretation does not exist. According to the district court, reading Title III to "encompass" an "evolving work product" like the SVRL "would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the state, would be 'impractical to the point of impossible.'" Add. 11 (citation omitted). That is incorrect. Reading Title III harmoniously with HAVA— which requires these continuous updates to the SVRL—yields the conclusion that an election officer properly "retain[s] and preserve[s]" an SVRL, 52 U.S.C. 20701, by updating it accurately as required by the HAVA, *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and

"constantly changing").[9] There is no obligation to "creat[e] a new, static version of the database with every single edit." (Add. 11).[10]

### B. The DOJ adequately stated the basis of its demand for New Hampshire's SVRL.

As an alternative ground for dismissing the DOJ's Title III claim, the court concluded that the DOJ's demand for an electronic, unredacted copy of New Hampshire's SVRL failed to state an adequate basis. Add. 14-20. The court reached this conclusion by erroneously grafting on Section 303's minimal basis-and-purpose requirement the mandate that the DOJ provide the "evidentiary or factual predicate giving rise to the demand in the first place." Add. 16. There is "no justification" for

---

[9] *See The American College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

[10] Because HAVA requires that "computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C. 21083(a)(1)(A)(viii), state election officials would be required to preserve a static version of the list used to generate the official voter registration lists distributed to local election offices used for the conduct of each federal election, or those lists themselves.

requiring the United States to "allege specific details" underlying its demand. *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*). Accordingly, the court erred in rejecting the DOJ's stated basis of "ascertain[ing] New Hampshire's compliance with the list maintenance requirements of HAVA" under 52 U.S.C. 21083(b)(4)(A) and (B) because it "does not identify any factual anomalies in New Hampshire's voter registration data, nor does it point to any complaint or pattern suggesting noncompliance with HAVA or the CRA." Add. 18 (brackets in original).

### 1. Courts play a limited role in assessing the Attorney General's demand under Title III.

Courts undertake a limited role in evaluating the sufficiency of a demand under 52 U.S.C. 20703. The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of the U.S.*, 285 F.2d 430 (5th Cir. 1961), and that "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 20701 in court under Title III, the DOJ initiated "a special statutory proceeding

- 34 -

in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure," but merely "a simple statement by the Attorney General that after a [Section 303] written demand for inspection of records and papers covered in [Section 301], the person against whom an order for production is sought under [Section 305] has failed or refused to make such papers 'available for inspection, production, and copying.'" *Id.* at 225-226 (quoting 52 U.S.C. 20703).

Title III's special statutory proceeding limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd II*, 306 F.2d at 226 (quoting 52 U.S.C. 20703). Accordingly, a state official responding to the Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers

- 35 -

the records essential." *Ibid.* Nor is "the factual foundation for, or the sufficiency of," this statement "open to judicial review or ascertainment." *Ibid.*; *see Lynd I*, 301 F.2d at 822.

The Fifth Circuit's approach to Title III's "summary proceeding[s]," *Lynd II*, 306 F.2d at 226, is consistent with subsequent Supreme Court precedent. In *Donaldson v. United States*, the Supreme Court observed that, although the Rules of Civil Procedure "have an application to a summons proceeding," they "are not inflexible in this application"; and, moreover, precedent does not suggest those rules should be used to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." 400 U.S. 517, 528-529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520; *see Lynd II*, 306 F.2d at 226 (allowing judicial determination of whether "written demand has been made" and whether the custodian "ha[s] been given reasonable notice of the proceeding").

In sum, so long as the Attorney General has stated in writing the basis and purpose of the demand, Title III is satisfied and the records

must be produced. *See* 52 U.S.C. 20703.

### 2. The DOJ's demand stated an adequate basis.

In line with this summary proceeding, nothing in the statute purports to authorize courts to second-guess or probe the sufficiency or sincerity of the Attorney General's statement. Indeed, the statute provides no meaningful standards that would permit such judicial review. *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

Instead, the Attorney General need only "identify in a general way the reasons for his demand," such as that it "was made for the purpose of investigating *possible* violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (emphasis added; citation omitted); *see, e.g.*, *Bruce*, 298 F.2d at 861 (citation omitted) ("The purpose of this demand is to examine the aforesaid records to ascertain whether or not violations of Federal law in regard to registration and

voting have occurred."). Accordingly, the only "matters open for determination" by the court when a recipient of the Attorney General's demand challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. Additionally, if "a genuine dispute subsequently arises as to whether or not any specified particular paper or record comes within this broad statutory classification," that too may be addressed by the court. *Ibid.*

The DOJ's demand for an unredacted copy of New Hampshire's SVRL easily satisfied these requirements. In its August 18 Letter, the Department stated that "the purpose of [the Department's] request [for the unredacted SVRL] is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. 21083(b)(4)(A) and (B)." App. 53. Under any reasonable interpretation of this statement the basis for the DOJ's written demand is clear—that New Hampshire's list maintenance program may violate HAVA—and thus the demand put Secretary Scanlan on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. The district court's imposition

of an additional requirement that the Attorney General provide a factual basis for his demand because "[a] statute that requires the Attorney General to identify the legal authority under which he acts would not naturally be phrased as one requiring a 'statement of the basis and the purpose'" (Add. 16) finds no support in *Lynd II*.

The district court's attempt (Add. 17-18) to reconcile *Lynd II* with its factual-basis requirement is unavailing. That the United States in that case based its demand for records on "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction," *Lynd II*, 306 F.2d at 229 n.6, merely shows that a demand may include such information. Notably, though, the cited demand provided no details regarding what this "information" in the Attorney General's possession was. *See ibid.*; *see also id.* at 229 n.5 (noting that the demand in a consolidated case was "substantially in the same words").

Indeed, *Lynd II* expressly provides that "the factual foundation for, or the sufficiency of, the Attorney General's statement of the basis and the purpose contained in the written demand *is not open to judicial*

*review or ascertainment.*" 306 F.2d at 226 (emphasis added; citation and internal quotation marks omitted). Accordingly, the district court erred in rejecting the legal sufficiency of the DOJ's stated basis because it "does not identify any factual anomalies in New Hampshire's voter registration data, nor does it point to any complaint or pattern suggesting noncompliance with HAVA or the CRA." Add. 18.

### C. The DOJ's stated purpose of ascertaining New Hampshire's compliance with HAVA was sufficient.

Because the district court held that the DOJ's demand lacked a sufficient basis, it did not determine whether the demand stated an adequate purpose. Add. 20. Defendants argued below that the Department's stated purpose of "ascertain[ing] New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)" was insufficient because New Hampshire is exempt from the NVRA and because the CRA targets the denial of voting rights. App. 72-75 (citation omitted); Doc. 37-1, at 10-15. These arguments are incorrect.

1. Intervenors argued below that New Hampshire "has no duty to comply with any substantive federal list-maintenance requirements," and so the Attorney General cannot claim such an investigation as a

proper purpose. Doc. 37-1, at 10. This argument is based on New Hampshire's exemption from the NVRA, 52 U.S.C. 20503(b)(2), and HAVA's statement that states falling under Section 20503(b)(2) "shall remove the names of ineligible voters from the [SVRL] in accordance with State law" as opposed to various procedures imported into the HAVA from the NVRA, 52 U.S.C. 21083(a)(2)(A)(iii). Intervenors misunderstand the import of these provisions.

