No. 26-1783

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

DAVID M. SCANLAN, New Hampshire Secretary of State;
STATE OF NEW HAMPSHIRE; NEAL KURK; ROBERT PERRY; LOUISE
SPENCER; CHRISTOPHER COLE,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

APPENDIX

HARMEET K. DHILLON
  Assistant Attorney General
JESUS A. OSETE
  Principal Deputy Assistant Attorney
  General
ANDREW G. BRANIFF
DAVID N. GOLDMAN
CHRISTOPHER C. WANG
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C. 20044-4403
  (202) 532-3803

# TABLE OF CONTENTS

**PAGE**

District Court Docket ................................................................................ 1

Complaint,
    filed September 25, 2025
    (Doc. 1) ................................................................................ 22

Letter from the DOJ to Secretary Scanlan,
    dated June 25, 2025
    (Doc. 31-2, Exh. 1) ................................................................ 39

Letter from Secretary Scanlan to the DOJ,
    dated July 25, 2025
    (Doc. 31-3, Exh. 2) ................................................................ 43

Letter from the DOJ to Secretary Scanlan,
    dated August 18, 2025
    (Doc. 31-4, Exh. 3) ................................................................ 52

Letter from Secretary Scanlan to the DOJ,
    dated August 28, 2025
    (Doc. 31-5, Exh. 4) ................................................................ 55

Motion to Dismiss,
    filed February 6, 2026
    (Doc. 32) ................................................................................ 57

Memorandum of Law Supporting Motion to Dismiss,
    filed February 6, 2026
    (Doc. 32-1) ............................................................................ 62

Opposition to Motions to Dismiss,
    filed February 20, 2026
    (Doc. 51) ................................................................................ 90

**TABLE OF CONTENTS (continued):**                                    **PAGE**

Reply to Opposition to Motions to Dismiss,
    filed March 13, 2026
    (Doc. 63) ................................................................................. 128

Transcript of Proceedings for Motion Hearing,
    held on May 26, 2026
    (Doc. 83) ................................................................................. 135

Notice of Appeal,
    filed July 6, 2026
    (Doc. 88) ................................................................................. 189



## *1:25cv371, Usa V. Nh Secretary Of State Et Al*

US District Court Docket

United States District Court, New Hampshire

(Concord)

**This case was retrieved on 07/24/2026**

## Header

**Case Number:** 1:25cv371
**Date Filed:** 09/25/2025
**Assigned To:** Judge Joseph N. Laplante
**Nature of Suit:** Voting (441)
**Cause:** Civil Miscellaneous Case
**Lead Docket:** None
**Other Docket:** Court of Appeals, No. 26-01783
**Jurisdiction:** Federal Question

**Class Code:** Closed
**Closed:** 06/30/2026
**Statute:**
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

| Litigants | Attorneys |
|---|---|
| USA<br>**Plaintiff** | Brittany E. Bennett<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>United States Department of Justice<br>150 M St Ne<br>Washington, DC  20002<br>USA<br>202-704-5430 Email:Brittany.Bennett@usdoj.Gov<br><br>Bridget Davidson<br>ATTORNEY TO BE NOTICED<br>US Attorney's Office (NH)<br>James C Cleveland Federal Bldg 53 Pleasant St, 4th Flr<br>Concord, NH  03301<br>USA<br>603-230-2512 Email:Bridget.Davidson@usdoj.Gov<br><br>John Casali<br>ATTORNEY TO BE NOTICED<br>United States Department of Justice<br>150 M St Ne<br>Washington, DC  20002<br>USA<br>202-316-8087 Email:John.Casali@usdoj.Gov<br><br>James Thomas Tucker<br>ATTORNEY TO BE NOTICED<br>US Department of Justice (Voting Section) |

App. 1

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|---|---|
| | 950 Pennsylvania Ave Nw 4con 8th Flr<br>Washington, DC  20530<br>USA<br>202-305-7376 Email:James.T.Tucker@usdoj.Gov |
| NH Secretary of State<br>other \| David M. Scanlan \|<br>**Defendant** | James Henry Holl , III<br>ATTORNEY TO BE NOTICED<br>NH Department of Justice<br>1 Granite Pl S<br>Concord, NH  03301<br>USA<br>603-371-1325 Fax: 603-271-2110<br>Email:James.H.Holl@doj.Nh.Gov |
| | Mary Alissa Triick<br>ATTORNEY TO BE NOTICED<br>NH Department of Justice<br>1 Granite Pl S<br>Concord, NH  03301<br>USA<br>603-491-6980 Email:Mary.A.Triick@doj.Nh.Gov |
| NH, State of<br>**Defendant** | James Henry Holl , III<br>ATTORNEY TO BE NOTICED<br>NH Department of Justice<br>1 Granite Pl S<br>Concord, NH  03301<br>USA<br>603-371-1325 Fax: 603-271-2110<br>Email:James.H.Holl@doj.Nh.Gov |
| | Mary Alissa Triick<br>ATTORNEY TO BE NOTICED<br>NH Department of Justice<br>1 Granite Pl S<br>Concord, NH  03301<br>USA<br>603-491-6980 Email:Mary.A.Triick@doj.Nh.Gov |
| Neal Kurk<br>**Intervenor Defendant** | Paul J. Twomey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Twomey Law Office<br>44 Ring Rd<br>Chichester, NH  03258<br>USA<br>603 568-3254 Email:Ptwomeylaw@gmail.Com |
| | Christopher D. Dodge<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-987-4928 Email:Cdodge@elias.Law |
| | David Robert Fox<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4546 Email:Dfox@elias.Law |

App. 2

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|---|---|
| | Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| | Marcos Mocine-McQueen<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4492 Email:Mmcqueen@elias.Law |
| | Steven J. Dutton<br>ATTORNEY TO BE NOTICED<br>McLane Middleton<br>900 Elm St Po Box 326<br>Manchester, NH  03105-0326<br>USA<br>603 628-1379 Email:Steven.Dutton@mclane.Com |
| | Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4659 Email:Wmckusick@elias.Law |
| Robert Perry<br>**Intervenor Defendant** | Paul J. Twomey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Twomey Law Office<br>44 Ring Rd<br>Chichester, NH  03258<br>USA<br>603 568-3254 Email:Ptwomeylaw@gmail.Com |
| | Christopher D. Dodge<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-987-4928 Email:Cdodge@elias.Law |
| | David Robert Fox<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4546 Email:Dfox@elias.Law |
| | Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED |

App. 3

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|---|---|
| | Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| | Marcos Mocine-McQueen<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4492 Email:Mmcqueen@elias.Law |
| | Steven J. Dutton<br>ATTORNEY TO BE NOTICED<br>McLane Middleton<br>900 Elm St Po Box 326<br>Manchester, NH  03105-0326<br>USA<br>603 628-1379 Email:Steven.Dutton@mclane.Com |
| | Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4659 Email:Wmckusick@elias.Law |
| Louise Spencer<br>**Intervenor Defendant** | Paul J. Twomey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Twomey Law Office<br>44 Ring Rd<br>Chichester, NH  03258<br>USA<br>603 568-3254 Email:Ptwomeylaw@gmail.Com |
| | Christopher D. Dodge<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-987-4928 Email:Cdodge@elias.Law |
| | David Robert Fox<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4546 Email:Dfox@elias.Law |
| | Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA |

App. 4

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|---|---|
| | 202-968-4513 Email:Efrost@elias.Law |
| | Marcos Mocine-McQueen<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4492 Email:Mmcqueen@elias.Law |
| | Steven J. Dutton<br>ATTORNEY TO BE NOTICED<br>McLane Middleton<br>900 Elm St Po Box 326<br>Manchester, NH  03105-0326<br>USA<br>603 628-1379 Email:Steven.Dutton@mclane.Com |
| | Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4659 Email:Wmckusick@elias.Law |
| Christopher Cole<br>**Intervenor Defendant** | Paul J. Twomey<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Twomey Law Office<br>44 Ring Rd<br>Chichester, NH  03258<br>USA<br>603 568-3254 Email:Ptwomeylaw@gmail.Com |
| | Christopher D. Dodge<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-987-4928 Email:Cdodge@elias.Law |
| | David Robert Fox<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4546 Email:Dfox@elias.Law |
| | Elisabeth C. Frost<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law |
| | Marcos Mocine-McQueen |

App. 5

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
| --- | --- |
| | PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4492 Email:Mmcqueen@elias.Law |
| | Steven J. Dutton<br>ATTORNEY TO BE NOTICED<br>McLane Middleton<br>900 Elm St Po Box 326<br>Manchester, NH  03105-0326<br>USA<br>603 628-1379 Email:Steven.Dutton@mclane.Com |
| | Walker Roy McKusick<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4659 Email:Wmckusick@elias.Law |
| Democratic National Committee<br>**Amicus** | Daniel J. Freeman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Democratic National Committee<br>430 South Capitol St Se #3 20003<br>Washington, DC  20003<br>USA<br>202-923-6429 Email:Freemand@dnc.Org |
| | Robin D. Melone<br>ATTORNEY TO BE NOTICED<br>Pastori Krans, PLLC<br>82 North Main Street Suite B<br>Concord, NH  03301<br>USA<br>603-369-4769 Email:Rmelone@pastorikrans.Com |
| AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE<br>**Amicus** | Gilles R. Bissonnette<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of New Hampshire<br>18 Low Ave<br>Concord, NH  03301<br>USA<br>603 224-5591 Email:Gilles@aclu-Nh.Org |
| | Henry Klementowicz<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of New Hampshire<br>18 Low Ave<br>Concord, NH  03301<br>USA<br>603 333-2201 Email:Henry@aclu-Nh.Org |
| | Kate Hamilton<br>ATTORNEY TO BE NOTICED<br>Campaign Legal Center<br>1101 14th St Nw Ste 400<br>Washington, DC  20005<br>USA |

App. 6

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|---|---|
| | 202-360-2864 Email:Khamilton@campaignlegalcenter.Org

Patrick Berry
ATTORNEY TO BE NOTICED
Brennan Center for Justice at NYU School of Law
120 Broadway, Ste 1750
New York, NY  10271
USA
646-925-8754 Fax: 212-463-7308
Email:Berryp@brennan.Law.Nyu.Edu

Sophia Lin Lakin
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY  10004
USA
212-519-7836 Email:Slakin@aclu.Org |
| League of Women Voters of New Hampshire
**Amicus** | Gilles R. Bissonnette
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
American Civil Liberties Union of New Hampshire
18 Low Ave
Concord, NH  03301
USA
603 224-5591 Email:Gilles@aclu-Nh.Org

Henry Klementowicz
ATTORNEY TO BE NOTICED
American Civil Liberties Union of New Hampshire
18 Low Ave
Concord, NH  03301
USA
603 333-2201 Email:Henry@aclu-Nh.Org

Kate Hamilton
ATTORNEY TO BE NOTICED
Campaign Legal Center
1101 14th St Nw Ste 400
Washington, DC  20005
USA
202-360-2864 Email:Khamilton@campaignlegalcenter.Org

Patrick Berry
ATTORNEY TO BE NOTICED
Brennan Center for Justice at NYU School of Law
120 Broadway, Ste 1750
New York, NY  10271
USA
646-925-8754 Fax: 212-463-7308
Email:Berryp@brennan.Law.Nyu.Edu

Sophia Lin Lakin
ATTORNEY TO BE NOTICED
American Civil Liberties Union Foundation
125 Broad St, 18th Flr
New York, NY  10004
USA
212-519-7836 Email:Slakin@aclu.Org |

App. 7

1:25cv371, Usa V. Nh Secretary Of State Et Al

| Litigants | Attorneys |
|-----------|-----------|
| Former Employees of U.S. Department of Justice<br>FORMER EMPLOYEES OF U.S. DEPARTMENT OF JUSTICE \|<br>**Amicus** | James Joseph Armillay , Jr.<br>ATTORNEY TO BE NOTICED<br>Bernstein Shur Sawyer & Nelson<br>670 N Commercial St, Ste 108 Po Box 1120<br>Manchester, NH  03105-1120<br>USA<br>603-623-8700 Email:Jarmillay@bernsteinshur.Com |
| State of Maryland<br>**Amicus** | Elizabeth Carol Velez<br>ATTORNEY TO BE NOTICED<br>Orr & Reno PA<br>Po Box 3550 45 S Main St<br>Concord, NH  03302<br>USA<br>603-223-9171 Email:Evelez@orr-Reno.Com |
| Daniel E. Hall<br>[Terminated: 04/21/2026]<br>**Intervenor** | Daniel E. Hall<br>PRO SE<br><br>393 Merrimack St<br>Manchester, NH  03103<br>USA<br>603 948-8706 |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 09/25/2025 | NEW CASE/ COMPLAINT (No fee paid, USA or IFP) filed by United States. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Addendum)(Tucker, James) (Entered: 09/25/2025) | |
| 2 | 09/25/2025 | REQUEST FOR ISSUANCE OF SUMMONS/WAIVER by United States(Tucker, James) (Entered: 09/25/2025) | |
| 3 | 09/25/2025 | REQUEST FOR ISSUANCE OF SUMMONS/WAIVER by United States(Tucker, James) (Entered: 09/25/2025) | |
| | 09/25/2025 | Case assigned to US Magistrate Judge Andrea K Johnstone. The case designation is: 1:25-cv-371-AJ. Please show this number with the judge designation on all future pleadings. (ed) (Entered: 09/26/2025) | |
| 4 | 09/25/2025 | NOTICE of Assignment to U.S. Magistrate Judge and Consent Form sent to plaintiff for service on all parties. MJ Consent Form Due 11/14/2025.(ed) (Entered: 09/26/2025) | |
| | 09/26/2025 | NOTICE. This case has been designated for Electronic Case Filing. All further submissions shall be filed in compliance with the Administrative Procedures for Electronic Case Filing. Pro se litigants are not required to file electronically and may continue to file documents in paper format. Persons filing electronically are strongly encouraged to complete the interactive training modules available on the courts website. To access these modules, click HERE. (ed) (Entered: 09/26/2025) | |
| 5 | 09/26/2025 | Summonses issued electronically as to NH Secretary of State, NH, State of. NOTICE: Counsel shall print and serve the summonses and all attachments in accordance with Fed. R. Civ. P. 4. NOTICE of Assignment to Magistrate Judge attached. (Attachments: # 1 Assignment to Magistrate, # 2 Notice ECF)(ed) (Entered: 09/26/2025) | |
| 6 | 09/30/2025 | MOTION to Intervene as Other  filed by Neal Kurk, Robert Perry, Louise Spencer, Christopher Cole. Attorney Steven J. Dutton added to party Neal Kurk(pty:intv), Attorney Steven J. Dutton | |

App. 8

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | added to party Robert Perry(pty:intv), Attorney Steven J. Dutton added to party Louise Spencer(pty:intv), Attorney Steven J. Dutton added to party Christopher Cole(pty:intv).Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law, # 2 Exhibit A - Proposed Answer, # 3 Exhibit (Affidavit) B - Kurk Declaration, # 4 Exhibit (Affidavit) C - Perry Declaration, # 5 Exhibit (Affidavit) D - Spencer Declaration, # 6 Exhibit (Affidavit) E- Cole Declaration, # 7 Exhibit F - June 25 Letter, # 8 Exhibit G - July 25 Letter, # 9 Exhibit H - August 18 Letter)(Dutton, Steven) (Attachment 5 replaced on 10/3/2025) (bd). (Entered: 09/30/2025) | |
| 7 | 09/30/2025 | MOTION for Elisabeth C. Frost to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2686575.) filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Elisabeth C. Frost)(Dutton, Steven) (Entered: 09/30/2025) | |
| 8 | 09/30/2025 | MOTION for David R. Fox to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2686578.) filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of David R. Fox)(Dutton, Steven) (Entered: 09/30/2025) | |
| 9 | 09/30/2025 | MOTION for Christopher D. Dodge to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2686580.) filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Christopher D. Dodge)(Dutton, Steven) (Entered: 09/30/2025) | |
| 10 | 09/30/2025 | MOTION for Walter McKusick to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2686584.) filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Walter McKusick)(Dutton, Steven) (Entered: 09/30/2025) | |
| 11 | 09/30/2025 | MOTION for Marcos Mocine-McQueen to Appear Pro Hac Vice (Filing fee $ 100, Receipt # ANHDC-2686586.) filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 10/14/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Marcos Mocine-McQueen)(Dutton, Steven) (Entered: 09/30/2025) | |
| 12 | 10/01/2025 | Assented to MOTION to Stay  filed by USA. Attorney Brittany Bennett added to party USA(pty:pla). (Attachments: # 1 Proposed Order)(Bennett, Brittany) (Entered: 10/01/2025) | |
| | 10/01/2025 | ENDORSED ORDER granting: 12 Assented to MOTION to Stay. Text of Order: Granted. This matter is stayed until counsel for the government is permitted to resume usual civil litigation functions. Current deadlines in this matter are extended commensurate with the duration of the lapse in appropriations. Counsel for the government shall inform the court promptly when it becomes aware of the restoration of its appropriations. So Ordered by US Magistrate Judge Andrea K Johnstone. (bd) (Entered: 10/01/2025) | |

App. 9

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 13 | 10/06/2025 | NOTICE of Change of Address by Steven J. Dutton on behalf of Neal Kurk(Dutton, Steven) (Entered: 10/06/2025) | |
| 14 | 11/24/2025 | NOTICE of Attorney Appearance by Paul J. Twomey on behalf of Neal Kurk, Robert Perry, Louise Spencer, Christopher Cole Attorney Paul J. Twomey added to party Paul Twomey(pty:intvd).(Twomey, Paul) Modified on 11/24/2025 to correct text to read: "on behalf of Neal Kurk, Robert Perry, Louise Spencer, Christopher Cole" (kad). (Entered: 11/24/2025) | |
| | 11/24/2025 | ENDORSED ORDER. Text of Order: The lapse in appropriations prompting the stay in this matter has resolved. Accordingly, the stay is lifted and the government shall respond to the pending motions on or before December 5, 2025. So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 11/24/2025) | |
| 15 | 12/02/2025 | NOTICE of Attorney Appearance by Mary Alissa Triick on behalf of NH Secretary of State, NH, State of  Attorney Mary Alissa Triick added to party NH Secretary of State(pty:dft), Attorney Mary Alissa Triick added to party NH, State of(pty:dft).(Triick, Mary) (Entered: 12/02/2025) | |
| 16 | 12/02/2025 | NOTICE of Attorney Appearance by James Henry Holl, III on behalf of NH Secretary of State, NH, State of  Attorney James Henry Holl, III added to party NH Secretary of State(pty:dft), Attorney James Henry Holl, III added to party NH, State of(pty:dft).(Holl, James) (Entered: 12/02/2025) | |
| 17 | 12/03/2025 | WAIVER OF SERVICE Returned Executed as to NH Secretary of State  by NH Secretary of State. Served/Mailed on 11/24/2025. Answer Follow Up on 1/26/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Holl, James) (Entered: 12/03/2025) | |
| 18 | 12/03/2025 | WAIVER OF SERVICE Returned Executed as to NH, State of  by NH, State of. Served/Mailed on 11/24/2025. Answer Follow Up on 1/26/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Holl, James) (Entered: 12/03/2025) | |
| 19 | 12/05/2025 | MEMORANDUM in Opposition re 6 MOTION to Intervene as Other   filed by USA. Follow up on Reply on 12/12/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit SC Order)(Bennett, Brittany) (Entered: 12/05/2025) | |
| 20 | 12/12/2025 | MOTION for Leave to File Reply in Support of Motion to Intervene filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 12/26/2025. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit 1 - Proposed Reply in Support of Motion to Intervene, # 2 Exhibit A to Proposed Reply - Oregon Intervention Order, # 3 Exhibit B to Proposed Reply - Michigan Intervention Order)(Dutton, Steven) (Entered: 12/12/2025) | |
| | 12/15/2025 | ACTION REQUIRED - NOTICE Nonconforming Document re 20 MOTION for Leave to File Reply in Support of Motion to Intervene filed by Robert Perry, Christopher Cole, Neal Kurk, Louise Spencer. The document fails to comply with LR 7.1 - No statement of concurrence was included. File statement as addendum using the Other Documents/Addendum event and link filing(s) to document no. 20. The document will remain on file. Please note that unless a document curing the defect is filed by the Notice of Compliance Deadline the matter may be referred to a judicial officer for appropriate action. If the filing party has any questions concerning this notice, please contact the judge's case manager | |

App. 10

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | | at 603-225-1423. Compliance Deadline set for 12/19/2025.(kad) (Entered: 12/15/2025) | |
| 21 | 12/15/2025 | NOTICE of No Position on Motion to Intervene by USA.(Bennett, Brittany) (Entered: 12/15/2025) | |
| | 12/16/2025 | ENDORSED ORDER granting 20 MOTION for Leave to File Reply in Support of Motion to Intervene. Text of Order: Granted. Within 48 hours counsel shall electronically refile the pleading attached to the Motion for Leave to File using the appropriate event in CM/ECF. So Ordered by US Magistrate Judge Andrea K Johnstone. (kad) (Entered: 12/16/2025) | |
| 22 | 12/16/2025 | REPLY to Objection to Motion re 6 MOTION to Intervene as Other filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. Surreply due by 12/22/2025. (Attachments: # 1 Exhibit A - Oregon Intervention Order, # 2 Exhibit B - Michigan Intervention Order)(Dutton, Steven) (Entered: 12/16/2025) | |
| 23 | 01/05/2026 | ORDER granting: 6 Motion to Intervene. So Ordered by US Magistrate Judge Andrea K Johnstone. (bd) (Entered: 01/05/2026) | |
| | 01/06/2026 | ENDORSED ORDER granting 7 MOTION for Elisabeth C. Frost to Appear Pro Hac Vice; granting 8 MOTION for David R. Fox to Appear Pro Hac Vice; granting 9 MOTION for Christopher D. Dodge to Appear Pro Hac Vice; granting 10 MOTION for Walter McKusick to Appear Pro Hac Vice; granting 11 MOTION for Marcos Mocine-McQueen to Appear Pro Hac Vice. Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court. So Ordered by US Magistrate Judge Andrea K Johnstone.The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(kad) (Entered: 01/06/2026) | |
| 24 | 01/06/2026 | NOTICE of Attorney Appearance by David Robert Fox on behalf of Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer Attorney David Robert Fox added to party Christopher Cole(pty:intvd), Attorney David Robert Fox added to party Neal Kurk(pty:intvd), Attorney David Robert Fox added to party Robert Perry(pty:intvd), Attorney David Robert Fox added to party Louise Spencer(pty:intvd).(Fox, David) (Entered: 01/06/2026) | |
| 25 | 01/06/2026 | NOTICE of Attorney Appearance by Elisabeth C. Frost on behalf of Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer Attorney Elisabeth C. Frost added to party Christopher Cole(pty:intvd), Attorney Elisabeth C. Frost added to party Neal Kurk(pty:intvd), Attorney Elisabeth C. Frost added to party Robert Perry(pty:intvd), Attorney Elisabeth C. Frost added to party Louise Spencer(pty:intvd).(Frost, Elisabeth) (Entered: 01/06/2026) | |
| 26 | 01/06/2026 | NOTICE of Attorney Appearance by Walker Roy McKusick on behalf of Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer Attorney Walker Roy McKusick added to party Christopher Cole(pty:intvd), Attorney Walker Roy McKusick added to party Neal Kurk(pty:intvd), Attorney Walker Roy McKusick added to party Robert Perry(pty:intvd), Attorney Walker Roy McKusick added to party Louise Spencer(pty:intvd).(McKusick, Walker) (Entered: 01/06/2026) | |
| 27 | 01/07/2026 | NOTICE of Attorney Appearance by Christopher D. Dodge on behalf of Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer Attorney Christopher D. Dodge added to party Christopher Cole(pty:intvd), Attorney Christopher D. Dodge added | |

App. 11

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | to party Neal Kurk(pty:intvd), Attorney Christopher D. Dodge added to party Robert Perry(pty:intvd), Attorney Christopher D. Dodge added to party Louise Spencer(pty:intvd).(Dodge, Christopher) (Entered: 01/07/2026) | |
| 28 | 01/23/2026 | Assented to MOTION to Extend Time to Answer to February 9, 2026 and for Additional Pages filed by NH Secretary of State, NH, State of.(Holl, James) (Entered: 01/23/2026) | |
| | 01/23/2026 | NOTICE of ECF Filing Error - NO ACTION REQUIRED - re: 28 Assented to MOTION to Extend Time to Answer to February 9, 2026 and for Additional Pages filed by NH, State of, NH Secretary of State.  In accordance with LR 7.1(a)(1) filers shall not combine multiple motions seeking separate and distinct relief into a single filing. Separate motions must be filed. NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. (kad) (Entered: 01/23/2026) | |
| 29 | 01/23/2026 | NOTICE of Attorney Appearance by Marcos Mocine-McQueen on behalf of Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer  Attorney Marcos Mocine-McQueen added to party Christopher Cole(pty:intvd), Attorney Marcos Mocine-McQueen added to party Neal Kurk(pty:intvd), Attorney Marcos Mocine-McQueen added to party Robert Perry(pty:intvd), Attorney Marcos Mocine-McQueen added to party Louise Spencer(pty:intvd).(Mocine-McQueen, Marcos) (Entered: 01/23/2026) | |
| | 01/23/2026 | ENDORSED ORDER granting 28 Assented to MOTION to Extend Time to Answer to February 9, 2026 and for Additional Pages. Text of Order: Motion to Extend Time to Answer and to Exceed the Page Limit is granted. For the reasons stated in the motion, the court finds good cause to extend the deadline for issuing the scheduling order pursuant to Fed. R. Civ. P. 16(b). So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 01/23/2026) | |
| 30 | 01/23/2026 | Assented to MOTION to Extend Time to Answer to 02/09/2026 filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.(Dutton, Steven) (Entered: 01/23/2026) | |
| | 01/26/2026 | ENDORSED ORDER granting 30 Assented to MOTION to Extend Time to Answer to 02/09/2026. Text of Order: Motion to Extend Time to Answer is granted. For the reasons stated in the motion, the court finds good cause to extend the deadline for issuing the scheduling order pursuant to Fed. R. Civ. P. 16(b). So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 01/27/2026) | |
| 31 | 01/29/2026 | MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq.  filed by USA.Follow up on Objection on 2/12/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law in Support of Motion to Compel Records Pursuant to Civil Rights Act of 1960, # 2 Exhibit 1- June 25 Letter, # 3 Exhibit 2- July 25c Letter, # 4 Exhibit 3- August 18 Letter, # 5 Exhibit 4- August 28 Letter, # 6 Exhibit (Affidavit) Declaration of Eric Neff, # 7 Exhibit 5- South Carolina Order, # 8 Exhibit 6- North Carolina Order, # 9 Proposed Order)(Bennett, Brittany) (Entered: 01/29/2026) | |
| | 01/29/2026 | NOTICE OF PRETRIAL CONFERENCE. Pretrial Conference set for 3/10/2026 10:00 AM before US Magistrate Judge Andrea K Johnstone. Follow up on Discovery Plan 3/3/2026. If no consent form has been filed, a consent form is due before filing the discovery plan.(kad) (Entered: 01/29/2026) | |

