No. 26-1783

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

UNITED STATES,

Plaintiff - Appellant,

v.

DAVID M. SCANLAN, New Hampshire Secretary of State; STATE OF NEW HAMPSHIRE; NEAL KURK; ROBERT PERRY; LOUISE SPENCER; CHRISTOPHER COLE,

Defendants - Appellees.

On Appeal from the United States District Court for the District of New Hampshire
No. 1:25-cv-00371-JL
Hon. Joseph N. Laplante

# DEFENDANTS-APPELLEES NEAL KURK, ROBERT PERRY, LOUISE SPENCER, AND CHRISTOPHER COLE'S BRIEF

Steven J. Dutton (1st Cir. No. 1182883)
**MCLANE MIDDLETON, P.A.**
900 Elm Street
Manchester, New Hampshire 03101
Tel.: (603) 625-6464

David R. Fox (1st Cir. No. 1189538)
Christopher D. Dodge (1st Cir. No. 1185553)
Branden D. Lewiston (1st Cir. No. 1224684)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Tel.: (202) 948-1135

Paul Twomey (1st Cir. No. 16166)
**TWOMEY LAW OFFICE**
44 Ring Road
Chichester, New Hampshire 03258
Tel.: (603) 568-3254

Walker McKusick (1st Cir. No. 1224620)
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Ste. 2100
Seattle, WA 98101
Tel.: (202) 948-1135

*Attorneys for Defendants-Appellees Neal Kurk, Robert Perry, Louise Spencer, and Christopher Cole*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF THE ISSUES .......... 4

STATEMENT OF THE CASE .......... 4

I. The Constitution and federal law commit voter registration practices to the States. .......... 4

A. The Civil Rights Act of 1960 .......... 5

B. The National Voter Registration Act .......... 8

C. The Help America Vote Act .......... 10

II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans. .......... 12

III. DOJ sues New Hampshire to compel disclosure of its protected voter data. .......... 15

IV. The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here. .......... 16

SUMMARY OF THE ARGUMENT .......... 17

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 19

I. The district court was correct to review DOJ's CRA demand. .......... 19

II. The Court should affirm because DOJ failed to state a claim. .......... 24

A. The district court correctly held that the CRA does not cover state-created, dynamic records like New Hampshire's SVRL. .......... 24

1. New Hampshire's SVRL was created by election officials and therefore did not "come into" their possession....24

2. Applying the CRA to New Hampshire's SVRL would require it to be preserved without alteration, but federal and New Hampshire law require constant updates....27

3. DOJ's interpretation of the CRA should be rejected. ....29

B. The district court correctly held that DOJ failed to state any basis for investigating New Hampshire's list maintenance program. ....36

C. The Court should alternatively affirm because New Hampshire is exempt from the provisions of HAVA that DOJ invokes. ....38

D. The Court should alternatively hold that investigating list maintenance is not a proper purpose for a CRA demand....40

1. Congress enacted the NVRA and HAVA—not the CRA—to regulate list maintenance by States, and only those not exempt. ....41

2. Congress enacted the CRA to facilitate investigations into the denial of the right to vote and violations of civil rights laws. ....44

E. The CRA does not preempt New Hampshire's voter privacy protections. ....48

III. DOJ has not complied with the Privacy Act....49

IV. If the Court reverses, it should remand for additional proceedings. ....52

CONCLUSION ....53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ... 43

*Anniston Mfg. Co. v. Davis*,
301 U.S. 337 (1937) ... 28

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ... 4

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ... 34

*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ... 11

*Biden v. Nebraska*,
600 U.S. 477 (2023) ... 3

*Bond v. United States*,
572 U.S. 845 (2014) ... 48

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
854 F.3d 683, 690 (D.C. Cir. 2017) ... 22, 23, 36

*CFPB v. Source for Pub. Data, L.P.*,
903 F.3d 456, 458 (5th Cir. 2018) ... 2

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ... 49

*Donaldson v. United States*,
400 U.S. 517 (1971) ... 21

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ... 28

*Evans v. City of Chicago*,
10 F.3d 474 (7th Cir. 1993) ... 39

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 43, 45, 47

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) .......... 9

*Foster v. Love*,
522 U.S. 67 (1997) .......... 4, 46

*Gonzales v. Oregon*,
546 U.S. 243 (2006) .......... 43

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .......... 37

*Iselin v. United States*,
270 U.S. 245 (1926) .......... 44

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .......... *passim*

*League of Women Voters v. DHS*,
No. 25-CV-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) .......... 50

*League of Women Voters v. DHS*,
No. 25-cv-3501, 2026 WL 1784297 (D.D.C. June 22, 2026) .......... 15, 49

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 45, 46

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) .......... 26

*Ocasio-Hernandez v. Fortuno-Burset*,
640 F.3d 1 (1st Cir. 2011) .......... 18

*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946) .......... 22

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
97 F.4th 120 (3d Cir. 2024) .......... 6

*Patel v. Garland*,
596 U.S. 328 (2022)....................................................................................35

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)......................................................................................39

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ................................................................ 2, 9, 31, 49

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................................................................................42

*Ramos-Pinero v. Puerto Rico*,
453 F.3d 48 (1st Cir. 2006) .........................................................................19

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
120 F.4th 390 (4th Cir. 2024)......................................................................10

*Rucho v. Common Cause*,
588 U.S. 684 (2019)....................................................................................27

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ...................................................................27

*Schwier v. Cox*,
412 F. Supp. 2d 1266 (N.D. Ga. 2005) .........................................................50

*Smiley v. Holm*,
285 U.S. 355 (1932)....................................................................................46

*State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*,
580 U.S. 26 (2016)......................................................................................43

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989)....................................................................................30

*United States v. Adams*,
No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026).......................13

*United States v. Aguilar*,
No. 3:25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026).....12

*United States v. Ahlers*,
305 F.3d 54 (1st Cir. 2002) ....................................................................37

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026)..........................................................13

*United States v. Bd. of Elections*,
No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026).....12

*United States v. Bellows*,
No. 1:25-CV-00468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026) ...... *passim*

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)........................................................... *passim*

*United States v. Caldwell*,
No. 3:26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026) ............................13

*United States v. Clarke*,
573 U.S. 248 (2014).......................................................................................52

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) ........................................................... 22, 23

*United States v. DeMarinis*,
No. 1:25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026) .........................13

*United States v. Evans*,
No. 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026) ................ *passim*

*United States v. Fontes*,
No. 2:26-CV-00066-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026)....12

*United States v. Galvin*,
830 F. Supp. 3d 122 (D. Mass. 2026) ............................................... 13, 14

*United States v. Gertner*,
65 F.3d 963 (1st Cir. 1995) ...................................................................21

*United States v. Griswold*,
No. 25-CV-03967-PAB-TPO, 2026 WL 2235374 (D. Colo. Aug. 3, 2026).........13

*United States v. Koski*,
No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026)....................13

*United States v. Matthews*,
No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026)............................13

*United States v. McAnlis*,
721 F.2d 334 (11th Cir. 1983)...........................................................................50

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)............................................................................... 22, 37

*United States v. Oliver*,
No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026) .......13

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026)........................................................... *passim*

*United States v. Powell*,
379 U.S. 48 (1964)........................................................................... 17, 20, 22

*United States v. Scanlan*,
No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026) .........................13

*United States v. Schmidt*,
No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026) .............13

*United States v. Simon*,
No. 25-cv-3761 (KMM/EMB), 2026 WL 2389778 (D. Minn. Aug. 17, 2026) ...13

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996) ......................................................................................37

*United States v. Thomas*,
3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026)............... 13, 28

*United States v. Walker*,
665 F.3d 212 (1st Cir. 2011) ...............................................................................37

*United States v. Warner*,
No. 2:26-CV-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026) .................13

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026)........................................................ *passim*

*United States v. Wis. Elections Comm'n*,
No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026).............13

*Watson v. Republican Nat'l Comm.*,
146 S. Ct. 2165 (2026)..........................................................................................29

*West Virginia v. EPA*,
597 U.S. 697 (2022)...............................................................................................47

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)...............................................................................................47

*Wis. Cent. Ltd v. United States*,
585 U.S. 274 (2018)...............................................................................................31

*Yates v. United States*,
574 U.S. 528 (2015)...............................................................................................26

**Statutes, Regulations, and Rules**

5 U.S.C. § 552a .................................................................................... 4, 50, 52

8 U.S.C. § 1454 ........................................................................................................32

10 U.S.C. § 130c ......................................................................................................33

28 U.S.C. § 1291 ........................................................................................................3

28 U.S.C. § 1331 ........................................................................................................3

28 U.S.C. § 1345 ........................................................................................................3

44 U.S.C. § 3572 ......................................................................................................33

52 U.S.C. § 10101 ............................................................................................ 7, 27

52 U.S.C. § 20503 ..................................................................................................1, 8

52 U.S.C. § 20507 ..................................................................................... 9, 41, 43

52 U.S.C. § 20510 ........ 9

52 U.S.C. § 20701 ........ *passim*

52 U.S.C. § 20702 ........ 8, 27, 28

52 U.S.C. § 20703 ........ *passim*

52 U.S.C. § 20705 ........ 3, 19

52 U.S.C. § 21083 ........ *passim*

52 U.S.C. § 21085 ........ 11, 43

52 U.S.C. § 21111 ........ 11, 42

52 U.S.C. § 20501 ........ 8

N.H. Const. pt. 1, art. 2-b ........ 48

RSA § 654:31 ........ 31

RSA § 654:36 ........ 40

RSA § 654:36-b ........ 40

RSA § 654:37 ........ 40

RSA § 654:45 ........ 4, 48

68 Fed. Reg. 47610, 47611 (Aug. 11, 2003) ........ 51

Fed. R. Civ. P. 1 ........ 19

Fed. R. Civ. P. 81(a) ........ 19

**Other Authorities**

106 Cong. Rec. 5086 (1960) ........ 46, 47

106 Cong. Rec. 6392 (Mar. 23, 1960) ........ 46

*Acquire*, *Webster's Third New International Dictionary* (1961) ........ 25

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ....................................42