Section 303 of HAVA requires States to, among other things, "perform list maintenance . . . on a regular basis." 52 U.S.C. 21083(a)(2)(A). For most States, that regular list maintenance incorporates certain voter protections embedded in the NVRA: for example, "[a] State shall not remove the name of a registrant" because that registrant "has changed residence" without taking certain processes or waiting a certain amount of time "to confirm the change [in] address." 52 U.S.C. 20507(d), 21083(a)(2)(A)(i). There is a 90-day quiet period before a federal election before which the State must complete "any program the purpose of which is to systematically remove the names of ineligible voters." 52 U.S.C. 20507(c)(2)(A), 21083(a)(2)(A)(i). And those States must also "coordinate" their SVRLs with "State agency records on

- 41 -

felony status" and "on death" "[f]or purposes of removing names of ineligible voters" under NVRA provisions relevant to removal for either of those reasons. 52 U.S.C. 21083(a)(2)(A)(ii); *see* 52 U.S.C. 20507(a)(3)(B) and (a)(4)(A).

From these NVRA-based requirements, New Hampshire is exempt and instead "shall remove the names of ineligible voters . . . in accordance with State law." 52 U.S.C. 21083(a)(2)(A)(iii). But 52 U.S.C. 21083(a)(2)(A)(iii) only exempts New Hampshire from the requirements laid out in 52 U.S.C. 21083(a)(2)(A)(i) and (ii)—not other requirements, such as the mandate that a "State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," 52 U.S.C. 21083(a)(4). As for "State law," 52 U.S.C. 21083(a)(2)(A)(iii), instead of following the NVRA protections provided to properly registered voters, New Hampshire must follow New Hampshire law which provides the methods and restrictions for removing registrants from the state registration list. *See* N.H. Rev. Stat. Ann. § 654:36-a (2026) (providing procedures for the supervisors of a voting checklist to correct the checklist).

2. Defendants' argument that Title III solely targets voting-related discrimination finds no support in the statute itself. Interpreting Title III's coverage "begins and ends with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). "[A] court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." *Cablevision of Bos., Inc. v. Public Improvement Comm'n*, 184 F.3d 88, 101 (1st Cir. 1999) (citation omitted). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (alteration in original; citation omitted).

Here, no language limiting Title III to violations of individuals' voting rights appears anywhere in the statutory text. *See* 52 U.S.C. 20701-20706. By contrast, Congress made clear elsewhere in the CRA

that it intended a remedy to be limited to particular harms—namely, racial discrimination. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101). The plain text of Title III provides no limitation on the permissible purpose of the Attorney General's demand. It is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

3. In any event, ensuring New Hampshire's compliance with HAVA *does* relate to individual voting rights, and thus is a proper purpose of the Attorney General's Title III demand for federal election records. By broadly authorizing the Attorney General to demand election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *Benson I*, 819 F. Supp. 3d at 767.

HAVA is a federal election statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat.

1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[11] By mandating list maintenance, HAVA also protects against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). Accordingly, "the DOJ may use the CRA to investigate possible [HAVA] violations." *See Benson I*, 819 F. Supp. 3d at 767.

3.a. Defendants nevertheless argued below that the absence of a requirement in HAVA that States make their SVRLs available for inspection by the Attorney General forecloses the DOJ's demand here for

---

[11] U.S. Election Assistance Comm'n, *Celebrating 20 Years of HAVA* 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf.

election records to ensure that a State is complying with its HAVA list maintenance obligations. App. 76-77; Doc. 37-1, at 22. Not so. As the *Benson I* court correctly observed, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson I*, 819 F. Supp. 3d at 767. Indeed, the opposite is true: "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *see United States v. Fausto*, 484 U.S. 439, 453 (1988) ("Th[e] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."). Accordingly, it is appropriate to interpret the CRA and the subsequently enacted HAVA in concert.

Congress gave the Attorney General the authority to enforce HAVA. *See* 52 U.S.C. 21111. This enforcement authority does not operate in a vacuum, separate from the Attorney General's preexisting Title III investigative authority. Said differently, Title III gives the Attorney

General investigative powers; HAVA gives him enforcement powers. These laws operate in harmony. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63-64 (2024) (citation omitted) (discussing the "strong presumption" that "federal statutes touching on the same topic" "can coexist harmoniously" and a court's duty to "giv[e] effect to both").

Viewed in this light, the lack of a tool for records inspection by the Attorney General in HAVA comparable to 52 U.S.C. 20703 *supports* the DOJ's position. It is implausible that Congress intended for the Attorney General to lack the ability to inspect complete records so pertinent to his enforcement authority under HAVA. *See* pp. 30-32, *supra*. Because it is well-settled that "Congress legislates against the backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted), a better inference is that Congress saw no need to provide an inspection provision for the Attorney General in the later-enacted HAVA, because the CRA provided a pre-existing investigative tool. This interpretation gives effect to the Supreme Court's directive that when two separate statutes "are complementary and have separate scopes and purposes," the "greater specificity" of one matters only if both

"cannot be implemented in full at the same time." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014).

b. Intervenors further argued below that "New Hampshire's full and unredacted statewide voter file is simply not helpful or necessary to investigate" the State's possible non-compliance with HAVA's list maintenance requirements. Doc. 37-1, at 16. Just as with the basis for the demand, *see* pp. 37-38, *supra*, the CRA does not leave "open for determination" the "scope of the order to produce insofar as it concerns the nature of the records or papers." *Lynd II*, 306 F.2d at 226. "This is so because the papers and records subject to inspection and demand have been specifically identified by Congress." *Ibid.*

In any event, the DOJ's Complaint plausibly explained why the Department believed the unredacted SVRL to be "relevant" or "necessary" to its enforcement obligations under HAVA. *See, e.g.*, *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966) (citation omitted) (explaining that "necessary" in a tax statute means "appropriate and helpful"); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 394 (3d Cir. 2004) (internal quotation marks omitted) (interpreting "necessary" to mean "convenient, useful, or helpful, not essential or indispensable"). The

- 48 -

Complaint alleged that the August 18 Letter requested New Hampshire's current SVRL and "explained that the purpose of the request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." App. 32 (citation and internal quotation marks omitted). The Complaint further alleged that the August 18 Letter specified that the SVRL "must include all fields, including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i)." App. 32 (citation and internal quotation marks omitted). Because HAVA prohibits a State from accepting or processing a voter registration application that lacks this information, *see* 52 U.S.C. 21083(a)(5)(A)(i), a court could draw the reasonable inference from these factual allegations that the DOJ needed this information to enforce list maintenance requirements under HAVA.

c. Finally, defendants argued below that the Attorney General's stated purpose for demanding New Hampshire's SVRL is pretextual, with intervenors contending that the DOJ's true motivation is to establish a national voter database to target and remove individuals from

the voter rolls illegally. *See* App. 75; Doc. 37-1, at 15-17. As already discussed, *see* pp. 37-38, 48, *supra*, 52 U.S.C. 20703 leaves no room for a court to second-guess the stated basis and purpose for the Attorney General's demand. Even if the demand was judicially reviewable, the district court was required—as it acknowledged (Add. 2)—to take "the well-pleaded facts in the [United States'] complaint as true and draw[] all reasonable inferences in favor of" the United States. *Clemente Props., Inc. v. Pierluisi-Urrutia*, 165 F.4th 1, 11 (1st Cir.), *petition for cert. pending*, No. 25-1426 (filed June 25, 2026). Under this standard, this Court should reject speculative allegations as to the true purpose of the DOJ's request.

The same result follows under this Court's precedents involving administrative subpoenas, which the district court concluded (Add. 2 n.2) did not apply here. *See Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"). This Court has held that a party resisting a subpoena based on claims of "bad faith" must support its assertions by "firm evidence."