App. 12

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 32 | 02/06/2026 | MOTION to Dismiss for Failure to State a Claim  filed by NH Secretary of State, NH, State of. If no consent form has yet been filed, the plaintiff is required to file a consent on or before the date of filing an objection to this Motion.Follow up on Objection on 2/20/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). MJ Consent Form Due 2/20/2026. (Attachments: # 1 Memorandum of Law In Support of Motion to Dismiss, # 2 Exhibit 1 June 25, 2025 Letter, # 3 Exhibit 2 July 25, 2025 Letter, # 4 Exhibit 3 August 18, 2025 Letter, # 5 Exhibit 4 August 28, 2025 Letter)(Holl, James) (Entered: 02/06/2026) | |
| | 02/09/2026 | NOTICE OF PRETRIAL CONFERENCE. Pretrial Conference set for 3/19/2026 10:00 AM before US Magistrate Judge Andrea K Johnstone. Follow up on Discovery Plan 3/10/2026. If no consent form has been filed, a consent form is due before filing the discovery plan.(kad) (Entered: 02/09/2026) | |
| 33 | 02/09/2026 | Notice of Amicus Curiae APPEARANCE entered by Robin D. Melone on behalf of Democratic National Committee Attorney Robin D. Melone added to party Democratic National Committee(pty:am).(Melone, Robin) (Entered: 02/09/2026) | |
| 34 | 02/09/2026 | MOTION to File Amicus Brief  filed by Democratic National Committee.Follow up on Objection on 2/23/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Melone, Robin) (Entered: 02/09/2026) | |
| 35 | 02/09/2026 | BRIEF/MEMORANDUM Amicus Curiae by Democratic National Committee(Melone, Robin) (Entered: 02/09/2026) | |
| 36 | 02/09/2026 | MOTION for Daniel Freeman to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2742198.) filed by Democratic National Committee.Follow up on Objection on 2/23/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration in Support)(Melone, Robin) (Entered: 02/09/2026) | |
| 37 | 02/09/2026 | MOTION to Dismiss for Failure to State a Claim  filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. If no consent form has yet been filed, the plaintiff is required to file a consent on or before the date of filing an objection to this Motion.Follow up on Objection on 2/23/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). MJ Consent Form Due 2/23/2026. (Attachments: # 1 Memorandum of Law)(Dutton, Steven) (Entered: 02/09/2026) | |
| | 02/10/2026 | NOTICE of ECF Filing Error - NO ACTION REQUIRED - re: 34 MOTION to File Amicus Brief  filed by Democratic National Committee. Filer used the wrong event. Filer should have used Motion/Leave to File event and attached to it the Proposed Brief/Memorandum. 35 BRIEF/MEMORANDUM Amicus Curiae filed by Democratic National Committee. Document should have been filed as an attachment to the main document (AP 2.5(a). NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1423.(kad) (Entered: 02/10/2026) | |
| 38 | 02/11/2026 | MOTION to Extend Time to Object to Plaintiff's Motion to Compel Production of Records ECF No. 31 filed by NH Secretary of State, NH, State of.Follow up on Objection on 2/25/2026. The court only follow up date DOES NOT include 3 additional days that may | |

App. 13

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | apply per FRCP 6(d) and FRCrP 45(c).(Holl, James) (Entered: 02/11/2026) | |
| | 02/11/2026 | ENDORSED ORDER granting 38 MOTION to Extend Time to Object to Plaintiff's Motion to Compel Production of Records. Text of Order: Granted. So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 02/11/2026) | |
| 39 | 02/11/2026 | MOTION to Extend Time to Object/Respond to 03/05/26 re: Plaintiff's Motion to Compel filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.Follow up on Objection on 2/25/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Dutton, Steven) (Entered: 02/11/2026) | |
| | 02/12/2026 | NOTICE of ECF Filing Error - NO ACTION REQUIRED - re: 39 MOTION to Extend Time to Object/Respond to 03/05/26 re: Plaintiff's Motion to Compel filed by Robert Perry, Christopher Cole, Neal Kurk, Louise Spencer. Counsel are reminded to link motions to extend to the motion to which the deadlines are to be extended. During docketing of a motion to extend see the note: "To select the motion whose deadlines are to be extended: on the document selection screen, check the box: Should the document you are filing link to another document in this case?" NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1423.(kad) (Entered: 02/12/2026) | |
| | 02/12/2026 | ENDORSED ORDER granting 39 Motion to Extend Time to Object/Respond re 31 Motion to Compel. Text of Order: Granted. So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 02/12/2026) | |
| 40 | 02/13/2026 | Pro Se MOTION to Intervene for the Limited Purpose of Seeking an Order Limiting Intervenors' Participation (Fed. R. Civ. P. 24(b) filed by Daniel E. Hall. Follow up on Objection on 2/27/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(kad) (Entered: 02/13/2026) | |
| 41 | 02/13/2026 | MOTION to File Amicus Brief (Unopposed) filed by AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire. Attorney Gilles R. Bissonnette added to party AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE(pty:am), Attorney Gilles R. Bissonnette added to party League of Women Voters of New Hampshire(pty:am).Follow up on Objection on 2/27/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Proposed Amicus Brief)(Bissonnette, Gilles) (Entered: 02/13/2026) | |
| 42 | 02/17/2026 | NOTICE of Attorney Appearance by Gilles R. Bissonnette on behalf of AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire (Bissonnette, Gilles) (Entered: 02/17/2026) | |
| 43 | 02/17/2026 | MOTION for Leave to File Amicus Brief on behalf of Amici Curiae Former Employees of U.S. Department of Justice  filed by Former Employees of U.S. Department of Justice. Attorney James Joseph Armillay, Jr added to party Former Employees of U.S. Department of Justice(pty:am).Follow up on Objection on 3/3/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law PROPOSED Brief of Amici Curiae Former Employees of U.S. Department of Justiceur)(Armillay, James) | |

App. 14

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | (Entered: 02/17/2026) | |
| 44 | 02/17/2026 | NOTICE of Attorney Appearance by James Joseph Armillay, Jr on behalf of Former Employees of U.S. Department of Justice (Amici Curiae) (Armillay, James) (Entered: 02/17/2026) | |
| 45 | 02/18/2026 | MOTION for Patrick Berry to Appear Pro Hac Vice (UNOPPOSED) (Filing fee $ 100, Receipt # ANHDC-2746353.) filed by AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire.Follow up on Objection on 3/4/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 02/18/2026) | |
| 46 | 02/18/2026 | MOTION for Kate Hamilton to Appear Pro Hac Vice (UNOPPOSED) (Filing fee $ 100, Receipt # ANHDC-2746354.) filed by AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire.Follow up on Objection on 3/4/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 02/18/2026) | |
| 47 | 02/18/2026 | MOTION for Sophia Lin Lakin to Appear Pro Hac Vice (UNOPPOSED) (Filing fee $ 100, Receipt # ANHDC-2746355.) filed by AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire.Follow up on Objection on 3/4/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bissonnette, Gilles) (Entered: 02/18/2026) | |
| 48 | 02/18/2026 | Partially Assented to MOTION for Daniel Michael Kobrin to Appear Pro Hac Vice  (Filing fee $ 100, Receipt # ANHDC-2747000.) filed by State of Maryland. Attorney Elizabeth Carol Velez added to party State of Maryland(pty:pla).Follow up on Objection on 3/4/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit Certificate of Good Standing)(Velez, Elizabeth) (Entered: 02/18/2026) | |
| 49 | 02/18/2026 | MOTION to File Amicus Brief (Unopposed) filed by State of Maryland.Follow up on Objection on 3/4/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Memorandum of Law Proposed Amicus Brief)(Velez, Elizabeth) (Entered: 02/18/2026) | |
| 50 | 02/18/2026 | ORDER OF RECUSAL. US Magistrate Judge Andrea K Johnstone recused. So Ordered by US Magistrate Judge Andrea K Johnstone.(kad) (Entered: 02/18/2026) | |
| | 02/19/2026 | Case reassigned to Judge Joseph N. Laplante. The new case designation is: 25-cv-371-JL. Please show this number with the correct judge designation on all further pleadings.(kad) (Entered: 02/19/2026) | |
| | 02/20/2026 | Deadline terminated Pretrial Conference set for 03/19/2026 is cancelled. Conference to be rescheduled before Judge Joseph N. Laplante. (ko) (Entered: 02/20/2026) | |
| 51 | 02/20/2026 | MEMORANDUM in Opposition re 32 MOTION to Dismiss for Failure to State a Claim , 37 MOTION to Dismiss for Failure to State a Claim   filed by USA. Follow up on Reply on 2/27/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Attachments: # 1 Exhibit (Affidavit) Declaration of Eric Neff, # 2 Exhibit 7- Texas MOU, # 3 Exhibit 8- GA 2006 Complaint, # 4 | |

App. 15

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Exhibit 9- GA Consent Decree, # 5 Exhibit 10- NC Consent Order, # 6 Exhibit 11- NC HAVA Report, # 7 Exhibit 12- Ford-Carter Report, # 8 Exhibit 13- MI Opinion, # 9 Exhibit 14- Oregon Opinion, # 10 Exhibit 15- CA Order, # 11 Exhibit 16- Middle Georgia Dismissal)(Bennett, Brittany) (Entered: 02/20/2026) | |
| 52 | 02/25/2026 | NOTICE of Attorney Appearance by Henry Klementowicz on behalf of AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire Attorney Henry Klementowicz added to party AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE(pty:am), Attorney Henry Klementowicz added to party League of Women Voters of New Hampshire(pty:am).(Klementowicz, Henry) (Entered: 02/25/2026) | |
| 53 | 02/27/2026 | REPLY to Objection to Motion re 37 MOTION to Dismiss for Failure to State a Claim   filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. Surreply due by 3/4/2026. (Dutton, Steven) (Entered: 02/27/2026) | |
| 54 | 02/27/2026 | MEMORANDUM in Opposition re 40 MOTION to Intervene as other  filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. Follow up on Reply on 3/6/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Dutton, Steven) (Entered: 02/27/2026) | |
| 55 | 02/27/2026 | MOTION to Extend Time to Object/Respond to 51 Memorandum in Opposition to Motion,,, to March 13, 2026  filed by NH Secretary of State, NH, State of.Follow up on Objection on 3/13/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Holl, James) (Entered: 02/27/2026) | |
| | 03/02/2026 | ENDORSED ORDER granting re 36 Motion for Daniel Freeman to Appear Pro Hac Vice; granting 45 Motion for Patrick Berry to Appear Pro Hac Vice; granting 46 Motion for Kate Hamilton to Appear Pro Hac Vice; granting 47 Motion for Sophia Lin Lakin to Appear Pro Hac Vice.  Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court. So Ordered by Judge Joseph N. Laplante.The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(ko) (Entered: 03/02/2026) | |
| 56 | 03/02/2026 | NOTICE of Attorney Appearance by Patrick Berry on behalf of AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire  Attorney Patrick Berry added to party AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE(pty:am), Attorney Patrick Berry added to party League of Women Voters of New Hampshire(pty:am).(Berry, Patrick) (Entered: 03/02/2026) | |
| 57 | 03/03/2026 | NOTICE of Attorney Appearance by Sophia Lin Lakin on behalf of AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire  Attorney Sophia Lin Lakin added to party AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE(pty:am), Attorney Sophia Lin Lakin added to party League of Women Voters of New Hampshire(pty:am).(Lakin, Sophia) (Entered: 03/03/2026) | |
| 58 | 03/03/2026 | NOTICE of Attorney Appearance by Kate Hamilton on behalf of AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, | |

App. 16

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | League of Women Voters of New Hampshire  Attorney Kate Hamilton added to party AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE(pty:am), Attorney Kate Hamilton added to party League of Women Voters of New Hampshire(pty:am).(Hamilton, Kate) (Entered: 03/03/2026) | |
| 59 | 03/03/2026 | NOTICE of Attorney Appearance by Daniel J. Freeman on behalf of Democratic National Committee  Attorney Daniel J. Freeman added to party Democratic National Committee(pty:am).(Freeman, Daniel) (Entered: 03/03/2026) | |
| 60 | 03/05/2026 | OBJECTION to 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq.   filed by NH Secretary of State, NH, State of. Follow up on Reply on 3/12/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Holl, James) (Entered: 03/05/2026) | |
| 61 | 03/05/2026 | MEMORANDUM in Opposition re 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq.   filed by Christopher Cole, Daniel E. Hall, Neal Kurk, Robert Perry, Louise Spencer. Attorney Steven J. Dutton added to party Daniel E. Hall(pty:intv). Follow up on Reply on 3/12/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c). (Dutton, Steven) Modified on 4/16/2026 to remove: Daniel E. Hall's name from the "filed by" docket entry. (ko) (Entered: 03/05/2026) | |
| | 03/11/2026 | ENDORSED ORDER granting re 55 Motion to Extend Time to Object/Respond re 37 Motion to Dismiss for Failure to State a Claim, 32 Motion to Dismiss for Failure to State a Claim.  Text of Order: Granted. So Ordered by Judge Joseph N. Laplante. Follow up on Reply on 3/13/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(ko) (Entered: 03/11/2026) | |
| | 03/12/2026 | ENDORSED ORDER granting re 48 Motion for Daniel Michael Kobrin to Appear Pro Hac Vice.  Text of Order: Granted. Local counsel shall comply with all obligations required by L.R. 83.2(b) absent order of the court.  So Ordered by Judge Joseph N. Laplante.The clerk's office will provide the admitted attorney with instructions on how to obtain access to electronic filing by separate email. The admitted attorney must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of New Hampshire. After obtaining e-filing access, the admitted attorney must file an appearance to begin receiving electronic notices.(ko) (Entered: 03/12/2026) | |
| | 03/12/2026 | ENDORSED ORDER granting re 34 Motion to File Amicus Brief; granting re 41 Motion to File Amicus Brief; granting 43 Motion for Leave to File; granting 49 Motion to File Amicus Brief.  Text of Order: Granted. So Ordered by Judge Joseph N. Laplante. (ko) (Entered: 03/12/2026) | |
| 62 | 03/12/2026 | REPLY to Objection to Motion re 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq.   filed by USA. Surreply due by 3/17/2026. (Tucker, James) (Entered: 03/12/2026) | |
| 63 | 03/13/2026 | REPLY to Objection to Motion re 32 MOTION to Dismiss for Failure to State a Claim   filed by NH Secretary of State, NH, State of. Surreply due by 3/18/2026. (Holl, James) (Entered: 03/13/2026) | |
| 64 | 03/13/2026 | REPLY to Objection to Motion re 40 MOTION to Intervene as other filed by Daniel E. Hall. Surreply due by 3/18/2026. (ko) (Entered: 03/16/2026) | |
| | 03/16/2026 | CLERK'S NOTICE re 41 Motion to File Amicus Brief, 43 Motion to | |

App. 17

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | File Amicus Brief, 49 Motion to File Amicus Brief. Within 48 hours counsel shall electronically refile the pleading attached to the Motion for Leave to File using the appropriate event in CMECF.(ko) (Entered: 03/16/2026) | |
| 65 | 03/16/2026 | BRIEF/MEMORANDUM of Amici Curiae by AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE, League of Women Voters of New Hampshire(Bissonnette, Gilles) (Entered: 03/16/2026) | |
| 66 | 03/17/2026 | BRIEF/MEMORANDUM Amici Curiae by Former Employees of U.S. Department of Justice(Armillay, James) (Entered: 03/17/2026) | |
| | 03/20/2026 | NOTICE re: 40 MOTION to Intervene for the Limited Purpose of Seeking an Order Limiting Intervenors' Participation (Fed. R. Civ. P. 24(b). Motion Hearing set for 4/16/2026 at 10:00 AM before Judge Joseph N. Laplante.(ko) (Entered: 03/20/2026) | |
| | 03/20/2026 | NOTICE re: 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et. seq, 32 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim.  Motion Hearing set for 4/29/2026 at 09:30 AM before Judge Joseph N. Laplante.(ko) (Entered: 03/20/2026) | |
| 67 | 04/09/2026 | NOTICE of Supplemental Authority  by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. (Attachments: # 1 Exhibit A - Order on Motions to Compel and Dismiss)(Dutton, Steven) (Entered: 04/09/2026) | |
| | 04/10/2026 | ENDORSED ORDER re 67 Notice of Supplemental Authority. Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 04/10/2026) | |
| 68 | 04/10/2026 | NOTICE of Attorney Appearance by John Casali on behalf of USA Attorney John Casali added to party USA(pty:pla).(Casali, John) (Entered: 04/10/2026) | |
| 69 | 04/13/2026 | NOTICE of No Position Reg. Mot. to Intervene by movant Daniel Hall  by USA.(Casali, John) (Entered: 04/13/2026) | |
| 70 | 04/13/2026 | RESPONSE re 67 Notice (Other) Supplemental Authority filed by USA. (Attachments: # 1 Exhibit Transcript Excerpt (D. Conn. Mar. 19 2026))(Casali, John) (Entered: 04/13/2026) | |
| | 04/15/2026 | ENDORSED ORDER re 70 Response re 67 Notice Supplemental Authority.  Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 04/15/2026) | |
| | 04/16/2026 | Minute Entry for proceedings held before Judge Joseph N. Laplante. HEARING on 4/16/2026 re 40 MOTION to Intervene for the Limited Purpose of Seeking an Order Limiting Intervenors' Participation (Fed. R. Civ. P. 24(b)). (Court Reporter: Liza Dubois) (Pltfs Atty: John Casali) (Defts Atty: James Henry Holl, III, Mary, Steven J. Dutton, Alissa Triick. David Robert Fox)(Total Hearing Time: 13 minutes) (ko) (Entered: 04/23/2026) | |
| 71 | 04/17/2026 | NOTICE of Voter Intervenors' Notice of Supplemental Authority by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. (Attachments: # 1 Exhibit A - Memorandum and Order)(Dutton, Steven) (Entered: 04/17/2026) | |
| 72 | 04/21/2026 | ORDER denying re 40 Pro Se MOTION to Intervene for the Limited Purpose of Seeking an Order Limiting Intervenors' Participation (Fed. R. Civ. P. 24(b) filed by Daniel E. Hall. So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 04/21/2026) | |
| | 04/21/2026 | RESHEDULING NOTICE re: 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq., 32 MOTION to Dismiss for Failure to State a Claim,  37 MOTION to Dismiss for Failure to State a Claim.  Motion Hearing reset for 5/26/2026 at 10:00 AM (from 4/29/2026) before Judge Joseph N. Laplante.(ko) | |

App. 18

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|   |      | (Entered: 04/21/2026) | |
| 73 | 04/23/2026 | NOTICE of Supplemental Authority Response by USA.(Bennett, Brittany) (Entered: 04/23/2026) | |
| 74 | 04/23/2026 | NOTICE of Errata and Supplemental Authority  by USA. (Attachments: # 1 Appendix)(Bennett, Brittany) (Entered: 04/23/2026) | |
| 75 | 04/29/2026 | NOTICE of Supplemental Authority  by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. (Attachments: # 1 Exhibit A - Order in USA v. Adrian Fontes)(Dutton, Steven) (Entered: 04/29/2026) | |
| 76 | 05/01/2026 | RESPONSE re 75 Notice (Other) Notice of Supplemental Authority filed by USA. (Casali, John) (Entered: 05/01/2026) | |
|   | 05/05/2026 | ENDORSED ORDER RE 75 Notice of Supplemental Authority, 76 Response RE: 75 Notice of Supplemental Authority.  Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante.(jwb) (Entered: 05/05/2026) | |
| 77 | 05/15/2026 | NOTICE of Supplemental Authority  by USA. (Attachments: # 1 Exhibit 1- OLC Opinion)(Bennett, Brittany) (Entered: 05/15/2026) | |
| 78 | 05/15/2026 | NOTICE of Supplemental Authority  by USA. (Attachments: # 1 Exhibit 1- OLC Opinion)(Bennett, Brittany) (Entered: 05/15/2026) | |
| 79 | 05/16/2026 | MOTION to Withdraw 77 Notice (Other)  filed by USA.Follow up on Objection on 6/1/2026. The court only follow up date DOES NOT include 3 additional days that may apply per FRCP 6(d) and FRCrP 45(c).(Bennett, Brittany) (Entered: 05/16/2026) | |
|   | 05/18/2026 | ENDORSED ORDER re 78 Notice of Supplemental Authority. Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante. (ko) (Entered: 05/18/2026) | |
| 80 | 05/18/2026 | RESPONSE re 78 Notice (Other) Plaintiff's Notice of Supplemental Authority filed by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer. (Dutton, Steven) (Entered: 05/18/2026) | |
|   | 05/18/2026 | ENDORSED ORDER re 79 Motion to Withdraw 77 Notice. Text of Order: As this motion seeks relief without indicating whether assent was sought or obtained, the court will not address it until the objection deadline has passed or other filings clarify the status.  So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 05/21/2026) | |
| 81 | 05/22/2026 | NOTICE of Attorney Appearance by Bridget Davidson on behalf of USA  Attorney Bridget Davidson added to party USA(pty:pla).(Davidson, Bridget) (Entered: 05/22/2026) | |
| 82 | 05/22/2026 | Voter Intervenor's Response to Plaintiff's Notice of Supplemental Authority  filed by Neal Kurk. (Twomey, Paul) Modified on 5/26/2026 to remove "Motion" from docket text (ko). (Entered: 05/22/2026) | |
|   | 05/26/2026 | NOTICE of ECF Filing Error re: 82 Supplemental MOTION Notice of Authority  filed by Neal Kurk. Filer used the wrong event. Filer should have used Civil Event/Objections, Responses and Replies/Response - not to Motion. NO ACTION REQUIRED - FOR INFORMATIONAL PURPOSES ONLY AND MERELY INTENDED TO EDUCATE ALL PARTIES IN THE CASE. If the filing party has any questions concerning this notice, please contact the judge's case manager at 603-225-1423.(ko) (Entered: 05/26/2026) | |
|   | 05/26/2026 | Minute Entry for proceedings held before Judge Joseph N. Laplante. MOTION HEARING held on 5/26/2026 re 31 MOTION to Compel Production of Records Pursuant to 52 USC 20701, et.seq., 32 MOTION to Dismiss for Failure to State a Claim, 37 MOTION to Dismiss for Failure to State a Claim.  Order to issue. | |

App. 19

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | (Court Reporter: Liza Dubois) (Pltfs Atty: Bridget Davidson, John Casali) (Defts Atty: Mary Triick) (Intervenor: Paul Twomey, David Fox) (Total Hearing Time: 1 hr. 5 minutes) (ko) (Entered: 05/26/2026) | |
| 83 | 06/02/2026 | TRANSCRIPT of Proceedings for Motion Hearing held on 5/26/2026. Court Reporter Liza Dubois - Telephone 603-225-1442. Transcript is available for public inspection, but may not be copied or otherwise reproduced, at the Clerk's Office for a period of 90 days. Additionally, only attorneys of record and pro se parties with an ECF login and password who purchase a transcript from the court reporter/ECRO will have access to the transcript through PACER during this 90-day period. If you would like to order a copy, please contact the court reporter/ECRO listed above.NOTICE: Any party who requests an original transcript has 21 days from service of this notice to determine whether it is necessary to redact any personal identifiers and, if so, to electronically file a Redaction Request. Redaction Request Follow Up 6/23/2026. Redacted Transcript Follow Up 7/6/2026. Release of Transcript Restriction set for 8/31/2026.(ko) (Entered: 06/02/2026) | |
| 84 | 06/22/2026 | NOTICE of Supplemental Authority by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.(Dutton, Steven) (Entered: 06/22/2026) | |
| | 06/23/2026 | ENDORSED ORDER RE 84 Notice of Supplemental Authority. Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante.(jwb) (Entered: 06/23/2026) | |
| 85 | 06/26/2026 | NOTICE of Supplemental Authority  by Christopher Cole, Neal Kurk, Robert Perry, Louise Spencer.(Dutton, Steven) (Entered: 06/26/2026) | |
| | 06/26/2026 | ENDORSED ORDER RE 85 Notice of Supplemental Authority. Text of Order: Reviewed. So Ordered by Judge Joseph N. Laplante.(jwb) (Entered: 06/26/2026) | |
| 86 | 06/29/2026 | ///MEMORANDUM ORDER denying as moot re 31 Motion to Compel; granting re 32 Motion to Dismiss for Failure to State a Claim; granting re 37 Motion to Dismiss for Failure to State a Claim. So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 06/29/2026) | |
| | 06/29/2026 | ENDORSED ORDER granting re 79 Motion to Withdraw re 77 Notice of Supplemental Authority. Text of Order: Granted. So Ordered by Judge Joseph N. Laplante.(ko) (Entered: 06/30/2026) | |
| 87 | 06/30/2026 | JUDGMENT is hereby entered in accordance with re 86 Memorandum Order on Motions to Dismiss for Failure to State a Claim. Signed by Tracy A. Uhrin, Clerk of Court. (Case Closed) (ko) (Entered: 06/30/2026) | |
| 88 | 07/06/2026 | NOTICE OF APPEAL  by USA. (No fee paid, USA or IFP.) [NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the Forms & Notices section of the First Circuit website at www.ca1.uscourts.gov, MUST be completed and submitted to the U.S. Court of Appeals for the First Circuit.]NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf (Casali, John) (Entered: 07/06/2026) | |
| 89 | 07/07/2026 | Appeal Cover Sheet as to 88 Notice of Appeal filed by USA. (Attachment: # 1 Transcript Order Form)(ko) (Entered: 07/07/2026) | |

App. 20

1:25cv371, Usa V. Nh Secretary Of State Et Al

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 90 | 07/07/2026 | Clerk's Certificate transmitting Record on Appeal to US Court of Appeals documents numbered 86, 87, 88, and 89 re 88 Notice of Appeal.(ko) (Entered: 07/07/2026) | |
| | 07/07/2026 | Appellate Case Number: Court of Appeals No. 26-1783 re 88 Notice of Appeal filed by USA.(ko) (Entered: 07/07/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

App. 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire, and the STATE OF NEW HAMPSHIRE.<br><br>    Defendants. | )<br>)<br>)<br>)<br>)    Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

As President Trump said earlier this year, "[f]ree, fair, and honest elections unmarred by fraud, errors, or suspicion are fundamental to maintaining our constitutional Republic." Exec. Order No. 14248, 90 Fed. Reg. 14005 (Mar. 25, 2025). Indeed, "[t]he right of American citizens to have their votes properly counted and tabulated, without illegal dilution, is vital to determining the rightful winner of an election." *Id*. Under our Constitution, States "must safeguard American elections in compliance with Federal laws that protect Americans' voting rights and guard against dilution by illegal voting, discrimination, fraud, and other forms of malfeasance and error." *Id*. Without such safeguards, "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). And "[v]oters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id*.

To prevent fraudulent votes from being cast in federal elections, federal law requires that all states conduct routine list maintenance of their statewide voter registration databases to

1

App. 22

maintain accurate voter rolls. The Civil Rights Division of the Department of Justice ("Department") is tasked with ensuring that states conduct voter registration list maintenance to prevent the inclusion of ineligible voters on any state's voter registration list for federal elections. This action seeks to remedy the State of New Hampshire's violations of federal voting laws.

Plaintiff, the United States of America ("United States"), brings this action against the State of New Hampshire ("New Hampshire") and David M. Scanlan, in his official capacity as the Secretary of State for the State of New Hampshire ("Secretary Scanlan"), and alleges as follows:

**INTRODUCTION**

1. The Attorney General of the United States brings this action to make demand for New Hampshire's statewide voter registration list ("SVRL") pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. §§ 20701-20706.

2. The United States, through the Attorney General of the United States, also files this action to enforce the requirements of Section 303 of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083, with respect to New Hampshire's refusal to provide its SVRL to the Attorney General and its failure to conduct list maintenance of the SVRL on a regular basis as required by HAVA.

3. On March 25, 2025, President Donald J. Trump signed Executive Order 14248 entitled "Preserving and Protecting the Integrity of American Elections" to ensure that elections are held in compliance with federal laws that guard against illegal voting, unlawful discrimination, and other forms of fraud, error, or suspicion. *See* 90 Fed. Reg. 14005 (Mar. 25, 2025).

App. 23

4.      HAVA requires responsible state and local election officials to "perform list maintenance" with respect to the centralized, computerized statewide voter registration list required under HAVA "on a regular basis…." 52 U.S.C. §§ 21083(a)(1)-(2). Specifically, HAVA mandates that states have "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," with "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. §§ 21083(a)(4)(A)-(B).

5.      Congress gave the Attorney General, through the Civil Rights Division, sole responsibility to enforce the core provisions of HAVA. *See* 52 U.S.C. § 21111.

6.      The United States Supreme Court has held that, "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

7.      The United States brings this action pursuant to its authority under the CRA and HAVA to compel New Hampshire and its chief state election official, Secretary Scanlan, to provide information to the Attorney General regarding New Hampshire's voter list maintenance procedures and an electronic copy of its SVRL including all fields, and to come into compliance with the requirements of HAVA.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); 52 U.S.C. § 21111; and 52 U.S.C. § 20705.

App. 24

9.      Venue for this action is proper in the United States District Court for the District of New Hampshire, pursuant to 28 U.S.C. §§ 109, 1391(b).

<div align="center"><strong><u>PARTIES</u></strong></div>

10.      Plaintiff United States seeks declaratory and injunctive relief pursuant to Section 401 of HAVA, 52 U.S.C. § 21111, which authorizes the Attorney General to bring a civil action against any state or jurisdiction to enforce the requirements of HAVA Section 303, 52 U.S.C § 21083.  Pursuant to 52 U.S.C. § 20701, *et seq.*, the Attorney General may compel states to produce certain records and papers relating to the administration of federal elections.

11.      Defendant New Hampshire is a State of the United States of America and is subject to the requirements of HAVA, including the requirements set forth in Section 303 regarding a computerized statewide voter registration list and attending obligations to perform list maintenance for federal elections. 52 U.S.C. §§ 21083, 21141. New Hampshire is also subject to the CRA. 52 U.S.C. § 20706. Every "officer of election" in Federal elections administered by New Hampshire, through its chief elections official, is subject to the record retention and production requirements of the CRA. *See* 52 U.S.C. §§ 20701, 20706.