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op.) ....................................14

*Come into*, *Webster's Third New International Dictionary* (1966) ....................................25

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) ....................................11

H.R. Rep. No. 86-956, at 7 (1959)....................................6

*Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. (1959) .................................... 6, 7, 45

*Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. (1960).................................... 6, 34

Kaylie Martinez-Ochao, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://perma.cc/WU9V-7ZMD ....................................12

Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/7Z6F-3NX5 ....................................14

*Obtain*, 7 *Oxford English Dictionary* (1933) ....................................25

Pub. L. No. 85-315, § 104(a)-(b), 71 Stat. 634, 635 (1957) .................................... 5, 45

Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2 ....................................15

*Receive*, *Black's Law Dictionar*y (12th ed. 2024) ....................................25

*Receive*, *Webster's Third New International Dictionar*y (1961) ....................................25

*Rep. of the U.S. Comm'n on C.R.* (1959).................................... 5, 6, 34

# INTRODUCTION

The Department of Justice has embarked on an unprecedented campaign to collect the voter-registration data of nearly every American. DOJ sent letters to election officials across the nation demanding each State's full, unredacted statewide voter registration list ("SVRL"). Most States refused, and DOJ sued 30 States and the District of Columbia to force them to surrender their lists. DOJ has lost every case to date: 24 courts—including the Sixth Circuit, the district court below, and 22 other district courts—have rebuffed DOJ's demand to seize SVRLs. Not one has ruled for DOJ.

In demanding New Hampshire's unredacted SVRL, DOJ relied on Title III of the Civil Rights Act of 1960 ("CRA"), which it claims authorizes it to investigate New Hampshire's compliance with voter list maintenance obligations under the Help America Vote Act ("HAVA"). But this theory has a major problem—New Hampshire is exempt from federal list maintenance obligations under HAVA because of its broader exemption from the National Voter Registration Act ("NVRA"). *See* 52 U.S.C. §§ 20503(b)(2), 21083(a)(2)(A)(iii). DOJ also tacked on a standalone HAVA claim, but it abandons that claim on appeal, apparently acknowledging that Congress did not grant it any inspection right in that statute that could extend to New Hampshire's SVRL. DOJ now relies exclusively on the CRA, a 66-year-old statute providing for the preservation and inspection of "records and papers which come

into [election officers'] possession relating to any application, registration, payment of poll tax, or other act requisite to voting" in recent elections. 52 U.S.C. § 20701; *see also id.* § 20703. But the CRA has never been held to cover SVRLs.

The district court was correct to dismiss DOJ's complaint. SVRLs are state-created databases that election officials continuously possess and revise, not voter-provided records that "come into [election officials'] possession," 52 U.S.C. § 20701, like the application, registration, and poll-tax-payment records that the CRA requires election officials to preserve and make available for inspection.

DOJ also failed to comply with a basic requirement for a CRA demand: that it "shall contain a statement of the basis and the purpose therefor." *id.* § 20703. DOJ's demand to New Hampshire failed to state *any* basis. And DOJ's stated purpose in invoking the CRA is improper. It claims to be using the CRA to enforce HAVA, but DOJ cannot repurpose the CRA to provide it pre-suit inspection powers to assess HAVA compliance, when Congress conspicuously declined to give DOJ such power in HAVA itself. That is particularly so for New Hampshire, which is exempt from the HAVA provisions that DOJ invokes.

DOJ has also failed to show that the CRA preempts New Hampshire's strict voter privacy laws, when this Court has already held that such laws permit states to redact sensitive voter information when responding to NVRA inspection requests. *See Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024).

That conclusion is even more sensible in New Hampshire, which is exempt from the NVRA's requirements. Finally, in its hurried quest to sweep up voter data across the country, DOJ has flouted its obligations under the Privacy Act, supplying yet another reason to affirm.

Courts have a long-recognized duty to review the lawfulness of intrusive federal investigations and demands. They should greet a federal agency's newfound claim to "extravagant statutory power" with a healthy "measure of skepticism." *Biden v. Nebraska*, 600 U.S. 477, 516 (2023) (Barrett, J., concurring) (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The district court properly fulfilled its duty by dismissing the complaint for failure to state a claim. This Court should affirm.

## JURISDICTIONAL STATEMENT

DOJ's jurisdictional statement is incomplete. The district court had federal question jurisdiction under 28 U.S.C. §§ 1331, 1345, and 52 U.S.C. § 20705, because DOJ alleges a violation of the Civil Rights Act of 1960, 52 U.S.C. § 20703. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on June 30, 2026, Add.27, based on an Order dismissing the complaint on June 29, 2026, Add.1-26. The United States filed a timely Notice of Appeal on July 7, 2026. App.189.

## STATEMENT OF THE ISSUES

1. Whether the CRA requires New Hampshire to give DOJ New Hampshire's SVRL, even though it is a state-created, dynamic database that does not "come into [election officials'] possession" and that by law must be constantly updated, rather than left unaltered. *See* 52 U.S.C. §§ 20701-20703.

2. Whether DOJ made a valid demand for production of New Hampshire's SVRL under the CRA, even though DOJ sought the records for a legally invalid "purpose" and provided no "statement of the basis" for the demand apart from unsubstantiated list-maintenance anomalies. *See* 52 U.S.C. § 20703.

3. Whether DOJ's demand for New Hampshire's complete, unredacted SVRL as part of a national campaign to assemble SVRLs from every State and territory violates the federal Privacy Act or New Hampshire's voter privacy laws. *See* 5 U.S.C. § 552a; RSA § 654:45(VI).

## STATEMENT OF THE CASE

### I. The Constitution and federal law commit voter registration practices to the States.

The Constitution "invests the States with responsibility for the mechanics" of elections, including federal elections. *Foster v. Love*, 522 U.S. 67, 69 (1997). While Congress may preempt state regulation of federal elections, such preemption extends only "so far as it is exercised, and no farther." *Arizona v. Inter Tribal Council of*

*Ariz., Inc.*, 570 U.S. 1, 9 (2013). Three federal election laws are implicated by this case.

### A. The Civil Rights Act of 1960

Congress enacted the Civil Rights Act of 1960 to address problems of proof that emerged from Southern resistance to the Civil Rights Act of 1957. In particular, the U.S. Commission on Civil Rights, created by the Civil Rights Act of 1957, was charged with "investigat[ing] allegations . . . that certain citizens of the United States are being deprived of their right to vote." Pub. L. No. 85-315, § 104(a)-(b), 71 Stat. 634, 635 (1957). As part of its work, the Commission reviewed voting applications in Jim Crow jurisdictions to identify discriminatory registration practices. By comparing voter registration forms submitted by Black and White applicants, the Commission revealed that election officials in Southern States often imposed tests on Black applicants from which White applicants were exempt, *see Rep. of the U.S. Comm'n on C.R.* 87-88 (1959) ("*Comm'n Rep.*"), and denied registration to Black applicants "because of inconsequential errors which they made, whereas many white applicants who committed similar errors were permitted to register," *id.* at 91.[1] The Commission thus concluded that reviewing voter "application forms" was "essential to any investigation of denials of the right to vote." *Id.* at 137.

---

[1] The Commission Report is available at https://www.usccr.gov/files/historical/1959/59-001-U.pdf.

Yet the Commission found its investigatory work thwarted by efforts to destroy or restrict access to "[r]ejected applications." *Id.* at 93. For instance, Alabama enacted legislation requiring the "destruction of the questionnaires of unsuccessful applicants for registration." *Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 86th Cong., 1st Sess. 212 (1959) ("*House Hearings*") (statement of Att'y Gen. Rogers).[2] Compounding the problem, DOJ lacked any "power in civil proceedings to require the production" of registration records, rendering its ability to investigate denials of the right to vote "relatively ineffective." H.R. Rep. No. 86-956, at 7 (1959). The Commission therefore recommended that Congress enact legislation requiring that election officials retain applications to vote and allow DOJ to inspect them. *Comm'n Rep*. at 137-38. DOJ likewise told Congress that comparing the voter applications of Black and White voters was essential to its civil rights work, explaining that, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *Hearings on H.R. 8601 Before the S. Comm. on the Judiciary*, 86th Cong., 2d Sess. 6 (1960) ("*Senate Hearings*") (statement of Att'y Gen. Rogers).[3] "Congress responded by passing the Civil Rights Act of 1960." *Pa. State Conf. of*

---

[2] Available at https://perma.cc/ET26-FKD9.

[3] Available at https://perma.cc/46G6-GQZB.

*NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (Schwartz, J., dissenting).

Congress tailored the CRA to the problem before it: the need to ensure the preservation and availability of the key evidence that DOJ and the Commission had identified as necessary to voting rights investigations. As explained by a principal drafter of the CRA, "[t]he purpose of title III is, first of all, to require that States preserve, for a reasonable length of time, the records upon which is based the decision of whether or not a person is a qualified elector." *House Hearings* at 700 (statement of Rep. William M. McCulloch).[4] The CRA thus "enable[s] the Attorney General to determine whether § 1971 suits or similar actions should be instituted." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).[5] To that end, the CRA contains interlocking provisions that permit DOJ "to assemble all of the voter record information within the time-reach of the statute relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights." *Id.*

The core provision of the CRA requires officials to "retain and preserve" the records most critical to a voting rights investigation:

---

[4] Available at https://perma.cc/ET26-FKD9.

[5] Section 1971, as recodified, guarantees the right to vote "without distinction of race, color, or previous condition of servitude." 52 U.S.C. § 10101(a)(1).

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal election] . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701. The CRA criminalizes "willfully fail[ing]" to comply with the statute's command, *id.*, threatening "imprison[ment]" for "[a]ny person . . . who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved." *Id.* § 20702. The CRA allows DOJ to inspect covered records after it makes a compliant pre-suit demand:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying[.]