*United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989).[12] "In the absence of firm evidence of bad faith, it is not [this Court's] role to intrude into the investigative agency's function," and accordingly, "discovery is improper in a summary subpoena enforcement proceeding" "[e]xcept in extraordinary circumstances." *Id.* at 543 (citations omitted).

Defendants' assertions of pretext fall well short of this standard. They relied on the fact of DOJ's demands for SVRL production from numerous States, statements by federal officials that are consistent with a desire to investigate list maintenance, reporting based on hearsay, and commentary on these same assertions by another district court. App. 75; Doc. 37-1, at 16-17. None of this shows "firm evidence" of pretext. *Comley*, 890 F.2d at 542-543. For the reasons stated above, the DOJ's stated

---

[12] Although the United States below analogized a proceeding under the CRA to an administrative-enforcement proceeding, that does not mean that these non-CRA precedents map on exactly to CRA claims; while these precedents leave some room to evaluate pretext, as the Fifth Circuit has explained, the CRA leaves *no* room for evaluating the sufficiency of the Attorney General's asserted purpose. *See* pp. 34-36, *supra*; *see also Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . . rather than for the issuance of a subp[o]ena"). The United States invokes these precedents for the sake of argument.

purpose of its demand—"to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. 21083(b)(4)(A) and (B)" (App. 53)—is sufficient to satisfy the CRA and defendants' speculations about the Department's motives should not be part of this proceeding.

## II. The DOJ's demand for an electronic, unredacted copy of New Hampshire's SVRL does not violate federal or state privacy laws.

Because the district court held that the DOJ's demand for an electronic, unredacted copy of New Hampshire's SVRL was beyond the scope of Title III, it did not reach defendants' privacy-related arguments. Defendants argued below that the DOJ's demand violated two federal privacy laws—the Privacy Act and the E-Government Act—and New Hampshire privacy laws. *See* App. 79-85; Doc. 37-1, at 21-25. Even if the United States' compliance were lacking—and it is not—New Hampshire's obligations under Title III are separate from, and not dependent on, the United States' obligations under other federal laws. *See United States v. McAnlis,* 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a

prerequisite to enforcement of an IRS summons"). Regardless, though, the United States is complying with federal privacy laws.

### A.    The DOJ's demand complied with the Privacy Act.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896).

1. New Hampshire argued below that disclosure of the unredacted SVRL threatens the First Amendment rights of voters, which the Privacy Act was enacted to protect, because it identifies a voter's political party, if any, and prior party primaries a voter has chosen to participate, and shows which voters chose to vote in which elections. App. 80-82.

The Privacy Act prohibits a federal agency from "maintain[ing a] record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute . . . or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. 552a(e)(7). Enforcing HAVA's list-maintenance requirements satisfies the law-enforcement exception. *See* 52 U.S.C.

- 53 -

21111 (giving the Attorney General enforcement authority). However, the United States agrees that certain information, like an individual's party affiliation and how that individual votes (including for which party), both "describ[es] how an[] individual exercises" his First Amendment rights and is not "pertinent to" the DOJ's investigation. 5 U.S.C. 552a(e)(7). Accordingly, the United States will not object to a redaction of that information in the State's SVRL. Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand.

2. Defendants argued below that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. *See* App. 82-84; Doc. 37-1, at 23-25. Not so. The full list of routine uses for the DOJ's collection of voter information can be found in the SORN titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610, 47,611 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned

to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers HAVA and the CRA as statutes for routine use.[13]

No more persuasive is defendants' argument that the SORN cannot be read to include all registered voters in New Hampshire and other States. *See* App. 83-84; Doc. 37-1, at 24-25. The Privacy Act requires that a SORN identify "the categories of individuals on whom records are maintained in the system." 5 U.S.C. 552a(e)(4)(B). The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022)

---

[13] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Aug. 3, 2026).

(citation omitted), which, for as long as the relevant SORN has existed, has included anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#.    Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into voter fraud. Moreover, because eligible voters' votes may be diluted by votes cast by non-eligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), they are potential "victims" of HAVA non-compliance, 68 Fed. Reg. at 47,611.

## B.    The E-Government Act does not prevent the DOJ from obtaining data supporting its HAVA claim.

In the district court, New Hampshire argued that because the United States did not allege that it conducted a privacy impact assessment (PIA), the United States had not complied with the E-Government Act. App. 84-85. Pursuant to the E-Government Act, agencies must "conduct a [PIA]" before "initiating a new collection of information" in particular circumstances "if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more

persons." E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(A)(ii) and (B)(i), 116 Stat. 2899, 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). And a "collection of information" is—with certain exclusions noted below—the act of "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for," as relevant here, "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons," where a "person" can include a "State." 44 U.S.C. 3502(3)(A)(i) and (10); *see* E-Government Act § 201 (incorporating definitions from 44 U.S.C. 3502 and 3601). The PIA requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with the Department of Justice's demand for New Hampshire's (or any State's) SVRL. E-Government Act § 208(b)(1)(B)(i); *cf.* 31 U.S.C. 5314(a) (mandating that the Secretary of the Treasury require individuals "to keep records, file reports, or keep records and file reports" whenever

- 57 -

individuals engage in transactions or maintain relationships with "any person with a foreign financial agency").

Second, a "collection of information" does not include information collected during an investigation like the type the Department is carrying out here. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of information "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities." The Department's investigation into New Hampshire's compliance with the HAVA falls squarely within this carve-out. *See* Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C., at 33 (2026), https://www.justice.gov/olc/media/1440346/dl.

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). "The term 'initiating'" in the E-Government Act "has no statutory . . . definition," *Electronic Privacy Info. Ctr.* (*EPIC*) *v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 87 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019), nor does the term "new." *See* 44 U.S.C. 3502,

3601. Accordingly, courts give these terms their "ordinary meaning" and may consult dictionary definitions. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-568 (2012). "Contemporary dictionaries define 'initiate' as '[t]o begin, commence, enter upon; to introduce, set going, give rise to, originate, 'start' (a course of action, practice, etc.).'" *EPIC*, 356 F. Supp. 3d at 89 (citation omitted; brackets in original) (collecting definitions). The relevant definition of "new" is "[h]aving been made or come into being only a short time ago; recent" or "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002); *see Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 2002) (defining "new" as "having existed or having been made but a short time" or "different from one of the same category that has existed previously").

The demand in this case did not begin any new collection of information. The Attorney General demanded that Secretary Scanlan provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State."

*Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

### C. Federal law preempts any contrary New Hampshire privacy law.

New Hampshire argued that its state law "does not interfere with any federal law" because "neither HAVA nor the Civil Rights Act compels production of the SVRL to the Federal Government on demand." App. 79. Similarly, intervenors invoked "New Hampshire's numerous state-law privacy protections for sensitive voter data" and claimed that "[n]othing in HAVA or Title III preempts these state-law protections." Doc. 37-1, at 21.

Notwithstanding a State's broad constitutional authority over the conduct of federal elections, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v.*

- 60 -

*Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.* at 69 (brackets in original) (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)).

A "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Conflict preemption applies both "where it is impossible for a private party to comply with both state and federal law" and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 372-373 (brackets in original; citation omitted). Whether a state law poses a sufficient obstacle to implicate preemption is determined "by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373. A state law that "undermines the intended purpose and 'natural effect'" of federal law is preempted. *Ibid.*

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA

imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). The CRA, moreover, imposes its own privacy protections for records and papers demanded under Section 20703. *See* 52 U.S.C. 20704; *cf.* 1959 CCR Report at 138 (recommending "that all State registration and voting records shall be public records" that "shall be subject to public inspection [for five years], providing only that all care be taken to preserve the secrecy of the ballot"). And HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Ibid.* Only the United States, through the Attorney General, is authorized to compel records

- 62 -

under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. 20703, 20705 (CRA); 52 U.S.C. 21111 (HAVA).