12.      Defendant Secretary Scanlan is the Secretary of State for the State of New Hampshire, and as such, he is the chief state election officer and is responsible for the State's compliance with HAVA, conducting Federal elections in New Hampshire, and overseeing all "officer[s] of election" in Federal elections, as that term is used in Sections 301 and 306 of the CRA, 52 U.S.C. §§ 20701, 20706. *See* N.H. Rev. Stat. § 652:23. Secretary Scanlan is sued in his official capacity only.

App. 25

## STATUTORY BACKGROUND

**A.    The Civil Rights Act of 1960 ("CRA")**

13.    Congress vested the Attorney General of the United States with the power to request records pursuant to Title III of the CRA, 52 U.S.C. §§ 20701-20706.

14.    Section 301 of the CRA requires state and local election officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special, or primary election. *See* 52 U.S.C. § 20701.

15.    Section 303 of the CRA provides: "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

**B.    The Help America Vote Act ("HAVA")**

16.    The purpose of HAVA "can be stated very simply—it is to improve our country's election system." H.R. Rep. 107-329(I) at 31 (2001). "Historically, elections in this country have been administered at the state and local level," but Congress found that "[w]hile local control must be preserved, it is time to recognize that the federal government can play a valuable [role] by assisting state and local government in modernizing their election systems." *Id.* at 31-32.

17.    HAVA imposes "minimum requirements" for the conduct of federal elections, which "allow the states to develop their own laws and procedures to fulfill the requirements" to the extent that they are consistent with the standards set by HAVA. *Id.* at 35.

App. 26

18. HAVA requires all states to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State…." 52 U.S.C. § 21083(a)(1)(A).

19. The computerized list required by HAVA "shall be coordinated with other agency databases within the State." 52 U.S.C. § 21083(a)(1)(A)(iv).

20. HAVA further establishes a "[m]inimum standard for accuracy of State voter registration records…." 52 U.S.C. § 21083(a)(4). Section 303 of the statute provides that a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A)-(B).

21. HAVA mandates that a state may not process a voter registration application without the applicant's driver's license number, where an applicant has a current and valid driver's license, or, for other applicants, the last four digits of the applicant's social security number. 52 U.S.C. § 21083(a)(5)(A)(i). For applicants who have neither a driver's license nor a social security number, a state must assign a unique identifying number for voter registration purposes. 52 U.S.C. § 21083(a)(5)(A)(ii). A state must determine the validity of the information provided by the applicant. 52 U.S.C. § 21083(a)(5)(A)(iii).

22. HAVA also provides specific rules for voters who register to vote by mail. *See* 52 U.S.C. § 21083(b). An individual who registers to vote by mail and has not previously voted in a

6

App. 27

federal election must comply with certain identification requirements. *Id.*

23.     HAVA applies to all fifty states, including New Hampshire. *See* 52 U.S.C. § 21141.

24.     Section 303 of HAVA incorporates by reference certain provisions of the National Voter Registration Act ("NVRA"). *See*, *e.g.*, 52 U.S.C. § 21083(a)(4)(A). Those provisions, unless explicitly noted otherwise, apply to all states covered under HAVA. *See id.*

25.     Although New Hampshire is exempt from the NVRA, it is not exempt from provisions of HAVA that require voter registration list maintenance, unless the statute provides a specific carveout. *See generally Colón-Marrero v. Vélez*, 813 F.3d 1, 14 (1st Cir. 2016) (holding that "'a sensible reading' of HAVA section 303(a)(4) compels the conclusion that Congress intended the obligations it sets forth to apply to all jurisdictions within HAVA's definition of 'State,'" and therefore applies to NVRA-exempt jurisdictions) (citations omitted).

26.     HAVA contains no private right of action. *See generally* 52 U.S.C. §§ 20901 to 21145; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (same).

27.     The Attorney General of the United States is exclusively empowered to bring a civil action pursuant to HAVA "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under section [303]." 52 U.S.C. § 21111.

## FACTUAL ALLEGATIONS

28.     The U.S. Election Administration Commission ("EAC") conducts a biennial Election Administration and Voting Survey ("EAVS"), which it describes as "an analysis of state-by-state data that covers various topics related to the administration of federal elections," including voter registration and list maintenance. EAC, "Election Administration and Voting

App. 28

Survey (EAVS) Comprehensive Report," *available at* https://www.eac.gov/research-and-data/studies-and-reports.

29.     The EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), explains that as part of the 2024 EAVS, the states "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance," such as the number of confirmation notices states sent "to verify continued eligibility from registered voters," and the number of voter registration records that state removed from their voter lists. EAC, 2024 EAVS Report at iv, *available at* https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf.

30.     New Hampshire supplied the requested information to the 2024 EAVS Report.

31.     As part of its enforcement authority of the requirements of HAVA, the Attorney General conducts an intensive review of each state's response to the 2024 EAVS Report. The Attorney General, through assigned Department employees, reviewed New Hampshire's responses.

32.     On June 25, 2025, shortly before the 2024 EAVS Report was released, the United States sent a letter to Secretary Scanlan seeking information regarding New Hampshire's compliance with Section 303 of HAVA, 52 U.S.C. § 21083. Letter of June 25, 2025, from the United States Department of Justice to Secretary Scanlan ("June 25 Letter").

33.     The June 25 Letter made 15 requests targeted at ensuring New Hampshire's compliance with HAVA. *Id.*

34.     For example, request number two asked Secretary Scanlan to describe the process by which New Hampshire uses driver's license numbers and the last four digits of a social

8

App. 29

security number for each legally registered voter in New Hampshire as required by HAVA Section 303(a)(1)(A), 52 U.S.C. § 21083(a)(1)(A). June 25 Letter at 1. Relatedly, request number eleven concerns the "verification process" pursuant to HAVA Section 303(a)(5), U.S.C. § 21083(a)(5), "to verify the required information supplied by the registrant" and to explain "what happens to the registration application if the information cannot be verified." *Id.* at 2.

35.     Request number 4 asked Secretary Scanlan to explain New Hampshire's process for identifying and removing duplicate voter registrations under HAVA Section 303(a)(2)(B)(iii), 52 U.S.C. § 21083(a)(2)(B)(iii). *Id.* at 1.

36.     Duplicate registrations are of particular concern because New Hampshire only identified .1 percent of new registrations as duplicates in the 2024 EAVS Report, whereas the national average was 12.7 percent. The 2024 EAVS Report further identified that New Hampshire only removed .3 percent of registered voters as duplicates when performing list maintenance, whereas the national average was 8.1 percent.

37.     Other requests from the United States' June 25 Letter asked Secretary Scanlan to "describe the process by which voters who have been convicted of a felony" are identified and removed from SVRL, June 25 Letter at 2 (request number 5); to "describe the process by which deceased registrants are identified and removed," *id.* (request number 6); to "[d]escribe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed" from the SVRL, pursuant to HAVA Section 303(a)(4)(A), 52 U.S.C. § 21083(a)(4)(A), *id.* (request number 8); and to "[d]escribe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed" from the SVRL, *id.* (request number 9).

App. 30

38. Finally, the June 25 Letter asked for New Hampshire's current SVRL, including both active and inactive voters, to evaluate HAVA compliance. *Id.* (request number 15).

39. On July 25, 2025, Secretary Scanlan responded to the United States' June 25 Letter. ("Secretary Scanlan's July 25 Response").

40. Secretary Scanlan prefaced his response by stating that some of the requests in the June 25 Letter "overlap with requirements under" the NVRA, 52 U.S.C. § 20501 *et seq.*, and noted that New Hampshire is exempt from the NVRA. *Id.*

41. Secretary Scanlan's July 25 Response failed to answer three requests entirely: duplicate registrations (request number 4); verification (request number 11); and requirements for voters registering by mail (request number 14). *Id.* at 3, 7, & 8.

42. Secretary Scanlan's July 25 Response also did not respond to the inquiry in request 2 asking the State to describe the process by which New Hampshire uses driver's license numbers and the last four digits of a social security number for each legally registered voter in New Hampshire as required by HAVA Section 303(a)(1)(A), 52 U.S.C. § 21083(a)(1)(A). Secretary Scanlan said that the system generates an automatic number for each voter, but that does nothing to explain how New Hampshire complies with HAVA Section 303(a)(1)(A). This is especially concerning when paired with the failure of Secretary Scanlan to answer whether New Hampshire verifies driver's license numbers and the last four digits of the social security numbers.

43. Similarly, Secretary Scanlan's July 25 Response failed to provide sufficient information to evaluate New Hampshire's compliance with its list maintenance obligations under HAVA Section 303 with respect to registrants with felonies (request number 5), deceased voters

10

App. 31

(request number 6), and voters who have moved out of state (request number 8), or are non-citizens (request number 9). *Id.* at 4, 5–6.

44.     In response to the request in the June 25 Letter for an electronic copy of the SVRL, Secretary Scanlan replied that state law did not allow him to provide the SVRL to the United States, but that the United States could seek public data from each municipality directly. Secretary Scanlan's July 25 Response at 8 (response to request number 15).

45.     On August 18, 2025, the United States sent an additional letter to Secretary Scanlan explaining that the United States sought New Hampshire's SVRL through its authority to enforce HAVA Section 303, citing 52 U.S.C. § 21111 ("August 18 Letter").

46.     The August 18 Letter also included a written demand to Defendants for the production of specific election records pursuant to the CRA, as authorized by 52 U.S.C. § 20703. *Id*. The letter explained that the purpose of the request "is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." *Id*.

47.     The August 18 Letter specified that the SVRL to be produced by the Defendants must "include all fields, including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i)."

48.     The August 18 Letter also informed Secretary Scanlan that "HAVA specifies that the last 4 digits of a social security number shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974." *Id.* (citations omitted).

49.     In addition, the August 18 Letter informed Secretary Scanlan that any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified

App. 32

at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority. *Id.*

50.    The August 18 Letter also stated that in charging the Attorney General with enforcement of the voter list maintenance requirements in the HAVA, Congress plainly intended that the Justice Department be able to conduct an independent review of each state's list. *Id.*

51.    Finally, the August 18 Letter informed Secretary Scanlan to the extent that he claimed state law prohibits him from providing this information, that is incorrect. If the federal voting laws and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

52.    On August 28, 2025, Secretary Scanlan sent a letter in response to the August 18 Letter ("Secretary Scanlan's August 28 Response"). In it, he reiterated his belief that New Hampshire law prohibits the disclosure of the SVRL and that, in his view, no provision of federal law compels the production of the SVRL. *Id.* Secretary Scanlan again directed the United States to each municipality's most recent public data. *Id*.

53.    Secretary Scanlan's July 25 Response and Secretary Scanlan's August 28 Response refusing to provide the SVRL hinder the United States from fully evaluating New Hampshire's compliance with HAVA Section 303, 52 U.S.C. § 21083.

54.    Controlling authority in the First Circuit provides that HAVA's list maintenance requirements apply to even the NVRA-exempt states like New Hampshire. *See Colón-Marrero*, 813 F.3d at 14.

App. 33

## CAUSES OF ACTION

### COUNT I:    CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703

55.    The United States restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

56.    The CRA, 52 U.S.C. §§ 20701-20706, provides the United States authority to obtain the records and information requested in its June 25 Letter and its August 18 Letter.

57.    The Department's August 18 Letter requested an electronic copy of New Hampshire's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, their State driver's license number, and the last four digits of their social security number pursuant to the CRA stating its purpose to enforce HAVA, as authorized by 52 U.S.C. § 20703.

58.    Secretary Scanlan's August 28 Response refused to provide the records requested in violation of the CRA. *See* 52 U.S.C. §§ 20701-20706.

59.    Unless and until ordered to do so by this Court, Defendants' refusal to provide these records as requested constitutes a continuing violation of federal law.

### COUNT II:    HELP AMERICA VOTE ACT, 52 U.S.C. § 21083

60.    The United States restates and incorporates herein the allegations in the foregoing paragraphs of the Complaint.

61.    Defendants, acting through Secretary Scanlan as New Hampshire's chief elections official, have failed to take actions required to comply with HAVA Section 303. These failures include, but are not limited to, the following:

a.    Defendants' failure to provide sufficient information in response to requests made in the United States' June 25 Letter and August 18 Letter to fully evaluate New Hampshire's compliance with HAVA, pursuant to its statutory enforcement

13

App. 34

authority, 52 U.S.C. § 21111.

    b.    Defendants' failure to conduct list maintenance of New Hampshire's SVRL "in a manner that ensures that… duplicate names are eliminated from the computerized list" pursuant to HAVA Section 303(a)(2)(B), 52 U.S.C. § 21083(a)(2)(B).

    c.    Defendants' refusal to provide to the United States the current electronic copy of New Hampshire's computerized, statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their State driver's license number or the last four digits of their social security number, prevents the Attorney General  from determining New Hampshire's compliance with the list maintenance requirements of HAVA, 52 U.S.C. § 21083(a)(5)(A).

    d.    Defendants' failure to respond to whether New Hampshire has a process— and uses it—to validate driver's license numbers and the last four digits of social security numbers when an applicant submits a voter registration application, also explains why the United States needs the unredacted data to determine compliance with 52 U.S.C. § 21083(a)(5)(A)(iii).

    e.    Defendants' failure to incorporate into New Hampshire's "election system… provisions to ensure that voter registration records in the State are accurate and are updated regularly" including a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote" pursuant to HAVA Section 303(a)(4), 52 U.S.C. § 21083(a)(4), particularly in regard to removing:

      i.   duplicate names from the SVRL;

      ii.   the names of registrants convicted of felonies;

      iii.   the names of registrants who are deceased; and

App. 35

iv.    the names of people ineligible to vote due to non-citizenship.

f.      Defendants' failure to follow the provisions of HAVA Section 303(b) governing requirements for voters who register by mail. 52 U.S.C. § 21083(b).

g.      Defendants' refusal to provide to the United States a copy of its SVRL, including active and inactive voters and containing all fields, which includes the registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of the registrant's social security number, as required by HAVA Section 303(a)(5)(A), 52 U.S.C. § 21083(a)(5)(A).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that this Court:

1.      Declare that Defendants' refusal to provide registration records and New Hampshire's electronic statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, their state driver's license number, and the last four digits of their social security number, upon a demand by the Attorney General violates Title III of the CRA. 52 U.S.C. § 20703.

2.      Declare that Defendants Secretary Scanlan and New Hampshire are not in compliance with the requirements of HAVA Section 303, particularly with respect to their obligations to perform list maintenance of New Hampshire's computerized statewide voter registration list and to have provisions in New Hampshire's election system to ensure its voter registration records are accurate and updated regularly. 52 U.S.C. § 21083.

3.      Declare that any state law that prohibits Secretary Scanlan from providing the requested statewide voter registration list (SVRL) is preempted by federal law.

15

App. 36

4.      Order the Defendants to provide to the United States New Hampshire's current statewide voter registration list, including active and inactive voters and containing all fields, including the registrant's full name, date of birth, residential address, and either their state driver's license number or the last four digits of their social security number, as required by the CRA, 52 U.S.C. §§ 20701-20706, and HAVA Section 303(a)(5)(A), 52 U.S.C. § 21083(a)(5)(A).

5.      Any other relief this Court deems just and proper.

DATED: September 25, 2025          Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

MICHAEL E. GATES (CA Bar No. 258446)
Deputy Assistant Attorney General
Civil Rights Division

*/s/ James Thomas Tucker*
MAUREEN S. RIORDAN (NY Bar No. 205880)
TIMOTHY F. MELLETT (DC Bar No. 430968)
JAMES THOMAS TUCKER (DC Bar No. 90010157)
BRITTANY E. BENNETT (GA Bar No. 717377)
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Maureen.Riordan2@usdoj.gov
Timothy.F.Mellett@usdoj.gov
James.T.Tucker@usdoj.gov
Brittany.Bennett@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

App. 37

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2025, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

*/s/ James Thomas Tucker*
James Thomas Tucker

17

App. 38

# EXHIBIT 1

App. 39



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

June 25, 2025

The Honorable David Scanlan
Secretary of State
State House, Room 204
107 North Main Street
Concord, NH 03301
david.scanlan@sos.nh.gov
elections@sos.nh.gov

Dear Secretary of State Scanlan:

The Help America Vote Act ("HAVA") establishes minimum standards for states to follow in several key aspects of administration of federal elections, including voting systems, provisional ballots, voter information posters on election days, first-time voters who register to vote by mail, and statewide voter registration databases. HAVA is codified at 52 U.S.C. § 20901 to 21145. In particular, HAVA imposes certain list maintenance obligations on states as part of the uniform statewide database requirements of Section 303(a)(2) of HAVA, 52 U.S.C. § 21083(a)(2), including coordinating the computerized statewide voter registration list ("statewide voter registration list") with state agency records on felony status and death.

Please provide the following information regarding the State's HAVA compliance:

(1)    Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.

(2)    Describe the process by which New Hampshire assigns a unique identifier to each legally registered voter in New Hampshire, as required by HAVA Section 303(a)(1)(A).

(3)    Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.

(4)    Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

App. 40

(5)  Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).

(6)  Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).

(7)  Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).

(8)  Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).

(9)  Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.

(10)  HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

(11)  Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

(12)  Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

(13)  Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

(14)  Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.

(15)  Please send us New Hampshire's current statewide voter registration list. Please include both active and inactive voters.

Please provide this information within 30 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

App. 41

If you have any questions, please email voting.section@usdoj.gov. We very much appreciate your cooperation in our nationwide efforts to monitor HAVA compliance.

Sincerely,

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

cc:    Patricia Piecuch, Elections Director
State House, Room 204
107 North Main Street
Concord, NH 03301
patricia.piecuch@sos.nh.gov

3

App. 42

Case 1:25-cv-00371-AJ    Document 31-3    Filed 01/29/26    Page 1 of 9

# EXHIBIT

# 2

App. 43



**NEW HAMPSHIRE SECRETARY OF STATE**
**David M. Scanlan**

July 25, 2025

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division

Via email: Voting.Section@usdoj.gov

Dear Chief Riordan and Deputy Assistant Attorney General Gates,

This letter is arranged in two parts. It begins with several prefatory notes. After that, the letter turns to the Secretary's answers to your questions. Please let our office know if you need any follow-up.

## I.  Prefatory Remarks

New Hampshire is somewhat unique when it comes to applicable federal election laws. Although your letter requests information related to the Help America Vote Act (HAVA), 52 U.S.C. § 20901 *et seq*, some of the questions overlap with requirements under the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq*. New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

Some of the questions ask for information that pose cybersecurity risk if disclosed. As you know, the Department of Homeland Security regards election systems and assets as "critical infrastructure," defined by Congress as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). Regardless of the fact that election systems and assets are critical infrastructure, divulging any cybersecurity information could harm the integrity of the systems. Therefore, our responses to questions regarding database infrastructure may be limited depending on the nature of the question.

As a final note, New Hampshire law requires the Secretary of State to prepare and distribute an election procedure manual prior to every state general election. RSA

App. 44

652:22. The most recent version was issued in 2024 and can be found on the Secretary of State's website.

## II. Secretary of State Responses

**1. Describe how the State processes new applications to register to vote for elections for federal office, as required by HAVA Section 303.**

In New Hampshire, voter registration is processed at the municipal level through locally elected election officials called "supervisors of the checklist" or, in some cities, appointed "registrars." *See generally* RSA Chapter 654. A voter can only become registered by their approval during public sessions held at regular intervals and on election day. *Id.*

A person can apply to the supervisors several ways. They can submit applications in person either at the town clerk's office, directly to the supervisors at their public session, or to the supervisors on election day. RSA 654:8–11. Qualified uniformed and overseas voters (UOCAVA) can register via the federal postcard application. A qualified voter can also register absentee if they are absent or have a physical disability. *See* RSA 654:3; 654:16; 654:20. Once a voter has submitted their application and proof of qualification, the supervisors must determine if they are qualified. RSA 654:12. In New Hampshire, voters must prove that they are qualified by submitting supporting documentation for age, identity, citizenship, and domicile. *See id.* A list of acceptable documentation can be found here: www.sos.nh.gov/elections/register-vote.

If the supervisors vote to approve a voter's registration, they add the voter's information to the Statewide Voter Registration System (SVRS). RSA 654:13.

**2. Describe the process by which New Hampshire assigns a unique identifier to each legally registered voter in New Hampshire, as required by HAVA Section 303(a)(1)(A).**

Every voter has a unique nine-digit identification number. These numbers are assigned automatically through the SVRS as voters are added.

**3. Describe how the statewide voter registration list is coordinated with the databases of other state agencies, as required by HAVA Section 303(a)(1)(A). Provide the name of each state database used for coordination, and describe the procedures used for the coordination as well as how often the databases are coordinated with the statewide voter registration list.**

RSA 654:45, IV(b) provides that "Voter database record data shall be verified by matching the records with those of the department of safety and the federal social security administration as are required by law, and with the records of the state agency or division charged with maintaining vital records." The statute goes on to say that the database "may be linked to the state agency or division charged with maintaining vital

App. 45

records and the department of safety, provided that no linked agency or division may save or retain voter information or use it for purposes other than verifying the accuracy of the information contained in the voter database." *Id.* The coordination of this data ensures the voter registration records are corrected when a voter dies, becomes an incarcerated felon, or willfully violates election law.

In sum, the SVRS data maintained by the Secretary of State is coordinated with databases managed by the Secretary of State – Division of Vital Records and Department of Safety – Division of Motor Vehicles. Information from these databases is received daily.

4. **Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.**

HAVA Section 303(a)(2) requires list maintenance be conducted pursuant to the NVRA. *See* 52 U.S.C. § 21083(a)(2)(A)(i)—(iii). As stated in the prefatory remarks, New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

New Hampshire law does, however, instruct the Secretary of State on how to ensure voters are unique. RSA 654:45(b) requires the Secretary to "provide for a verification process that voters sharing a place and date of birth, along with a substantially similar name to include nicknames or likely maiden/married name changes, are unique voters." If a voter "appear[s] to be a duplicate, that information shall be forwarded to the supervisors of the checklist of the cities or towns involved for review and confirmation. The supervisor of the checklist shall notify the secretary of state of the result of such review, and should the records show that a single individual may have voted more than once in any election such information shall be forwarded to the attorney general for further investigation or prosecution." *Id.*

Moreover, RSA 654:45, VIII(a) permits—though does not require—the Secretary of State to "enter into an agreement to share voter information or data from the statewide centralized voter registration database for the purpose of comparing duplicate voter information with other states or groups of states." If duplicate matches are found, the statute requires the Secretary to investigate. RSA 654:45, VIII(b). "If the investigation results in the inability to confirm the eligibility of a person or persons who voted, or there is reason to believe a person or persons voted who were not eligible, the secretary of state shall forward the results to the attorney general for further investigation or prosecution." *Id.* If this occurs, then upon completion of the investigation "the attorney general and the secretary of state shall forward a report summarizing the results of the investigation to the speaker of the house of representatives, the president of the senate, and the chairpersons of the appropriate house and senate standing committees with jurisdiction over election law." RSA 654:45, VIII(c). The Secretary of State is not currently comparing SVRS voter information with other states.

App. 46

5. **Describe the process by which voters who have been convicted of a felony are identified and, if applicable under state law, removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(I).**

For purposes of removing names of ineligible voters from the official list, HAVA Section 303(a)(2)(A)(ii)(I) requires coordination with State agency records on felony status be conducted pursuant to the NVRA. *See* 52 U.S.C. § 21083(a)(2)(A)(ii)(I). As stated in the prefatory remarks, New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

In New Hampshire, persons convicted of a felony cannot vote while incarcerated. *See* RSA 607-A:2, I(a). The Secretary of State's Office receives records from the New Hampshire Department of Corrections, the New Hampshire Attorney General's Office, Attorney General Offices from other states, and the United States Attorney's Office/Department of Justice. This ensures that the database is accurate, supervisors are notified, and the incarcerated felons are removed from the checklist.

6. **Describe the process by which deceased registrants are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(A)(ii)(II).**

For purposes of removing names of ineligible voters from the official list, HAVA Section 303(a)(2)(A)(ii)(II) requires coordination with State agency records on death be conducted pursuant to the NVRA. *See* 52 U.S.C. § 21083(a)(2)(A)(ii)(II). As stated in the prefatory remarks, New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

RSA 5-C:4 requires the Secretary to "compare information contained on each death record received by the division of vital records with information contained in the statewide centralized voter registration database and submit to the state registrar a list of every city or town that has a registered voter matching the decedent's information. Where there is not a full match of name, date of birth, and residence, the secretary of state shall provide information of partial matches for further review and confirmation by the town or city pursuant to paragraph V." Further, that statute requires the state registrar to then "transmit notice of the death to the clerk of the city or town of residence of the decedent and to each city or town listed by the secretary of state for the decedent pursuant to paragraph IV."

For out-of-state deaths, where the decedent's address is listed as New Hampshire, this information is uploaded in our vital records system which in turn is uploaded in SVRS.

When the municipal clerk receives an official notice of death or a notice of death record under RSA 5-C:4, the clerk "shall notify the supervisors of the checklist of said deaths by submitting a notice of same to the supervisors at their next regular meeting." RSA 654:37. The supervisors, upon such notice, "shall examine the checklist; and, if the name of said deceased person appears thereon, it shall be removed." *Id.*

App. 47

When the supervisors "learn of the death of a voter but do not receive notice as outlined in RSA 654:37, they shall mail to the last known address of the voter a 30-day letter specifically for updating the checklist upon the death of a voter. Such letter shall include the contact information for the supervisors of the checklist to which a response may be sent. If there is no response within 30 days, the supervisors will remove that voter's name from the checklist. If there is a response confirming the death within 30 days, the supervisors may remove the voter's name upon receipt of the confirmation of death." RSA 654:37-a.

7. **Describe all technological security measures taken by the State to prevent unauthorized access to the statewide voter registration list, as required by HAVA Section 303(a)(3).**

RSA 654:45, VI provides that the SVRS "shall be private and confidential and shall not be subject to RSA 91-A and RSA 654:31, nor shall it or any of the information contained therein be disclosed pursuant to a subpoena or civil litigation discovery request. The secretary of state is authorized to provide voter database record data to the administrative office of the courts to assist in the preparation of master jury lists pursuant to RSA 500-A and to the clerk of the District Court of the United States for the District of New Hampshire to assist in the preparation of federal court jury lists. The voter checklist for a town or city shall be available pursuant to RSA 654:31. Any person who discloses information from the voter database in any manner not authorized by this section shall be guilty of a misdemeanor."

The Secretary of State has implemented robust security measures to prevent unauthorized access to the SVRS. Some of the measures include penetration testing, strict password requirements, dark web monitoring, and training of local election officials on cybersecurity. Any further details on the technological security measures of the SVRS pose a cybersecurity risk.

8. **Describe the process by which voters who have moved outside the State and subsequently register to vote in another state are identified and removed from the statewide voter registration list, under HAVA Section 303(a)(4)(A).**

HAVA Section 303(a)(4)(A) requires States to implement file maintenance systems consistent with the NVRA. *See* 52 U.S.C. § 21083(a)(4)(A). As stated in the prefatory remarks, New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

New Hampshire law provides several mechanisms for identifying voters who have moved outside the State. RSA 654:13, III requires the Secretary of State to "provide information on individuals who report being previously registered to vote out of state to the chief elections officer of that state." Further, it provides that the Secretary "shall pursue establishing routine secure electronic transfers of this information between states." *Id.* This electronic transfer is then linked to the SVRS, allowing supervisors to be notified when a registered voter in their municipality has registered in another state. *Id.*

App. 48

If a supervisor receives such notification, RSA 654:36 provides that "they shall strike that name from the checklist at the next session for the correction of the checklist." In the same vein, RSA 654:36-b instructs that if "the supervisors of the checklist receive a report from the United States Postal Service or the department of safety directly or as communicated by the secretary of state through the centralized voter registration database that a voter has permanently changed his or her address to another town, city, or state, they shall strike that name from the checklist at the next session for the correction of the checklist. The supervisors of the checklist shall retain the report in accordance with RSA 33-A:3-a. As an alternative, the supervisors of the checklist may first send a 30-day notice letter and then shall remove the name from the checklist if the voter does not respond to that notice as set forth in RSA 654:44.

The Secretary of State receives National Change of Address notifications from the Postal Service and uploads them into the SVRS to notify the supervisors.

9. **Describe the process by which registrants who are ineligible to vote due to non-citizenship are identified and removed from the statewide voter registration list.**

RSA 654:12, I requires applicants to present proof of citizenship (among other things) to the supervisors or clerks. The statute lays out several types of acceptable documents to prove citizenship: "the applicant's birth certificate, passport, naturalization papers if the applicant is a naturalized citizen, or any other reasonable documentation which indicates the applicant is a United States citizen." RSA 654:12, I(a).