*Id.* § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

### B. The National Voter Registration Act

Three decades after enacting the CRA, Congress passed the NVRA to "establish procedures that will increase the number of eligible citizens who register to vote" and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b). Congress, however, exempted States that had and maintained same-day voter registration from the NVRA's requirements. *Id.* § 20503(b). New Hampshire is one of six exempt States. *See* App.28.

For the States covered by the NVRA, the statute's requirements are aimed at ensuring "simple means are available to register for federal elections and [that] these means are actively presented to voters by the states." *Fish v. Kobach*, 840 F.3d 710, 721 (10th Cir. 2016). The NVRA also requires covered States to take steps to ensure their voter rolls are reasonably up to date. *See* 52 U.S.C. § 20507(a)(4). But in doing so, the NVRA reaffirms the principal role of States in managing registration lists, requiring only that States "conduct a general program" that "makes a reasonable effort" to remove names from the list that are ineligible because of either (1) "the death of the registrant" or (2) "a change in the residence of the registrant." *Id*. The NVRA tempers this modest list-maintenance obligation with a series of safeguards designed to prevent erroneous or rushed cancellations of voters' registrations. *Id*. § 20507(a)(3).

The NVRA also requires covered States to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507(i). This inspection provision permits States to redact sensitive personal information on voters before disclosing SVRLs. *PILF*, 92 F.4th at 56. The NVRA also authorizes DOJ and private enforcement actions to address any alleged violations. *See* 52 U.S.C. § 20510.

### C. The Help America Vote Act

A decade after the NVRA, and more than four decades after the CRA, Congress enacted HAVA to "improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Among other things, HAVA for the first time required States to create a "single, uniform, official, centralized, interactive computerized statewide voter registration list"—the SVRL. 52 U.S.C. § 21083(a)(1).

The SVRL is dynamic by design. HAVA directs that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official." *Id.* § 21083(a)(1)(A)(vi). The State's chief election official must ensure "local election officials are able to enter [that] information, and the SVRL must be "coordinated with other agency databases within the State." *Id.* § 21083(a)(1)(A). HAVA also requires State law to "include provisions to ensure" that "voter registration records" are "accurate and . . . updated regularly." *Id.* § 21083(a)(4). In those ways, HAVA charges States with regularly changing their SVRLs so that they reflect the current snapshot of the State's registered voters.[6]

[6] In States that are (unlike New Hampshire) subject to the NVRA, HAVA further requires the performance of "list maintenance with respect to the computerized list on a regular basis" in accordance with the NVRA's list-maintenance provisions. 52 U.S.C. § 21083(a)(2).

HAVA gives DOJ authority to sue to address violations of the statute, *see id.* § 21111, but it does not grant it the right to demand SVRLs or otherwise empower it to superintend or audit States' voter list maintenance practices. *See United States v. Bellows*, No. 1:25-CV-00468-LEW, 2026 WL 1430481, at *8 (D. Me. May 21, 2026) (finding nothing in HAVA "contemplate[s] production of" State's unredacted SVRLs "so that [the Attorney General] might loom over the shoulder of . . . state election official[s]"). To the contrary, HAVA reaffirms the preeminent role of States in managing SVRLs, instructing that each list be "defined, maintained, and administered at the State level," *id.* § 21083(a)(1)(A), and committing "[t]he specific choices on the methods of complying with the requirements of [HAVA] to the discretion of the State," *id.* § 21085. The absence of any inspection provision in HAVA is a feature, not a bug—Congress viewed state authority over voter registration as central to preserving our democracy:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. *The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome*. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, pt. 1, at 31-32 (2001) (emphasis added).

HAVA also discusses list maintenance, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192,

1202 (11th Cir. 2019). Rather, HAVA relies on the NVRA's list maintenance requirements, and the list maintenance obligations on NVRA-exempt states are limited. Under HAVA, "if a State is described in section 4(b) of the National Voter Registration Act"—meaning, it is NVRA-exempt—"that State shall remove the names of ineligible voters from the computerized list in accordance *with State law*." 52 U.S.C. § 21083(a)(2)(A)(iii) (emphasis added). Thus, under HAVA, an NVRA-exempt state (like New Hampshire) has no duty to comply with any substantive federal list-maintenance requirements—its only obligation is to act "in accordance with State law." *Id.*

## II. DOJ embarks on a nationwide campaign to collect private voter data on millions of Americans.

Last year, DOJ launched an unprecedented campaign to collect States' SVRLs, which include sensitive information about each registered voter. DOJ sent demands to at least 48 States, but most refused to turn over their unredacted lists.[7] DOJ then sued 30 States and the District of Columbia to compel disclosure. Each district court that has addressed DOJ's CRA claims to date has dismissed them,[8] and

---

[7] *See* Kaylie Martinez-Ochao, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://perma.cc/WU9V-7ZMD.

[8] *See United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026), *appeal docketed*, No. 26-1231 (9th Cir. argued May 19, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir. argued May 19, 2026); *Bellows*, 2026 WL 1430481, *appeal docketed*, No. 26-1676 (1st Cir. June 15, 2026); *United States v. Fontes*, No. 2:26-CV-00066-PHX-SMB, 2026 WL 1177244

the Sixth Circuit affirmed the Michigan district court's decision dismissing DOJ's claims. *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026), *petition for rehearing*

---

(D. Ariz. Apr. 28, 2026), *appeal docketed*, No. 26-3609 (9th Cir. June 4, 2026); *United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026), *appeal docketed*, No. 26-1657 (1st Cir. June 10, 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir. June 9, 2026); *United States v. Wis. Elections Comm'n*, No. 3:25-CV-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026), *appeal docketed*, No. 26-2217 (7th Cir. June 5, 2026); *United States v. DeMarinis*, No. 1:25-cv-03934, 2026 WL 1780586 (D. Md. June 18, 2026), *appeal docketed*, No. 26-018781 (D. Md. July 13, 2026); *United States v. Schmidt*, No. 2:25-CV-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026), *appeal docketed*, No. 26-2684 (3d Cir. July 7, 2026); *United States v. Scanlan*, No. 25-CV-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026), *appeal docketed*, No. 26-1783 (1st Cir. July 7, 2026); *United States v. Warner*, No. 2:26-CV-00156, 2026 WL 2018877 (S.D. W. Va. July 13, 2026); *United States v. Bd. of Elections*, No. 1:25-CV-1338-MAD-PJE, 2026 WL 1999921 (N.D.N.Y. July 10, 2026), *appeal docketed*, No. 26-2060 (2d Cir. July 24, 2026); *United States v. Oliver*, No. 1:25-CV-01193-JCH-JFR, 2026 WL 2031479 (D.N.M. July 14, 2026), *appeal docketed*, No. 26-2126 (10th Cir. July 27, 2026); *United States v. Koski*, No. 3:26CV42 (RCY), 2026 WL 2032532 (E.D. Va. July 14, 2026), *appeal docketed*, No. 26-2002 (4th Cir. July 29, 2026); *United States v. Thomas*, 3:26-CV-21 (KAD), 2026 WL 2070437 (D. Conn. July 17, 2026), *appeal docketed*, No. 26-2064 (2d Cir. July 24, 2026); *United States v. Adams*, No. 3:26-CV-00019, 2026 WL 2123871 (E.D. Ky. July 23, 2026), *appeal docketed*, No. 26-5657 (6th Cir. July 24, 2026); *United States v. Caldwell*, No. 3:26-cv-2025, 2026 WL 2186515 (D.N.J. July 29, 2026), *appeal docketed*, No. 26-3085 (3d Cir. Aug. 20, 2026); *United States v. Matthews*, No. 25-CV-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026), *appeal docketed*, No. 26-2695 (7th Cir. Aug. 17, 2026); *United States v. Griswold*, No. 25-CV-03967-PAB-TPO, 2026 WL 2235374 (D. Colo. Aug. 3, 2026), *appeal docketed*, No. 26-1326 (10th Cir. Aug. 18, 2026); *United States v. Evans*, No. 25-4403 (RDM), 2026 WL 2267774 (D.D.C. Aug. 6, 2026), *appeal docketed*, No. 26-5296 (D.C. Cir. Aug. 19, 2026); *United States v. Aguilar*, No. 3:25-CV-00728-ART-CLB, 2026 WL 2364502 (D. Nev. Aug. 14, 2026), *appeal docketed*, No. 25-5375 (9th Cir. Aug. 20, 2026); *United States v. Simon*, No. 25-cv-3761 (KMM/EMB), 2026 WL 2389778 (D. Minn. Aug. 17, 2026), *appeal docketed*, No. 26-2679 (8th Cir. Aug. 21, 2026).

*en banc denied* (Aug. 14, 2026).

DOJ's legal theories have shifted over the course of these lawsuits. In New Hampshire, DOJ brought claims both under HAVA and the CRA. *See* App.34-36. But in its more recent suits against other States, DOJ rested exclusively on the CRA. *See, e.g.*, *Galvin*, 830 F. Supp. 3d at 126. And, as noted above, DOJ has now abandoned its HAVA claim in this appeal.

DOJ has also recast its factual allegations in these lawsuits. In its early complaints, DOJ alleged that its demands were prompted by state-specific anomalies in voter list maintenance statistics. *See United States v. Bellows*, No. 1:25-CV-468 (D. Me. Sept. 16, 2025), ECF No. 5-4. Here, DOJ has abandoned the pretext that its demands were prompted by individualized concerns and argues instead that CRA demands require no factual basis at all. Br.38-39; Add.18.