For the reasons explained above, *see* pp. 15-52 *supra*, the United States is entitled under federal law to compel and inspect New Hampshire's unredacted SVRLs. To the extent that state law prohibits New Hampshire from complying with the DOJ's demands—as defendants insisted below state law does (*see* App. 78-79; Doc. 37-1, at 21)—that state law must yield. *See* U.S. Const. Art. VI, Cl. 2; *see also Arizona v. Inter Tribal Council of Ariz, Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing the DOJ's Title III claim and denying the Motion to Compel Production, and remand with instructions to order Secretary Scanlan to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with HAVA, as set forth above.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court [should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). A decision in August or September would still allow the United States to work with New Hampshire to take real steps to clean up its SVRL, if necessary, prior to the upcoming November 3, 2026, general election. The United States is confident that States will not ignore out-of-hand alerts from the United States that their SVRLs contain ineligible voters.

- 64 -

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. 2, 40(d)(1).

Respectfully submitted,

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General

s/ Andrew G. Braniff
ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 532-3803

Date: August 3, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,977 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Andrew G. Braniff<br>
ANDREW G. BRANIFF<br>
Attorney

Date: August 3, 2026

## CERTIFICATE OF SERVICE

I certify that on August 3, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Andrew G. Braniff
ANDREW G. BRANIFF
 Attorney

Date: August 3, 2026

**ADDENDUM**

# TABLE OF CONTENTS

**PAGE**

Memorandum Order Granting
  Defendants' Motions to Dismiss, filed June 29, 2026
  (Doc. 86) ..................................................................................... 1

Judgment, filed June 30, 2026 (Doc. 87) ................................................ 27

52 U.S.C. 20701 .................................................................................. 28

52 U.S.C. 20703 .................................................................................. 28

52 U.S.C. 20704 .................................................................................. 29

52 U.S.C. 20705 .................................................................................. 29

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

    v.

Case No. 25-cv-371-JL
Opinion No. 2026 DNH 085

<u>David M. Scanlan, et al.</u>

## **<u>MEMORANDUM ORDER</u>**

In one of more than two dozen lawsuits across the country in which the United States seeks production of a state voter registration list, the United States seeks to compel the New Hampshire Secretary of State to produce, among other information, the state's unredacted state voter registration list.  New Hampshire declined to provide the list to the U.S. Attorney General in response to a series of written requests, after which the Attorney General filed suit.  New Hampshire moves to dismiss the complaint, while the United States moves to compel production of the list, along with other information.[1]

This court has jurisdiction under 28 U.S.C. § 1331 (federal question).  After reviewing the parties' submissions and hearing oral argument, because the Attorney General's demand did not comply with Title III of the Civil Rights Act of 1960 (CRA), and because he failed to allege a violation under the Help America Vote Act (HAVA), the court grants New Hampshire's motion to dismiss and denies as moot the United States' motion to compel.

---

[1] The defendant-intervenors made a separate motion to dismiss the complaint with overlapping arguments to New Hampshire's, which the court considers here.  *See* doc. nos. 32, 37.

Add. 1

## I.    Applicable legal standard

To state a claim for relief, a complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Martinez v. Petrenko*, 792 F.3d 173, 179 (1st Cir. 2015). This standard "demands that a party do more than suggest in conclusory terms the existence of questions of fact about the elements of a claim." *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013). In ruling on a motion brought under Rule 12(b)(6), the court accepts as true all well-pleaded facts set forth in the complaint and draws all reasonable inferences in the plaintiff's favor. *See, e.g., Martino v. Forward Air, Inc.*, 609 F.3d 1, 2 (1st Cir. 2010).[2]

Factual background

***June 2025 letter.*** On June 25, 2025, a Deputy Assistant Attorney General from the Civil Rights Division of the U.S. Department of Justice sent a letter to New Hampshire's Secretary of State noting that HAVA "establishes minimum standards" governing certain aspects of federal election administration and requesting information

---

[2] The United States contends that its CRA claim should be evaluated under the summary enforcement standard applicable to administrative subpoenas rather than the Rule 12(b)(6) standard because a CRA records demand is analogous to an administrative subpoena and courts have historically resolved such demands through summary proceedings. But the United States brought its CRA claim alongside its claim under the HAVA, which does not confer administrative subpoena authority. Because the complaint therefore takes the form of a traditional civil complaint rather than a petition for summary enforcement, the standard applicable to motions to dismiss for failure to state a claim governs the court's review. *See United States v. Benson*, 819 F. Supp. 3d 753, 765-66 (W.D. Mich. 2026). The court further notes that, as of the time of this order's issuance, "no district court has adopted the United States' view" that resolving its CRA claim requires a "special statutory proceeding." *United States v. Bellows*, 2026 WL 1430481, at *5 n.8 (D. Me. May 21, 2026).

Add. 2

"regarding the State's compliance with HAVA."[3]  In it, DOJ posed a series of questions concerning the State's voter-registration procedures, statewide voter registration database, list-maintenance practices, and related processes, and requested production of, inter alia, "New Hampshire's current statewide voter registration list" including "both active and inactive voters."[4]  The letter concludes by requesting a response within 30 days and thanking the Secretary for his "cooperation in [DOJ's] nationwide efforts to monitor HAVA compliance."[5]

*Initial response.*  The Secretary of State timely responded with a letter answering DOJ's questions concerning New Hampshire's voter-registration procedures, statewide voter registration database, and list-maintenance practices, with the caveat that he had "limited" certain responses to the extent they implicated cybersecurity concerns.[6]  The letter also addressed DOJ's request for the statewide voter registration list, explaining that "New Hampshire law authorizes the Secretary of State to release the statewide voter registration list in limited circumstances not appliable here."[7]  The letter added that "each municipality's public checklist [could] be obtained from their respective supervisors or clerks."[8]

*August 2025 demand.*  On August 18, 2025, DOJ sent another letter renewing its "request for a copy of New Hampshire's statewide voter registration list" with "all fields,

---

[3] June 25, 2025 Letter (doc. no. 32-2) at 2-3.
[4] *Id.*
[5] *Id.* at 3.
[6] July 25, 2025 letter (doc. no. 32-3) at 2.
[7] *Id.* at 9.
[8] *Id.*

Add. 3

including all identifiers, including the registrant's full name, date of birth, residential

address, and the last four numbers of each registrant's social security number and the full

state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i)."[9]

The letter explains that DOJ's request is made pursuant to the "Attorney General's

authority to enforce HAVA" and "the Civil Rights Act of 1960, codified at 52 U.S.C. §

2070" for the "purpose" of "ascertain[ing] New Hampshire's compliance with the list

maintenance requirements of HAVA."[10]

*August 28, 2025 response.*  The Secretary responded ten days later, reiterating that

"New Hampshire law prohibits the sharing of [the statewide voter registration list] with

the [DOJ] in the manner [DOJ] request[s]."[11]  He noted that his refusal was informed by

consultation with legal counsel, who concluded that DOJ's August 18 letter did not cite

"any provision under federal law" that supersedes New Hampshire law to "compel[] the

production of voter registration data" to the federal government.[12]

*Litigation.*  About a month later, the United States filed this lawsuit, alleging

violations of Title III of the Civil Rights Act, 52 U.S.C. § 20703 (Count 1); and the Help

America Vote Act, *id.* § 21083 (Count 2).[13]  The United States seeks an injunction

ordering the Secretary and the State of New Hampshire "to provide to the United States

New Hampshire's current statewide voter registration list, including active and inactive

---

[9] Aug. 18, 2025 letter (doc. no. 32-4) at 2.
[10] *Id.* at 2-3.
[11] Aug. 28, 2025 letter (doc. no. 32-5) at 2.
[12] *Id.*
[13] Compl. (doc. no. 1).