It is the job of the supervisors to ensure that the checklist contains the names of only qualified voters. *See* RSA 654:28 ("The supervisors of the checklist shall hear all applications for a correction of the checklist and the evidence submitted thereon and shall correct it according to their best knowledge so that it contains only the names of those persons qualified to vote at said election.").

The supervisors engage in the following procedure to remove names from the list based on lack of qualifications. Any person (including a supervisor or clerk) "may submit a request for correction of the checklist to the supervisors of the checklist or to the town or city clerk based upon evidence that a person listed on the checklist is not qualified as a voter in the town or ward." RSA 654:36-a, I. At their next session, the supervisors "examine the requests and determine whether or not it is more likely than not that the person's qualifications are in doubt." *Id*. "If the supervisors of the checklist determine that it is more likely than not that the person's qualifications are in doubt, they shall send a notice to the person and afford the person at least 30 days to provide proof of his or her qualifications. If the person fails to respond to the 30-day notice or responds but fails to provide proof that establishes that it is more likely than not that the person is qualified to vote in the town or ward, the person's name shall be removed from the checklist." RSA 654:36-a, II.

App. 49

10. HAVA requires states to verify voter registration information by mandating that applicants provide certain information under HAVA Section 303(a)(5). Please provide a copy of the voter registration application(s) utilized for in-person voter registration, a link to the State's online voter registration application, and, if applicable, the voter registration application used for same-day registration.

New Hampshire does not have an online voter registration form. Please see the attached in-person voter registration form. There is not a different form used for same-day registration. New Hampshire also accepts the federal postcard application form from qualified UOCAVA voters.

11. Please describe the verification process under HAVA Section 303(a)(5) that election officials perform to verify the required information supplied by the registrant. Please describe what happens to the registration application if the information cannot be verified.

RSA 654:12 governs qualifications of applicants to register to vote. It requires applicants to present proof of citizenship, age, domicile, and identity to the supervisors or municipal clerks. A list of acceptable documentation can be found here: www.sos.nh.gov/elections/register-vote.

As for what happens if an applicant's information cannot be verified, RSA 654:12, V provides that "Any dispute as to whether a person has met the requirements to register to vote or to vote shall be decided by the election official of the town or ward in charge of voter registration or in charge of the polling place if the dispute arises at the polling place." RSA 654:12, V.

RSA 654:13, II instructs supervisors that if they "decide not to add the name of the applicant to the checklist, they shall send notification in writing to the applicant within 7 days stating the reason for the denial. They shall write the word 'REJECTED' and the date of rejection across the registration form." To help ensure a rejected registrant's rights are not violated, the Secretary of State trains local election officials to contact the New Hampshire Attorney General's Office if they reject an application on election day.

12. Provide a copy of the current agreement, under HAVA Section 303(a)(5)(B)(i), between the chief State election official and the State's motor vehicle authority.

Please see the attached memorandum of understanding between the New Hampshire Secretary of State and the New Hampshire Department of Safety – Division of Motor Vehicles.

13. Provide a copy of the current agreement between the official responsible for the State's motor vehicle authority and the Commissioner of Social Security Administration under HAVA Section 303(a)(5)(B)(ii).

App. 50

The Secretary of State does not possess the current agreement between the New Hampshire Department of Safety – Division of Motor Vehicles and Commissioner of Social Security Administration. The Division of Motor Vehicles can be contacted at:

New Hampshire Department of Safety
Division of Motor Vehicles
23 Hazen Drive
Concord, NH 03305
(603) 227-4000

14. **Under HAVA Section 303(b), describe the State's requirements for an individual to vote if the individual registered to vote by mail and has not previously voted in an election for federal office in the State.**

HAVA Section 303(b) requires States to comply with the NVRA in establishing requirements for voters who register by mail. *See generally* 52 U.S.C. § 21083(b). As stated in the prefatory remarks, New Hampshire is exempt from the NVRA. *See* 52 U.S.C § 20503(b)(2).

As noted in Question 1, voters can register absentee if they are temporarily absent or have a physical disability. *See* N.H. CONST. pt. I, art. 11; RSA 654:3; 654:16.

15. **Please send us New Hampshire's current statewide voter registration list. Please include both active and inactive voters.**

New Hampshire law authorizes the Secretary of State to release the statewide voter registration list in limited circumstances not applicable here. RSA 654:31, IV permits the Secretary to, upon request, provide a political party, political committee, or candidate for county, state, or federal office, "a list of the name, domicile address, mailing address, town or city, voter history, and party affiliation, if any, of every registered voter in the state."

That said, each municipality's public checklist can be obtained from their respective supervisors or clerks. *See* RSA 654:31, II ("The supervisors of the checklist or city or town clerk shall furnish a physical copy or an electronic copy of the most recent public checklist of their town or city to any person requesting such copy."). Contact information for each of the city and town clerks can be found at app.sos.nh.gov/clerkinformation.

Sincerely,

David M. Scanlan
New Hampshire Secretary of State

App. 51

# EXHIBIT

# 3

App. 52



**U.S. Department of Justice**

Civil Rights Division

---

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

August 18, 2025

Via Mail and Email

The Honorable David Scanlan
Secretary of State
State House, Room 204
107 North Main Street
Concord, NH 03301
david.scanlan@sos.nh.gov;
elections@sos.nh.gov

Re:    **New Hampshire's Voter Registration List**

Dear Secretary of State Scanlan:

We are writing in response to your letter of July 25, 2025, concerning the United States Department of Justice's request for a copy of New Hampshire's statewide voter registration list ("VRL"), including both active and inactive voters.

Despite New Hampshire's exemption from the National Voter Registration Act ("NVRA"), New Hampshire is subject to the Help America Vote Act ("HAVA"). HAVA provides independent authority for the Justice Department to seek the State's VRL through Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide VRL requirements. *See* 52 U.S.C. § 21111.

In addition to the Attorney General's authority to enforce HAVA, the Civil Rights Act of 1960, codified at 52 U.S.C. § 20701, *et seq.*, requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for a period of 22 months after any federal general, special, or primary election.

52 U.S.C. § 20703 provides that *all* records or papers required to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

To that end, this letter serves notice that the Attorney General is making a demand pursuant to 52 U.S.C. § 20703 for a complete copy of the state of New Hampshire's statewide VRL. The purpose of this request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B). The VRL is to include all fields, including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number, as required by HAVA at 52 U.S.C. § 21083(a)(5)(A)(i).  To the extent

App. 53

that you claim state law prohibits you from providing this information, that is incorrect. If the federal voting laws and state law "do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to 'alter' the state's regulation, and that regulation is superseded." *Gonzalez v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013).

HAVA specifies that the last 4 digits of a social security number shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974. (52 U.S.C. § 522(a) note; see 52 U.S.C. § 21083(c)). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority. In charging the Attorney General with enforcement of the VRL maintenance requirements in the Act, Congress plainly intended that the Justice Department be able to conduct an independent review of each state's list.

To allay any privacy concerns, Section 304 of the CRA also provides, "Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury."

Accordingly, please provide the requested electronic Voter Registration List[1] to the Justice Department within seven days or by August 25, 2025. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:   Patricia Piecuch
      Elections Director
      State House, Room 204
      107 North Main Street
      Concord, NH 03301
      patricia.piecuch@sos.nh.gov

---

[1] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, their state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

App. 54

# EXHIBIT

# 4

App. 55



**NEW HAMPSHIRE SECRETARY OF STATE**
**David M. Scanlan**

August 28, 2025

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

Via email: Voting.Section@usdoj.gov
CC: Michael.Gates2@usdoj.gov

Dear Assistant Attorney General Dhillon,

I am in receipt of your August 18, 2025, letter requesting a copy of New Hampshire's statewide voter registration list. As I stated in my prior response, New Hampshire law prohibits the sharing of this information with the United States Department of Justice in the manner you request.

Having reviewed the citations in your August 18, 2025 letter with legal counsel, there does not appear to be any provision under federal law that compels the production of voter registration data superseding the provisions of New Hampshire statutes that I must follow.

As stated in my prior response, you can obtain each municipality's most recent public checklist from their respective supervisors or clerks. *See* RSA 654:31, II. The statewide, public checklist may also be purchased by a political committee registered in the State of New Hampshire.

Alternatively, my office can provide you with copies of the marked paper checklists from the 2024 general and/or primary elections. These records are also public.

Sincerely,

David M. Scanlan
New Hampshire Secretary of State

107 North Main St., Concord, NH 03301
(603) 271-3242 | elections@sos.nh.gov

App. 56

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

United States of America,       \*
        \*
     Plaintiff,       \*
   v.       \*     Civil No. 1:25-cv-00371-AJ
        \*
David M. Scanlan, in his official capacity  \*
as Secretary of State for the  \*
State of New Hampshire, and  \*
the State of New Hampshire.  \*
        \*
     Defendants.     \*
        \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>DEFENDANTS DAVID SCANLAN AND THE STATE OF NEW HAMPSHIRE'S MOTION TO DISMISS</u>

Defendants David M. Scanlan, in his official capacity as Secretary of State for the State of New Hampshire, and the State of New Hampshire, by and through their counsel, the New Hampshire Office of the Attorney General, hereby move to dismiss all claims against them pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, stating as follows:

1.     In late June 2025, the Federal Government, through the U.S. Department of Justice, sent New Hampshire Secretary of State, David Scanlan, a two-page letter which noted that federal law, specifically the Help America Vote Act (HAVA), contained minimum standards for states with relation to "several key aspects of administration of federal elections[.]" The letter asked Secretary Scanlan to provide "information regarding the State's HAVA compliance" to the U.S. Department of Justice within thirty days in the form of answers to fifteen separate questions/requests for information.

2.     Secretary Scanlan largely complied with the demands put forth in the Federal Government's letter, answering the majority of the questions in full. However, Secretary

App. 57

Scanlan also explained to the Federal Government that he would be unable to give full answers to some questions because he had legal obligations to protect information that would pose a cybersecurity risk if disclosed.

3.      The Federal Government responded back a few weeks later with a new letter discussing only their request for a copy of the statewide voter registration list; no mention whatsoever was made to any perceived deficiencies in the answers provided by Secretary Scanlan to the other fourteen questions and requests for information/documentation. The Federal Government's second letter claimed that the U.S. Department of Justice had "independent authority … to seek the State's [voter registration list]" under 52 U.S.C. § 21111. The Federal Government also claimed to have authority to a copy of the statewide voter registration list under the Civil Rights Act of 1960. The letter claimed that the Federal Government's "purpose" for making its request for the statewide voter registration list was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA[.]" Notably absent was any assertion that the Federal Government had reason to believe New Hampshire was out of compliance with federal law. Finally, the letter clarified that the demand was for a full, unredacted version of the SVRL, "including all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number[,]" to be provided within seven days and made clear that the Federal Government, while not intending to make the information public, would consider itself free to share the provided unredacted list with other "governmental agencies[.]"

4.      Secretary Scanlan responded by letter ten days later wherein he explained that production of an unredacted copy of New Hampshire's SVRL was prohibited by state law and that, having reviewed the purported authorities offered by the Federal Government, found no

- 2 -

App. 58

"provision under federal law that compels the production of voter registration data" that would supersede the prohibition put in place by state law.

5.      The Federal Government subsequently filed its complaint on September 25, 2025, initiating this legal proceeding. The Federal Government's complaint contains two counts. Count I claims that the State of New Hampshire violated the Civil Rights Act, 52 U.S.C. §§ 20701-20706, when it refused to provide the Federal Government with an electronic copy of its computerized statewide voter registration list (SVRL).  Count II claims that the State of New Hampshire violated The Help America Vote Act (HAVA), 52 U.S.C. § 21083.

6.      The Federal Government's complaint is not sufficient to survive this motion to dismiss as it fails to state a claim of relief that is plausible on its face.  The complaint is neither supported by any viable legal theory nor by well plead facts.  Specifically, the Civil Rights Act does not compel the State of New Hampshire to comply with the demands being made by the Federal Government for disclosure of the SVRL, nor does HAVA compel such compliance.  To the contrary, compliance with the Federal Government's demand would directly violate both federal and state law.  As to the Federal Government's allegations that New Hampshire is out of compliance with its obligations under HAVA, the Complaint contains no well plead facts supporting any allegation that New Hampshire is substantively out of compliance with its legal obligations under federal law.  New Hampshire has provided information on its procedures and processes whenever it has been asked, and the complaint contains no well plead facts to support a legal conclusion that New Hampshire is out of compliance with its list maintenance obligations under HAVA.

App. 59

7.       The Federal Government's demand that New Hampshire provide it a full, unredacted version of the SVRL is not only without grounding in any legal authority, it is also made in violation of at least two federal laws: the Privacy Act and the E-Government Act.

8.       Pursuant to Local Rule 7.1(a)(2), a supporting memorandum of law is filed herewith.

9.       Pursuant to Local Rule 7.1(c), concurrence has not been sought given the dispositive nature of this Motion.

WHEREFORE, Defendants respectfully request that this Honorable Court:

A.  Dismiss the Complaint against David Scanlan, in his official capacity as the Secretary of State for the State of New Hampshire and the State of New Hampshire; and

B.  Grant such other or further relief as is just and necessary

> Respectfully submitted,
>
> David M. Scanlan, in his official capacity as Secretary of State for the State of New Hampshire, and the State of New Hampshire
>
> By their attorney,
>
> THE OFFICE OF THE ATTORNEY GENERAL

Dated: February 6, 2026

> /s/ Mary A. Triick
> Mary A. Triick, Bar #277277
> Senior Assistant Attorney General
> New Hampshire Department of Justice
> 1 Granite Place South
> Concord, NH 03301
> Mary.A.Triick@doj.nh.gov
> 603-271-0447

- 4 -

App. 60

/s/ James H. Holl
James H. Holl, Bar #279633
Assistant Attorney General
Civil Bureau
NH Department of Justice
1 Granite Place South
Concord, NH 03301
James.H.Holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by ECF on February 6, 2026 to counsel of record.

/s/ James H. Holl
James H. Holl

- 5 -

App. 61

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

United States of America,          \*
                                        \*
          Plaintiff,       \*
      v.                    \*      Civil No. 1:25-cv-00371-AJ
                                          \*
David M. Scanlan, in his official capacity  \*
as Secretary of State for the        \*
State of New Hampshire,          \*
and the State of New Hampshire.     \*
                                        \*
          Defendants.     \*
                                        \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

The Federal Government brought this action to try to compel or coerce the New Hampshire Secretary of State and the State of New Hampshire to provide it with a complete, unredacted copy of New Hampshire's statewide voter registration list (SVRL).[1] The SVRL is an interactive computer database created and maintained by the State to allow it to more efficiently and effectively administer elections. The SVRL contains massive quantities of confidential information—including names, social security numbers, dates of birth, residential addresses, party registrations, and voting histories—on all active and inactive registered voters in New Hampshire.

This case should be dismissed because the Federal Government has no statutory authority to compel the State of New Hampshire to comply with its unprecedented demand. *See generally United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at \*5 (C.D. Cal. Jan.

---

[1] The Federal Government filed this civil action as part of a larger, coordinated effort to acquire from each state the personal identifying information of virtually all their citizens, paired with historic voter participation and in some cases party affiliation information. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at \*13-14 (C.D. Cal. Jan. 15, 2026) (noting demands have been made to at least 43 states and D.C. and that US DOJ has filed suit against at least 23 states and D.C.).

App. 62

15, 2026) (finding in a nearly identical lawsuit that the request being made by the Federal Government was both "unprecedented and illegal."). The demand is neither authorized by the Help America Vote Act nor by the Civil Rights Act of 1960. In fact, quite the opposite is true. Providing the SVRL to the Executive Branch of the Federal Government would violate both state and federal law. As such, this Court should grant New Hampshire's motion to dismiss upon a finding that the Federal Government's complaint fails to state a legal claim for relief.

**Statement of Facts**[2]

In late June 2025, the Federal Government, through the U.S. Department of Justice, sent New Hampshire Secretary of State, David Scanlan, a two-page letter. Exhibit 1: June 25 Letter. The letter noted that federal law, specifically the Help America Vote Act (HAVA), contained minimum standards for states with relation to "several key aspects of administration of federal elections[.]" *Id.* The letter asked Secretary Scanlan to provide "information regarding the State's HAVA compliance" to the U.S. Department of Justice within thirty days in the form of answers to fifteen separate questions/requests for information. *Id.* For example, the letter requested that Secretary Scanlan:

> Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

---

[2] Despite this case being at the Motion to Dismiss stage, the court may consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment. *See Torréns v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994); 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[2] (3d ed. 1999). Certain written instruments attached to pleadings may be considered part of the pleading. *See* Fed. R. Civ. P. 10(c). Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. *See Van Buskirk*, 284 F.3d at 980; *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). The defendant may offer such a document, and the district court may treat such a document as part of the complaint and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).

App. 63

*Id.* Additionally, the letter demanded Secretary Scanlan "send" the Federal Government a "current statewide voter registration list" including both active and inactive voters. *Id.*

Secretary Scanlan largely complied with the demands put forth in the Federal Government's letter, answering the majority of the questions in full. *See* Exhibit 2: July 25 Letter. For example, as to the duplicate voter registration question, Secretary Scanlan provided a summary of the process adopted by New Hampshire and contained within its statutes for identifying and removing duplicate voter registrations. *Id.* However, Secretary Scanlan also explained to the Federal Government that he would be unable to give full answers to some questions because he had legal obligations to protect information that would pose a cybersecurity risk if disclosed. *Id.* As to the Federal Government's demand that Secretary Scanlan send a current statewide voter registration list, Secretary Scanlan explained that he was only permitted by law to provide the statewide list in limited circumstances not applicable here. *Id.*; *see also* N.H. RSA 654:31, IV (authorizing the Secretary of State to provide a statewide list with limited voter information to candidates, political parties, and political committees). Secretary Scanlan noted, however, that the Federal Government could obtain a copy of the public checklist from each municipality and provided a link to a list of all municipalities. *Id.* N.H. RSA 654:31, II (requiring each municipality to provide a copy of the most recent public checklist to any person who requests it). Finally, Secretary Scanlan's letter made clear that the Federal Government should let him know if it needed any follow-up information in addition to what was being provided. *Id.*

The Federal Government responded back a few weeks later with a new letter discussing only their request for a copy of the statewide voter registration list. *See* Exhibit 3: August 18 Letter. No mention whatsoever was made to any perceived deficiencies in the answers provided

- 3 -

App. 64

by Secretary Scanlan to the other fourteen questions and requests for information/documentation. *Id.* Instead, the Federal Government's second letter made a new claim that the U.S. Department of Justice had "independent authority … to seek the State's [voter registration list]" under 52 U.S.C. § 21111. That statute provides that the U.S. Attorney General "may bring a civil action against any State" to seek declaratory or injunctive relief "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. *Id.* The Federal Government also claimed to have authority to a copy of the statewide voter registration list under the Civil Rights Act of 1960. Exhibit 3: August 18 Letter. The letter claimed that the Federal Government's "purpose" for making its request for the statewide voter registration list was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA[.]" *Id.* Notably absent was any assertion that the Federal Government had reason to believe New Hampshire was out of compliance with federal law.

Finally, the letter expanded the prior request, now demanding that it be provided not just a "current statewide voter registration list," Exhibit 1: June 25 Letter, but instead a full, unredacted version of the SVRL, including "all fields" and "all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number," Exhibit 3: August 18 Letter. The Federal Government demanded that this information to be provided within seven days and made clear that the Federal Government, while not intending to make the information public, would consider itself free to share the provided unredacted list with other "governmental agencies[.]" *Id.*

Secretary Scanlan responded by letter ten days later. Exhibit 4: August 28 Letter. He once again explained that production of an unredacted copy of New Hampshire's SVRL was

- 4 -

App. 65

prohibited by state law and that, having reviewed the purported authorities offered by the Federal Government, found no "provision under federal law that compels the production of voter registration data" that would supersede the prohibition put in place by state law. *Id.*  Secretary Scanlan once again reminded the Federal Government that it could get copies of the municipal level voter lists and even offered to provide copies of all the marked checklists from the 2024 general and primary elections should the Federal Government wish to see them. *Id.*

Secretary Scanlan received no further communication from the Federal Government on these topics and, about a month later, the Federal Government filed its complaint initiating this legal proceeding. The Federal Government's complaint contains two counts.  Count I claims that the State of New Hampshire violated the Civil Rights Act, 52 U.S.C. §§ 20701-20706, when it refused to provide the Federal Government with an electronic copy of its computerized statewide voter registration list (SVRL). Compl. ¶¶55-59.  Count II claims that the State of New Hampshire violated The Help America Vote Act (HAVA), 52 U.S.C. § 21083, by: (1) failing to provide sufficient information to the Federal Government upon request; (2) failing to conduct list maintenance as required; (3) refusing to provide the Federal Government a complete computerized copy of its SVRL; and (4) failing to provide the Federal Government information about the process it uses to validate driver's license numbers and social security numbers submitted with voter registration applications. Compl. ¶¶60-61.

Based upon these two claims of statutory violations, the Federal Government's prayer for relief is in four parts. Compl. (Prayer for Relief) ¶¶1-4.  The Federal Government seeks to have this Court issue three declarations: that the State of New Hampshire is out of compliance with Title III of the Civil Rights Act; that the State of New Hampshire is out of compliance with HAVA section 303; and that the State of New Hampshire law prohibiting disclosure of the

- 5 -

App. 66

SVRL except in limited circumstances is preempted by federal law.  Finally, the Federal Government seeks an order compelling the State of New Hampshire to provide the Federal Government a current, unredacted copy of its SVRL.

**Argument**

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient to "raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Courts should grant Rule 12(b)(6) motions when there is no cognizable legal theory to support the claim. *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). At the motion to dismiss stage, courts must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Tomkins v. United Health Care of New England, Inc.*, 203 F.3d 90, 93 (1st Cir. 2000).

The Federal Government's complaint is not sufficient to survive this motion to dismiss as it fails to state a claim of relief that is plausible on its face.  The complaint is neither supported by any viable legal theory nor by well plead facts.  Specifically, the Civil Rights Act does not compel the State of New Hampshire to comply with the Federal Government's demands for a complete, unredacted copy of the SVRL.  Neither does HAVA compel such compliance and, to the contrary, compliance with the Federal Government's demand would directly violate both federal and state law.  As to the Federal Government's allegations that New Hampshire is out of compliance with its obligations under HAVA, the Complaint contains no well plead facts supporting any allegation that New Hampshire is substantively out of compliance with its legal obligations under federal law.  New Hampshire has provided information on its procedures and processes whenever it has been asked, and the complaint contains no well plead facts to support

- 6 -

App. 67

a legal conclusion that New Hampshire is out of compliance with its list maintenance obligations under HAVA.

For all these reasons, the State of New Hampshire is entitled to have this motion to dismiss granted and the case against it dismissed for failure to state a claim upon which relief may be granted.

### I. The State of New Hampshire is not compelled by the Civil Rights Act to provide the Federal Government with an unredacted copy of its SVRL.

52 U.S.C. § 20701 requires state election officials to "retain and preserve, for a period of twenty-two months … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20703 then requires that the records so retained and preserved "shall, upon demand in writing by the Attorney General or his representative …, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." When making such a demand the Federal Government must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The Federal Government's demand for the SVRL was not a valid demand pursuant to 52 U.S.C. § 20703 for two reasons. First, an electronic copy of New Hampshire's SVRL is not a record which must be retained and preserved under 52 U.S.C. § 20701 (and therefore not a record that must be produced under 52 U.S.C. § 20703). Second, the Federal Government's demand did not contain a sufficiently stated basis and purpose to be validly made under the law.

App. 68

**a. The SVRL is not a record or paper covered by 52 U.S.C. § 20701's retention and preservation requirements.**

The Civil Rights Act requires state officials to "retain and preserve … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. It is only these records and papers which must be produced upon demand by the executive branch of the federal government through the Attorney General. 52 U.S.C. § 20703. New Hampshire's SVRS is not such a record or paper.

Passed in 1960, Title III of the Civil Rights Act was intended to ensure states preserved, and the federal government could access, "public records which ought ordinarily to be open to legitimate reasonable inspection." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962). It was not intended by Congress to provide the executive branch of the federal government unrestricted access to "confidential, private papers and effects" of all voting citizens within the United States. *Id.* The SVRL, a centralized statewide database full of highly sensitive information, did not exist until more than forty years after the passage of the Civil Rights Act, when HAVA was passed in the early 2000s. It is inconsistent with precedent, and frankly illogical, to think that Congress intended the Civil Rights Act record retention and production requirement passed to ensure the federal government could inspect voter registration paperwork to prevent disenfranchisement of minorities to apply in such a way as to require wholesale production to the federal government of all states' unredacted SVRLs.

When interpreting the Civil Rights Act over the last half century, courts have not reached a consistent conclusion as to what constitutes a record or paper which must be retained and produced because it relates to applications, registrations, payment of a poll tax,

- 8 -

App. 69

or "other act requisite to voting" as the phrases are used within the Civil Rights Act. *See Liebert v. Millis*, 733 F. Supp. 3d 698, 711-12 (W.D. Wis. 2024) (collecting cases interpretating meaning of phrase "any record or paper relating to any application, registration, or other act requisite to voting" as used within another section of the Civil Rights Act). However, even courts which interpret this phrase most broadly extend it only to "voting-related paperwork." *Id.* Covered documents have, in some circumstances, been found to include things such as voter registration forms and applications for absentee ballots. *Id.* However, even the inclusion of paper ballots themselves is in question as ballots do not appear to be a record or paper "requisite to voting in an election." *Id.*; *see generally Ritter v. Migliori*, 142 S. Ct. 1824, 1826 n.2 (Alito, J., dissenting) ("It is therefore awkward to describe the act of voting as 'requisite to the act of voting.'"). Under all the case law, the SVRL is far outside the kinds of papers and records which are implicated by the retention and production requirements of the Civil Rights Act.

**b.** **The Federal Government's demand for the SVRL did not comply with the Civil Rights Act's statutory requirement that written production demands contain a statement of the basis and the purpose therefor.**

The Civil Rights Act requires that the Federal Government's demand for election records "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The plain language of the statute—in particular the use of the definite article "the" before both "basis" and "purpose"—creates a bipartite requirement. *See Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.,* 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'"). Accordingly, when seeking records under the Civil Rights Act, the Federal Government must state both the basis and the purpose, *i.e.* both the objective or goal of the request and the underlying fact or condition giving rise to the request. *See Black's Law Dictionary* (12th ed. 2024) (defining purpose as the

- 9 -

<span style="float:right">App. 70</span>

"objective, goal, or end" and the basis as the "underlying fact or condition"). *See also Kennedy v. Lynd,* 306 F.2d 222*,* 229 n.6 (5th Cir. 1962) (finding the United States Attorney General to have articulated a sufficient statement of the basis and purpose of a request for documents when he explained that the demand was "based upon information" tending to show race based discrimination in voting and voter registration was occurring and that the "purpose of this demand" was to ascertain whether a violation of federal law was occurring); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at \*24 (C.D. Cal. Jan. 15, 2026) ("The DOJ is required to offer a written statement of *both* the purpose and basis for its demands to California.").

  **i. No basis for the Federal Government's demand was offered within its letter to New Hampshire.**

As outlined in the fact section above, the Federal Government's demand pursuant to 52 U.S.C. § 20703 purported to articulate a purpose (the insufficiency of which will be discussed in the following section). Exhibit 3: August 18 Letter.  However, it made no statement whatsoever as to the basis for its request. *Id.*  The Federal Government does not contest this fact herein, describing their demand as follows:

> The August 18 Letter also included a written demand to Defendants for the production of specific election records pursuant to the CRA, as authorized by 52 U.S.C. § 20703. The letter explained that the purpose of the request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA.

*See* Compl. ¶46 (internal citations omitted).

Given this failure to offer any basis, the Federal Government's demand is, on its face, an invalid record request under 52 U.S.C. § 20703 and the State of New Hampshire had no obligation to comply.  As such, count I of the Federal Government's complaint, which claims

<div align="center">- 10 -</div>

<div align="right">App. 71</div>

that by failing to comply New Hampshire was in violation of the Civil Rights Act, must be dismissed on this basis alone.

### ii. The purpose offered for the Federal Government's demand was not factually nor legally valid.

The Federal Government's stated purpose for its demand was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." Exhibit 3: August 18 Letter.  This is neither a valid nor a credible purpose for making a request under the Civil Rights Act.