DOJ's actions betray its true aim: to take federal control of state voter list maintenance. DOJ intends to run the SVRLs it seizes through the Department of Homeland Security's notoriously unreliable Systematic Alien Verification for Entitlements ("SAVE") database to identify suspected noncitizens and then demand States remove them from voter rolls.[9] DHS Secretary Mullin has threatened to

[9] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1, 5-7); Nicholas Kerr & Elise Spenner, *System That DHS Is Urging States to Use to Assess Voter Rolls Known to Return Faulty Results: Reports*, ABC News (July 19, 2026), https://perma.cc/7Z6F-3NX5.

withhold grants from, fine, and even criminally prosecute election officials if they do not meet the administration's voter-removal demands.[10] Those threats come despite a recent federal court injunction blocking the federal government's efforts to use SAVE for voter removals, finding that agencies "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable," and that using SAVE for voter verification would risk removing "citizens from voter rolls based on inaccurate information." *League of Women Voters v. DHS*, No. 25-cv-3501, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026), *appeal docketed*, No. 26-5243 (D.C. Cir. June 29, 2026).

**III. DOJ sues New Hampshire to compel disclosure of its protected voter data.**

On June 25, 2025, DOJ sent a letter to Secretary Scanlan, seeking New Hampshire's SVRL under HAVA. App.40. The letter also posed questions about the State's list maintenance. App.40-42.

In response, Secretary Scanlan thoroughly answered DOJ's questions and provided a comprehensive overview of New Hampshire's list maintenance processes under state law. App.44-51. The Secretary reminded DOJ that New Hampshire is exempt from the NVRA. App.44-51. The Secretary also explained that, under state law, New Hampshire's SVRL may only be released "in limited circumstances not

[10] Rebecca Shabad, *Homeland Security Secretary Markwayne Mullin Threatens States over Elections*, NBC News (July 17, 2026), https://perma.cc/XE54-XUW2.

applicable here." App.51.

In its August 18 response, DOJ asked no follow-up questions but reiterated its demand for the SVRL, invoking the CRA for the first time. App.53-54. DOJ stated its purpose was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." App.53. After Secretary Scanlan refused to produce the SVRL, DOJ sued on September 25, 2025. App.22.

## IV. The district court dismisses DOJ's complaint, concluding it lacks the sweeping authority claimed here.

DOJ's complaint brought claims demanding the SVRL under HAVA and the CRA. App.22-37. The district court rejected both claims after a thorough analysis of the statutory texts. On the CRA claim—the only one DOJ presses on appeal—the court found that the statute is limited to external records that "come into [the] possession" of election officials, not internal records that officials themselves "have created and thus have always possessed." Add.9-10. Over a dozen other courts, including the Sixth Circuit, have similarly held the CRA does not reach SVRLs. *Benson*, 179 F.4th at 479; *Evans*, 2026 WL 2267774, at *5 (collecting cases).

The court separately held that DOJ failed to state a basis—an "evidentiary or factual predicate"—for its demand, as the CRA requires, Add.16, and that nothing in HAVA obligates election officials to turn over voter lists to DOJ. Add.23.

Because the court dismissed DOJ's complaint on these grounds, it had no need to address other grounds for dismissal presented below, including that DOJ's demand letters failed to contain a legitimate purpose for its CRA claim; that the CRA does not preempt New Hampshire's privacy laws; and that DOJ did not comply with the Privacy Act. Add.2 n.2.

## SUMMARY OF THE ARGUMENT

1. The district court correctly reviewed DOJ's CRA claim under the Federal Rules of Civil Procedure. Nothing in those Rules or the CRA exempts CRA claims from review in the ordinary course, and the Supreme Court has made clear that courts have the duty to ensure government document demands, at a minimum, are issued for legitimate purposes and follow all statutory requirements. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964).

2. The district court correctly dismissed DOJ's CRA claim for failure to state a claim. First, the district court correctly held the statute covers only external records—like voter applications—that "come into" the possession of election officials. 52 U.S.C. § 20701. An SVRL is not a record that "come[s] into" the possession of election officials—it is a database that is created, maintained, and continuously revised by those officials. Second, the district court correctly held DOJ failed to state *any* basis for investigating New Hampshire's compliance with HAVA. The Court should also affirm because New Hampshire is exempt from the provisions

of HAVA that DOJ says it seeks to enforce, and also because Congress conspicuously declined to give DOJ the power to inspect a State's unredacted SVRL outside the context of civil discovery. Fundamental principles of statutory interpretation preclude DOJ from repurposing the CRA to empower it to do what Congress chose not to authorize in HAVA. The Court should also affirm because nothing in the CRA suggests Congress intended to preempt New Hampshire state privacy law forbidding disclosure of the SVRL.

3. The Court should alternatively affirm because DOJ failed to comply with the notice requirements of the federal Privacy Act, which are triggered whenever a federal agency seeks to maintain or collect a system of records, as DOJ seeks to do here.

4. If the Court were to reverse, the proper next step would be to remand and allow for discovery on, among other things, whether DOJ's stated purpose is pretextual.

## STANDARD OF REVIEW

This Court "review[s] the dismissal of a complaint under Rule 12(b)(6) de novo." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). The Court must disregard legal conclusions and conclusory allegations and ask whether the "[n]on-conclusory factual allegations in the complaint" state "a plausible, not merely a conceivable, case for relief." *Id.* at 12 (citation modified). The Court is not limited

to the district court's reasoning and "may affirm an order of dismissal on any basis made apparent by the record." *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 51 (1st Cir. 2006).

## ARGUMENT

### I. The district court was correct to review DOJ's CRA demand.

The district court properly subjected DOJ's CRA demand to judicial review. Add.2 & n.2. Relying almost entirely on *Lynd*, a Fifth Circuit case from 1962, DOJ argues "litigation tools ordinarily available under the Federal Rules of Civil Procedure" may not be used to challenge its CRA claim. Br.35. But nothing in the Federal Rules or the CRA supports DOJ's demand for an exemption from ordinary Rule 12(b)(6) analysis, and the Court should treat this appeal as it would any other.

Start with the Federal Rules, which "govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. This case is just such an action. While Rule 81 sets out a narrow set of prescribed cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—none involve the CRA. *See* Fed. R. Civ. P. 81(a).

Nor does anything in the CRA support the exemption DOJ seeks. The statute merely provides that federal district courts "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705. That

unremarkable jurisdictional language cannot be read to insulate CRA claims from routine judicial review or displace the Federal Rules.

Just two years after *Lynd*, the Supreme Court construed a statute with materially identical language ("appropriate process") and held that, because it "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 58 n.18. DOJ appears to recognize this: Despite suggesting the CRA supplants the Federal Rules, DOJ explicitly invokes Rule 12(b)(6) as the standard of review for this appeal. *See* Br.14.

*Powell* also held that courts have the duty to ensure a government document demand is related to a "legitimate purpose, that the inquiry may be relevant to the purpose," and "that the administrative steps required" have been followed. 379 U.S. at 57-58. That more than authorizes the judicial review conducted below. And courts evaluating DOJ's recent CRA demands have consistently held "[t]he Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention[s] and reliance on *Lynd*." *Oregon*, 828 F. Supp. 3d at 1102; *see, e.g.*, *Benson*, 179 F.4th at 483 n.2 (rejecting *Lynd* as "60-year-old out-of-circuit caselaw" and holding that "subsequent binding precedent from the Supreme Court and this court carves out a role for the courts in reviewing civil investigative demands" (citing *Powell*, 379 U.S. at 58)).

Despite this chorus of courts finding that *Powell* requires rejection of DOJ's claimed exemption from judicial review, DOJ's opening brief omits any discussion of *Powell* or the mountain of case law holding that government document demands, including under the CRA, are subject to judicial scrutiny. DOJ instead insists the Rules cannot interfere with the "summary" nature of the proceedings. Br.36. But DOJ does not explain how that argument could help it here, where the district court limited its analysis to the facial sufficiency of DOJ's demand letter—an inquiry that even *Lynd* acknowledges is proper. Add.14-20; *Lynd*, 306 F.2d at 226 (explaining that judicial proceedings could properly consider "whether the written demand has been made"). Nor does DOJ even explain how the ordinary application of Rule 12(b)(6) should be modified here. Instead, DOJ vaguely alludes to a "special statutory proceeding" that, ironically, is not spelled out in the CRA or any other statute. Br.34-35. *Donaldson v. United States* offers DOJ no aid: there the Court confirmed that Rule 24(a)(2) of the Federal Rules—regarding intervention—continues to apply in a civil action to enforce a tax summons, even while it affirmed the Fifth Circuit's conclusion that a putative intervenor failed to satisfy Rule 24's substantive terms. 400 U.S. 517, 528-32 (1971).

At bottom, DOJ misunderstands the proper judicial role in a suit to enforce a government document demand. The question is "whether the federal judiciary's imprimatur should be impressed" on DOJ's demand. *United States v. Gertner*, 65

F.3d 963, 966 (1st Cir. 1995). Because DOJ's authority "is created solely by statute," *CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*ACICS*"), 854 F.3d 683, 690 (D.C. Cir. 2017) (citation omitted), DOJ exceeds its statutory power if its demand is not made pursuant to a "proper purpose authorized by Congress." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989); *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946) (agency investigations must be for "a lawfully authorized purpose"). The Court cannot endorse DOJ acting beyond its power—it must ensure that DOJ acts "within the authority of the agency." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). By granting courts jurisdiction to enforce DOJ's demands, the CRA necessarily "entrusts courts with the authority and duty not to rubber-stamp" such demands "but to adjudge their legitimacy." *ACICS*, 854 F.3d at 689 (affirming quashal of civil investigative demand). After all, "[i]t is the court's process which is invoked," and "a court may not permit its process to be abused." *Powell*, 379 U.S. at 58.