4

Add. 4

voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of their social security number" under the CRA and HAVA.[14]

Judge Johnstone permitted four individual New Hampshire voters to intervene as defendants.[15] The Secretary and the intervenor-defendants moved to dismiss the complaint and opposed the motion to compel.[16] The United States filed a consolidated opposition to the motions to dismiss.[17]

## II. Legal landscape

The United States brings claims under HAVA and Title III of the Civil Rights Act of 1960.

***Title III***. Title III requires state election officials to "retain and preserve all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. It also requires state election officials to produce those records for inspection and copying "upon demand in writing by the Attorney General." *Id*. § 20703. The Attorney General

---

[14] *Id*. at 16. Courts have dismissed nine similar lawsuits to date, and no court has granted the United States' requested injunction. *See United States v. Demarinis*, 2026 WL 1780586, at *2 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *Bellows*, 2026 WL 1430481; *United States v. Fontes*, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)*; United States v. Galvin*, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *Benson*, 819 F. Supp. 3d 753, *aff'd*, 2026 WL 1815425 (6th Cir. June 24, 2026); *United States v. Oregon*, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

[15] Dec. 16, 2025 Endorsed Order. United States Magistrate Judge Andrea Johnstone initially presided over this case.

[16] Doc. nos. 32, 37, 60, 61.

[17] Doc. no. 51.

Add. 5

must provide "a statement of the basis and the purpose" for the written demand. *Id.* The federal district court for the district in which the demand is made or records are located "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

**Help America Vote Act.** "Through HAVA, Congress established standards for states' voting systems and voter registration lists." *Id.* (citing 52 U.S.C. § 21081, 21083). The law requires each state to develop a single, computerized official statewide voter registration list ("SVRL") that includes a unique identifier for each registered voter. 52 U.S.C. § 21083(a)(1)(A). The SVRL must be an interactive computerized list designed, maintained, and administered at a statewide level. *Id.* HAVA requires state officials to engage in various list-maintenance activities and to "provide adequate technological security measures to prevent that unauthorized access" to the SVRL, although the federal statute does not provide any further directions or requirements as to the security measures a state is allowed to choose. 52 U.S.C. § 21083(a)(2)-(4).

States must also adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(4)(A); *see also Colón-Marrero v. Vélez*, 813 F.3d 1, 13-14 (1st Cir. 2016). Congress expressly left the "specific choices on the methods of complying with [its] requirements ... to the discretion of the State." 52 U.S.C. § 21085. In response to these directives, New Hampshire passed N.H. RSA 654:45, which directs the Secretary of State to "plan, develop, equip, establish, site, and maintain a statewide centralized voter registration database and communications system[.]" RSA 654:45,I(a).

6

Add. 6

### III. Analysis

#### a. Title III

The Secretary argues that New Hampshire is not compelled by the Title III of the CRA to provide the United States with an unredacted copy of its statewide voter registration list (SVRL) for two reasons. First, he contends that the SVRL is not a record subject to production under 52 U.S.C. § 20703. Second, he contends that DOJ's demand letter did not contain a sufficiently stated basis and purpose as required by § 20703. The court addresses these arguments in turn.

##### i. Record subject to production

Whether the SVRA is a document subject to production under of 52 U.S.C. § 20703 is a question of statutory interpretation. To determine the meaning of a statute, the court's "starting point is the text of the statute itself." *United States v. Gordon*, 875 F.3d 26, 33 (1st Cir. 2017). "To the extent that Congress chose words that it did not define, [the court] assume[s] those words 'carry their plain and ordinary meaning.'" *Id.* (citing *Stornawaye Fin. Corp. v. Hill*, 562 F.3d 29, 32 (1st Cir. 2009). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1 (1st Cir. 1998) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). "Other tools of statutory interpretation, such as legislative history, customarily carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result." *City of Providence v. Barr*, 954 F.3d 23, 31-32 (1st Cir. 2020). As a general matter, "there is no reason to

Add. 7

look past the statutory text itself if that text is unambiguous and consistent with a coherent statutory scheme." *United States v. Freeman*, 147 F.4th 1, 13 (1st Cir. 2025), *cert. denied*, 224 L. Ed. 2d 13 (Feb. 23, 2026).

Here, 52 U.S.C. § 20703 authorizes the Attorney General to demand the production of "[a]ny record or paper required by [52 U.S.C § 20701] to be retained and preserved." Section 20701, in turn, requires election officers to preserve and retain "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The operative question is thus whether the SVRL is a paper or record subject to the retention and preservation requirements of § 20701.

On this point, New Hampshire argues that the SVRL is "far outside" the scope of papers and records covered by § 20701 because it is "a relational database … into which users are consistently adding, changing, and correcting data,"[18] and therefore "not a static record or paper."[19] Moreover, New Hampshire emphasizes that the SVRL is materially different from the election records historically subject to inspection and preservation requirements: namely, voter registration forms, applications for absentee ballots, and other "voting-related paperwork."[20] *See Liebert v. Millis*, 733 F.Supp.3d 698, 711-12 (W.D. Wis. 2024) (collecting authorities interpreting the meaning of "any record or paper relating to any application, registration, or other act requisite to voting" as that phrase is

---

[18] Reply to Obj. to Mot. to Dismiss (doc. no. 63) at 3.
[19] State Mot. to Dismiss (doc. no. 32-1) at 8-9.
[20] *Id.*

Add. 8

used in 52 U.S.C. § 10101(a)(2)(B)).  The United States, by contrast, contends that the SVRL falls comfortably within § 20701's "broad" text, which it says covers electronic records, non-public records, or records generated by state officials themselves.[21]  For authority, the United States relies principally on the Fifth Circuit Court of Appeals' characterization of the retention and preservation obligations under § 20701 as "sweeping" in *Kennedy v. Lynd*, arguing that the Secretary is effectively attempting to limit the scope of the statute by creating an exception for electronic records or non-public records.[22]  306 F.2d 222, 226 (5th Cir. 1962).

While the parties largely focus their arguments on the scope of documents covered by the phrase "all records and papers," an examination of the statutory text reveals a threshold question that proves dispositive: namely, what it means for a record or paper to "come into [an officer's] possession."  "Come into possession" is most naturally read to "refer[] to a process by which someone *acquires* an item from an external source." *Benson*, 819 F. Supp. 3d at 768 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966)); RECEIVE, *Black's Law Dictionary* (11th ed. 2019) (defining "receive" as "to come into possession of or get from some outside source")).  The language does not describe a static state of possession; rather, "come into" is a prepositional verb phrase that implies there was a prior state when election officials did not have the record or paper, and a transition that changed that.

---

[21] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 22.
[22] *Id.* at 23-24

9

Add. 9

Because the court must "give effect to the phrase 'come into [their] possession' and prevent it from being surplusage," it interprets § 20701 as referring only to records that election officials obtain from outside sources—i.e., prospective voters—and not to records that they themselves have created and thus have always possessed. *Benson*, 819 F. Supp. 3d at 768; *see also Feliciano v. Dep't of Transp.*, 605 U.S. 38, 51-52 (2025) (the surplusage canon reflects an assumption that "[w]henever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be presumed improbable" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (Scalia & Garner)).