In enacting the Civil Rights Act, Congress did not intend to give the executive branch through the Attorney General in Washington roving and unbounded authority to request states' election records. *See generally United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979) ("It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'").  Instead, it was intended to give the Attorney General the tools necessary to protect American's civil rights.

When enacted in 1960, the Civil Rights Act sought to protect the "constitutional right of every American … to vote without discrimination on account of race or color." "Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960, https://tinyurl.com/3ses36xe.  To ensure this purpose could be realized, the law provided the Attorney General the "power to require the production of election records during any investigation of complaints that qualified persons have been denied the right to vote in violation of federal law," without which "assembl[ing] the necessary proof of discrimination [was] impracticable, if not impossible." Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14

- 11 -

App. 72

(Mar. 20, 1959), https://tinyurl.com/2caa3m27.[3] *See also* H.R. Doc. No. 75 (1st Sess. 1959), *reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959); H.R. Rep. No. 86-956 (Aug. 20, 1959), *reprinted in* 1960 U.S.C.C.A.N. 1925, 1944; *Lynd*, 306 F.2d at 228 (explaining that purpose of Title III is to allow for gathering of records "relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights" in order to allow Attorney General to fulfill "duties imposed upon him by the Civil Rights Act of 1957 and 1960").

When viewed in this context, the inclusion of "the basis and the purpose" requirement in 52 U.S.C. § 20703 is properly understood as a requirement that the Attorney General disclose "the basis" it has to believe there has been a violation of an American's civil rights and "the purpose" for which the records will be used. *See generally Lynd,* 306 F.2d at 229 n.6 (finding sufficient a statement of the basis and purpose which explained the demand was based upon information tending to show race based discrimination in voting and voter registration was occurring and that the purpose of this demand was to ascertain whether a violation of federal law was occurring); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (finding valid statement of basis and purpose where it was explained that the Attorney General had information "tending to show that discriminations on the basis of race and color have been made with respect to registration and voting"); *Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (noting that statistical evidence in a CRA records-production

---

[3] *See also* Proposed Civil Rights Legislation: Hearing Before the S. Comm. on the Judiciary, 86th Cong. 8 (Mar. 28, 1960) ("March 28, 1960 AG Statement") (statement of William P. Rogers, Att'y Gen. of the U.S.) at 8, https://tinyurl.com/ydx2y9wd (reiterating the Election Records Provision was "essential to the effective enforcement of the Civil Rights Act of 1957"); U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights, 1959*, at 137–38 (Sept. 9, 1959), https://tinyurl.com/24mddz2z (recommending Congress require states and localities to retain records and permit inspection to facilitate investigation of alleged voter discrimination).

App. 73

proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry").

Understanding "the basis and the purpose" requirement as delineating a boundary on the statutorily conferred authority is vital because, without it, the Executive Branch of the Federal Government, through the appointed Attorney General in Washington, would have limitless authority to demand that states turn over sensitive voter data for any reason, including a patently improper one. It would be illogical to read the statutory language requiring the Attorney General to state in writing the basis and the purpose for her request as not to also require that this basis and purpose be factually valid and legally proper.

Applying the appropriate interpretation of the statute to this case, the purpose offered by the Federal Government here is neither factually valid nor legally proper. As to legal propriety, the Federal Government's stated purpose—"to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)[,]" Exhibit 3: August 18 Letter—is improper as it is wholly unrelated to the voting-related discrimination targeted by the Civil Rights Act. The Federal Government is not seeking these documents in connection with any investigation of nor allegations about New Hampshire's compliance with federal civil rights laws. As such, the Federal Government can no more assert the record demand provisions of the Civil Rights Act to compel the State to disclose information based on this stated purpose than it could demand such records in order to, for example, create a list of active voters affiliated with one particular party in order to initiate targeted tax audits.

Furthermore, the Federal Government's stated purpose is legally insufficient because, even in circumstances where checking compliance with a federal law provides a legally valid purpose, it must be accompanied by a factually valid basis to believe some violation is occurring.

- 13 -

App. 74

*See generally Lynd,* 306 F.2d at  229 n.6 (finding sufficient a statement of the basis and purpose of a request for documents which explained the demand was based upon information tending to show race based discrimination in voting and voter registration was occurring and that the purpose of this demand was to ascertain whether a violation of federal law was occurring); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (finding valid statement of basis and purpose where it was explained that the Attorney General had information "tending to show that discriminations on the basis of race and color have been made with respect to registration and voting").  As discussed above, no such basis was provided by the Federal Government's letters.

As to the factual validity of the Federal Government's stated purpose, the Federal Government's behavior forecloses its ability to credibly claim its records request is based upon information and belief of an ongoing violation of the law and for the purpose of conducting a reasonable, targeted investigation into that alleged violation (if such a claim had even been made). *See generally United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *29-33 (C.D. Cal. Jan. 15, 2026).  The Department of Justice has made requests for full unredacted versions of SVRLs from nearly all 50 states and has commenced litigation against 23 states and the District of Columbia to date. *Id.* at *13-14.  Various federal officials have also made public statements indicating the Federal Government's purported purpose offered within this litigation is pretextual. *Id.* at *29-33.  Federal courts are "not required to accept pretextual, formalistic explanations untethered to the reality of which the government has said outside the courtroom." *Id.* at *29-30 (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019)).

App. 75

**II. HAVA does not compel states to produce their SVRL upon demand of the Federal Government.**

    **a. HAVA does not compel production by any of its express terms.**

In 2002, Congress passed the Help America Vote Act, Pub. L. 107-252. Title III, § 302, 116 Stat. 1706 (codified at 42 U.S.C. § 15301 et seq.) ("HAVA"). Among its provisions is a requirement that states implement a computerized statewide voter registration list. 52. U.S.C. § 21083(a). This SVRL must be an interactive computerized list designed, maintained, and administered at a statewide level. 52 U.S.C. § 21083(a)(1)(A). State officials are required by federal law to engage in various list-maintenance activities. 52 U.S.C. § 21083(a)(2)&(4). They are also required to "provide adequate technological security measures to prevent that unauthorized access to the" SVRL, although the federal statute does not provide any further directions or requirements as to the security measures a state is allowed to choose. 52 U.S.C. § 21083(a)(3). Finally, states are required to "shar[e] information" from the SVRL with not only appropriate election officials but also with officials responsible for the state's department of motor vehicles in order to allow such officials to check the accuracy of the information. 52 U.S.C. § 21083(a)(5)(B).

The statutory text is notably devoid of any requirement that states make their SVRLs accessible to or otherwise available for inspection by the United States Attorney General or any other federal agency or official. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *42 (C.D. Cal. Jan. 15, 2026) (noting that, unlike the NVRA or the Civil Rights Act, HAVA includes no disclosure provision). This is not surprising because, both historically and constitutionally, the running of elections is a power conferred to the states and not to the federal government. *See generally Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 568 (6th Cir. 2004) ("The States long have been primarily responsible for regulating

- 15 -

App. 76

federal, state, and local elections."); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *8 (C.D. Cal. Jan. 15, 2026) ("State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for.").

The only authority granted to the Attorney General through HAVA is:

> The Attorney General may bring a civil action against any State … for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [HAVA].

52 U.S.C. § 21111.

While this creates a mechanism for enforcement of the terms of HAVA should there be credible claims to support the filing of such a lawsuit, it does not compel States to provide unredacted electronic copies of their SVRL to the Attorney General at any time upon demand. *See generally Colón-Marrero v. Vélez*, 813 F.3d 1, 15 (1st Cir. 2016) (noting that HAVA has two mechanisms for remedying grievances: an action by the Attorney General or an administrative grievance). The refusal to turn over information prior to litigation "does not create an independent violation of HAVA[,]" not even if it is possible USDOJ might get some or all of this information were there ongoing litigation discovery if a civil lawsuit was properly plead and proceeded beyond the motion to dismiss stage. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *43-44 (C.D. Cal. Jan. 15, 2026).

- 16 -

App. 77

**b. HAVA expressly authorizes states to design and set rules for their voter files and New Hampshire's rules preclude production.**

When enacting HAVA, Congress was clear: "The specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." 52 U.S.C. § 21085. *See also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1172 (11th Cir. 2008) (explaining that HAVA grants significant discretion to the States in determining how to implement its tenets). New Hampshire followed this directive and passed N.H. RSA 654:45 which directs the Secretary of State to "plan, develop, equip, establish, site, and maintain a statewide centralized voter registration database and communications system[.]" RSA 654:45, I(a). While leaving many of the specific details to the Secretary of State, the Legislature specifically provided:

> The voter database shall be private and confidential and shall not be subject to RSA 91-A and RSA 654:31, nor shall it or any of the information contained therein be disclosed pursuant to a subpoena or civil litigation discovery request. The secretary of state is authorized to provider voter database record data to the administrative office of the courts to assist in the preparation of master jury lists … and to the clerk of the [federal district court] to assist in the preparation of federal court jury lists. The voter checklist for a town or city shall be available pursuant to RSA 654:31. Any person who discloses information from the voter database in any manner not authorized by this section shall be guilty of a misdemeanor.

RSA 654:45, V.

This state law clearly precludes the New Hampshire Secretary of State from complying with the Federal Government's demands to produce a full unredacted list of the SVRL and, in fact, would put him at risk of criminal liability were he to do so. Recognizing this fact, the Federal Government asks this Court to declare New Hampshire's state law precluding disclosure to be "preempted by federal law." Compl. (Prayer for Relief) ¶15.

- 17 -

App. 78

When a state law "interferes with or is contrary to federal law," the state law must yield to the federal law. *Free v. Bland*, 369 U.S. 663, 666 (1962).  However, as has been explained above, neither HAVA nor the Civil Rights Act compels production of the SVRL to the Federal Government on demand.  Therefore, New Hampshire's state law does not interfere with any federal law.  Because the two "can coexist" there is no preemption. *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *39 (C.D. Cal. Jan. 15, 2026).

RSA 654:45, V is not only able to coexist with HAVA but is authorized by HAVA.  As discussed above, the methods of complying with HAVA have been left to the states. 52 U.S.C. § 21085.  New Hampshire's chosen method of adoption—of complying with federal requirements such as providing adequate security of our system as required by 52 U.S.C. § 21083(a)(3)—is (among other things) to significantly limit access to the SVRL.  Providing the federal government a complete electronic copy of all information contained within our SVRL would violate a state law that is not only consistent with federal law but that was passed in order to articulate how New Hampshire would comply with federal law.

## III.   The Federal Government's demand directly violates federal law.

The Federal Government's demand that New Hampshire provide it a full, unredacted version of the SVRL is not only without grounding in any legal authority, it is also made in violation of at least two federal laws: the Privacy Act and the E-Government Act.[4]

---

[4] This Court can consider this affirmative defense at the motion to dismiss stage because "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England Sch. of Law.*, 389 F.3d 5, 12 (1st Cir. 2004).

- 18 -

App. 79

> **a. The Federal Government's demand was made in violation of the Privacy Act of 1974.**

"The Privacy Act of 1974 serves to safeguard the public interest in informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals." *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 555 (S.D.N.Y. 1980). It is designed, among other things, to prevent "the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch." S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917.

The Federal Government's demand for New Hampshire's SVRL violates the Privacy Act because the demand seeks to collect data on citizen's First Amendment protected activity and, even if it did not, it fails to comply with the Privacy Act's procedural requirements.

> **i. The Federal Government is seeking to collect data on citizens' First Amendment protected activity without an authorized purpose in violation of federal law.**

Though many of the Privacy Act's provisions are procedural in nature, it flatly forbids federal agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C.A. § 552a(e)(7). This prohibition reflects "Congress' own special concern for the protection of First Amendment rights." *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980).

Each individual entry in New Hampshire's voter file is clearly a "record" under the Privacy Act of 1974. 5 U.S.C.A. § 552a(a)(4) (defining "record" as "any item, collection, or

App. 80

grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . .").  And each record indicates how the voter exercises rights guaranteed by the First Amendment in several ways.  It identifies the political party, if any, in which the voter has chosen to enroll, and in which prior party primaries a voter has chosen to participate; political party affiliation and participation are an "integral part" of associational freedom under the First Amendment. *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).  It allows the holder of the information to determine which citizens have chosen to register to vote, a choice that "implicates political thought and expression." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999).  And the SVRL shows which New Hampshire citizens actually voted in which elections, acts in which voters "express their political preferences." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 31 (D.D.C. 1999) ("When a citizen steps into the voting booth to cast a vote on a matter properly on the ballot, he or she intends to send a message in support of or in opposition to the candidate or ballot measure at issue").  A federal database of such information is flatly prohibited by the Privacy Act as it is ripe for the very types of abuses—such as targeting voters based on their party affiliation—that the Privacy Act was enacted to prevent.

None of the three narrow statutory exceptions contained in 5 U.S.C. § 552a(e)(7) apply to authorize the collection of the SVRL and its information related to citizens exercise of their First Amendment rights.  As explained in the first two sections of this Memorandum, the collection is not "expressly authorized" by any statute and there is no way to see it as having been authorized by the voters' themselves.

- 20 -

App. 81

As to the third exception, the information the Federal Government seeks to compile is not "pertinent to and within the scope of an authorized law enforcement activity[.]" *Id*. The Federal Government's role in HAVA enforcement is limited to filing a civil lawsuit as may be necessary to "carry out the uniform and nondiscriminatory election technology and administration requirements under" HAVA. 52 U.S.C. § 21111.  Of relevance here, HAVA's election technology and administrative requirements include that states have an SVRL, have various procedures in place for administering the system, and make reasonable efforts to remove non-eligible voters from the SVRL. *See* 52 U.S.C. § 21083(a).  The Federal Government has offered no explanation as to why it needs the SVRL and all of its sensitive and First Amendment protected information related to New Hampshire voters to ensure New Hampshire has reasonable procedures and is making reasonable efforts to maintain its list, and it is implausible that it does.  To satisfy federal requirements, a state's list-maintenance program need only be "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Benson*, 136 F.4th at 625.  Determining whether a state meets this standard requires review of its methodology and procedures, not a static compilation of all its voters' personal information.  As such, the Federal Government's demand is not within the scope of "authorized" law enforcement activity.

### ii. The Federal Government has not complied with the statutory requirement that it notify the public and Congress of its data-collection efforts.

The Federal Government's demand for the SVRL also violates the Privacy Act because the United States Department of Justice has not properly notified the public and Congress of its intentions to compile a massive database of voter's protected, confidential information.

- 21 -

App. 82

The Privacy Act requires federal agencies to publish public notices, called Systems of Records Notices (SORNs), with nine categories of information describing each "system of records" held by the agency that contains records about individual Americans. 5 U.S.C.A. § 552a(e)(4). The SORN must include categories of records maintained, categories of individuals contained in the records, expected "routine uses" of the records, categories of users, and policies governing access, storage, disposal. *Id.* The agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use. *Id.* § 552a(e)(11). Notice must also be provided to the Office of Management and Budget and Congress. *Id.* § 552a(r).

The United States Department of Justice's Civil Rights Division has an existing SORN, the "Central Civil Rights Division Index File and Associated Records" SORN, as amended. *See* 68 Fed. Reg. 47610–01 (Aug. 11, 2003). This existing SORN, however, is inadequate in a number of respects. Its identified "categories of individuals on whom records are maintained in the system[,]" 5 U.S.C.A. § 552a(e)(4)(B), are insufficiently narrow, including such individuals as "subjects of investigations," "victims," and "potential witnesses." 68 Fed. Reg. 47610–01 at 47611. Likewise, its identified "categories of records maintained in the system[,]" 5 U.S.C.A. § 552a(e)(4)(C), are insufficiently narrow covering only documents such as "case files," "memoranda," and "reports." Fed. Reg. 47610–01 at 47611. Finally, its list of the "the categories of sources of records in the system[,]" 5 U.S.C.A. § 552a(e)(4)(I), is limited to "an agency or person who has or offers information related to the law enforcement responsibilities and/or other statutorily-mandated duties of CRT." *See Shearson v. U.S. Dept. of Homeland Security*, 638 F.3d 498, 502 (6th Cir. 2011).

App. 83

No reasonable reader of the SORN would come away with the impression that Civil Rights Division of the United States Department of Justice intended to maintain files listing every registered voter in the country, extensive personal identifying information, their party affiliation, their voting history, etc.

Furthermore, federal executive agencies are required to publish a new SORN whenever there is a "revision" to its system of records. 5 U.S.C.A. § 552a(e)(4). The Office of Management and Budget interprets this provision to require a revised SORN if there is "[a] substantial increase in the number, type, or category of individuals about whom records are maintained in the system" or "[a] change that expands the types or categories of records maintained in the system." OMB Circular A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 5, https://tinyurl.com/3hkzbyr2. The Federal Government's decision to begin collecting complete voter files from multiple states, containing personal identifying information on millions of voters as well as information on their First Amendment–protected activities, easily satisfies these standards.

**b. The Federal Government's demand was made in violation of the E-Government Act.**

This Motion to Dismiss should also be granted because the Federal Government failed to conduct the privacy impact assessment required by the E-Government Act.

Under the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy, including any initiation of a new collection of information that will be collected, maintained, or disseminated using information technology and that "includes any information in an identifiable form permitting the physical or online

- 23 -

App. 84

contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." *Id.* § 208(b)(1)(A)–(B).

New Hampshire's SVRL, which includes names and mailing addresses and consists largely of voters' answers to standardized questions on the voter registration application, falls within the strictures of the privacy impact assessment requirement.  Neither the Complaint nor the correspondence from the United States Department of Justice to New Hampshire leading up to this litigation cited any privacy impact assessment. Absent citation to an applicable assessment, the Complaint should be dismissed for a failure to comply with the E-Government Act.

### IV. The Federal Government fails to support their cursory allegations regarding New Hampshire's lack of compliance with HAVA with any well plead facts leaving New Hampshire entitled to judgement as a matter of law.

HAVA confers upon the Attorney General of the United States authority to:

> bring a civil action against any State … for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under [HAVA].

52 U.S.C. § 21111.  In Count II of the Federal Government's Complaint may be seen as attempting to bring such a civil action when it alleges that New Hampshire is in violation of HAVA by: (1) failing to provide sufficient information to the Federal Government upon request; (2) failing to conduct list maintenance as required; … and (4) failing to provide the Federal Government information about the process it uses to validate driver's license numbers and social security numbers submitted with voter registration applications. Compl.

- 24 -

App. 85

¶¶60-61.  These allegations should be dismissed as they are insufficiently pled, being unsupported by any well-pled facts.

While a complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 555 U.S. at 557). This Court must reject "unsupported conclusions or interpretations of law," *Estate of Bennett v. Wainwright*, 548 F.3d 155, 162 (2008) (quotations omitted), and the allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.,* 550 U.S. at 555.  The Court must "carefully balance the rule of simplified civil proceeding pleadings against our need for more than conclusory allegations." *Aybar v. Crispin-Reyes*, 118 F.3d 10, 13 (1st Cir. 1997) (quotation omitted).

The Federal Government's allegations that New Hampshire failed to provide sufficient information upon request and failed to conduct list maintenance as required by HAVA are nothing more than naked assertions devoid of sufficient factual allegations to raise a right to relief above a level of mere speculation.  As outlined in the fact section above, Secretary Scanlan answered all the questions put to him by the Federal Government. *See* Exhibit 2: July 25 Letter. The Federal Government's follow-up letter did not ask any clarifying questions, identify any perceived deficiencies in Secretary Scanlan's answers, or otherwise request any additional information or explanation. *See* Exhibit 3: August 18 Letter.  The Federal Government's complaint contains no factual allegations that New Hampshire has ever refused to answer questions put to it by the Federal Government regarding its HAVA compliance efforts.  Nor did the Federal Government identify any perceived deficiencies in the New Hampshire statutes that require municipalities to regularly maintain voter lists. *See* N.H. RSA Chapter 654.

App. 86

The Federal Government does assert that it is concerned because of the level of duplicate voter registrations New Hampshire reported as compared to the national average. Compl. ¶36. However, this does not raise the right to relief above a speculative level, particularly when the Federal Government failed to engage with the realities of New Hampshire's election system which, unlike many other states, has systems in place to ensure that voter registrations are not completed and submitted in the first place if they are going to be duplicates.

Finally, the Federal Government alleges several of New Hampshire's offered answers in its July 25 letter were insufficient. Compl. ¶¶41-43.  As stated above, Secretary Scanlan provided good faith answers to the questions put to him by the Federal Government and he offered to provide additional information if needed. *See* Exhibit 2: July 25 Letter.  The Federal Government did not ask any follow up questions or request additional information.  But, even if this Court would need to proceed to the summary judgement phase to resolve the factual question as to the sufficiency of New Hampshire's answers, the Federal Government's claims fail as a matter of law as the Federal Government offers no legal authority by which it is entitled to compel New Hampshire to provide information upon request to the Attorney General about New Hampshire's list maintenance procedures.  The statute allows the Attorney General to file suit if it can plead facts as to New Hampshire's failure to comply with HAVA's procedures, but it cannot bring a lawsuit alleging only that New Hampshire failed to write a detailed explanation of how it complies with HAVA.

As a similarly situated federal district court wrote when faced with nearly identical litigation:

> Even the federal government is not permitted to sue first, obtain discovery, and finalize its allegations later.  This appears to be a telltale "fishing expedition." District courts do not "condone the use

- 26 -

App. 87

of discovery to engage in 'fishing expeditions'" when the Plaintiff
has no basis other than "gross speculation" to support their claims.

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *44 (C.D. Cal. Jan.

15, 2026).

**Conclusion**

The Federal Government has hauled the State of New Hampshire into federal court

claiming that it is attempting to "remedy the State of New Hampshire's violations of federal

voting laws[,]" without even making an assertion, plausible or otherwise, that there is reason to

believe New Hampshire is out of compliance with federal law. Compl. P.2. As has been detailed

above, it is not the State of New Hampshire's actions which are out of compliance with the law.

It is the Federal Government's actions which are out of compliance with the law. The Federal

Government comes before this Court, and courts across this country, attempting to convince the

federal judiciary to compel sovereign states to comply with their unprecedented and illegal

demands. This Court should follow the lead of at least one other federal district court[5] and grant

the State's motion to dismiss, finding the Federal Government's complaint to be wholly without

grounding in this Country's laws.

<div style="margin-left:40%">

Respectfully submitted,

DAVID M. SCANLAN, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF STATE FOR
THE STATE OF NEW HAMPSHIRE, AND THE
STATE OF NEW HAMPSHIRE

By their attorney,

THE OFFICE OF THE ATTORNEY GENERAL

JOHN M. FORMELLA
ATTORNEY GENERAL

</div>

---

[5] *See United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897 (C.D. Cal. Jan. 15, 2026).

- 27 -

<span style="float:right">App. 88</span>

Dated: February 6, 2026

/s/ Mary A. Triick
Mary A. Triick, Bar #277277
Senior Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
Mary.A.Triick@doj.nh.gov
603-271-0447

/s/ James H. Holl
James H. Holl, Bar #279633
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
James.H.Holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by ECF on February 6, 2026, to counsel of record.

/s/ James H. Holl
James H. Holl, Bar #279633

- 28 -

App. 89

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>DAVID M. SCANLAN in his official capacity as Secretary of State for the State of New Hampshire, and the STATE OF NEW HAMPSHIRE,<br>Defendants. | CASE NO: 1:25-cv-00371-JL |

**UNITED STATES' CONSOLIDATED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DOC. 32) AND INTERVENOR-DEFENDANTS' MOTION TO DISMISS (DOC. 37)**

App. 90

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 5

II.     BACKGROUND ........................................................................................ 7

III.     MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND ......................... 9

    A.     The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA. .................................................................................... 10

    B.     Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights. ................................ 15

    C.     Movants cannot challenge the Attorney General's basis and purpose to investigate New Hampshire's HAVA compliance. ........................................................................ 19

    D.     New Hampshire's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections..................................... 22

    E.     The United States is entitled to unredacted "reproduction" and "copying" of New Hampshire's federal election records, including its SVRL...................................... 28

IV.     THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS......... 31

    A.     The United States is complying with the Privacy Act. .................................. 32

    B.     The First Amendment does not prohibit access to data the United States needs for its HAVA claim. ......................................................................................... 34

    C.     The E-Government Act does not prevent the United States from obtaining data supporting its HAVA claim. ......................................................................... 35

V.     CONCLUSION........................................................................................ 36

App. 91

**TABLE OF AUTHORITIES**

**Cases**

*Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960) ..................................... passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .................................................... 7

*Becker v. United States*, 451 U.S. 1306 (1981) ................................................................ 14

*Becker v. United States,* 452 U.S. 912 (1981) .................................................................. 14

*Becker v. United States,* 452 U.S. 935 (1981) .................................................................. 14

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ........................................................ 19

*Coal. for Open Democracy v. Scanlan,*

　No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025)............................................ 31

*Coleman v. Campbell*, 208 F. Supp. 199 (S.D. Miss. 1962)............................................. 16, 21, 22

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ...................................................... passim

*Colón-Marrero v. Vélez*, 813 F.3d 1 (1st Cir. 2016)......................................................... 8

*Donaldson v. United States*, 400 U.S. 517 (1971)......................................................... 14

*Ebert v. Poston*, 266 U.S. 548 (1925) ..................................................................... 18

*Ex Parte Siebold*, 100 U.S. 371 (1879)...................................................................... 7

*Foster v. Love*, 522 U.S. 67 (1997)......................................................................... 7

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ........................................................ 12

*Judicial Watch v. Lamone*, 399 F.Supp. 3d 425 (D. Md. 2019) ........................................ 24

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)....................................................... passim

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995).................................................. 7

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846 (W.D. La. 1960)......... 10, 11

*United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026).. passim

*United States v. Bisceglia*, 420 U.S. 141 (1975)............................................................ 10

*United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006).................................... 27

*United States v. Great N. Ry. Co.,* 343 U.S. 562 (1952)................................................. 19

*United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269 (1929) .............................................. 18

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)........................................... passim

App. 92

*United States v. Oregon*, Case No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026) .................... 12, 13

*United States v. Powell*, 379 U.S. 48 (1964) ........................................................... passim

*United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan. 15, 2026) ..... passim

**Statutes**

52 U.S.C. § 20701 ......................................................................................... passim

52 U.S.C. § 20703 ......................................................................................... passim

52 U.S.C. § 20705 .......................................................................................... 6, 8, 20

52 U.S.C. § 20706 ................................................................................................ 6

52 U.S.C. § 21083 ......................................................................................... passim

52 U.S.C. § 21111 ............................................................................................... 8

The E-Government Act of 2002, Pub. L. No. 107–347, § 208 ................................. 35, 36

**Other Authorities**

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral

    Process 32-33 (Aug. 2001) ............................................................................ 17

*Webster's New World Dictionary of the American Language* 1140 (8th coll. ed. 1960) ............. 25

*Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ................................. 25

**Regulations**

28 C.F.R. § 0.51 ................................................................................................ 33

28 C.F.R. § 0.50 ................................................................................................ 33

U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25,

    2017) ............................................................................................................. 33

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ..................................................................................... 7

**Legislative Materials**

106 Cong. Rec. 7767 .......................................................................................... 16

H.R. Rep. 107-329, pt. 1 (2001) ............................................................................ 17

App. 93

Plaintiff United States of America respectfully submits this Memorandum of Law in opposition to the Motions to Dismiss by: (1) Defendant Secretary of State for the State of New Hampshire, David Scanlan ("Secretary Scanlan") and Defendant State of New Hampshire (Doc. 32) ("Defendants"); and (2) Intervenor-Defendants Neal Kurk, Robert "Bob" Perry, Louise Spencer, and Christopher Cole (Doc. 37) ("Intervenors"). Collectively, Defendants and Intervenors are referred to as the "Movants." The United States submits this consolidated Memorandum, instead of two separate opposition briefs, to facilitate the Court's review of the duplicative and overlapping arguments made by the Movants.[1]

## I.       INTRODUCTION

The Attorney General of the United States brought this case as part of her investigation of New Hampshire's list maintenance practices under the Help America Vote Act ("HAVA"). The United States engaged in repeated correspondence with Secretary Scanlan, requesting his cooperation in providing federal election records necessary to its assessment in a manner consistent with federal privacy law. Those efforts were met by Secretary Scanlan's refusal to produce records as mandated by federal law and necessary to evaluate compliance with federal election laws. This action followed. *See* Compl., Doc. 1.

Title III of the Civil Rights Act ("CRA") provides the principal statutory authority for the United States to immediately obtain federal election records including New Hampshire's statewide Voter Registration List ("SVRL"). Those provisions broadly authorize the Attorney General to compel production of "all records and papers" that "come into … possession" of the officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. §

---

[1] The combined brief complies with the total page limit for two separate opposition briefs to the pending Motions to Dismiss (Docs. 32 & 37).  *See* LR 7.1(a)(3).