*Powell*'s charge that courts must ensure "administrative steps required" have been followed, *id.*, also forecloses DOJ's suggestion that courts cannot assess whether DOJ complied with the CRA's requirement that it state "the basis and the purpose" for its demand. 52 U.S.C. § 20703; *contra* Br.36-37. In fact, courts have not hesitated to assess statutorily required statements of purpose for other civil investigative demands. *ACICS*, 854 F.3d at 691-92 (quashing demand that made "no

mention" of how the records sought "relate to [the agency's] investigation"); *see also* *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018). To insulate the statement of basis and purpose from judicial review, as DOJ urges, would "effectively write out of the statute all of the notice requirements that Congress put in." *ACICS*, 854 F.3d at 692; *see also Comley*, 890 F.2d at 541 (explaining a subpoena is enforceable only if "statutory procedures are followed in the subpoena's issuance").

As for *Lynd*, it never addressed the issues here. Rather, the Fifth Circuit recognized courts must be "open for . . . determination" if there is a "genuine dispute" about whether a "particular paper or record" falls under the CRA. 306 F.2d at 226. There was no such dispute in *Lynd*, but there is one here. *See infra* Argument § II.A. And unlike here, in *Lynd* the Fifth Circuit had no reason to doubt that DOJ invoked the CRA for a valid purpose and complied with the statute's demand requirements. As *Lynd* explained, the CRA's "clearest purpose[]" is to permit investigations "concerning infringement or denial of . . . voting rights," 306 F.2d at 228, and "[t]he record establishe[d] without contradiction" that DOJ had "adequately stated the basis and the purpose" of its investigation based on evidence of racial discrimination "with respect to registration and voting," *id.* at 229 & n.6.

Finally, DOJ suggests judicial review is improper because the CRA contains no "meaningful standard" against which courts could ascertain the sufficiency of the

Attorney General's stated basis and purpose. Br.37. Not so. The CRA itself provides the standard—it requires that DOJ state "the basis and the purpose" for the demand, and it specifies what records fall within its scope.

## II. The Court should affirm because DOJ failed to state a claim.

### A. The district court correctly held that the CRA does not cover state-created, dynamic records like New Hampshire's SVRL.

The district court correctly held that "New Hampshire's SVRL falls outside the scope of documents or records covered by [the CRA]," because it is not "a record or paper that 'comes into [an election officer's] possession.'" Add.14. Holding otherwise would also put the CRA into direct conflict with HAVA. While the CRA mandates that covered records remain unaltered (under threat of criminal penalty), HAVA mandates that election officials *continuously* make changes to SVRLs to keep them up to date. DOJ's unpersuasive counterarguments have been unanimously rejected by every court to consider them to date. *See Evans*, 2026 WL 2267774, at *5 (collecting cases).

#### 1. New Hampshire's SVRL was created by election officials and therefore did not "come into" their possession.

The CRA requires election officers to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Only records that "come into" election officials' possession within the

meaning of Section 20701 are subject to inspection upon a proper demand by the Attorney General. *Id.* § 20703.

The CRA does not define what it means for a record to "come into" possession of an election officer. But dictionaries from around the time Congress enacted the CRA equated "coming into" possession of something with acquiring, obtaining, or receiving the thing. *Come into*, *Webster's Third New International Dictionary* 452 (1966) ("to enter upon or in possession of: acquire esp. as an inheritance"); *Acquire*, *Webster's Third New International Dictionary* 18 (1961) ("to come into possession, control, or power of disposal of"); *Obtain*, 7 *Oxford English Dictionary* 37 (1933) ("to come into the possession or enjoyment of (something)"); *Receive*, *Webster's Third New International Dictionary* 1894 (1961) ("to come into possession of: acquire"); *see also* Add.9 (district court below listing similar definitions). This same understanding endures sixty-six years later. *See, e.g.*, *Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source").

Common usage confirms what the dictionaries make clear. Consider, as the Sixth Circuit did, a cake. "A baker may purchase ingredients from a grocery store (flour, eggs, etc.) and then proceed to bake cakes." *Benson*, 179 F.4th at 479. The baker might have "come into" possession of the purchased ingredients, but it would be "rather strange to say" she has "come into" possession of a cake she baked with

those ingredients. *Id.* By the same principle, "an ordinary English speaker would not say" that New Hampshire came into possession of an SVRL that it "created." *Id.*

Accordingly, the district court's definition of "come into possession" is the "natural" and "ordinary" meaning of the phrase. *See Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Because New Hampshire election officials internally generate and continuously update the SVRL, it does not "come into" their possession and thus is not a record subject to inspection under the CRA.

As the district court observed, this definition of "comes into possession" is "bolstered" by the records the statute lists as covered. Add.10. Section 20701 extends to records "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion) ("[A]ccompanying words" are key context because "a word is known by the company it keeps."). Those are the sort of records that officials "obtain from . . . third parties," such as a prospective voter, rather than create themselves. *Benson*, 179 F.4th at 479. As the Sixth Circuit recounted, even the reference to records related to "payment of poll tax" reveals the narrow category of documents captured in this language. *Id.* When the CRA was enacted, voters would pay poll taxes to their sheriff, who would provide a receipt for the voter to present to election officials. *Id.* The CRA thus required that officers "would have to retain

and preserve the poll-tax receipts submitted by voters, as these were often the only voter-registration documents these States had." *Id.*

The CRA also "draw[s] meaning from related provisions." *Rucho v. Common Cause*, 588 U.S. 684, 716 (2019). Echoing the CRA, the materiality provision in the Civil Rights Act of 1964 prohibits denial of the right to vote based on "an error or omission on *any record or paper relating to any application, registration, or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also* 52 U.S.C. § 20701. The materiality provision concerns "errors or omissions on . . . application forms," *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), just as the 1960 CRA concerns application forms and similar materials submitted by voters.

**2. Applying the CRA to New Hampshire's SVRL would require it to be preserved without alteration, but federal and New Hampshire law require constant updates.**

The CRA's preservation requirement confirms that it does not apply to New Hampshire's SVRL. Any record covered by the CRA must be "retain[ed] and preserv[ed]" and may not be "alter[ed]." 52 U.S.C. §§ 20701, 20702. If Section 20701 were read to cover New Hampshire's SVRL, it would "effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which, New Hampshire

explains, would be 'impractical to the point of impossible.'" Add.11 (quoting representations from New Hampshire). It is implausible that "Congress was attempting to require the impossible." *Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 355 (1937).

The command to preserve and retain covered records is paired with Section 20702's criminal penalties for those who willfully "alter" them. 52 U.S.C. § 20702. HAVA, however, *requires* States to establish a dynamic SVRL "that is constantly being 'altered' as information is updated; voters are added; voters are removed; addresses changed; or any of the thousands of datapoints contained in the [list] otherwise require modification." *Thomas*, 2026 WL 2070437, at *6; 52 U.S.C. § 21083(a)(1). Adopting DOJ's interpretation of the CRA would create an unavoidable clash with HAVA and place election officials in the impossible bind of choosing which statute to honor—at risk of criminal penalty.[11] Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). Earlier-adopted

[11] DOJ tries to reconcile HAVA and the CRA by citing a case interpreting the NVRA's requirement that records covered by that statute be "maintained." Br.32 (citing *Voter Reference Found, LLC v. Torrez*, 160 F.4th 1068, 1084-84 (10th Cir. 2025)). But the CRA's directive to "preserve," "retain," and not "alter" covered records, under the threat of criminal punishment, 52 U.S.C. §§ 20701, 20702, is much stricter than the NVRA's command to "maintain" records covered by that statute, which not only makes DOJ's comparison inapt but also illustrates that the statutes are meant to cover different categories of records.

statutes should be read "to contain that permissible meaning which fits most logically and comfortably into the body of both previously *and subsequently* enacted law." *Watson v. Republican Nat'l Comm.*, 146 S. Ct. 2165, 2177 n.8 (2026) (emphasis added) (citation omitted). This Court should join the Sixth Circuit and numerous district courts in declining to "adopt a reading that would place election officials in violation of one federal law for trying to comply with others." *Benson*, 179 F.4th at 480.

### 3. DOJ's interpretation of the CRA should be rejected.

DOJ lodges a host of half-baked objections to the district court's conclusion, but none should convince this Court to depart from the consensus that the CRA's plain text does not extend to internally generated, dynamic SVRLs.

*First*, DOJ misses the point in arguing that New Hampshire's SVRL must be covered by the CRA because it "relates to voter registration" and the phrase "relating to" has a "broadening effect." Br.17 (citation omitted). To be covered by the CRA, a record must not merely "relate to" voter registration—it must *also* "come into" the possession of election officials. Whether the SVRL *relates* to voter registration is irrelevant to whether that dynamic, state-created list came into the possession of election officials. The two phrases impose distinct textual requirements.

*Second*, DOJ speculates Congress "likely used the term 'comes into his possession' precisely because it is broad enough to include both voter-generated and

state-generated documents." Br.19. But "[i]f that is the meaning Congress intended," the phrase "come into . . . possession" is "an odd selection of words to convey it," particularly in light of "obvious alternative" language. *Bellows*, 2026 WL 1430481, at *6 n.10. Congress "could have referred simply to 'records in the possession of' election officials, or even just 'records' without any qualifier, which is the language used in the NVRA." Add.13 (internal quotations omitted). But Congress "chose not to use this broader formulation in § 20701 and, having done so, the court must give meaning to the words 'come into.'" Add.13.

*Third*, DOJ claims the Supreme Court has "demonstrated a similar understanding of" come into possession, citing *United States Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989). Br.19-20. *Tax Analysts* cuts the other way. In that FOIA dispute, the Court construed the meaning of "agency records," which was defined in the statute to cover records "made *or received*" by the agency. 492 U.S. at 145-46 (emphasis added) (quoting 44 U.S.C. § 3301(a)(1)(A)). The Court explained that definition would cover both records that an agency "create[s]" *and* records that it "obtain[s]"—that is, records that "come into the agency's possession." *Id.* at 144-45. This distinction illustrates that "come into" possession most naturally refers to the latter, and not the former.