This interpretation is "bolstered" by the types of items described by the rest of the sentence—records "relating to any application, registration, payment of poll tax, or other act requisite to voting"—all of which "refer[ ] to something that the voter submits or does as part of the registration process" and are thus "records that election officials *receive*, rather than *create*." *Benson*, 819 F. Supp. 3d at 769. It is also "consistent with a coherent statutory scheme." *Freeman*, 147 F.4th at 14; *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) ("A statutory 'provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.'" (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 371 (1988)). Section 20701 is, after all, a document retention and preservation statute. The obligation to preserve implies an obligation not to alter or destroy the covered material. That framework makes sense when applied to discrete records and

Add. 10

papers submitted by voters and other outside sources but could produce absurd results when applied to a state's own evolving work product, like a database that is constantly being revised as election officials add, change, and correct voter data. *See United States v. Demarinis*, 2026 WL 1780586, at *5 (D. Md. June 18, 2026) ("An SVRL, unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered."). Reading § 20701 to encompass such a system would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, per the state, would be "impractical to the point of impossible."[23]

The United States argues that the court's interpretation of § 20701 provides "an unwritten carve-out for records or documents that are self-generated."[24] It contends that statutes use similar phrases to "regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*," and thus that the distinction "between possessing something and having something come into one's possession" is strictly temporal in nature.[25] The court is not persuaded. Congress has consistently employed the phrase "comes into possession" to describe the process by which a person receives something from an external source, including in the statutes cited by the United States. *See K.L. v. Rhode Island Bd. of Educ.*, 907 F.3d 639, 646 (1st Cir. 2018) (describing the "whole code" canon of statutory

---

[23] State Mot. to Dismiss (doc. no. 63) at 3.
[24] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 25.
[25] *Id.*

Add. 11

interpretation, "under which courts construe terms across different statutes consistently" (quoting A. Gluck & L. Schultz Bressman, Statutory Interpretation from the Inside -- an Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 936 (2013))).  For example, the census statute, 13 U.S.C. § 214, prohibits the disclosure of information that "comes into [the] possession" of a "census liaison" and is deemed confidential by 13 U.S.C. § 9, under which "data for particular individuals and establishments" is confidential while the census report itself is not.  In other words, the information that "comes into [the] possession" of the census liaison as that phrase is used in 13 U.S.C. § 214 is that which is gathered from respondents, not the data compiled by the agency itself.  *See also* 44 U.S.C. § 3572(b), (f) (prohibiting agency employees from disclosing "information acquired by an agency under a pledge of confidentiality and for exclusively statistical purposes" that they "come[] into possession of by reason of his or her being an officer, employee, or agent [of that agency]"); 18 U.S.C. § 654 (prohibiting the conversion of property entrusted by another that "comes into one's possession"); 50 U.S.C. § 217 (requiring soldiers to report property found or surrendered in the field that "comes into their possession").

This holds true when examining the United States' lead statutory exemplar for this theory, 8 U.S.C. § 1445(a), which provides that "the applicant or any other person who shall have, or may come into possession" of a lost certificate of naturalization must surrender that document to the Attorney General.  The United States argues that the distinction between "shall have" and "may come into possession of" in this provision is purely temporal because "shall have" refers to current possession while "come into

Add. 12

possession" refers to future acquisition, and that the phrase "come into possession" therefore says nothing about the item's source.[26] But the certificate of naturalization is a document issued by the federal government to the applicant; neither the applicant nor any third party who subsequently acquires it has created it. The provision contemplates only persons who receive the certificate from a source other than themselves. So while "come into possession" does connote a temporal difference (i.e., *when* the certificate is received or found), it does nothing to displace the external-acquisition aspect of the phrase (i.e., that the certificate is received rather than self-generated). Indeed, the provision would have no occasion to speak of a person who "comes into possession" of a self-generated certificate because, as the United States correctly observes, no private person generates naturalization certificates. Section 1445(a) therefore confirms that even where "come into possession" carries a temporal meaning, it presupposes receipt from an external source.

Lastly, the court notes that if "come into possession" were purely temporal, as the United States contends, it would cover every record that an election official touches at any point in time. Again, if that were the case, the provision "could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, which is the language used in the NVRA, *see* 52 U.S.C. § 20507(i)(1)." *Benson*, 819 F.Supp.3d at 768. Congress chose not to use this broader formulation in § 20701 and, having done so, the court must give meaning to the words "come into." *See*

---

[26] Consolidated Opp. to Mot. to Dismiss (doc. no. 51) at 26.

Add. 13

*Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (statutes should be construed such that every word is given effect).[27] For the reasons explained above, the court gives meaning to the phrase "come into possession" by construing it to refer only to records that election officials obtain from prospective voters.

Applying that interpretation here, the court concludes that New Hampshire's SVRL falls outside the scope of documents or records covered by § 20701. The SVRL is not a document that arrived at the Secretary's office from prospective voters or any other external source at an identifiable moment in time. Instead, it is a continuously maintained, state-generated compilation of data housed in a "relational database"[28] that New Hampshire has built, updated, and controlled since its creation. As such, it does not constitute a record or paper that "comes into [an election officer's] possession" as this phrase is used in § 20701, and § 20703 does not compel its production.[29]

### ii. Purpose and basis

New Hampshire argues in the alternative that the United States' claim under Title III of the CRA should be dismissed because DOJ's demand did not contain a sufficiently stated basis and purpose as required to constitute a valid request under 52 U.S.C. § 20703. That statute provides that paper and records subject to the preservation requirements of § 20701 "shall, upon demand in writing by the Attorney General or his

---

[27] For this same reason, the court finds the United States' reliance on cases finding voter lists to be a "record" as that term is used in the NVRA unpersuasive. *See Fontes*, 2026 WL 1177244, at *6 (observing that "the NVRA's statutory language is too dissimilar to be of any real value in interpreting the text of § 20701").

[28] Reply to Obj. to Mot. to Dismiss (doc. no. 63) at 3.

[29] The court notes that the Sixth Circuit Court of Appeals reached the same conclusion in *United States v. Benson*, 2026 WL 1815425, at *6-7 (6th Cir. June 24, 2026).

Add. 14

representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection," and that such "demand shall contain a statement of the basis and the purpose thereof." 52 U.S.C. § 20703. New Hampshire contends that while DOJ's August demand letter purported to articulate a purpose, it contained no statement whatsoever as to the basis of its request, and is therefore facially invalid under § 20703.

As with any question of statutory interpretation, the court's "starting point is the text of the statute itself." *Gordon*, 875 F.3d at 33. Here, the textual structure of § 20703 is instructive. The statute requires that a demand "contain a statement of the basis and the purpose thereof," employing the definite article "the" before each noun and joining the two with the conjunctive "and." On its plain terms, this construction signals that "basis" and "purpose" are separate, non-overlapping requirements, each of which must independently be satisfied. *See Galvin*, 2026 WL 972129, at *4 ("[T]he statutory text [of § 20703] clearly conveys that 'the basis' and 'the purpose' are conceptually distinct."). To read the statute as satisfied by a statement of either basis or purpose alone would run afoul of the ordinary rules of statutory construction by rendering one half of the phrase superfluous. *See* Scalia & Garner 174 (explaining that, under the surplusage canon, no word or provision "should needlessly be given an interpretation that it causes it to… have no consequence"); W. Eskridge, Jr. Interpreting Law: A Primer on How to Read Statutes and the Constitution 113 (2016) ("[E]very provision, indeed every word, of a statute adds something to the statutory scheme if plausible.").