App. 94

20701; *see also* 52 U.S.C. § 20705 (authorizing the Attorney General to bring an action to compel the production of federal election records demanded under Section 303 of the CRA). In that manner, Title III is unique because it is purely an investigative tool. As such, it enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[2]

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that she satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. §§ 20703, 20706.

As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these requirements. In contrast, Movants have wholly failed to establish that there remains any "matter[] open for determination" which would provide a basis for the motions to dismiss. *Lynd*, 306 F.2d at 226. Therefore, the United States' Motion to Compel (Doc. 31) should be granted, the Motions to Dismiss (Doc. 32 and Doc. 37) should be denied, and an

---

[2] Circuit caselaw addressing the CRA in any depth has been confined to courts within the Fifth Circuit in the early years following the CRA's enactment. The United States is unaware of any circuit courts disagreeing with the Fifth Circuit's approach to the CRA. Recently two District Courts in the Ninth Circuit and one District Court in the Sixth Circuit reached a contrary conclusion. However, those decisions are burdened by erroneous applications of the statute. *See infra* at 11-15, 19, 23-27.

App. 95

order compelling production of New Hampshire's SVRL and other responsive federal election records should be entered.

## II.   BACKGROUND

While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832-33 (1995)) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Foster*, 522 U.S. at 69 (quoting *Ex Parte Siebold*, 100 U.S. 371, 384 (1879)); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State

7

App. 96

are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*[3]  Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).

Acting pursuant to the United States' authority to enforce these federal election statutes, on August 18, 2025, the Department of Justice sent Secretary Scanlan, New Hampshire's chief elections officer, a letter requesting, *inter alia*, a copy of New Hampshire's SVRL. Aug. 18, 2025 Ltr., Doc. 31-4.  As stated in the August 18 Letter, the basis for the demand was Title III of the Civil Rights Act of 1960 (CRA) codified at 52 U.S.C. §20701, *et seq*. and the purpose was to "ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." Doc. 31-4. The letter informed Secretary Scanlan that the list is subject to federal privacy protections, including Section 304 of the CRA. *Id.* It further informed him that the statewide voter registration list could be produced via encrypted email or using the Department of Justice's secure file-sharing system. *Id.*

On August 28, 2025, Secretary Scanlan rejected the Attorney General's written demand. Doc. 31-5. On September 25, 2025, the Attorney General then instituted these summary proceedings to compel production. *See* Compl., Doc. 1.

---

[3] "HAVA's look-back to NVRA in section 303(a)(4)(A) is sensibly understood only as an assurance that the obligations and procedures required by that HAVA subsection—i.e., a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters, but protects eligible voters—align with those previously mandated by NVRA." *Colón-Marrero v. Vélez*, 813 F.3d 1, 13-14 (1st Cir. 2016).

App. 97

As explained in the attached second declaration of Eric Neff, the United States seeks these documents for one purpose only: to evaluate New Hampshire's compliance with the list maintenance provisions of HAVA, and if appropriate, to bring an enforcement action. *See* Second Declaration of Eric Neff ("2d Neff Decl.") ¶ 2. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections. 2d Neff Decl. ¶¶ 3-4.

### III. MOTIONS TO DISMISS ARE INAPPLICABLE TO TITLE III OF THE CRA AND CANNOT CHALLENGE THE BASIS AND PURPOSE FOR THE DEMAND

Movants misapprehend the nature of a CRA claim by erroneously suggesting the Court should apply the Federal Rules of Civil Procedure to the demand for records under the CRA. They incorrectly maintain that Title III of the CRA applies to only discrimination claims. They ask the Court to ignore caselaw under the CRA and allow an impermissible challenge to the basis and purpose of the Attorney General's written demand. Likewise, they assert that the Court should undermine the Attorney General's enforcement authority by rewriting the congressional mandate in the CRA. In place of producing all election records requisite to voting in federal elections, Movants invite the Court to narrow the mandate to encompass only publicly available records. For the reasons discussed below, Movants' Motions to Dismiss (Docs. 32 & 37) should be denied, the United States' Motion to Compel (Doc. 31) granted, and Secretary Scanlan compelled to produce the demanded federal election records including New Hampshire's SVRL.

App. 98

### A.    The Federal Rules of Civil Procedure are inapplicable to motions to compel under Section 305 of the CRA.

Movants argue that the Federal Rules of Civil Procedure govern these proceedings. *See* Defs.' Mot., Doc. 32-1, at 24-27; Intervenors' Mot., Doc. 37-1 at12-16. They repeat what the Fifth Circuit has described as "a basic misconception … concerning a Title III proceeding." *Lynd*, 306 F.2d at 225.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). It does not require known violations of federal law. In that manner, Title III enables the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228. Contrary to what the Movants argue, no factual allegations of a substantive violation of federal law are required. Instead, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped [her] with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA.[4] *Id.* at 230. That approach makes sense.

---

[4] Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Bisceglia*, 420 U.S. 141, 148 (1975). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this

App. 99

The United States cannot be expected to effectively enforce federal election laws like HAVA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to her. *See id.* at 227 (the Attorney General's "right to records does not require that [she] show [she] could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress has indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including the motions to dismiss presently before the Court, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

A recent decision issued by a District Court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Movants. *See United States v. Benson*, Case No. 1:25-cv-01148-

---

paradigm.

11

HYJ-PJG, slip op at 14 (W.D. Mich. Feb. 10, 2026) (attached to 2d Neff Decl. as Ex. 13). Instead, the *Benson* court construed "a request for records under the CRA as a form of administrative subpoena." *See* slip. op. at 14 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…" *Benson*, slip op. at 15. The court acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (citation omitted).

Two District Courts in the Ninth Circuit reached a different conclusion but erred in doing so. Both courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's holding in *Lynd* that Title III of the CRA is a special statutory proceeding where the Federal Rules of Civil Procedure do not apply. *See United States v. Oregon*, Case No. 6:25-cv-01666-MTK, slip op. at 15 (D. Or. Feb. 5, 2026) (attached to 2d Neff Decl. as Ex 14); *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, slip op. at 13 & n.15 (C.D. Cal. Jan. 15, 2026) (attached to 2d Neff Decl. as Ex. 15).[5] *Powell* applied the Federal Rules of Civil Procedure to an IRS administrative summons. There, the Supreme Court made the unremarkable observation that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying

---

[5] Defendants and Intervenors extensively cite to *Weber* in their motions. *See* Defs.' Mot., Doc. 32-1; Intervenors' Mot., Doc. 37-1. As discussed below, *Benson* addressed many of the legal errors in *Weber* that call into question whether *Weber* merits any consideration.

App. 101

reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, slip. op. at 15 (quoting *Powell*, 379 U.S. at 58). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.* That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Id.* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not*.'" *Powell*, 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd* and in no way restricts records demands under the CRA to the statutory limitations that Congress included in the IRC.[6]

---

[6] The *Oregon* decision similarly misreads *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, slip op. at 15 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to

App. 102

In addition to *Powell*, the *Weber* court also referred to what it indicated was a decision of the United States Supreme Court. *See Weber*, slip op. at 13 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

Moreover, in *Becker*, which involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson v. United States*, 400 U.S. 517, 528-29 (1971)). Justice Rehnquist distinguished between agency efforts to "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311.

---

"satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-26.

App. 103

In other words, far from supporting Movants' argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it.

Accordingly, the "usual notions under the Federal Rules of Civil Procedure" do not apply to the CRA's "special statutory proceeding" to compel production of federal election records. *Lynd*, 306 F.2d at 225-26; *see also Gallion*, 187 F. Supp. at 852 (same).

**B.      Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [her] representative." 52 U.S.C. § 20703.

Notwithstanding the CRA's plain language, Defendants argue that the only permissible purpose for a Title III request is if it is related "to the voting-related discrimination targeted by the Civil Rights Act." Defs.' Mot., Doc. 32-1 at 13. Intervenors similarly contend that the CRA is limited to discrimination based on race despite the absence of any language in Title III supporting their position. *See* Intervenors' Mot., Doc. 37-1 at 14. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-

15

App. 104

449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See, e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* a case cited by Intervenors, *see* Intervenors' Mot., Doc. 37-1 at 14, the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Movants suggest that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Defs.' Mot., Doc. 32-1 at 13 (arguing that "'ascertain[ing] [a state's] compliance with the list maintenance

App. 105

requirements of HAVA … is improper as it is wholly unrelated to the voting-related discrimination targeted by the [CRA]") (citation omitted); Intervenors' Mot., Doc. 37-1 at 15 (same). They are mistaken. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2001) (excerpts provided as 2d Neff Decl., Ex. 12). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* It explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to "reduce the incidence of voters appearing at a polling place only

App. 106

to discover that no record of their registration can be found."[7] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of requirements in HAVA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what

---

[7] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. 2d Neff Decl. ¶¶ 13-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as 2d Neff Decl., Ex. 10). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as 2d Neff Decl., Ex.11).

App. 107

Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of the Movants in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. The court first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. The court explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes." *Benson*, slip op. at 17. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fit neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Movants' invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id*.

### C. Movants cannot challenge the Attorney General's basis and purpose to investigate New Hampshire's HAVA compliance.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records. As explained in the preceding discussion, it covers "all records and papers" which come into possession of an officer of election

App. 108

that relate to any prerequisite to voting in a federal election, including voter registration applications and records. 52 U.S.C. § 20701. Pursuant to Section 303 of the Act, to obtain those federal election records, the Attorney General need only make to an officer of election with custody, possession, or control of those records a "demand in writing" for "inspection, reproduction, and copying," accompanied by "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705.

In the August 18 Letter, the Attorney General made a written demand under Section 303 of the CRA for New Hampshire's federal election records, including its SVRL. Aug. 18, 2025 Ltr., Doc. 31-4. The CRA provided the basis for making the request, and the letter explained that the purpose of the request "is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA." *Id*. at 2.

Nevertheless, Movants argue that the United States failed to provide a sufficient statement of the basis and purpose of its request for federal election records. Defendants criticize the Attorney General's stated basis and purpose for demanding records not required to be retained under 52 U.S.C. § 20701.  Defs.' Mot., Doc. 32-1 at. Defendants further argue that the August 18 Letter does not contain a "sufficiently stated basis and purpose to be validly made under the law." *Id.* Intervenors make related arguments. *See* Intervenors' Mot., Doc. 37-1 at 17.

Federal courts have rejected contentions that parallel those made by Movants. Movants' contention that the demand needs to include a factual basis showing an *extant* violation of federal law, fails for the reasons discussed above. *See supra* Part III(A) (describing why the investigative nature of a demand under Title III forecloses any requirement that a specific allegation of a

20

App. 109

violation of federal law be included in that demand). Instead, a reference to the statutory basis for making the demand, namely the CRA, suffices.[8]

Similarly, Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General [must] identify in a general way the reasons for [her] demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). The United States satisfied that requirement by stating, "[t]he purpose of the request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." Aug. 18, 2025 Ltr., Doc. 31-4 at 1-2.

Contrary to what Movants argue, they are prohibited from using "any procedural device or maneuver," including Movants' motions to dismiss, to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily

---

[8] Even if more of an explanation was required, to wit, why the records are needed, the Attorney General did so in her August 18 Letter, in which she wrote that the SVRL must contain:

> *all fields*, which includes either the registrant's full name, date of birth, residential address, their state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Aug. 18, 2025, Ltr., Doc. 31-4 (emphasis in original). The letter also explained that when Congress charged the Attorney General with HAVA enforcement, it "plainly intended that [the] Justice Department be able to conduct an independent review of each state's list." *Id.*

App. 110

available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228; *see also Benson*, slip op. at 8 ("[T]he CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose."). Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303 "is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate"). Movants' motions to dismiss the CRA claim for not meeting an elevated showing of statement of "the basis and the purpose" fails under the plain language of the statute, as applied by federal courts.

> **D.    New Hampshire's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in federal elections.**

The scope of federal election records covered by Title III of the CRA is broadly established by Congress. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth.

Indeed, federal courts that have applied Section 301 have concluded that Congress meant what it said in the statute. It does not exclude production of electronic or non-public records, as

22

App. 111

Movants argue. *See* Defs.' Mot., Doc. 32-1 at 7; Intervenors' Mot., Doc. 37-1 at 21-22. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election …' if they relate to acts requisite to voting in such election.

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). In *Lynd*, the Fifth Circuit likewise recognized that "the papers and records" covered by Section 301 "have been specifically identified by Congress." 306 F.2d at 226. This requirement "is sweeping." *Id.* It applies to "all records and papers," as the statute provides, *id.*, and cannot be circumvented in the manner that the Movants suggest.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL for a reason not explicitly raised by Movants: that it applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." Slip op. at 18-19 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many – and likely even most – voter registration applications are only in electronic form in a SVRL.[9]

---

[9] According to the limited data that New Hampshire reported to the U.S. Election Assistance Commission (the reported data was incomplete or missing altogether for several categories), it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations. *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report at 162, 164 (June 2025), *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 20, 2026).

App. 112

Such a reading would effectively carve out vast numbers of federal election records, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic." Slip op. at 22. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*. *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court rejected that contention. It explained that Maryland misunderstood the requirements of the NVRA and the plaintiff was entitled to the registered voter list because "a voter list is simply a pared down compilation of voter registrations" encompassed by the Act. *Id*. at 439-40. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id*. at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, slip op. at 22. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified]

24

App. 113

election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 230701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. Slip op. 19 (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 1140 (8th coll. ed. 1960) (defining "possess" and "possession"). Secretary Scanlan acquired the relevant records in the course of carrying out his duties as an officer of election.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Following this focus on the *when* and *how* an individual gains possession

App. 114

of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court, then, "distinction[s] between possessing something and having something come into one's possession," slip op. 19, are temporal distinctions—not distinctions between obtaining records from an outside source and through self-generation—as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization is declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof, any other "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record

26

App. 115

under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. And Secretary Scanlan, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, Movants' construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole purpose. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[10] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure herself that the applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* 2d Neff Decl. ¶¶ 3-5, 7-14. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for her to carry out the duties assigned to her by Congress.

---

[10] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Doc. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Doc. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Mem. of Understanding between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited Feb. 20, 2026). For the Court's convenience, the three documents are provided herein as 2d Neff Decl., Exs.7-9.

App. 116

**E.  The United States is entitled to unredacted "reproduction" and "copying" of New Hampshire's federal election records, including its SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or her representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute … arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Movants ask the Court to legislate limitations conspicuously absent from Title III. First, Defendants argue that no records need to be produced to the United States. Instead, they contend there is no "'provision under federal law that compels the production of voter registration data' that would supersede the prohibition put in place by state law." Defs.' Mot., Doc. 32 at 2-3 (citation omitted). Intervenors make a similar argument. Intervenors' Mot., Doc. 37-1, at 21-23. However, Section 303 provides, "[a]ny record or paper required by [Section 301] to be retained and preserved shall, upon demand in writing by the Attorney General … be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. Federal courts have concluded that Section 303 requires reproduction and copying. For example, in *Lynd*, the court rejected a "mechanical objection[]" in which copying federal election records "would, at one time, have been a formidable thing." *Lynd*, 306 F.2d at 231. There, the court observed that "[m]odern photostating equipment will make short order of most of these demands…." *Id.* New Hampshire's SVRL is required by HAVA to be in electronic form. It is axiomatic that providing the United States with an electronic

28

App. 117

copy of its SVRL will be much less burdensome than physical copying of every individual registration record if complete physical records even exist outside of their electronic form.

Movants cite state and federal statutes governing privacy of voter registration records to support their argument that only a publicly available version of New Hampshire's SVRL is required. *See* Defs.' Mot., Doc. 32-1 at 18; Intervenors' Mot., Doc. 37-1 at 21. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Yet, Movants ignore the plain language of Section 304 and ask the Court to do the same by rewriting the CRA to exclude all non-public records and information. Congress rejected the position that they advance by its broad reference to "all records and papers." 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including New Hampshire's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Therefore, the argument by Movants that all electronic and non-public records are excluded fails as a matter of law.

App. 118

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[11] *Lynd*, 306 F.2d at 230.

Finally, if the Movants' position were to be adopted, it would eviscerate Title III. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA by having access to the voter identification numbers required by federal law. For each voter, that includes their driver's license number, their SSN4, or other HAVA identifying number. *See* 52 U.S.C. § 21083(a)(5)(A). As explained above, that information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[12] *See supra* Part III(B). There is no question that enforcement of the list maintenance requirements of HAVA is for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

---

[11] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States has offered all states a memorandum of understanding, or MOU, memorializing these requirements. *See* 2d Neff Decl. ¶¶ 15-16. As of February 20, 2026, twelve states have provided their SVRLs without any MOU. 2d Neff Decl. ¶ 16. Two states have agreed to provide their SVRL under the terms of the MOU. *Id*.

[12] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

App. 119

The data the United States has requested under the CRA is the same that twenty-five states (not including New Hampshire) and the District of Columbia routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[13] Similarly, private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights, including one such recent case in this District Court. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed sub nom. Coal for Open Democracy v. Formella*, 23-1585, 2025 WL 3786144 (1st Cir. July 2, 2025).

Accordingly, the United States is entitled to reproduction and copying of New Hampshire's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).[14]

## IV.    THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS

---

[13] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited Feb. 20, 2026).

[14] Defendants have argued that HAVA does not require production of the SVRL.  *See* Defs.' Mot., Doc. 32-1 at 15-18.  The summary nature of an action to compel federal election records under Section 305 of the CRA, and the sweeping scope of that provision, obviate the need for additional relief under HAVA. If the Court agrees, the United States stipulates that it is appropriate to dismiss without prejudice its records requests under HAVA, which would be mooted by a CRA order of production.

App. 120

Movants make a variety of arguments that privacy laws require dismissal of the United States' efforts to compel production of New Hampshire's federal election records. *See* Defs.' Mot., Doc. 32-1 at 18-24; Intervenors' Mot., Doc. 37-1 at 23-25. Those arguments are misguided at best. The United States does not dispute that the requirements of the Privacy Act and Section 304 of the CRA apply here, and it is complying with those requirements. The First Amendment does not prohibit the collection of voter information by the United States to assess compliance with HAVA. The requirement for a Privacy Impact Assessment under E-Government Act does not apply to the investigation of New Hampshire's list maintenance practices being conducted by the United States under HAVA.

### A. The United States is complying with the Privacy Act.

Movants argue that the United States must comply with the Privacy Act, and the United States is doing that. But Movants go even further, contending that the Complaint must be dismissed "because the relief it seeks fails to comply with the Privacy Act as a matter of law." Intervenors' Mot., Doc. 37-1 at 23; *see also* Defs.' Mot., Doc. 32 at 19-21 (same). Not surprisingly, however, there is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. Rather, the Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S.

App. 121

Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. Notably, Movants – and *Weber* – incorrectly refer to only the three SORNs issued by the Civil Rights Division, without addressing any of the dozens of Department of Justice SORNS that are summarized in the table in the May 25, 2017 SORN.

The statutes cited for routine use include HAVA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy. The United States made its requests pursuant to those statutes. *See* Exs. 1, 3 to Doc. 31-1 (Docs. 31-2, 31-4). The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Also, contrary to what Movants contend through presumed third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to create an unauthorized, unprecedented national voter registration database." Intervenors' Mot., Doc. 37-1 at 16. Rather, the records sought from New Hampshire are necessary to perform an individualized assessment of the State's efforts to comply with HAVA.[15] 2d Neff Decl. ¶ 5. The extent of the litigation necessary to obtain those records, in this case and in others, reflects a coordinated effort to impede federal enforcement of those statutes in every state.

Similarly, to the extent that Movants are concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File

---

[15] When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. 2d Neff Decl. ¶ 6.

App. 122

Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

Moreover, the Privacy Act does not bar the disclosure of New Hampshire's SVRL to the United States, as Defendants contend. Defs.' Mot., Doc. 32-1 at 18. The Privacy Act regulates federal agencies' collection, maintenance, and disclosure of information within their own systems of records—it does not restrict the ability of state actors to share information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. § 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93–579, § 2(b), 88 Stat. 1896 (1974), only within the scope of federal agency record systems. There is no basis for Secretary Scanlan to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States is complying with the provisions of the Privacy Act.

**B.    The First Amendment does not prohibit access to data the United States needs for its HAVA claim.**

The United States is not violating 5 U.S.C. § 552a(e)(7) of the Privacy Act by requesting New Hampshire's SVRL. Defendants contend that voter registration data the United States seeks is a form of political expression protected by the First Amendment and implicates a statutory bar to collecting such data. Defs.' Mot., Doc. 32-1 at 19-21. But Defendants miss the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment. But that does not foreclose the United States from enforcing federal election laws like HAVA and the CRA. Likewise, the United States may use those records to assess whether New

34

App. 123

Hampshire is in compliance with Section 303 of HAVA by obtaining the required identifying numbers and whether it is engaging in reasonable list maintenance practices. Indeed, application of Defendants' argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

### C. The E-Government Act does not prevent the United States from obtaining data supporting its HAVA claim.

Defendants next argue that the demand for production of New Hampshire's SVRL and other federal election records violates the E-Government Act. According to Defendants, the Voting Section is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA. *See* Defs.' Mot., Doc. 32-1 at 23-24. Again, neither the E-Government Act nor interpretative case law support their assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the CRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107–347, § 208(b)(1)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The request is made to Secretary Scanlan to provide a voter registration list already maintained pursuant to federal law to analyze New Hampshire's federally required list maintenance. The SVRL would be kept on a system for

App. 124

which a Privacy Impact Assessment has been done.[16] Only when a new system is established—not when each new data request is made—is a Privacy Impact Assessment required.[17]

Applying the E-Government Act to enforcement of voting statutes would lead to an absurd result in which thousands of Privacy Impact Assessments would have to be done whenever the Voting Section gathers any voter data to enforce the Voting Rights Act, NVRA, HAVA, or the Uniform and Overseas Citizens Voting Act. Nothing in the E-Government Act or the purpose of the privacy provision in the Act suggests it was meant to encompass the enforcement provisions of all voting laws where voter data is examined. *See* Pub. L. No. 107–347, § 208(a).

## V.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its Motion to Compel Production of federal election records under Section 305 of the CRA (Doc. 2), and deny Movants' Motions to Dismiss (Doc. 32 & Doc. 37).

---

[16] An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored. *See* 2d Neff Decl. ¶ 17.

[17] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited Feb. 20, 2026).

App. 125

DATED: February 20, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division


/s/ *Brittany E. Bennett*
BRITTANY E. BENNETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Brittany.Bennett@usdoj.gov
James.T.Tucker@usdoj.gov
Tel. (202) 307-2767
Attorneys for the United States

App. 126

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsels of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: Brittany.Bennett@usdoj.gov

App. 127

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| United States of America, | \* |
| | \* |
| Plaintiff, | \* |
| v. | \*   Civil No. 1:25-cv-00371-JL |
| | \* |
| David M. Scanlan, in his official capacity | \* |
| as Secretary of State for the | \* |
| State of New Hampshire, | \* |
| and the State of New Hampshire, | \* |
| | \* |
| Defendants. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**REPLY TO OBJECTION TO MOTION TO DISMISS**

Defendants David M. Scanlan, in his official capacity as Secretary of State for the State of New Hampshire, and the State of New Hampshire, by and through their counsel, the New Hampshire Department of Justice, hereby reply to the issues raised in the Federal Government's Opposition to the Defendants' Motion to Dismiss.

The majority of the issues raised, and arguments made by the Federal Government in its opposition have been fully and sufficiently briefed by the Defendants in their previously filed Memorandum in Support of Defendants' Motion to Dismiss, ECF No. 32-1, and Objection to Plaintiff's Motion to Compel, ECF No. 60.  The Defendants incorporate these arguments herein by reference and offer only brief arguments below regarding the Federal Government's new assertions.

I.   **The SVRL is not a record or paper which must be retained, preserved, and produced pursuant to the Civil Rights Act.**

The Defendants explained in their Memorandum in Support of Defendants' Motion to Dismiss that the SVRL is not a record or paper covered by 52 U.S.C. §

1

App. 128

20701's retention and preservation requirements. ECF No. 32-1, P.8-9. Defendants pointed out, among other things, that it would be inconsistent with precedent and illogical to think that Congress intended for the SVRL to be among the papers and records subject to the Civil Rights Act's retention and preservation requirements and that even the courts which have adopted the broadest application of these retention and preservation requirements have limited them to "voting-related paperwork." *Id.* (citing *Liebert v. Millis*, 733 F. Supp. 3d 698, 711-12 (W.D. Wis. 2024)).

Just days after Defendants filed their Motion to Dismiss, a federal district court in Michigan found, in a separate but extremely similar case, that a state's SVRL is not a record coming within the retention and preservation requirements of the Civil Rights Act. *United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG, slip op. at 18-22 (W.D. Mich. Feb. 10, 2026). In reaching this conclusion, the Michigan court pointed primarily to the language within the statute that limited the retention and preservation requirements to papers and records that "come into [the state's] possession[.]" *Id.* The federal district court found the plain meaning of this phrase to limit the Civil Rights Act's retention and preservation requirements to papers and records which government officials obtain, rather than papers and records which government officials create, and also found this limitation to be consistent with the purpose of the statute. *Id.* The federal district court's ruling is based on sound reasoning with which Defendants agree.

The Federal Government's subsequently filed opposition, ECF No. 51, attaches the Michigan federal district court's decision as exhibit 13 and discusses it extensively. The Federal Government attempts to counter the conclusion reached by that court by arguing that the phrase "comes into [the state's] possession" does not create the kind of

<div align="center">2</div>

<div align="right">App. 129</div>

distinction between received and created records that the federal district court found. Instead, the Federal Government argues that the phrase creates a temporal limit, denoting the imposition of the retention and preservation obligations as starting at a specific point in time. *See* ECF No. 51, P.23-26.

Plaintiff's interpretation is misguided. While it may have some rhetorical value in countering the findings of the Michigan federal district court, the interpretation offered by the Federal Government also serves to exemplify the point made in the Defendants' original Motion to Dismiss: that it would be illogical to apply the Civil Rights Act's retention and preservation requirements to a state's SVRL. The SVRL is a relational database, not a static record or paper. It is a database into which users are consistently adding, changing, and correcting data. To retain and preserve the SVRL as a record at every temporal moment when the SVRL could be said to "come into" the possession of an applicable state official would effectively require states to save a new, static copy of the database every time a change of any sort was made by any user within the database, therefore creating a new and different record. Such a requirement would be impractical to the point of impossible and patently absurd.

## II.     The Federal Government's factual claims regarding voter registration applications kept in electronic form are incorrect.

The Federal Government alleges that "today many – and likely even most – voter registration applications are only in electronic form in the SVRL." ECF No. 51, P.23. The Defendants will refrain from taking a position as to whether this assertion is true nationwide, as that is outside the expertise of New Hampshire's state officials. However, the Federal Government's statement is not true in New Hampshire.

As to New Hampshire, the Federal Government told this Court:

3

App. 130

> According to the limited data that New Hampshire Reported to the U.S. Election Assistance Commission (the reported data was incomplete or missing altogether for several categories), it is doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form.  A large percentage of voter registration transactions were reported as being through e-mail, online, and in-person, and through computer entries at designated voter registration locations.  *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 comprehensive Report at 162, 164 (June 2025), *available at* http://www.eac.gov/research-and-data/studies-and-reports (last visited Feb. 20, 2026).

*Id.* at P.23 n.9.  These assertions are neither correct nor supported by the citations offered.

What the Federal Government characterizes as "incomplete or missing data" in the U.S. Election Assistance Commission's Report (hereinafter the "EAVS Report") is merely data accurately reflecting the realities of New Hampshire's chosen election system.  *See* N.H. RSA 654:7 through N.H. RSA 654:24.  New Hampshire does not allow individuals to register to vote online. *Id.*  New Hampshire does not have an automatic registration program, nor does it register individuals to vote through the DMV or public assistance offices. *Id.*  New Hampshire requires individuals wishing to register to vote to complete a hard-copy standardized voter registration form mostly in person and with only limited exception for use of mail.[1] *Id.*  A registrant's paper form is received and processed at the local level and the form must be retained securely in a municipal office under the direction of the town or city clerk, so long as the individual remains on the voting rolls and for seven years thereafter. *Id.*; N.H. RSA 33-A:3-a, CXLI.

---

[1] New Hampshire allows visually impaired voters registering by mail to complete the voter registration form in an electronic format.  But the voter must then print off the form and mail a hard copy to their local clerk's office in the same manner as other voters.  Local election officials process and retain these printed voter registration forms in the same manner as all other physical registration forms.