*Fourth*, DOJ claims that "[t]his Court has already rejected similar attempts to limit the scope of voting records under other statutes," citing *PILF*. Br.20. *PILF* held

that the NVRA's inspection provision extends to redacted SVRLs because they "concern[] the implementation of programs and activities" relating to list maintenance. 92 F.4th at 45-49 (quoting 52 U.S.C. § 20507(i)). That NVRA language is targeted at internal, state-generated records about the "implementation" of state programs concerning SVRLs—quite unlike the CRA, which is focused on discrete and static records received from voters. The phrase "come into possession" does not appear in the NVRA, so *PILF* sheds little light on the scope of records covered by that phrase. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'" (citation omitted)).

*Fifth*, DOJ conflates an individual voter's application or registration record with the information contained therein. Br.21. The CRA's preservation and inspection provision covers particular records. Although the SVRL draws from *information* contained in records that came from voters, the SVRL is a different record. It is not even a mere compilation of the voter-provided records, but a new thing entirely: It repurposes and combines information from voter-provided records while also mixing in information from election officials, such as "voter history." RSA § 654:31(VI).

*Sixth*, DOJ proposes a "temporal" reading under which "come into" possession cabins an election official's liability to documents she received '*during*

*her tenure*.'" Br.23 (quoting *Benson*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting) (emphasis added)). This interpretation is untethered from the CRA's text, which does not contain the additional phrases that DOJ relies upon: "during her tenure" and "in the course of administering" an election. Br.23. As a result, the phrase "come into" in the CRA's text does nothing to support restricting it to documents received during an official's service. The only temporal language in the statute is the reference to the 22 months after a federal election. To the extent that "comes into" imposes any temporal restriction, it would therefore limit the CRA to records first acquired during that 22-month period, which would bizarrely exclude records received during the two months immediately before election day, when the relevant records are most likely to be received. DOJ does not defend such an argument.

DOJ also points to other statutes that use the phrase "come into possession," Br.23, 25-26, but those statutes undercut DOJ's "temporal" construction: Each confirms that Congress deliberately uses the phrase "come into possession" when referring to things *received* by someone. For example, 8 U.S.C. § 1454(a) says that someone who "comes into" possession of a "lost" certificate of naturalization must return it to the Attorney General; as the district court observed, "it presupposes receipt from an external source." Add.13. DOJ's other examples illustrate that "come into" most naturally refers to receiving something from an outside source. *See, e.g.*,

44 U.S.C. § 3572 (using phrase "comes into possession" in reference to "information supplied by individuals or organizations to an agency"); 10 U.S.C. § 130c(d) (using phrase "came into possession or under the control of the United States" in reference to information "received by an agency" from a foreign government). The district court's construction of the CRA sits comfortably among these laws.

In a similar vein, DOJ argues the district court's construction of the statute would still cover self-generated records because even if one employee "created the SVRL," other employees who acquire the record from the first employee would "come into [the] possession" of the record and thereby make it subject to the CRA. Br.29-30. But the district court—and others around the country—did not hold that coverage under the CRA turns on an employee-by-employee assessment, such that whether records are covered "turn[s] on the staffing practices of state election bodies." *Evans*, 2026 WL 2267774 at *10 n.8 (characterizing DOJ's argument as "pedantry"). The district court instead held that the relevant provisions as a whole draw a line between voter-created documents on the one hand and internally generated documents on the other, requiring preservation only of the former and not of the latter. Such an approach makes far more sense than DOJ's employee-by-employee straw man, as it is a "doubtful proposition that Congress sought to accomplish" coverage of internal records in such a "surpassingly strange manner" when it could have done so "in a much more straightforward way." *Azar v. Allina*

*Health Servs.*, 587 U.S. 566, 577 (2019) (citation omitted). And DOJ's reading would also *still* fail to capture New Hampshire's SVRL, which does not transfer from one election officer to another as a static, discrete record would but is instead a "continuously maintained, state-generated compilation of data" that "New Hampshire has built, updated, and controlled since its creation." Add.14.

*Seventh*, DOJ asserts that the "context" in which the CRA was enacted supports its view. Br.27. In fact, context shows why the CRA is keyed to discrete documents submitted by voters to election officials. The Civil Rights Commission found its investigations thwarted by Jim Crow officials' efforts to destroy "[r]ejected applications" submitted by Black applicants, *Comm'n Rep.* at 93, and it determined that comparing such applications to accepted applications submitted by White applicants was "essential to any investigation of denials of the right to vote," *id.* at 137. As the Attorney General explained, "[i]n many cases, discrimination in registration can be proved only by comparing the records of Negro applicants with those of white applicants." *Senate Hearings* at 9 (statement of Att'y Gen. Rogers). DOJ needed those *applications* specifically because "[w]ithout access to accepted and rejected registration materials, the Attorney General could not independently evaluate whether black voters had satisfactorily established their qualifications or had done all that was asked of white voters, such that their omission from the voter rolls could be attributed to race." *Evans*, 2026 WL 2267774, at *9.

Unlike voter applications, voter lists would "not have enabled the Attorney General to conduct the sort of *comparative* analysis necessary to seek injunctive relief." *Id.* at *10 (emphasis added). Regardless, voter lists (although not SVRLs, with their detailed personal identifying information) were *already* available to DOJ in most States even before the CRA, because "voter rolls have long been treated as public records, which are made available to political parties, advocacy organizations, and members of the public." *Id.* (citing Joseph P. Harris, *Registration of Voters in the United States*, Inst. for Gov't Rsch. 44, 167, 179, 236, 259, 270, 272, 290 (1929)). That is why "[i]n the years leading up to the passage of Title III, the Civil Rights Commission was able to obtain lists of qualified voters, even in jurisdictions hostile to its mission." *Id.* It is no surprise that Congress drafted the CRA to cover records that are *not* traditionally available, rather than records already treated as public.

*Finally*, DOJ turns to hyperbolic policy arguments, claiming that it would "paralyze" DOJ's ability to enforce federal laws if the CRA did not reach SVRLs. Br.30. This is not credible. DOJ's present campaign is unprecedented; DOJ has never before claimed to need the sweeping and previously unasserted power it now contends is *vital* to enforcing federal law. Further, "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022). If Congress thought it necessary for DOJ to audit unredacted SVRLs to

assess compliance with HAVA, it would have given DOJ the authority to do so *in HAVA*. *See Bellows*, 2026 WL 1430481, at *9. It did not.

**B. The district court correctly held that DOJ failed to state any basis for investigating New Hampshire's list maintenance program.**

The CRA requires the Attorney General to make a "demand in writing," which "shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphases added). Requiring DOJ to articulate a factual basis for its demand is an important check against bad-faith investigations. *See ACICS*, 854 F.3d at 691 (quashing civil investigative demand that failed to "adequately state 'the specific conduct under investigation'"). And, as the district court noted, the requirement of a "factual predicate" is also "entirely consistent with Title III's overall structure, which conditions the government's inspection power on compliance with these threshold requirements." Add.17. Because DOJ's demand failed to state any factual "basis," DOJ has not satisfied the CRA's plain requirements.

DOJ alleges that its August 18 letter is its CRA demand, App.32, but although that letter stated that "[*t*]*he purpose* of the request is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA," it included nothing at all about DOJ's *factual basis* for its demand. App.53 (emphasis added). DOJ disputes whether a CRA demand requires a "factual" basis, and insists that mentioning "New Hampshire's list maintenance program" under HAVA is enough to put Secretary Scanlan on "notice." Br.37-39. But "[r]eading 'basis' in the way [DOJ]

suggests collapses its meaning with that of 'purpose.'" *Oregon*, 828 F. Supp. 3d at 1103. DOJ's argument therefore fails as a matter of basic statutory interpretation. After all, courts "presume that Congress intended all words and provisions contained within a statute to have meaning and effect." *United States v. Ahlers*, 305 F.3d 54, 58 (1st Cir. 2002). The conjunctive "and" in the CRA requirement that DOJ state both "the basis" and "the purpose" for its demand indicates that they are distinct. *See United States v. Walker*, 665 F.3d 212, 224 (1st Cir. 2011). The CRA thus requires DOJ to state its aim in using the records demanded (its purpose) and *also* state its "factual basis for investigating a violation." *Oregon*, 828 F. Supp. 3d at 1104; *see also Weber*, 816 F. Supp. 3d at 1184 (similar).

Demands made shortly after the passage of the CRA reveal that DOJ originally understood the CRA to require it to state its factual basis. *See, e.g.*, *Lynd*, 306 F.2d at 229 n.6 ("This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction.") (emphasis added); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (similar).

Moreover, DOJ's purported basis is disconnected from the information it seeks. A government document demand must be "reasonably relevant" to the matter under investigation. *Morton Salt Co.*, 338 U.S. at 652; *see also United States v.*

*Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). But obtaining New Hampshire's unredacted SVRL would shed little light on whether New Hampshire complied with any list-maintenance obligations, which, as explained below, only require compliance with New Hampshire's own state laws. And the SVRL is just a snapshot of registered voters that becomes immediately outdated. The unredacted list is thus not "reasonably relevant" to DOJ's purported list-maintenance investigation.

### C. The Court should alternatively affirm because New Hampshire is exempt from the provisions of HAVA that DOJ invokes.

A CRA demand must also state "the purpose therefor." 52 U.S.C. § 20703. DOJ's CRA demand for New Hampshire's SVRL stated its purpose was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." App.53. That makes no sense. The cited provision of HAVA concerns mail-in voter registration forms required by the NVRA—specifying, for instance, that such forms must ask whether a voter will be 18 years old by election day. 52 U.S.C. § 21083(b)(4)(A)(ii). That has nothing to do with "list maintenance" or the SVRL. And HAVA expressly relieves NVRA-exempt States like New Hampshire from any obligation to comply with this provision in any event. *See id.* § 21083(b)(5). Investigating mail registration forms cannot be a legitimate purpose for DOJ's CRA demand.