Add. 15

The question then becomes how to construe the independent requirements of "purpose" and "basis" in this context. The parties appear to agree that "the purpose" refers to the objective or goal of the demand.[30] *See* PURPOSE, *Black's Law Dictionary* (12th ed. 2024) (defining "purpose" to mean "[a]n objective, goal, or end"); *see also, e.g.*, *Lynd*, 306 F.2d at 229 n.6 (reviewing CRA demand with a stated "purpose" of "examin[ing] the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred"). If "the purpose" denotes the investigative objective of the demand, it follows that "the basis" in this context is the evidentiary or factual predicate giving rise to the demand in the first place. *See* BASIS, *Black's Law Dictionary* (12th ed. 2024) (defining basis to mean "an underlying fact or condition; a foundation or starting point"); *Oregon*, 2026 WL 318402, at *9 (construing "basis" to mean "a factual basis for investigating a violation of a federal statute"). A statute that requires the Attorney General to identify the legal authority under which he acts would not naturally be phrased as one requiring a "statement of the basis and the purpose." *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 669 (2007) (cautioning "against reading a text in a way that makes part of it redundant"); *see also* Scalia & Garner 174 ("Whenever a reading arbitrarily ignores linguistic components or inadequately accounts for them, the reading may be deemed improbable." (citation omitted)); W. Eskridge, Jr. 112 ("[I]t is a cardinal rule of statutory

---

[30] *See* Mot. to Dismiss (doc. no. 32-1) at 9-10 (proffering definition of "purpose"); Obj. to Mot. to Dismiss (doc. no. 51) at 20 (arguing that August demand letter articulated a valid "purpose" to "ascertain New Hampshire's compliance with the list maintenance requirements of HAVA").

Add. 16

interpretation that no provision should be construed to be entirely redundant or

meaningless." (citation omitted)).

There is no indication that construing "the basis" to refer to the factual basis for

the demand produces an absurd result or is logically inconsistent with the statutory

scheme as a whole.  *See Freeman*, 147 F.4th at 13.  To the contrary, requiring the

Attorney General to articulate both a factual predicate and an investigative objective

before compelling production of state records is entirely consistent with Title III's overall

structure, which conditions the government's inspection power on compliance with these

threshold requirements.  *See King v. Burwell*, 576 U.S. 473, 475 (2015) (examining "the

broader structure of the Act to determine whether" proffered construction of statutory

provision "produces a substantive effect that is compatible with the rest of the law"

(quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371

(1988)).

This reading also accords with the Attorney General's own historical practice

under Title III, which has been to include a statement of factual basis in § 20703 demand

letters.  *See, e.g., Lynd*, 306 F.2d at 229 n.6 (§ 20703 demand letter's statement that it was

"based upon information in the possession of the Attorney General tending to show that

distinctions on the basis of race or color have been made with respect to registration and

voting within your jurisdiction" complied with Title III's requirements); *see also id.* at

226 (referring to the "factual foundation for, or the sufficiency of, the Attorney General's

Add. 17

'statement of the basis and the purpose' contained in the written demand" made under § 20703).[31]

Applying this textual framework to DOJ's August letter, the court finds that the demand fails to satisfy § 20703's basis requirement. The demand does not identify any factual anomalies in New Hampshire's voter registration data, nor does it point to any complaint or pattern suggesting noncompliance with HAVA or the CRA. *Contrast with Benson*, 819 F. Supp. 3d at 766 (noting that DOJ's letter to Michigan cited the state's "high percentage of registered voters, [] low confirmation notice rate, [] low voter removal rate, and [] high duplicate registration rate," as well as a complaint regarding Michigan's compliance with HAVA's unique-identifier requirements). Instead, the letter states only that the demand represents an exercise of the Attorney General's "authority to enforce" HAVA and Title III of the CRA, i.e., provides a statement of legal authority, not a factual basis.

The United States contends that this reference to its statutory authority is sufficient under § 20703, particularly when read together with the letter's stated purpose of "ascertain[ing] New Hampshire's compliance with the list maintenance requirements of HAVA." But this argument conflates the legal authority under which the Attorney General acts with the statute's independent requirement that the demand state "the basis." As *Galvin* observed, "[i]f Congress sought to direct the Attorney General to include a

---

[31] Other district courts in this circuit construing § 20703 have reached the same conclusion through similar textual analysis. *See, e.g.*, *Amore*, 2026 WL 1040637, at *5; *Galvin*, 2026 WL 972129, at *4.

Add. 18

citation to Title III in demand letters, requiring the letter to contain a 'statement of the basis and the purpose therefor' would not be the obvious way to do so." 2026 WL 972129, at *5 (citing 5 U.S.C. § 553(b)(2) (requiring notice of proposed rulemaking to include "reference to the legal authority under which the rule is proposed"); 8 U.S.C. § 1229(a)(1)(B) (requiring notice to appear for removal proceedings to "specify[ ] ... [t]he legal authority under which the proceedings are conducted")); *see also* W. Eskridge, Jr. 415 ("Presume against reading a specific concept into general words when precise language in other statutes reveals that Congress knew how to identify that concept."). Accepting the government's reading would collapse "the basis" into "the purpose" and read the word "basis" out of the statute altogether, which is a result the plain text forecloses. *See Breest v. Cunningham*, 752 F.2d 8, 10 (1st Cir. 1985) (courts should not interpret a statute to cause redundancy because "every word is presumed to have a purpose and meaning").

The cases on which the United States relies do not countenance a different result. In both *Lynd* and *Bruce*, the demand letters at issue stated expressly that they were "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within [the] jurisdiction." *Lynd*, 306 F.2d at 229 n.6; *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962). Those letters thus satisfied the "basis" requirement that this court identifies today.

Finally, the United States argues that requiring a statement of factual basis would undermine the investigatory character of Title III. This argument does not alter the plain

19

Add. 19

meaning of the text Congress enacted.  "Congress did not require the Attorney General to prove a violation before compelling production of records, it *did* require the Attorney General to make a demand 'contain[ing] the basis for the demand." *Galvin*, 2026 WL 972129, at *6.  The investigatory nature of a Title III demand does not permit the Attorney General to dispense with the statutory prerequisites Congress imposed as conditions on that investigatory authority.

Because the plain text of § 20703 requires a statement of factual basis distinct from a statement of purpose, and because the August 18 letter contains no statement of factual basis whatsoever, the letter is facially invalid under § 20703.  The court need not reach the question whether the letter adequately stated a "purpose" within the meaning of the statute.  The absence of any basis is independently fatal to the United States' claim and provides an independent ground for dismissal of the CRA claim.