App. 131

New Hampshire reported conducting 722,299 voter registration transactions (as having occurred on or between the day after the 2022 general election and the day of the 2024 general election) to the Commission as reflected in the EAVS report. U.S. Election Assistance Commission, Election Administration and Voting Survey 2024 Comprehensive Report (2024), at 162 *available at* https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (last visited March 4, 2026).  The EAVS report subdivides this transaction number in two ways relevant here.  First, it divides these transactions into new registrations and updates to existing registrations. *Id.* at 173.  In New Hampshire, about 90% of the reported transactions were updates being made to existing registrations and only 61,210 were new registrations. *Id.* The EAVS report also subdivides the transactions by source/location. *Id.* at 162-69.  New Hampshire reported four sources for its transactions: mail, [2] in person at an election office, at a polling place, and "other source." *Id.*  These other sources would include things like an election official/clerk going to a high school to register voters.  But, as reflected in New Hampshire's laws discussed above, all of these registrations (except the limited exceptions for mail in registrations) are completed by filling out a paper form in front of an election official. *See* N.H. RSA Chapter 654.  For each registrant there is a paper registration form, and all these registration forms are retained by the appropriate local official and are available for inspection in accordance with the Civil Rights Act. *Id.*

Even a cursory examination of New Hampshire's election laws eliminates the undeniable truth that the Federal Government's assertion to this Court—that "it is

---

[2] The Report groups all registrations by mail, email, and fax together. However, New Hampshire law does not permit any registrations by email or fax, so that whole number is attributable to mail-in registrations. *See* N.H. RSA 654:16 through RSA 654:19 (outlining rules for registering by mail).

App. 132

doubtful that hundreds of thousands of federal voter registration records exist in any medium other than electronic form" in New Hampshire, ECF No. 51, P.23 n.9—is, at best, uninformed speculation by those unfamiliar with New Hampshire law.

As stated above, the Defendants decline to likewise engage in factual speculation and therefore do not take a position as to whether there are states for whom some voters' registration documents are retained nowhere outside the state's SVRL. However, it is worth making clear that exclusion of the SVRL itself as a paper or record which must be retained, preserved, and available for inspection under the Civil Rights Act does not relieve a state of its otherwise clear obligations under the Civil Rights Act to retain, preserve, and make available the records and papers (whether electronic or not) completed by voters when registering to vote. In other words, the placement of a document in the SVRL would not somehow exempt it from production under the Civil Rights Act. However, its placement in the SVRL also does not somehow transform the database in which it is stored, and all other information contained therein, into a record or paper that must be retained and preserved in its own right.

WHEREFORE, Defendants respectfully request that this Honorable Court grant the Defendants' Motion to Dismiss, finding the Federal Government's complaint to be wholly without grounding in the law or the facts, for all the reasons stated in the Defendants' Motion and expanded upon herein.

App. 133

Respectfully submitted,

DAVID M. SCANLAN, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE FOR THE STATE OF NEW HAMPSHIRE

and

THE STATE OF NEW HAMPSHIRE

By their attorneys,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: March 13, 2026

*/s/ Mary A. Triick*
Mary A. Triick, Bar #277277
Senior Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
Mary.A.Triick@doj.nh.gov
603-271-0447

*/s/ James H. Holl*
James H. Holl, Bar #279633
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place South
Concord, NH 03301
James.H.Holl@doj.nh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by ECF on March 13, 2026, to counsel of record.