On appeal, DOJ invokes two *different* sections of HAVA to support its CRA demand: 52 U.S.C. §§ 21083(a)(2) and (a)(4). But the CRA requires DOJ's statement

of purpose to be in its "demand" to election officials. *Id.* § 20703. DOJ cannot rehabilitate its facially defective CRA demand on appeal.

In any event, those provisions provide no support for DOJ's demand either. DOJ admits that because New Hampshire is exempt from the NVRA, it is also exempt from 52 U.S.C. § 21083(a)(2). Br.42. That is because this provision—which is the only place HAVA requires election officials to conduct "list maintenance"—contains a crucial limitation: NVRA-exempt States like New Hampshire need only "remove the names of ineligible voters" from their lists "in accordance with *State law*," rather than based on any *federal* list maintenance obligations. 52 U.S.C. § 21083(a)(2)(A)(iii) (emphasis added). Accordingly, New Hampshire's *only* affirmative list maintenance obligations flow from state law. But DOJ never argues that it intends to use its CRA demand to assess New Hampshire's compliance with its own laws, much less identify any statutory authority for doing so. Nor could it: "The Constitution does not authorize federal judges to superintend state and local governments' compliance with their own laws." *Evans v. City of Chicago*, 10 F.3d 474, 481 (7th Cir. 1993); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (explaining federal courts cannot compel state officials to comply with state law). This provision of HAVA cannot, therefore, support DOJ's CRA demand.

DOJ relies instead on a separate portion of HAVA that directs that a State's "election system shall include *provisions* to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4) (emphasis added). But the only duty this subsection imposes on New Hampshire is to "include" certain "provisions" in its statutory law—quite unlike 52 U.S.C. § 21083(a)(2), which actually directs officials in covered States to "perform" and "conduct[]" "list maintenance." DOJ can assess New Hampshire's compliance with 52 U.S.C. § 21083(a)(4)'s requirements by consulting New Hampshire's statutes. *E.g.*, RSA § 654:36 (providing for the removal of duplicate registrations); *id.* § 654:36-b (providing for removals based on change of address); *id.* § 654:37 (providing for removals of deceased voters). The SVRL itself would do nothing to facilitate that assessment. Thus, this provision cannot support DOJ's CRA demand.

At bottom, New Hampshire's limited obligations under HAVA cannot justify a federal demand that New Hampshire turn over protected information on every registered voter in the State. DOJ therefore has no valid purpose for its CRA demand, requiring dismissal.

### D. The Court should alternatively hold that investigating list maintenance is not a proper purpose for a CRA demand.

Even leaving aside the other issues with DOJ's demand, investigating a State's compliance with federal list maintenance obligations is not a permissible purpose under the CRA, which Congress enacted to aid DOJ in the enforcement of

civil rights laws (specifically the Civil Rights Act of 1957). It makes little sense to allow DOJ to use the CRA to investigate compliance with a separate statute—HAVA—with its own enforcement regime that does not include any pre-suit inspection authority. "The United States' undertaking to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce is in direct contravention" of foundational principles of statutory interpretation. *Bellows*, 2026 WL 1430481, at *8. Rather, when DOJ wants to enforce HAVA, it must use the "enforcement mechanisms that Congress provided in [HAVA]—which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of . . . state election official[s]." *Id.*

**1. Congress enacted the NVRA and HAVA—not the CRA—to regulate list maintenance by States, and only those not exempt.**

A core problem with DOJ's invocation of the CRA as a tool for disclosure of list maintenance records is that Congress has spoken to that issue in a *different* statute. The NVRA grants DOJ the right to inspect "all records concerning the implementation of programs and activities conducted for" list maintenance, 52 U.S.C. § 20507(i)(1), but *only* in the States to which it pertains. HAVA, on the other hand, has no public inspection provision whatsoever. Although DOJ brought a claim for New Hampshire's SVRL under HAVA, it has since abandoned it on appeal,

effectively conceding that HAVA itself does not provide DOJ the authority it desires.

Dissatisfied with the reach of the tool Congress provided, DOJ argues that an unrelated statute—the CRA—provides it more far-ranging authority. Br.44. Furthermore, DOJ insists that the "lack of a tool for records inspection" in HAVA somehow *supports* its position that it can use the CRA instead. Br.47. But DOJ cannot supplant the tools Congress *did* provide for federal list maintenance supervision—including an inspection provision—with the one DOJ *wishes* Congress provided. Allowing DOJ to invoke another statute's disclosure tool because it finds HAVA unsatisfactory would result in "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In such cases it is "[t]he terms of the specific authorization [that] must be complied with." *Id.*; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 184 (2012) (explaining the general provision is "suspended" as "to cases covered by the specific provision").

DOJ resists this conclusion by insisting that Congress enacted HAVA against the "backdrop" of the CRA, and therefore must simply have assumed DOJ enjoyed unlimited authority to demand state voter rolls. Br.47. But that is implausible. HAVA speaks *expressly* to DOJ's specific enforcement powers, including those not shared by the broader public. *See* 52 U.S.C. § 21111. And the NVRA provides DOJ

pre-suit inspection authority, *see* 52 U.S.C. § 20507(i)—just not in States Congress chose to exempt, including New Hampshire. If Congress intended HAVA to include an inspection tool on par with the CRA or even the NVRA, it could have easily said so or cross-referenced the CRA itself. In fact, HAVA regularly cross-references other statutes—including the NVRA, 52 U.S.C. § 21083(a)(2)(A); the Privacy Act, *id*. § 21083(a)(5); and the Uniformed and Overseas Citizens Absentee Voting Act, *id*. § 21083(b)(3). But HAVA conspicuously fails to cross-reference Title III of the CRA. In short, "Congress knew how to draft the kind of statutory language that" DOJ wishes "to read into" HAVA but chose not to. *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 580 U.S. 26, 36 (2016). And Congress's "express provision of one method of enforcing" HAVA "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

Further, HAVA takes pains to maintain state primacy over voter rolls. *See, e.g.*, 52 U.S.C. § 21085 (leaving implementation of HAVA to the "discretion of the state"). If Congress meant to disrupt that deliberate balance by granting DOJ *carte blanche* access to state voter rolls, it would not have done so silently. "The idea that Congress gave the Attorney General such broad . . . authority through an implicit delegation . . . is not sustainable." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (explaining Congress does not delegate authority of "political significance to an

agency in so cryptic a fashion."). The Court should therefore reject DOJ's argument that Congress silently enlarged a pre-existing statute like the CRA by *declining* to place a similar provision in either the NVRA or HAVA.

Lurking beneath DOJ's argument is the misguided assumption that Congress surely *meant* to afford the Attorney General such a far-ranging inspection tool. *See*, *e.g.*, Br.47. That is wrong for a host of reasons. For one, there is nothing remarkable about granting the federal government limited enforcement powers in two statutes meant to preserve state primacy in list maintenance. *See supra* Statement §§ I.B-C. Under the framework Congress designed, DOJ can obtain the fruits of civil discovery through HAVA enforcement actions—so long as it can plead a plausible violation of those laws. That reflects Congress's judgment that DOJ must be able to make some preliminary showing—enough to satisfy Rule 12(b)(6), at least—before it can seek records beyond what is publicly available to assess compliance with HAVA. While DOJ might desire "an enlargement" of its powers "by the Court," to "supply [such] omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926).

**2. Congress enacted the CRA to facilitate investigations into the denial of the right to vote and violations of civil rights laws.**

DOJ alternatively contends that the CRA "provides no limitation on the permissible purpose" of a Title III demand, so that the provision is not "limited to particular harms." Br.44. But the CRA's overall text and context foreclose that

expansive claim. Courts do not read isolated fragments of statutory text to find previously undiscovered wellsprings of federal power. *See Brown & Williamson*, 529 U.S. at 132 (explaining "a reviewing court should not confine itself to examining a particular statutory provision in isolation"). "Textualists—like all those who use language to communicate—do not interpret words in a vacuum. Instead, we use context, including '[b]ackground legal conventions,' 'common sense,' and 'constitutional structure,' to ascertain a text's 'most natural meaning.'" *Learning Res., Inc. v. Trump*, 607 U.S. 229, 301 (2026) (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515).

The relevant statutory and historical context for the CRA is not seriously disputed. *See supra* Statement § I.A. Congress enacted the CRA to bolster enforcement of a closely related statute, the Civil Rights Act of 1957. *See* Pub. L. No. 85-315, 71 Stat. 634. As DOJ's own preferred case acknowledges, the CRA's "purpose is to enable the Attorney General to determine whether [§ 10101] suits or similar actions should be instituted." *Lynd*, 306 F.2d at 228. But it was also undisputed that "[i]t [was] not the purpose of title III to supervise State elections." *House Hearings* at 700 (statement of Rep. William M. McCulloch, a principal drafter of Title III). Rather, the "purpose of Title III" is to preserve records for cases where "reasonable cause is thought to exist that any person qualified to vote has been improperly denied that right." *Id.* at 600 (Attorney General Rogers explaining Title

III is meant to facilitate investigations into "complaints that qualified persons have been denied the right to vote in violation of Federal law"); 106 Cong. Rec. 5086 (1960) (explaining Title III "requires the preservation of voting records and gives the Justice Department power to inspect them in enforcing the 1957 act" (Statement of Sen. Saltonstall)). Indeed, Representative Cramer, who proposed the basis and purpose language, did so to ensure that any demand "have some relationship to the title and purpose of the bill, the title of the bill being 'to enforce constitutional rights.'" 106 Cong. Rec. 6392 (Mar. 23, 1960) (statement of Rep. Cramer).