### b. Help America Vote Act

The United States brings a second claim under HAVA, alleging that the defendants have failed to comply with HAVA Section 303 by failing, in response to its demand letters, to provide the federal government with several types of information, including New Hampshire's SVRL.  The United States also alleges that New Hampshire failed to conduct list maintenance as required by 52 U.S.C. § 21083(a) or to follow governing requirements for voters who register by mail.  New Hampshire and the intervenor-defendants seek to dismiss the HAVA claim.  They argue that the United States failed to state a claim under HAVA, first because HAVA contains no provision requiring states to disclose this kind of voter information to the federal government, so a failure to disclose

20

Add. 20

does not constitute a violation of the statute,[32] and second because the federal government failed to allege facts sufficient to show that New Hampshire had committed a substantive violation of the statute.[33]

The United States failed to object in its briefs to the defendants' and intervenors' motions to dismiss the HAVA claims. In fact, in its briefing, the federal government made no attempt to address arguments that it had failed to state a claim under HAVA, or to argue that any alleged facts could show that New Hampshire had committed a substantive HAVA violation. The Attorney General all but abandoned any allegation that a HAVA violation had taken place, stating that "United States seeks these documents for one purpose only: to evaluate New Hampshire's compliance with the list maintenance provisions of HAVA, and *if appropriate*, to bring an enforcement action,"[34] and, in a section addressing the purpose of its demand under Title III, characterizing "enforcement of the list maintenance requirements of HAVA" as being "for the purpose of investigating *possible* violations of a Federal statute."[35] The United States has accordingly waived the claim. *See, e.g., Dahua Tech. USA, Inc. v. Zhang,* 138 F.4th 1, 11 (1st Cir. 2025) (stating that a party is generally responsible for "the consequences of its decision to press one theory to the exclusion of another."); *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)* ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Pickering v. Citizens Bank,*

---

[32] Mot. to Dismiss (doc. no. 32-1) at 15-16.
[33] Intervenor-Defs.' Mot. Dismiss (doc. no. 37) at 20.
[34] *See* Consolidated Opp. to Mot. Dismiss (doc. no. 51) at 9.
[35] *Id.* at 30 (emphasis added) (internal citations removed).

21

Add. 21

*N.A.*, 2019 WL 3457602, at *4 (D.N.H. July 31, 2019) (DiClerico, J.) ("[A] court is not obligated to make arguments on behalf of a party, particularly a party represented by counsel, and may disregard arguments that are not developed.").

Even if the United States had objected, the court would dismiss the HAVA claim. HAVA provides for civil actions against a state by the Attorney General for declaratory or injunctive relief "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of the law. 52 U.S.C. § 21111. On a 12(b)(6) motion, a court takes a plaintiff's factual allegations in the complaint as true, and draws all reasonable inferences from those facts in the plaintiffs' favor. *Martino v. Forward Air, Inc.*, 609 F.3d 1, 2 (1st Cir. 2010). But "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (quoting *SEC v. Tambone,* 597 F.3d 436, 442 (1st Cir.2010)).

Here, the complaint contains two kinds of factual allegations: first, that the defendants failed to provide the United States with certain information to allow the Attorney General to "evaluate New Hampshire's compliance" with various provisions of HAVA; and second, that its response to the Election Administration and Voting Survey 2024 Comprehensive Report showed that the number of potential duplicate names that New Hampshire identified or removed from its voter list was lower than the national

22

Add. 22

average.[36]  This second type of factual allegation about discrepancies between New

Hampshire's duplicate removal rates relative to other states' was notably absent from the

Attorney General's letters to Secretary of State Scanlan.

As to the claims regarding New Hampshire's alleged failure to provide various

types of information, several courts facing nearly identical suits have found that failure to

disclose information to the Attorney General does not constitute a substantive violation of

HAVA because HAVA has no disclosure provision.  *See, e.g., Benson*, 819 F. Supp. 3d at

759b ("HAVA lacks any provision related to disclosure"); *Weber*, 816 F. Supp. 3d at 1190

("HAVA simply contains no such [disclosure] provision. This ends the inquiry. And the

fact that the NVRA and CRA do include such provisions signals that the omission in

HAVA was intentional." (citing *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392

(2015))); *Oregon*, 2026 WL 318402, at *6 ("Congress knows how to include disclosure

provisions, as it did so in both the NVRA and Title III. It did not do so here, and the

Court will not play the role of Congress by adding one where it does not exist." (citing

*Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988))).  This court therefore joins

others in finding that a state's failure to disclose information, including the SVRA, does

not on its own constitute a substantive violation giving rise to a claim for relief under

HAVA.  *See, e.g. Benson*, 819 F. Supp. 3d at 759 (the United States cannot "file a HAVA

claim, allege no violations of HAVA, and obtain information to support its (as-yet-

nonexistent) claim via discovery.").

---

[36] Compl. (doc. no. 1) at ¶¶ 28-53.

Add. 23

As to potential substantive violations of HAVA, the federal government makes three allegations: that New Hampshire failed to (i) "conduct list maintenance of [its] SVRL in a manner that ensures that… duplicate names are eliminated from the computerized list;"[37] (ii) incorporate "provisions to ensure that voter registration records in the State are accurate and are updated regularly… particularly in regard to removing [*inter alia*]…duplicate names from the SVRL;" and (iii) follow requirements for voters who register by mail.  The only factual allegation in the complaint that could conceivably pertain to any of these claims is that the number of potential duplicates that New Hampshire identified or removed from its voter list was lower, in 2024, than the national average.  This allegation is pertinent, at most, to the claim that New Hampshire failed to conduct list maintenance in a manner that ensures that duplicate names are eliminated from the computerized list, but no others.

The *Weber* court found in response to similar allegations that "the fact that California *reported* duplicate registrations…does not indicate that its list maintenance system is deficient."  816 F. Supp. 3d at 1191.  The court noted that "a lag in removals is not indicative of any wrongdoing" and that, as here, DOJ had not alleged any specific breakdown in the state's removal program.  *Id.* at 1192 (citing *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019) and *Republican Nat'l Comm. v. Benson*, 754 F. Supp. 3d 773, 792 (W.D. Mich. 2024)).

---

[37] *Id.* at ¶ 61.

Add. 24

The allegation that New Hampshire's rate of identifying and removing duplicates from its SVRL is lower than the national average, without any other factual allegation or level of specificity, is not a sufficient factual basis to make out a claim that New Hampshire has substantively violated HAVA, particularly not one that would not allow the far-reaching discovery that the Attorney General seeks.  *See Ríos-Campbell v. U.S. Dep't of Com.*, 927 F.3d 21, 26 (1st Cir. 2019) (explaining that "[o]ne of the main goals of [Rule 12(b)(6)] is the avoidance of unnecessary discovery.").

The mere contention that New Hampshire's duplicate identification rates are lower than the national average, without more, cannot support a lawsuit allowing the Attorney General unrestricted access to New Hampshire's SVRL to conduct a line-by-line audit to assess a "possible" violation of a federal statute.[38]  Moreover, the United States's silence in the face of pleading deficiency arguments in both motions to dismiss operates as a waiver of its HAVA claim.  This court therefore joins others in finding that the United States has failed to state a claim under HAVA.[39]

## IV.    Conclusion

For the reasons above, the defendants' and intervenors' motions to dismiss[40] are **GRANTED**.  The United States' motion to compel[41] is **DENIED** as moot.

---

[38] The *Bellows* court found that, though HAVA gives the Attorney General the power to bring a civil suit against a state that has violated the list maintenance provisions, "it does not contemplate the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions."  2026 WL 1430579, at *8.

[39] Because the court dismisses the claims based on Title III and HAVA, it does not address the defendants' and intervenors' arguments on privacy and preemption.

[40] Doc. nos. 32, 37.

[41] Doc. no. 31.

Add. 25

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated: June 29, 2026

Cc: Counsel of record

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

      v.                                  Case No. 25-cv-371-JL

<u>NH Secretary of State, et al.</u>

<u>JUDGMENT</u>

In accordance with the Order by District Judge Joseph N. Laplante dated June 29, 2026, judgment is hereby entered.

By the Court:

_____

Tracy A. Uhrin
Clerk of Court

Date: June 30, 2026

cc:   Counsel of Record

Add. 27

**52 U.S.C. 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**52 U.S.C. 20703. Demand for records or papers by Attorney General or representative; statement of basis and purpose.**

Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

Add. 28

**52 U.S.C. 20704. Disclosure of records or papers.**

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

**52 U.S.C. 20705. Jurisdiction to compel production of records or papers.**

The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.

Add. 29