*/s/ James H. Holl*
James H. Holl, Bar #279633

App. 134

```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * * * *
                                      *
UNITED STATES OF AMERICA,             *
                                      *
               Plaintiff,             *
                                      *   1:25-cv-371-JL
            v.                        *   May 26, 2026
                                      *   10:23 a.m.
DAVID M. SCANLAN, in his official     *
capacity as Secretary of State for    *
the State of New Hampshire, and the   *
STATE OF NEW HAMPSHIRE,               *
                                      *
               Defendants.            *
* * * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Plaintiff:      John Casali, Esq.
                        United States Department of Justice
                        Civil Rights Division, Voting Section

                        Bridget Davidson, AUSA
                        United States Attorney's Office



For the Defendants:     Mary Alissa Triick, Esq.
                        New Hampshire Department of Justice



For the Intervenors:    David Robert Fox, Esq.
                        Elias Law Group LLP

                        Paul J. Twomey, Esq.
                        Twomey Law Office

App. 135

2

Appearances (continued):


For the Amici:            Henry Klementowicz, Esq.
                          American Civil Liberties Union of NH


Court Reporter:           Liza W. Dubois, RMR, CRR
                          Official Court Reporter
                          U.S. District Court
                          55 Pleasant Street
                          Concord, New Hampshire 03301
                          (603) 225-1442

App. 136

3

P R O C E E D I N G S

THE CLERK:  Court is now in session, has before it for consideration a motion hearing in 25-cv-371-JL, United States vs. New Hampshire Secretary of State, et al.

THE COURT:  All right.  We're here on these cross-motions to compel versus motions to dismiss.

We've chatted in chambers for a couple of minutes just earlier here and I explained to counsel that I view the motion to compel as really the substance of the lawsuit.  So I'm -- I don't plan on approaching the motions to compel like Rules of Civil Procedure motion practice.  I just view those as the motion to compel just addresses the merits of the lawsuit, so we're going to focus on the motion to dismiss.

And I'll let -- why don't we have everybody identify themselves for the record and then we'll let the moving party proceed.

MS. TRIICK:  Good morning, your Honor.  Mary Triick on behalf of the State of New Hampshire and the Secretary of State.

THE COURT:  Good morning.

MR. FOX:  Good morning, your Honor.  David Fox for the voter intervenor.

MR. TWOMEY:  Paul Twomey for the voter intervenor.

THE COURT:  Good morning.

MR. KLEMENTOWICZ:  Henry Klementowicz for amici.

App. 137

4

THE COURT:  Thank you.

MR. CASALI:  Good morning, your Honor.  John Casali for the United States.

MS. DAVIDSON:  Good morning, your Honor.  Bridget Davidson on the behalf of the United States.

THE COURT:  Okay.  Let's proceed.

MS. TRIICK:  Good morning, your Honor.

THE COURT:  Good morning.

MS. TRIICK:  I'm here on behalf of, as I said, the Secretary of State and the State of New Hampshire and New Hampshire is asking this Court to dismiss the case filed by the federal government because their complaint fails to state a claim.

There are a number of ways in which it fails to state a claim and a number of ways in which this Court could rule on behalf of the State of New Hampshire.  Those are outlined in our filings --

THE COURT:  Yup.

MS. TRIICK:  -- but I'm going to start with the simplest.

The demand letter is faulty on its face.

THE COURT:  You're going to start with what?

MS. TRIICK:  The demand letter and how it's faulty on its face.

THE COURT:  Okay.  So the federal government claims

App. 138

5

that New Hampshire violated the Civil Rights Act by failing to produce a copy of the SVRL when a copy was demanded by the federal government.

The letter in which they make the demand is the August 18th letter.  The Civil Rights Act requires the demand to fulfill three things:  It has to be a demand in writing, it has to state the basis for the demand, and the purpose for the demand.

The demand letter sent to the State of New Hampshire on August 18th says that this letter serves as notice that the Attorney General is making a demand pursuant to the Civil Rights Act for a complete copy of the State of New Hampshire statewide -- SVRL.  The purpose of this request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 51 U.S.C. Section 21 --

THE COURT:  So down a little bit for the reporter, please.

MS. TRIICK:  Yup.  Sorry.

THE COURT:  No problem.

MS. TRIICK:  The requirements of HAVA under 52 U.S.C. Section 21083(b)(4)(A) and (B).  So that's the demand letter that the State of New Hampshire received.  That demand was in writing and it did state a purpose, but it does not state a basis.  The Civil Rights Act has three simple requirements which the federal government did not follow and so

App. 139

6

the State does not have to comply under federal law.

Stating a basis isn't a high bar.  The case law is clear that you have -- that information -- that a statement like the federal government has information tending to show that race-based discrimination is occurring in an area is sufficient to state a basis, but nevertheless, the federal government did not include a basis in their letter and that says a lot.  It says they didn't have a basis and so they can't make a demand for the SVRL under the Civil Rights Act.

I would also just point out that the purpose stated in the letter facially makes no sense as well.  It says that they want to check --

THE COURT:  Does it have to make sense, though, to satisfy the -- I mean --

MS. TRIICK:  Well, the statute cited -- they say they want to check our HAVA compliance under a specific provision of HAVA --

THE COURT:  Yup.

MS. TRIICK:  -- which deals with voting by mail and what the voting by mail forms need to -- need to include, but they also say they're checking our list maintenance requirements under that provision.  So I think that those two -- like it doesn't -- those two don't match.  It doesn't make any sense.

THE COURT:  Right.

App. 140

7

MS. TRIICK:  But I would say -- so I can move on from the lack of basis in the letter.  I think that that's enough all by itself to grant the motion to dismiss.  But the -- there's also the purpose and the purpose here was -- is insufficient for four different reasons.

So the first one is that it -- it doesn't make sense.  It says that you're checking our HAVA maintenance requirements, but then it cites to a provision about whether or not our forms for mail-in voting are appropriate.

Secondly, the federal government has in this lawsuit filed a notice of additional authority which is a memo opinion of the Department of Justice which expressly says that their purpose in requesting this document was not the purpose that's included in the letter, that their purpose was that the president ordered the identification of those who were voting illegally, whether by reason of alienage or otherwise, and so the civil rights provision proposed seeking statewide lists and sharing those lists with DHS.  It has a purpose in that opinion which is not the purpose that was given to the State of New Hampshire.

Thirdly, the stated purpose is outside the limits of -- of allowable purposes under the Civil Rights Act.  So even, I think, the feds agree that there has to be some outer bound of what purposes are allowed.  Otherwise, what would be the point of stating the purpose?  It can't be unbounded.

App. 141

8

There are improper purposes.  The text does not offer us a bound -- an outer bound of what the purpose is, so you have to look at the history or the purpose of the statute, which is a little confusing because I'm using the word purpose an awful lot, but --

THE COURT:  I understand the distinction and I'm with you.

MS. TRIICK:  Okay.

THE COURT:  Yeah.

MS. TRIICK:  So the Civil Rights Act was enacted to ensure that individuals are not disenfranchised, to ensure that states and localities are not keeping people who are entitled to vote from voting.  And so if you use that purpose to bound this basis and purpose of the Civil Rights Act, this request is far outside of that proper purpose.

And then the last of the four reasons I think that the purpose is insufficient is there's no match between the requested documents and the stated purpose.  So having some number of people on your voting list who should be removed through list maintenance proceedings is not a violation of HAVA.  HAVA requires you to have sort of a process in place, a procedure --

THE COURT:  Yeah.

MS. TRIICK:  -- or process.

So looking at the list, it's not matched up with --

App. 142

9

assuming what they're checking is list maintenance and not mail-in voting, but it also is not matched up with mail-in voting, that there's no match between the requested records and the stated purpose.

As I said at the beginning, there's a number of different independent reasons why the federal government's claim fails.  Another is that the SVRL is not a record or paper which must be retained, preserved --

THE COURT:  Let's keep this orderly then.

MS. TRIICK:  Yup.

THE COURT:  Let's stick with basis -- starting with basis and purpose.

MS. TRIICK:  Yup.

THE COURT:  I thought that was a good place to start.  Why don't I hear from everybody on basis and purpose and then we'll move on to your -- your document -- you know, nature of the documents.

MS. TRIICK:  Great.  Thank you.

THE COURT:  Did any of the intervenors want to be heard on basis and purpose?

MR. FOX:  Yes, your Honor, just a few points on basis and purpose.

THE COURT:  Sure.

MR. FOX:  Again, David Fox for the voter intervenor.

We agree with the State that the lack of a basis is

App. 143

10

the most straightforward problem with the DOJ's demand in this case, and I would point the Court to Judge Sorokin's decision in *United States vs. Galvin* in Massachusetts as a particularly clear articulation of why --

THE COURT:  Very thorough -- very thorough, very thoughtful approach.

MR. FOX:  On purpose, you -- your Honor asked does the purpose need to make sense.  The answer is yes and the reason comes from the Supreme Court's decision in *Powell*, which emphasizes that because in these document demands it is the Court's process that is being invoked, the Court does have a duty to make sure that its process is not being abused.  And Congress required in the Civil Rights Act that the basis and the purpose be stated in the demand and then required DOJ to go to court to enforce that demand.  And in doing so, it is reasonable for the Court to understand that the basis and the purpose in the document need to be legally proper and that the Court has a role in doing that.  If the Court was supposed to be a rubber stamp, then Congress would not have required the Court to get involved at all.

The purpose must be the purpose.  It does not say a purpose.  And so we agree with the State that the evidence, including the OLC opinion, suggests that this was not the purpose of the request and that it is not accurate.

In addition to what the State mentioned, I would

App. 144

11

point the Court to what I think is a quite shocking discussion in the OLC opinion, that's ECF 78-1, of estoppel.  It's pages 34 to 36 of the OLC opinion.  There's also a reference to this issue on page 20 of the OLC opinion where the Civil Rights Act asks OLC about the -- this is supposedly memorializing advice given back in September.

THE COURT:  Understood.

MR. FOX:  And they asked OLC, well, what if we told a state that we were only going to use this for list maintenance; can we turn around and use it for other things?  And OLC's advice is, yes, that's no problem, you can do that.

Now, OLC does say you need to have -- at the point when you told the State that you were going to use it for a particular purpose, that needs to have been true at that point, but if you change your mind, you can change your mind.

Well, here we are now, it's May, and they asked this for a reason.  Presumably, that reason is that they intended to use this information for another purpose, but now DOJ is in front of this Court trying to enforce a demand that states that the purpose is this list maintenance investigation purpose when there is quite clear evidence from their own legal opinion request that their purpose is at least broader than, if not different than, that and that is strong evidence that we don't have the purpose in the demand letter and that, in fact, they plan to do other or additional things with this information.

App. 145

12

THE COURT: The strong evidence that there's a different purpose is what, the fact that they asked about the ability to use it for other purposes?

MR. FOX: So it's the fact that they asked can we use it for other things, because why would you ask that if you weren't planning to use it for other things, and other statements in the OLC opinion, including on the first page that say this was in response to the president's executive order that set off the whole thing.

But, again, the Court doesn't need to reach that. There are also express discussions in the OLC opinion about immigration enforcement, which was not a purpose that was included in the letter. Again, the Court doesn't need to reach that if it sticks with *Galvin* and basis, but there is fairly direct evidence that the purpose is not entirely what the letter said.

And then, in addition, the purpose that is a lawful purpose needs to involve an actual duty that New Hampshire has. And in addition to what the State says, intervenors want to emphasize that New Hampshire's duties under HAVA are sharply limited and more limited than many of the other states in which DOJ's complaints have been dismissed because of the NVRA exemption.

And, in particular, the subsection of HAVA which is 52 U.S.C. 21083(a)(2) that actually imposes federal list

App. 146

13

maintenance duties does not apply to New Hampshire because subsection 21083(a)(2)(A)(iii) says:

Notwithstanding the preceding provisions of this subparagraph, if a state is exempt from the National Voting Rights Act, that state shall remove the names of ineligible voters from computerized list --

THE COURT:  That doesn't seem --

MR. FOX:  -- in accordance with state law.

THE COURT:  That's not in dispute.  I mean, whether it matters is in dispute, but the fact isn't in dispute.

MR. FOX:  Well, I think it -- well, it's not disputable.  I mean, the statute says what it says.

THE COURT:  Right.

MR. FOX:  But the fact that there is only a state law duty to actually conduct list maintenance in New Hampshire makes the DOJ's demand that they look over the shoulders of the State and line-by-line audit whether that list maintenance is being done properly even more extraordinary in New Hampshire because they are not even supervising the federal law duty; they are supervising a state law list maintenance duty.

And they turn to subsection (4) of the statute to try to get around this, but subsection (4) requires only that the state election system shall include provisions to ensure particular things.  So to assess compliance with subsection (4), you would look at state law, state regulations procedures.

App. 147

14

It must include provisions.  It's -- the actual duty to conduct list maintenance in New Hampshire is a statewide duty.  So that goes to purpose.

I would also point the Court to the *Bellows* decision last week from Maine, from Judge Walker in Maine, which talks about purpose.  And what Judge Walker emphasizes in the *Bellows* decision is that HAVA includes a strictly limited set of enforcement requirements.  DOJ can bring a lawsuit in federal court if they can allege that HAVA is being violated, but HAVA does not include any authority for DOJ to request the voter list or do this line-by-line audio that DOJ wants to do.  And as Judge Walker explains, it would be extraordinary and contrary to the Court's duty to read federal law as a cohesive whole to conclude that the Civil Rights Act allows DOJ to do something that HAVA, which comprehensively regulates the subject, does not authorize DOJ to do.

Those are my points on basis and purpose.  Thank you.

THE COURT:  Thank you, Counsel.

I'll hear from the United States.

MR. CASALI:  Thank you, your Honor.  John Casali for the United States.

Your Honor, just before we get going, for the record, the United States does not believe that the Federal Rules of Civil Procedure normally apply to this action and I

App. 148

15

would just reference *Kennedy vs.* --

THE COURT REPORTER:  Sorry.  Excuse me.

MR. CASALI:  Apologies.  I'm quick.

Just for the record, the United States does not believe that the Federal Rules of Civil Procedure apply to this action.  And I would cite *Kennedy vs. Lynd*, 306 F.2d, 222, pages 225 to 226.

Your Honor, so the basis and the purpose, I would direct your attention to the August 18th demand letter.  And that's document 31-4.  The very first sentence:

We are writing in response to your letter of July 25, 2025.

That is the basis, your Honor.  The Attorney General had previously requested just general information about New Hampshire's compliance with HAVA standards, received a response on July 25th from the secretary, but that response did not satisfy the Attorney General's investigation.  And the Attorney General can seek records just for assurances that the law is being followed.  So, your Honor, the basis is stated in the -- the basis is that that correspondence did not satisfy the initial inquiry.

THE COURT:  All right.  Wait.  So your argument is that the basis that's required by the statute is the fact that their -- that their response to your initial request in June was insufficient.

App. 149

16

MR. CASALI:  Yes, your Honor.

THE COURT:  That's the basis.

MR. CASALI:  Well, I would also suggest, your Honor, that the -- the case law suggests in *Kennedy vs. Lynd*, again, that it's not the Court's role to assess whether the basis was sufficient or not, just whether one was given.  And one was.  I do believe it was in the very first sentence.  And I believe that that first sentence would fairly incorporate that whole course of correspondence.

And it's true that the letter goes on to specifically reference some sections of HAVA, but the letter is much more broad and does specifically demand the State's voter registration list, your Honor.

Regarding the purpose, the OLC opinion was just mentioned.  And, again, that's docket 78-1.  And I would bring your attention to page 4 where the OLC says, quote:  The purpose of its activity is to facilitate ordinary list maintenance, to ensure -- and now we're going back up to the top of that page -- to ensure, among other things, that states are complying with Congress's demand --

THE COURT:  When you're reading, you've got to really slow down.

MR. CASALI:  Apologies, your Honor.

THE COURT:  That's okay.

MR. CASALI:  To remove those who are ineligible to

App. 150

17

vote from their voter rolls, your Honor.

So that then is the purpose and that was referenced generally in the correspondence from June and July and then incorporated in the August letter.

And ordinary list maintenance does include making sure that the State of New Hampshire is including all fields as required under HAVA. And that is mentioned, that statute with those fields, is mentioned at the bottom of our August 18th demand. It cites 52 U.S.C. 21083(a)(5)(A)(i) and that is where the State is required to collect driver's license, social security information for each registrant, your Honor.

THE COURT: I think your bigger problems are on basis, not purpose.

MR. CASALI: I'm sorry, your Honor?

THE COURT: Think your bigger problems here are on basis, not purpose. Tell me about basis.

MR. CASALI: Yes, your Honor.

Again, basis is that the Attorney General had conducted in the course of his ordinary responsibilities to ensure the federal law on -- is being followed, specifically federal law regarding list maintenance activities, and the original outreach made clear that that was what the Attorney General was looking for. The Attorney General had requested -- she posed a number of questions to the State and she did receive some responses to that. However, the State

App. 151

18

denied access to the full voter list.

So this letter, your Honor, the demand letter in August 18th, goes on specifically to state that the Attorney General is actually entitled to that list. That seems to be the conflict between the State and the United States, and that is the basis of this request, your Honor.

THE COURT: So the -- basically you're telling me the basis equals the purpose?

MR. CASALI: No, your Honor. I wouldn't say so.

THE COURT: I'm sorry then. I misunderstood you. Go ahead.

MR. CASALI: Your Honor, I believe that you were asking if there was a basis provided in the letter and I think that the first line here saying that we are writing in response to your letter is a basis, that there was an exchange of communication between --

THE COURT: You told me that was the purpose a minute ago. Am I misunderstanding you?

MR. CASALI: Your Honor, the purpose is to ensure --

THE COURT: Oh, no. Actually, you know, I'm -- I am misinterpreting. You told me it was the basis.

I want to talk about what the word basis means. What does it mean?

MR. CASALI: Your Honor, the United States, first of all, would not suggest that a factual basis is required for

19

this demand.  I understand that your Honor may feel otherwise and I respect that, your Honor, but --

THE COURT:  It's not that I feel otherwise.  It's, you know --

MR. CASALI:  Yes, I understand.

THE COURT:  It's just every other case ever written says otherwise.  So I guess that's what I want to hear from you about.

MR. CASALI:  Yes, your Honor.

Well, the basis -- let's think about *Kennedy vs. Lynd.*  Footnote, I believe, 16 says that information in the Attorney General's possession tended to show that there was some violation discrepancy of federal election law.

Now, the Attorney General is in possession of the secretary's letter from July 25th and that's what's specifically referenced here.  That letter did not assure the United States Attorney General that the State of New Hampshire had been satisfying -- had been conducting list maintenance in satisfaction with HAVA.

THE COURT:  Okay.

MR. CASALI:  Thank you, your Honor.

Move on to purpose?

THE COURT:  Sure.

MR. CASALI:  Okay.  Your Honor, to the extent that counsel has suggested that using the -- sorry -- using HAVA's

App. 153

requirements to enforce making sure that noncitizens and other ineligible -- or other ineligible voters are not included on the State's voter list, that is a valid purpose. That is something that HAVA requires that the State do and that is something that the Attorney General is entitled to enforce. And that's 52 U.S.C. 21111, where the Attorney General's given that enforcement --

THE COURT: You've got to slow down. You've got to slow down.

MR. CASALI: Sorry, your Honor.

THE COURT: Yeah.

MR. CASALI: 52 U.S.C. 21111.

And the statute that is specifically provided at the end of our August 18th demand cites 52 U.S.C. 21083 (b)(4)(A) and (B). And those statutes, your Honor, do concern citizenship. A registrant by mail must confirm that they are a citizen of the United States. This is a valid purpose the United States Attorney General can investigate.

THE COURT: All right.

MR. CASALI: Thank you.

THE COURT: Thank you.

All right. AG's office, do you want to move on to the other argument regarding whether the list is subject to the statute?

MS. TRIICK: Sure.

App. 154

So the SVRL is not a record or paper that must be retained, preserved, or produced pursuant to the Civil Rights Act.  The Civil Rights Act requires election officials to retain, preserve without altering, and produce on demand all records and papers which come into that officer's possession related to any application, registration, poll tax or other act requisite to voting.  This does not cover the SVRL for two main reasons.

First, the SVRL does not come into state official -- election officials' possession.  I guess I said state.  State or local, right, election officials' possession.

The courts in Michigan, in Arizona, in Maine, in Wisconsin also rule on this ground, that -- that the Civil Rights Act requires state and election officials to preserve records that come into their possession --

THE COURT:  Yeah.

MS. TRIICK:  -- that people fill out and come into the State's possession.

I think I won't belabor that point because I think those four judges do an excellent job of explaining it and I don't know that I can improve on that here speaking this morning.

THE COURT:  I've read them.

MS. TRIICK:  I would also point out that it cannot -- record and paper are not expressly defined in the

22

statute, but it cannot be that a database is such a record or paper because it has to be something you can retain and preserve without altering and the very idea of the SVRL as a database is that it's being constantly updated, right, and so it --

THE COURT:  Wouldn't -- wouldn't it just be the record that exists as of the date of the request?  I mean, I -- I think -- I understand your argument about coming into possession --

MS. TRIICK:  Correct.

THE COURT:  -- because that just seems to be a matter of reading the language and understanding -- you know, interpreting it --

MS. TRIICK:  Uh-huh.

THE COURT:  -- by its ordinary meaning.

MS. TRIICK:  Yes.

THE COURT:  But this idea that a database can't be a record, I really struggle with that.

MS. TRIICK:  So I want to be clear about two things.

THE COURT:  Yeah.

MS. TRIICK:  First, it's not that under some other laws a database couldn't be a record.  There are certainly plenty of laws in which the word record is used broad enough, right?

THE COURT:  Yeah.

23

MS. TRIICK: So I don't -- it's not that. But the word record can mean different things, right? It's a record or a paper here. And in the Civil Rights Act -- so Section 20701 is the one -- is the section that requires us to retain or preserve these records or papers. Immediately following that in 702 it makes criminal for any person to willfully destroy, manipulate, or alter the record or paper which you have to keep pursuant to -701. And so I think in that particular context it cannot be that this is a record or paper that has to be preserved without alteration.

I want -- I want to be clear that I'm not saying that somehow by putting a record into the database, you can somehow exempt that record from disclosure.

THE COURT: No.

MS. TRIICK: Right? So if registrations were occurring entirely electronically and they only ended up in the database, it wouldn't somehow exempt the State from having to produce the record of registration. Right? But New Hampshire doesn't do it that way. All record -- all voter registrations are done in paper. They're retained at the local level. They're available and kept for inspection until seven years after someone comes off the list. Right? They -- the SVRL doesn't contain -- it's not like a holding place for electronic documents that exist nowhere else.

So the question is not whether there are some -- the

24

question is whether the database itself is a record --

THE COURT:  Right.

MS. TRIICK:  -- and not whether or not some State's databases might include records that need to be produced.

THE COURT:  I'm with you.

MS. TRIICK:  Okay.

THE COURT:  But I still don't understand why -- I mean, if it's records or papers --

MS. TRIICK:  Yup.

THE COURT:  -- clearly it's not just papers.

MS. TRIICK:  Clearly it's not just papers.  Yes, it could include -- definitely could include electronic records, but I think there's a difference between an electronic record and a database.

THE COURT:  What's that?  What's the difference?

MS. TRIICK:  Well, a database -- my husband, who does electronics, would be very displeased with my explanation, but it's a computer system that holds information or records or stores things, right?  An electronic record would be like someone's voter registration.  Right?  If it were only electronic.  But, again, here in New Hampshire, it's not.

I would also be sure to point out that as I said at the very beginning, there are a number of different grounds upon which this Court can rule and so to the extent one presents a problem, you can move on to another.

App. 158

25

THE COURT:  Last weekend I went online to the Fish and Game Department --

MS. TRIICK:  Uh-huh.

THE COURT:  -- bought my hunting-fishing license for 2026.

MS. TRIICK:  Yeah.

THE COURT:  I just typed it in --

MS. TRIICK:  Yup.

THE COURT:  -- it appeared on the screen, gave me an option to print it.

MS. TRIICK:  Yup.

THE COURT:  Right?

And I -- I think the way I understand the law is if you're out there hunting or fishing, you're supposed to have a paper record on you, so I printed it.

But -- so in my possession, that paper record is a paper.

MS. TRIICK:  Uh-huh.

THE COURT:  I don't think it's a paper in the State of New Hampshire anywhere probably.

MS. TRIICK:  Probably.

THE COURT:  And is that a record?  It's -- certainly it's a record, isn't it?  It's not a paper, but it's a record.

MS. TRIICK:  I think so, yes.

THE COURT:  Okay.  Is that what you meant by

App. 159

26

someone's voter registration?

MS. TRIICK: I think it could -- I think if that's how the voter registration system in New Hampshire worked, I would definitely want more information about how we were storing them because if we, say, stored them as PDFs and then also data entered them into a database, I'm not sure the database is the record anymore.

THE COURT: You think it's the PDF.

MS. TRIICK: I think it's the PDF. But I think in that situation -- but I think it's a very fact-specific situation and here we have the record of the registration. It's in paper. We do it all on paper. The State of New Hampshire chooses to do that --

THE COURT: Yeah.

MS. TRIICK: -- that way. And so the information in our database is just a collection of information.

And I also want to point out that the State of New Hampshire did offer to provide a voting list. So if you want a list of registered voters, that has also been made available. So each election, the State of New Hampshire produces the checklist. Some number of days, I don't know the exact number of days, before the election, the checklist is produced of all eligible voters, right? Everybody who's registered. And then people who register the day of the election are added to the checklist.

App. 160

27

And so if you want a compilation list of the people eligible to vote in the 2024 federal election, that is available.  That is the checklist, not the SVRL.

THE COURT:  I'm just -- but just to use the analogy again, right?

MS. TRIICK:  Yeah.

THE COURT:  I guess I'm assuming that in the State of -- in the State of New Hampshire's hands, my hunting-fishing license is a record.  But if -- there's probably another record at Fish and Game that they could probably just punch up and have a list of everybody who's a bought a hunting license in 2026.

You're saying that my license would be subject to -- if it's covered by this act -- would be subject to production, but that I guess that -- that list would not be.

MS. TRIICK:  So I think for sure your registration would be.  I --

THE COURT:  Because it came into their possession when I --

MS. TRIICK:  Yeah, when you filled it out.

THE COURT:  But what it -- but if -- if Fish and Game created a list --

MS. TRIICK:  Yup.

THE COURT:  -- and that -- that it maintains and probably the list grows every day when more people do it,

App. 161

28

that's not a record that's come into its possession.

MS. TRIICK:  Under the Civil Rights Act, yes.

THE COURT:  Yeah, yeah.

MS. TRIICK:  So I want to be clear again that there are other places where it might be a record, right?  So like 91-A and those kinds of things, we ask what's a record, you know, how does a database work, do you --

THE COURT:  I'm with you.  It all comes down to how it's statutorily defined.

MS. TRIICK:  It does.  So the Civil Rights Act is talking about papers or records that have to be maintained or preserved when they come into possession.

THE COURT:  Yeah.

MS. TRIICK:  And I do think the two -- the "come into possession" and the "retained or --

THE COURT:  Yeah.

MS. TRIICK:  -- preserved without altering" inform each other, right?  They're definitely connected arguments, even though they're about sort of separate words in one sentence.

But either way, under either of those, the SVRL itself is not a paper or record that has to be retained and preserved and produced pursuant to the Civil Rights Act.

THE COURT:  And I guess what I'm saying is -- and you can tell me if you agree or disagree -- I think the reason

App. 162

29

for that is that the SVRL doesn't come into the Secretary of State's possession.  That's the distinction that seems to matter to me more than whether it's a record, because it's clearly a record of something; it's just not a record as defined by this particular -- that's my understanding --

MS. TRIICK:  Yes.

THE COURT:  -- defined under this definition that incorporates the coming into possession.

MS. TRIICK:  Yes.

THE COURT:  Do you disagree or agree?

MS. TRIICK:  Well, I think I would hate to disagree with the assertion that allows us to win, so I definitely agree.  I think that the State gets a little more nervous about it because federal law makes it a crime to be altering these records --

THE COURT:  Uh-huh.

MS. TRIICK:  -- right?  And so to suggest that in any world that this is a record covered by that section would make alteration of it -- it proposes -- it imposes duties to retain, preserve, and not alter that the State would not want to be coming out of compliance with, right --

THE COURT:  Yeah.

MS. TRIICK:  -- if there's any suggestion that it's a record that has to be retained and preserved, right?

THE COURT:  Yup.

App. 163

30

MS. TRIICK:  So -- I don't feel a strong need -- I think we're going topic by topic.  I don't feel a strong need to talk about the Privacy Act and the E-Government stuff.  I think my brief -- unless the Court would like to hear about that.

THE COURT:  No.

MS. TRIICK:  I'm --

THE COURT:  Let's be orderly about this and I'll hear from the intervenors regarding -- regarding records and papers and then we'll hear from the United States.

MS. TRIICK:  Thank you, your Honor.

THE COURT:  Thank you.

MR. FOX:  Your Honor, David Fox for the intervenors.

I think your Honor is exactly right that the key question is not is this a record in general, but is it a record that comes into the possession of the state election officials.  And I think the key distinction from your Fish and Game example is that when you applied for your license, you went online and typed it in and there was some sort of electronic transfer on the back end, but you provided that information to the state agency electronically.

And so the question of what an analogous Fish and Game statute would require to be preserved there if it talks about records that come into possession would depend, I suppose, on the details of how that electronic information gets

App. 164

31

transmitted to the State's database, but there would be some preservation obligation because you are providing a record that is coming into the possession of the State.

What's happening here is not that, because that's not New Hampshire voter registration works.  The voter gives an election official a registration form.  That form comes into the official's possession, but then the official always, and the voter never, types that information into the state voter registration list.  And so no aspect of the SVRL comes into the state election official's possession.  It is generated entirely by election officials and not by voters.

THE COURT:  But from information provided by the voters.

MR. FOX:  Correct.  But what the statute refers to is records or papers, not information.  And that's the critical distinction.  If it was information that comes into the possession of the election officials, it might be a different matter, but it is records and papers.  And so I think we can all agree that the application form is a different record or paper than the database.

And the question, yes, someone is transferring information between them, but the record that is the database does not come into the election official's possession.  It is created by the election official.  And I think that is a key -- the key fact here that makes this outside the scope.

App. 165

32

And then your Honor asked about, well, couldn't the obligation just be to produce the database as it exists when they get the demand separate from the preservation obligation, and the answer is no because of the way the statute is written. That would be perfectly possible in theory, but the way the statute is written, the obligation to permit inspection by the Department of Justice is tied exactly to the records that must be preserved under Section -701.

And so it is not statutorily possible to say that this record needs to be turned over to DOJ, but it does not need to be preserved and not altered. In order to say that it is something that DOJ is entitled to get, it must be a record that election officials are obligated to preserve. And that raises a serious conflict with the provisions of HAVA that require that the database be continually updated.

And so that is another reason to understand that what we're talking about here are records provided by voters to election officials and not records that election officials create.

Thank you.

THE COURT:  Thank you.

Mr. Casali.

MR. CASALI:  Thank you, your Honor.  John Casali again for the United States.

Your Honor, to the extent that this Court is

App. 166

33

wondering whether a state's registered voter list is a record subject to Section 20701 or it comes into possession as some barrier, it is not and this is why.

First, in *Kennedy vs. Lynd*, 306 F.2d, 222, the quintessential and persuasive case on the matter, it actually addresses whether state-created records or compilation of records count. *Lynd* at 230:  An election officer was told that they had --

THE COURT:  Time out.  Time out.  Time out.

MR. CASALI:  Sorry.

THE COURT:  You don't have to cite it.  We got the briefs.

MR. CASALI:  Understood, your Honor.

THE COURT:  It's tough on the reporter.  You can just talk about the cases.

Go ahead.

MR. CASALI:  All right.  Happy to do so.

Your Honor, what happened there was a court officer was told that these records that came into their possession, that they were in possession of from another state agent, that they had compiled -- this is another state agent's work compiling records, the applications form into a centralized document.  The election official came into possession of this state-generated compilation.  That qualified under *Lynd*, your Honor.

App. 167

34

Second, the Court order at the resolution of *Lynd* uses the language, all records compiled, and that included, actually, the state voter registration list.  It's always worked this way and it makes sense if you look at this in context of the 1960s, your Honor, because the application that these voters would have submitted would have included in some states, say, a citizenship test and you would get on the application the answers from a Black or a White voter, but that information says nothing about whether or not that individual was ultimately registered.  You need the state's voter registration list in order to do so.  That was provided at the conclusion of *Kennedy vs. Lynd*, your Honor, and it makes sense that that would be a record that would qualify here.

Second, your Honor, regarding whether or not the voter list just in general could qualify as a record, I would direct you to a case in the First Circuit, *Public Interest Legal Foundation vs. Bellows*.  I won't cite the whole thing, your Honor, but there's a quote there that says that the voter file can be characterized as the output and end result of registration activities.

And, again, Section 20 -- 20701 says all records and papers which come into possession related to registration.  So this is contemplated, your Honor.

And I would also direct your attention -- it's an out-of-circuit case, but it does touch upon whether or not this

App. 168

35

database that's constantly changing can be considered a record -- and this case, your Honor, is *Voter Reference Foundation LLC vs. Torrez*, 160 F.4th at 1068.  And this is the Tenth Circuit, again, your Honor, but, quote:

As to the State's argument that dynamic documents held electronically cannot be records, the argument failed because such an interpretation --

THE COURT:  Please slow down.

MR. CASALI:  -- such an interpretation is counter to the NVRA and its purposes.

And I know New Hampshire is not subject to the NVRA, your Honor.  I'll get to that in a second.

But the public disclosure provision of the NVRA would require the State to maintain the records for two years. Maintain they define as carry or keep up and inevitably this means that the records must be consistently and constantly updated; in other words, to be dynamic, to ensure accurate and current voter registration rolls are maintained, your Honor.

And just regarding the NVRA and the application to the State of New Hampshire, there's a case *Colon-Marrero vs. Velez*.  It's also in our brief, but a quote from that is:

It's inconceivable that Congress would have made HAVA applicable to NVRA-exempted states but exempted them from HAVA's list maintenance aspects.

So this all comes together to paint the picture that

App. 169

36

this voter registration list is related to voting and should be subject to the disclosure provision in Section 20701.

Your Honor, I would also say that HAVA requires that the State have a centralized state voter registration list, so the State cannot say that these records are more properly held at the local level and not with the secretary.  HAVA requires that there be a centralized voter registration list and that's what we're looking for here.

And the secretary mentioned that it would be possible to get a list of all registered voters at the 2024 election.  The United States would be happy with that record.  That would satisfy us, your Honor.  But -- of course, we want the -- we want more general information as well, but that would certainly be a remedy for the United States.  Not the entire thing, but that would certainly be appropriate.  It seems like your Honor had indicated so.

Thank you.

THE COURT:  All right.  I've got to take another look at this *Kennedy vs. Lynd* case because I didn't understand it to be -- I didn't understand it to be a case you were citing for the proposition of -- or at least that that could be drawing inferences about the records involved in that case.  You cited it to say it's very sweeping and broad.

MR. CASALI:  That's correct, your Honor.

THE COURT:  But now you're saying that it -- it

App. 170

37

demonstrably brings the -- you know, the SVRL under the ambit of the statute, right?  That's what you're saying, based on, I guess, inferences I can draw from the records involved in *Kennedy v. Lynd*.

MR. CASALI:  Yes, your Honor.  And I would just say that this has been an evolving area of law and the decisions of multiple courts have, you know, focused on this distinction between come into possession.  But the *Kennedy vs. Lynd* case that has been cited throughout is insightful.

THE COURT:  Okay.  Thank you.

MS. TRIICK:  Your Honor, I was hoping to add one thing quickly.

THE COURT:  Please.

MS. TRIICK:  I don't want to waste the Court's time, but I just want to point out that Exhibit 4 of our motion to dismiss is a letter that the secretary sent back to U.S. Department of Justice on August 28th before this lawsuit was initiated and the very last paragraph of that offers to provide a copy of the March checklist from the 2024 general and/or primary election, should it be requested.

So the State has affirmatively offered before this litigation started to provide the March checklist, which is the voter registration list from the last election.

THE COURT:  But that's not what you were saying you'd be satisfied with.

App. 171

38

MR. CASALI: No, your Honor.

THE COURT: You wanted the SVRL from the last election.

MR. CASALI: Yes, the whole -- all fields, your Honor. Yes. Thank you.

THE COURT: I -- you -- you're grimacing.

MS. TRIICK: I don't know what the SVRL from the last election is. We don't retain a copy as of the date of the last election, as we talked about in my prior discussion. So the SVRL as of the last election doesn't exist and that is why it can't be a record under the Civil Rights Act because otherwise it would have been criminal not to retain it, but HAVA doesn't want us to retain it. It wants us to update it.

THE COURT: Well, you know, retain -- I mean, so should I understand you to be saying that, you know, a snapshot couldn't be provided as of a certain date? I can't pick really any date and you can't -- the State can't produce the SVRL as of that date?

MS. TRIICK: A future date, not a past date.

THE COURT: A future date?

MS. TRIICK: Like if you told me you wanted a copy of the SVRL as it exists tomorrow, I believe the State does have the capacity to do that.

THE COURT: Tomorrow.

MS. TRIICK: Tomorrow. But I don't --

39

THE COURT:  We're not in the Marvel universe, right?  We're just --

MS. TRIICK:  I don't know if you can do today.

THE COURT:  You're just saying I can't go back and take a snapshot.

MS. TRIICK:  I can't go back and take a snapshot, as far as I know, your Honor.  I guess I haven't asked the technical people, but I believe we add data all the time, so --

THE COURT:  I know, but --

MS. TRIICK:  I don't know.

THE COURT:  Yeah, I -- okay.  Okay.  You say you don't know.  You say that's your assumption, but you haven't --

MS. TRIICK:  That's my assumption, but I have not asked.

THE COURT:  Fair enough.  That's a straight answer.

Go ahead.

MR. FOX:  On the new issue of the records involved in *Lynd*, your Honor, I would just point out that that paragraph of *Lynd* talks about records compiled by a prior election official, and I do think compiled is an important word.  That is different than created.  It's not clear that the records at issue -- certainly the Fifth Circuit didn't address the possibility of records that were created by a prior official.  Compiled means brought together, but that could be a stack of voter applications.  The argument that that portion of *Lynd* was

App. 173

40

talking about was the argument that was like I didn't get these records when I was in office, I came into office and the records were on the desk and so I shouldn't be responsible for producing them.

And the Court rejected that, it is true, because they were compiled by a prior election official, but that doesn't actually, I don't think, answer the question of a record that it's created entirely within the State, like the SVRL.

THE COURT:  Okay.

MR. FOX:  And then on the *Colon-Marrero* issue, which is the First Circuit case about the scope of HAVA, that case involved a very particular provision of HAVA which was the prohibition on removing voters from voter rolls slowly by reason of their failure to vote in a prior election.  And it said, yes, that that is a freestanding prohibition that applies even in Puerto Rico and even here in New Hampshire, but it did not address the other aspects of HAVA.  There was some broader language in the opinion, but that is the statute that was at issue.  It did not say that all aspects of HAVA list maintenance apply in NVRA-exempt states and the statute quite clearly says that they do not.

Thank you.

THE COURT:  You want the last word on this before we move on?

App. 174

41

MR. CASALI:  If I could be briefly heard, your Honor.

The distinction between created or compiled is not where the argument is, because what a state is doing is not creating, for example, a voter registration driver's license number or social security number.  They are compiling that data.  Compiling is the appropriate word, your Honor.

Thank you.

THE COURT:  Okay.  Next.

MS. TRIICK:  Your Honor, I don't know if there was something specific you wanted to talk about next.  There's the HAVA claims.  I don't know if those are still before the Court as the federal government has offered no substantive response in their objection to our motion to dismiss.

So I guess I would just say in very short that HAVA has no affirmative obligation to disclose documents of any sort to the federal government.  It does give them the authority to file a civil lawsuit, but this is not that.  They haven't -- the -- the complaint doesn't allege facts sufficient to be -- to survive the motion to dismiss.  They don't plead facts sufficient to move on to discovery under a HAVA claim.

THE COURT:  Yeah.  When you say this isn't that, it is a complaint; it is a federal court complaint.

MS. TRIICK:  It is a federal court complaint.

THE COURT:  You're just saying it fails to state a

App. 175

42

claim.

MS. TRIICK:  It fails to state a claim.  It has insufficient factual allegations.

THE COURT:  You understand why I asked that, though; because if you say it's not a complaint, then their argument that the civil procedure rules don't apply gets better legs.

MS. TRIICK:  Yes, correct.

THE COURT:  So I want to be clear what you're saying here.

MS. TRIICK:  So I'm saying it doesn't have -- so the arguments I've been making so far have been legal.  That argument that it's just a HAVA lawsuit fails because it doesn't plead sufficient facts to survive a motion -- a motion to dismiss.

And I do just want to briefly, since this sort of connects, say that while it's the State's position as outlined in our objection that *Powell* overruled *Lynd* as to the application of the civil rules, even if *Lynd* was applied, you'd still need to answer the same questions here because *Lynd* still provides for a substantive hearing on the merits open for determination.  And so the -- the facial validity of the demand letter and whether the record being demanded is within -- covered by the Civil Rights Act would be the same questions under just a different proceeding.  The State moved to dismiss because the federal government filed a complaint, but the

App. 176

43

questions would be, I think, substantively the same.  Again, *Powell* overrules that -- that provision and so the Rules of Civil Procedure do apply.

And then I guess I did want to just briefly -- I think we've touched on these things, but the federal government's pleadings do mention that many or most registration applications are likely only in the SVRL.  As I've stated before, that's not true in New Hampshire.  Ours are all on paper and retained as they need to be pursuant to the Civil Rights Act and, actually, for much longer.  And there is no missing data from the EAVS report.  New Hampshire provided all the data it needed to under the EAVS report and when -- where there are zeros or not applicables, it's because of the structure of New Hampshire's election system and not because we failed to report data under the EAVS report.

The final two factual arguments made -- I guess the final two arguments made in the State's motion to dismiss have to do with the Privacy Act and the E-Government Act and the federal government being precluded from collecting data which details protected First Amendment activities of its citizens unless one of the three exceptions applies.

None of those three exceptions apply.  It isn't expressly authorized by law for the federal government to collect this information.  It hasn't been authorized by the citizens involved and it's not pertaining to or within the

App. 177

44

scope of an authorized law enforcement activity.

And, also, even if it weren't First Amendment activity, the federal government would need a SORN.  And here they rely upon the current existing one which is both too narrow and also insufficient because you need a new SORN every time there's a substantive increase in the number of records collected or an expansion or type of the categories collected. Those are supposed to notify the public and Congress of data collection efforts.  And so when you embark on a fundamentally new or larger data collection effort, you're supposed to notify the public and Congress with a new SORN, which hasn't been done.

The E-Government Act requires a privacy impact assessment when initiating new data collection efforts that impact personal privacy.  I don't think there's any argument here that this does not impact personal privacy and I think that the OLC opinion makes clear that this is a new and very much broader and larger data collection effort and so there's no privacy impact assessment that has been done, so collection of this data is in violation of federal law.

THE COURT:  Yup.

MS. TRIICK:  I think that got to the end of the things I had to discuss unless the Court had questions.

THE COURT:  No, I think you're good.

MS. TRIICK:  Okay.

App. 178

45

THE COURT:  The AUSA didn't really engage on this issue, you know.  It's -- let me hear from the intervenors.

MR. FOX:  On the question of the HAVA claim itself, I would just add that I believe the only factual allegation in the complaint suggesting a HAVA violation which is, of course, what they would need to allege --

THE COURT:  Is that rates below the national average.

MR. FOX:  -- is that they have too few duplicate registrations, which actually suggests uncommonly good HAVA compliance.  And --

THE COURT:  One court suggested that, I saw, but I -- I don't know.  I guess, you know, I don't -- that, to me -- what it suggests isn't really the proper fodder for this analysis because it's a motion to dismiss, right?

MR. FOX:  So I think that might be fair in theory, but, you know, they need to provide factual allegations making it plausible that there has been a violation of HAVA.  And if what they have come up with is a very low set of duplicate registrations, does that make it plausible that New Hampshire is doing a poor job of identifying duplicate registration?  I would submit it does not, particularly in the context that is judicially noticeable.  It is a legal structure of New Hampshire --

THE COURT:  I know, but we -- we draw inferences,

App. 179

46

right, and I'm supposed to -- on a motion to dismiss, I'm supposed to draw the inferences that the plaintiff would draw.

So I -- I understand your point, by the way. This is -- this is the only fact I can find myself. But I don't think I'm supposed to assess the credibility or the fair -- it seems to me that two inferences could be drawn from that, the one you're drawing and the California -- I think the California court drew, and then there's the one that the United States is drawing. So I don't think I should be in that business.

MR. FOX: So, your Honor, I guess what I would say is under *Twombly*, if there are -- if there is an obvious alternative explanation is the quote from *Twombly* for an alleged fact, then the Court is not supposed to credit that inference in the face of obvious alternative explanation.

And, in this case, what we have is New Hampshire's quite unusual voter registration procedures that involve someone always showing up in person to register to vote with very rare exceptions, unlike most states where you register whenever you get a driver's license or be it any number of other ways. And I think there is this obvious alternative explanation that New Hampshire's system, which the State is justifiably quite proud of, produces many fewer duplicate registrations. And there's just nothing in the complaint that would tend to suggest that that obvious explanation isn't what's happening here. You have a low rate of duplicates and a

App. 180

47

low rate of duplicate removals, as are consistent with there just not being very many duplicates.

On the question of the Privacy Act -- well, separate from the Privacy Act, the other argument that we make is that the federal government has not shown that New Hampshire law's privacy protections for this information are preempted by federal law.

So New Hampshire doesn't allow disclosure. If New Hampshire has to turn it over, it has to be because the New Hampshire laws that prohibit disclosure are preempted by federal law. And the federal government doesn't show that those laws are preempted by federal law. And, in particular, they don't show -- certainly there's no express preemption, so they would need to show obstacle preemption. They would need to show that New Hampshire's laws make it -- are an obstacle to the enforcement of HAVA. But they haven't shown that.

And I would point the Court in particular to the First Circuit's decision in the *PILF* case which involved the NVRA, which does have an express disclosure provision and which said that private information can be redacted, that laws requiring private information are not preempted by the NVRA. The State can redact that when it makes its voter rolls public.

And, similarly, the government has not shown that New Hampshire law protections for that private information are preempted by HAVA. They would need to show that they really

App. 181

48

need that private information and they just have not made that showing here.

THE COURT: Understood.

MR. FOX: Thank you.

MR. CASALI: Thank you, your Honor.

Regarding the HAVA claim, your Honor, as I just heard from the State of New Hampshire, New Hampshire would not be able to generate a list from the last election or, arguably, within the past 22 months as required by Title III. I think that that is a concern, your Honor.

The secretary also stated that these records are at the local level and they are selected and they're all on paper, but HAVA clearly requires a digital, computerized list. So there's facts for a HAVA claim, your Honor.

You had also mentioned, your Honor, that --

THE COURT: Well, except they're not in your complaint.

MR. CASALI: I'm sorry?

THE COURT: Except they're not in your complaint.

MR. CASALI: Understood, your Honor. That did just appear in the record. But --

THE COURT: Yeah.

MR. CASALI: -- what was in our --

THE COURT: But we agree I can't consider that, can I?

App. 182

49

MR. CASALI:  Understood, your Honor.  Yes, we agree.

THE COURT:  Okay.

MR. CASALI:  Your Honor, but as you did mention, the motion to -- or our initial complaint does cite a factual basis and that is, again, the shockingly low number of registrants. And if it's the case that New Hampshire is doing a phenomenal job preventing duplicates, let it be so.  We'll be happy to say so.  However, the record as it is states these facts and we are construing them as a potential issue with HAVA, your Honor.

Your Honor, the idea that -- well, actually, let me go into privacy first, your Honor.  To the extent that the Court is concerned about privacy, the United States is happy to work with this Court on the appropriate remedy.  But, to be clear, privacy concerns are an issue to be addressed in crafting a remedy and not whether or not the Attorney General is entitled to these records in the first place.

And I'd also direct your Honor's attention to the statute 20704, which seems to explicitly contemplate that sensitive records would be turned over pursuant to a Title III request.  If it -- if that was not so, that entire statute would not be relevant.  It would be superfluous, your Honor. So privacy concerns, your Honor, are really a question of remedies and not whether or not the Attorney General is entitled to this information.

I would also bring your Honor's attention to the

App. 183

50

fact that just recently -- I apologize, your Honor -- this Court did grant, your Honor, recently, access to the State's voter list to a group of private organizations. I believe that list was ultimately redacted, but that just occurred from this Court last year. I believe it was -- I'm sorry. I don't have the cite in front of me, but I do believe it's in our record or our brief, your Honor.

THE COURT: I'm familiar.

MR. CASALI: Thank you, your Honor.

Okay. So regarding the privacy assessment and the SORN, first of all, this is not a collection of new records, your Honor. We have used this SORN since 2003 numerous times to collect the State's voter registration lists. An example of that is I believe Exhibit 8 of our motion to compel. It's a memorandum of understanding with the State of Georgia. We did receive a state voter registration list with the all fields attached as part of that memorandum, your Honor.

So this is a routine use, subject to the terms of the SORN, where the documents are held and how they are accessed, and they're being accessed for the same purposes that they've always been used for, which is to ensure federal list maintenance compliance. So that memorandum in Georgia was regarding proper NVRA list maintenance, your Honor, so very similar circumstance, your Honor.

And then regarding the E-Government Act, this is not

App. 184

51

a new collection of records. The State is already obligated to collect these records under federal law and is not posing any sort of new questions to the State, either. This is the same use of records as always, your Honor.

And then just the idea that state law would preempt federal -- or federal law would preempt state law, Title III very clearly states that it is federal law to provide these records upon the request. There are no carve-outs for state law whatsoever. It is very clear that all records that come into possession regarding federal elections are subject to disclosure.

THE COURT: Okay. Anybody have anything else they want to say to me?

No?

MS. TRIICK: No.

THE COURT: Don't go anywhere for a minute. I want to quickly look up a couple of things. I'm going to come back out.

We're in recess briefly.

THE CLERK: All rise.

(Recess taken from 11:24 a.m. until 11:36 a.m.)

THE COURT: All right. I guess I'm satisfied with what I've heard based on the papers and the oral argument, but I did -- the first thing I told you when I came out today was that I'm focused on the motions to dismiss because I view the

App. 185

52

motions to compel as -- I view the motion to compel as the substantive basis for the lawsuit, not as some sort of separate motion within a lawsuit, and I just want to make sure I'm not -- I don't want to give you short shrift.

So if you want to argue about the motion to compel -- I think I totally understand it, but if there's something about it being a motion that I should view as different from the underlying basis for your -- for your claim, I want to give you a chance to be heard about it.

MR. CASALI:  Thank you, your Honor.

I think that I do agree with what you're saying. The motion to compel largely overlaps with the issues in the motion to dismiss.  I think the ruling on the motion to dismiss would inform, obviously, the motion to compel as well.

THE COURT:  That's my thinking as well.

MR. CASALI:  Yes.  Thank you.

THE COURT:  Okay.  Anybody else need to be heard on anything at all?

MS. TRIICK:  (Shakes head.)

THE COURT:  All right.  I appreciate your presentations and I will get an order out here -- I'm not saying in a couple days because it won't be a couple of days. It's going to take a little bit longer than that.  I have to -- look, you made some arguments today you didn't make in your papers and to the extent they're not waived, I want to make

53

sure I look at them.  So I will.  Okay?

MR. CASALI:  Thank you, your Honor.

THE COURT:  To the extent they're not waived.
Thanks, everyone.

MS. TRIICK:  Thank you.

THE COURT:  We are adjourned.

THE CLERK:  All rise.

THE COURT:  I should say for the record -- and I
don't mean to be -- I'm not being petty about this, but a
record should be clear.

When I say you've made some record -- you've made
some arguments today that weren't in your papers.  I was
addressing that to the United States.  I don't mean to say that
as a way of being petty with you, but sometimes the record
needs to be clarified and that might have been an example.

We're adjourned.

(Proceedings concluded at 11:38 a.m.)

App. 187

54

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 6/2/26          /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>DAVID M. SCANLAN, *et al.*,<br><br>Defendant(s). | Case Number: 1:25-cv-00371-JL |

**NOTICE OF APPEAL**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, appeals to the United States Court of Appeals for the First Circuit from this Court's Order Denying the United States' Motion to Compel and Granting Defendant's Motion to Dismiss and Intervenors' Motions to Dismiss (Doc. 86) and the District Court's entry of final judgment (Doc. 87). Doc. 86 was filed on June 29, 2026, and Doc. 87 was filed on June 30, 2026

Dated: July 6, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General

ERIC V. NEFF
Acting Chief, Voting Section

/s/ John R. Casali
John R. Casali
James T. Tucker
Trial Attorney
Civil Rights Division

1

App. 189

150 M Street, 8th Floor
Washington, D.C. 20002
(202) 316-8087
John.casali@usdoj.gov

2

App. 190

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 6, 2026, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

<div align="center">

/s/ John R. Casali
John R. Casali
Trial Attorney
Civil Rights Division
150 M Street, 8th Floor
Washington, D.C. 20002
(202) 316-8087
John.casali@usdoj.gov

</div>

App. 191

## CERTIFICATE OF SERVICE

I certify that on August 3, 2026, I electronically filed the foregoing Appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<div style="text-align: right;">

s/ Andrew G. Braniff
ANDREW G. BRANIFF
Attorney

</div>

Date: August 3, 2026