Buttressing this historical context are important "'[b]ackground legal conventions,' 'common sense,' and 'constitutional structure.'" *Learning Res.*, 607 U.S. at 301 (Barrett, J., concurring) (alteration in original) (quoting *Nebraska*, 600 U.S. at 509, 511-12, 515). The Constitution, in the first instance, "invests the States with responsibility for the mechanics of congressional elections." *Foster*, 522 U.S. at 69. The Elections Clause empowers States to "provide a complete code for congressional elections, not only as to times and places, but in relation to registration." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). And the NVRA and HAVA supply important "background legal conventions" reinforcing that voter registration remains principally a state matter. *See supra* Statement §§ I.B-C. These foundational principles reinforce that Congress did not casually grant DOJ authority to demand inspection of unredacted state voter rolls on a whim and for any conceivable purpose.

The Court also "must be guided to a degree by common sense," which reinforces that Congress did not haphazardly grant DOJ a power of such "political magnitude" in a six-decade-old civil rights law that no court has ever applied outside of investigations into violations of voting rights. *Brown & Williamson*, 529 U.S. at 133. In recent years, the Supreme Court has emphatically rejected the notion that Congress accidentally grants sweeping power to the Executive Branch through obscure or opaque statutory provisions. Rather, it demands "clear congressional authorization," not "a merely plausible textual basis," whenever an agency like DOJ claims previously "unheralded" power. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022). Congress, after all, "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

DOJ claims to have discovered just such an elephant, but fails to grapple with the context, history, statutory framework, and constitutional presumptions above. Nor does it advance any principled limitation on the permissible scope of Title III demands. DOJ quotes legislative statements to the effect that the CRA may be marshaled for the purpose of "investigating *possible* violations of a Federal statute." Br.44 (quoting *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating))). But in that same colloquy, Senator Keating made clear that Title III was intended "to add essential features to the laws already on the statute books toward ending discrimination in the voting privileges of our citizens." 106

Cong. Rec. at 7767. And DOJ's view "would take a sledgehammer to the balance Congress struck when it required states to create and maintain computerized lists of registered voters in the first place." *Bellows*, 2026 WL 1430481, at *9. This Court should decline to endorse such a "boundless reading" of the CRA, particularly given the "basic principles of federalism" at issue in the voter registration context. *Bond v. United States*, 572 U.S. 845, 858-59 (2014) ("[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides" the "usual constitutional balance of federal and state powers." (citation omitted)).

### E. The CRA does not preempt New Hampshire's voter privacy protections.

New Hampshire law dictates that its SVRL is "private and confidential." RSA § 654:45(VI). Data from the SVRL may be provided only to the state and federal courts for the preparation of jury lists. *Id.* And the New Hampshire Constitution guarantees that "[a]n individual's right to live free from governmental intrusion in private or personal information is natural, essential, and inherent." N.H. Const. pt. 1, art. 2-b. DOJ does not appear to contest that state law prohibits the disclosure of the information it seeks, and it now appears to concede that it will accept some redactions on the SVRL. *See* Br.54. Because DOJ has failed to demonstrate that the CRA preempts New Hampshire's voter privacy laws, it is not entitled to New Hampshire's SVRL.

Nothing in the CRA's text specifically extends to sensitive voter information, and the early case law confirms it was not meant to. As *Lynd* recognized, the CRA was intended to reach only "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." 306 F.2d at 231. Indeed, since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), Congress's purpose in enacting the CRA could not possibly have extended to requiring disclosure of such information. *See also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) ("[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." (citation modified) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978))). Further, as this Court has held, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in [SVRLs]." *PILF*, 92 F.4th at 56. Just like the NVRA, the CRA is devoid of any language prohibiting redactions.

## III. DOJ has not complied with the Privacy Act.

The Court should also affirm because the mass data collection DOJ seeks would violate the Privacy Act. *See Weber*, 816 F. Supp. 3d at 1192-94 (dismissing DOJ's demand for California's unredacted SVRL on this ground); *see also League of Women Voters*, 2026 WL 1784297, at *21-28 (finding DHS violated the Privacy Act in seeking to run voter lists through SAVE).

The Privacy Act "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. DHS*, No. 25-CV-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). One such requirement is that before an agency may "'establish or revise' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records.'" *Id.* at *2 (quoting 5 U.S.C. § 552a(e)(4)). The System of Records Notice or "SORN" must specify the "purposes for which the information is intended to be used," whose records are at issue, and the types of records covered. 5 U.S.C. § 552a(e). DOJ does not appear to contest that New Hampshire's SVRL, which contains the names and other identifying information of all registered voters, qualifies as a "system of records" under the Act. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1271-72 (N.D. Ga. 2005) (holding a voter list is a system of records), *aff'd*, 439 F.3d 1285 (11th Cir. 2006). DOJ must, therefore, issue a compliant SORN before it engages in activity covered by the Act.[12]

DOJ points to a SORN identified as "JUSTICE/CRT - 001," the "Central Civil Rights Division Index File and Associated Records." Br.54. But this SORN fails to

[12] DOJ's reliance on *United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983), is misplaced because *McAnlis* held only that an agency's failure to provide an individual with an intake form required by 5 U.S.C. § 552a(e)(3) does not defeat enforcement of an IRS summons; *McAnlis* said nothing about the Privacy Act's distinct SORN requirement, which is a prerequisite to an agency lawfully "collect[ing]" a system of records. 5 U.S.C. §§ 552a(a)(3), (e)(4).

support DOJ's attempt to collect voter data here several times over. *First*, it does not disclose what DOJ intends to do with the voter data it collects—indeed, it does not even *mention* the NVRA, HAVA, or the CRA.

*Second*, the SORN says DOJ may maintain information about the "[s]ubjects of investigations, victims, [and] potential witnesses." 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). DOJ insists that this language covers its demand here because every registered voter in New Hampshire is simultaneously a "subject" and "victim" in its "investigation into . . . voter fraud." Br.56. New Hampshire's voters would be aghast to learn that DOJ views each and every one of them as a "subject" of an investigation—a designation serious enough that it would normally trigger a well-advised recipient to seek criminal defense counsel. And it is similarly implausible to call every registered voter in New Hampshire a "victim" in an investigation purportedly about the sufficiency of New Hampshire's processes and programs to maintain its voter roll. Reading those terms as capaciously as DOJ urges would make a mockery of the Privacy Act's notice requirements.

*Third*, the SORN describes the categories of covered records as "case files, matters, memoranda, correspondence, studies, and reports." 68 Fed. Reg. at 47611. While this language may cover run-of-the-mill files maintained for specific investigations and litigation, it would be remarkable to conclude—as DOJ insists—that these terms extend to permit proactively seizing each State's unredacted SVRL.

For all these reasons, this SORN does "nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on [such] an unprecedented level." *Weber*, 816 F. Supp. 3d at 1193-94. "Because the DOJ has not fulfilled its requirements under the Privacy Act, it cannot collect the sensitive, unredacted voting records of millions of" New Hampshire voters. *Id.*[13]

## IV. If the Court reverses, it should remand for additional proceedings.

Even if the Court were to reverse, it should reject DOJ's audacious request to "remand with instructions to order Secretary Scanlan to immediately produce the requested unredacted SVRL" and to immediately issue its mandate. Br.64. The appropriate next step would be for the matter to proceed to discovery, including as to whether DOJ's purpose in seeking New Hampshire's SVRL was pretextual. *See United States v. Clarke*, 573 U.S. 248, 254 (2014) (permitting discovery into government's motive in issuing document demand upon "a showing of facts that give rise to a plausible inference of improper motive"). The CRA requires DOJ to state "the purpose" for its demand, so it matters whether the asserted purpose is the true one.

[13] The "law enforcement" exception DOJ references only means that DOJ is not *categorically* barred from collecting First Amendment information. *See* 5 U.S.C. § 552a(e)(7). There is no law enforcement exception to the Act's SORN requirement. *Id.* § 552a(e)(4).

As multiple federal courts have noted, there is reason to doubt DOJ's stated purpose in seeking SVRLs. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182-86 (concluding DOJ's stated purpose in demanding California's SVRL was "pretextual" and "contrived"); *Oregon*, 828 F. Supp. 3d at 1107 (similar). DOJ's actual purpose appears to be to run New Hampshire's SVRL through DHS's SAVE database and to then pressure the State to remove flagged registrants, notwithstanding SAVE's demonstrable unreliability. *See supra* Statement § II. But, as noted, that endeavor has nothing to do with DOJ's stated purpose here—and DHS is currently enjoined from using SAVE to facilitate voter removals in any event. *Id.*

DOJ also invites an "inquiry on remand" on its compliance with the Privacy Act. Br.54. That is incompatible with its request for an order directing Secretary Scanlan to "immediately" produce New Hampshire's SVRL. Br.64. This is yet another reason why the Court should decline DOJ's request to enter a rubber-stamp judgment on remand.

## CONCLUSION

The Court should affirm.

September 2, 2026

Respectfully submitted,

*/s/ David R. Fox*
David R. Fox (1st Cir. No. 1189538)
Christopher D. Dodge (1st Cir. No. 1185553)

Branden D. Lewiston (1st Cir. No. 1224684)
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
dfox@elias.law
cdodge@elias.law
blewiston@elias.law

Walker McKusick (1st Cir. No. 1224620)
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Ste. 2100
Seattle, WA 98101
Tel.: (202) 948-1135
wmckusick@elias.law

Steven J. Dutton (1st Cir. No. 1182883)
**MCLANE MIDDLETON, P.A.**
900 Elm Street
Manchester, New Hampshire 03101
Tel.: (603) 625-6464
steven.dutton@mclane.com

Paul Twomey (1st Cir. No. 16166)
**TWOMEY LAW OFFICE**
44 Ring Road
Chichester, New Hampshire 03258
Tel.: (603) 568-3254
polotuama7@gmail.com

*Attorneys for Defendants-Appellees Neal Kurk, Robert Perry, Louise Spencer, and Christopher Cole*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,972 words, excluding parts of the brief exempted by Federal Rules of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ David R. Fox*
David R. Fox

## CERTIFICATE OF SERVICE

I certify that on September 2, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ David R. Fox*
David R. Fox