**No. 26-1783**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

UNITED STATES,
*Plaintiff-Appellant,*

—v.—

DAVID M. SCANLAN, New Hampshire Secretary of State; STATE OF NEW HAMPSHIRE; NEAL KURK; ROBERT PERRY; LOUISE SPENCER; CHRISTOPHER COLE,
*Defendants-Appellees.*

On Appeal from the United States District Court for the District of New Hampshire (No. 1:25-cv-00371)

# BRIEF FOR LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, NATIONAL URBAN LEAGUE, LEAGUE OF UNITED LATIN AMERICAN CITIZENS, AND ASIAN LAW CAUCUS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

Edward G. Caspar
Robert Weiner
Leah Frazier
Gillian Cassell-Stiga
Catherine Meza
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW
Ninth Floor
Washington, DC 20005
(202) 662-8600

Lanny A. Breuer
Thomas Perrin Cooke
Hassan Ahmad
Samuel T. Ackerman
*Counsel of Record*
Joshua M. Schenk
Basundhara Mukherjee
Evan Chiacchiaro
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *Amici* Lawyers' Committee for Civil Rights Under Law, National Urban League, League of United Latin American Citizens, and Asian Law Caucus state that they have no parent corporations and do not issue stock.

/s/ Samuel T. Ackerman
Samuel T. Ackerman
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 4

BACKGROUND .......... 4

ARGUMENT .......... 5

I. The Decision Below Is Correct. .......... 5

II. The Court Should Not Interpret the CRA in a Manner That Chills and Burdens Constitutional Rights .......... 6

  A. The Administration's Demand Must Be Understood As Part of Its Strategy to Centralize and Weaponize Voter Data Ahead of the 2026 Election .......... 8

  B. The Demand Will Result in the Impermissible Chilling and Denial of the Right to Vote .......... 17

  C. To Avoid Serious Constitutional Issues, the Court Should Construe the CRA, HAVA, and NVRA Not to Authorize the Demand for Unredacted Voter Files .......... 26

III. AI-Enabled Data Aggregation Heightens the Constitutional Burden of DOJ's Demand. .......... 29

CONCLUSION .......... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFSCME, AFL-CIO v. SSA*,
2026 WL 1842617 (D. Md. June 26, 2026) ........ 16

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ........ 27, 28

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ........ 21

*Benson v. United States*,
179 F.4th 470 (6th Cir. 2026) ........ 6, 7

*Benson v. United States*,
819 F. Supp. 3d 753 (W.D. Mich. 2026) ........ 7

*Buckley v. Am. Const. Law Found., Inc.*,
525 U.S. 182 (1999) ........ 18

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........ 21

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sep. 25, 2026) ........ 13

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Trades Council*,
485 U.S. 568 (1988) ........ 7

*Greidinger v. Davis*,
988 F.2d 1344 (4th Cir. 1993) ........ 18

*Harper v. Va. State Bd. of Elections*,
383 U.S. 663 (1966) ........ 18, 22

*League of Women Voters v. DHS*,
2026 WL 1784297 (D.D.C. June 22, 2026) ........ 13, 14

*LULAC v. Pub. Int. Legal Found.*,
2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ........ 26

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ........ 34

*Norman v. Reed*,
502 U.S. 279 (1992) ........ 7

*Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021) ........ 20

*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 27, 28

*United States v. Nguyen*,
673 F.3d 1259 (9th Cir. 2012) ........ 25

*United States v. Oregon*,
828 F. Supp. 3d 1092 (D. Or. 2026) ........ 21, 27

*United States v. Scanlan*,
838 F. Supp. 3d 150 (D.N.H. 2026) ........ 4, 5

*United States v. Schmidt*,
2026 WL 1850016 (W.D. Pa. June 27, 2026) ........ 8, 9, 11, 27

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........ 27

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........ 18

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ........ 27

**Statutes**

13 U.S.C. § 9 ........ 29

13 U.S.C. § 214 ........ 29

52 U.S.C. § 20701 *et seq.* .......................................................... 5

Family Educational Rights and Privacy Act of 1974, Pub. L. No. 93-380, 88 Stat. 484 .......................................................... 29

**Legislative Materials**

Help America Vote Act of 2001, H.R. Rep. No. 107-329 (2001) .............. 28

**Administrative Materials**

Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. __ slip. op. (May 12, 2026) .............................. 12

Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 25, 2025) .............................. 17

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025) .............................. 24

Exec. Order No. 14,399, 91 Fed. Reg. 17,125 (Mar. 31, 2026) .............................. 15, 19, 23, 24

**Other Authorities**

*Address to the Nation on Election Security (transcript)*, Univ. of Va. Miller Ctr. (July 16, 2026) .............................. 10

*American Oversight Sues ICE and DOJ for Records on Sensitive Voter Data Collection and Sharing*, Am. Oversight (Mar. 10, 2026) .............................. 31

Albert Cevallos, *How Autocrats Weaponize AI-and How to Fight Back*, J. Democracy Online Exclusive (2025) .............................. 35

Alice Clapman & Andrew Garber, *A New Antidemocracy Tool*, Brennan Ctr. Just. (Sep. 5, 2023) .............................. 32

Almog Simchon, Matthew Edwards, & Stephan Lewandowsky, *The Persuasive Effects of Political Microtargeting in the Age of Generative Artificial Intelligence*, 3 PNAS Nexus 1 (2024) .............................. 32

Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024) .......... 8

Bill Barrow, *Donald Trump Ousts Election Commission Members in Latest Push to Reshape US Voting Process*, Associated Press (July 10, 2026) .......... 11

Blair Shiff & Stephanie Johnson, *Racist Text Messages Sent Out Following Presidential Election*, WCNC (Nov. 7, 2024) .......... 33

C-SPAN, *DHS Secretary Mullin Delivers Remarks on Election Security* (July 17, 2026) .......... 23

Cade Metz, *Chatbots May 'Hallucinate' More Often Than Many Realize*, *N.Y. Times* (Nov. 6, 2023) .......... 31

Cong. Rsch. Serv., *Artificial Intelligence: Overview, Recent Advances, and Considerations for the 118th Congress* (2023) .......... 29

Daniel Thilo Schroeder et al., *How Malicious AI Swarms Can Threaten Democracy*, 397 Sci. 354 (2026) .......... 32

Def.'s Not. Corrections R. 5, *AFSCME v. SSA*, No. 25-cv-00696 (D. Md. Jan. 16, 2026), Dkt. No. 197 .......... 16

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025) .......... 9

*Georgia Election Workers Ruby Freeman and Shaye Moss Describe Threats*, Wash. Post (June 21, 2022) .......... 20, 25

Jacob Ritondo, *Black Students Receive Racist Text Messages After Trump's Win, Part of Apparent Nationwide Trend*, Crimson White (Nov. 6, 2024) .......... 33

Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. Just. (July 21, 2025) .......... 15

Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, Tex. Trib. (Feb. 17, 2026) ........ 15

Jennifer King & Caroline Meinhardt, *Rethinking Privacy in the AI Era*, Stanford Human-Centered AI (2024) ........ 30

Joint Appendix, *Common Cause v. DOJ*, No. 1:26-cv-01352 (D.D.C. May 7, 2026), Dkt. No. 45-1 ........ 13

Jude Joffe-Block, *As DOJ Prepares to Share State Voter Data with DHS, a Key Privacy Officer Resigns*, NPR (Apr. 3, 2026) ........ 12

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025) ........ 14, 31

Karl Manheim & Lyric Kaplan, *Artificial Intelligence: Risks to Privacy & Democracy*, 21 Yale J.L. & Tech. 106 (2019) ........ 31

Matt Cohen, *Non-citizen Voting: Utah Finds Just 13 Invalid Ballots out of Millions Cast*, Democracy Docket (May 28, 2026) ........ 8

Mekela Panditharatne, *Preparing to Fight AI-Backed Voter Suppression*, Brennan Ctr. Just. (Apr. 16, 2024) ........ 32

*Memorandum on Addressing Risks from Chris Krebs and Government Censorship*, 2025 Daily Comp. Pres. Doc. 465 (Apr. 9, 2025) ........ 34

Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026) ........ 9

Michael Kosnar & Kyla Guilfoil, *DOJ Threatens Criminal Charges for State Election Officials over Noncitizen Voting*, NBC News (July 8, 2026) ........ 10

Off. of Legal Counsel, *Authority of the Department of Justice to Demand State Voter Registration List Records Under the Civil Rights Act of 1960* (2026) .................... 33

Press Release, *Democrats Launch Inquiry into Weaponization of IRS*, Congressman Lloyd Doggett (Apr. 14, 2026) .................... 24

Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026) .................... 12

Stephen Gowler & Jude Joffe-Block, *How DOGE Improperly Accessed and Shared Social Security Data*, NPR (Jan. 30, 2026) .................... 16

U.S. Comm'n on C.R., *An Assessment* of *Minority Voting Rights Access in* the *United States* 148 (2018) .................... 14

White House, *America's AI Action Plan* (July 2025) .................... 30

## INTEREST OF *AMICI CURIAE*[1]

The Lawyers' Committee for Civil Rights Under Law is a nonpartisan, nonprofit organization formed in 1963 at the request of President John F. Kennedy to enlist the private bar in the fight for civil rights. It has worked for decades to enforce federal voting rights protections, combat voter intimidation and suppression, and ensure fair and equal access to the democratic process. The Lawyers' Committee regularly represents voters and civic organizations harmed by unlawful election practices and has a substantial interest in preventing misuse of sensitive voter information.

The National Urban League ("NUL"), founded in 1910, is a historic, nonpartisan civil rights and economic empowerment organization dedicated to advancing equity and opportunity for Black people and other marginalized communities. For over a century, NUL has worked to eliminate barriers to full participation in American democracy through advocacy, education, employment initiatives, civic engagement, and

[1] All parties have consented to the filing of this brief. Pursuant to Rule 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in whole or in part, and that no person other than amici or their counsel made any monetary contributions intended to fund the preparation or submission of this brief.

policy reform, with a central focus on protecting the fundamental right to vote. NUL played a pivotal role in the civil rights movement, contributing to the passage of the Voting Rights Act of 1965 (VRA), and continues to lead national efforts to safeguard ballot access, promote fair redistricting, and defend voting rights for historically disenfranchised communities.

League of United Latin American Citizens ("LULAC") is the largest and oldest Latino civil rights organization in the United States. Established in 1929 and headquartered in Washington, D.C., LULAC is a nationwide, non-profit, non-partisan, membership-based organization with more than 400 councils (local chapters) and over 570,000 members, with members in every state in the country.

Asian Law Caucus ("ALC") is the nation's first legal and civil rights organization serving low-income, immigrant, and underserved Asian American and Pacific Islander communities. ALC brings together impact litigation, direct legal services, community empowerment, and policy advocacy to fight for immigrant justice, economic security, and a stronger, multiracial democracy. In the voting rights context, ALC advocates to advance voting for AAPI voters, voters with limited English

proficiency, and other historically disenfranchised groups, and to protect the ability of voters to exercise their right to vote without fear, interference, or barriers. Before major elections, ALC conducts Know Your Voting Rights workshops for community partners and their members and creates translated voting related factsheets; ALC also has one of the largest nonpartisan poll observation projects in California and regularly litigates voting rights cases across the nation.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's order denying the Department of Justice's ("DOJ" or the "Department") attempt to compel the disclosure of New Hampshire's statewide voter registration list should be affirmed because the Department lacks statutory authority to request—much less demand—the information it seeks. *Amici* submit this brief to address the real-world consequences of the Department's effort to subvert federal law to create a national voter registry. Both clear doctrine and sound policy rationales—rooted in the protection of voting rights, voter privacy, and federalism—support affirmance of the decision below.

## BACKGROUND

On June 25, 2025 and August 18, 2025, DOJ sent letters to New Hampshire Secretary of State David Scanlan seeking, among other things, production of New Hampshire's unredacted voter registration list. *United States v. Scanlan*, 838 F. Supp. 3d 150, 153–54 (D.N.H. 2026). In response, to each letter Secretary of State Scanlan twice explained that that New Hampshire law prohibits sharing the statewide voter registration list. *Id.*

DOJ filed this lawsuit on September 25, 2025, asserting claims under Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20701 *et seq.*, and the Help America Vote Act ("HAVA") and moving to compel production of New Hampshire's unredacted voter registration list. *Id.* at 151. Thereafter, state defendants and intervenors, a group of individual New Hampshire voters, moved to dismiss.

On June 29, 2026, the district court denied DOJ's motion to compel and granted the motions to dismiss. *Id.* at 165. The court rejected the Title III claim, holding both that New Hampshire's statewide voter registration list is not a "record" within the meaning of the CRA, and that in any event, DOJ failed to state a factual basis as the plain text of § 20703 so requires. *Id.* at 155-162-8. The Court also held that DOJ failed to state a claim under HAVA. *Id.* at 162-64. This appeal followed.

## ARGUMENT

### I. The Decision Below Is Correct.

The district court properly held that DOJ's demand failed under both Title III of the Civil Rights Act of 1960 ("CRA") and the Help America Vote Act ("HAVA"). *See United States v. Scanlan*, 838 F. Supp. 3d 150, 153–54 (D.N.H. 2026). Every court to rule on the government's

nationwide campaign for unredacted statewide voter files has reached the same conclusion: no federal statute authorizes bulk, unredacted disclosure of statewide voter registration databases to the Department of Justice. To date, twenty-six federal district courts have rejected the government's theory, and the Sixth Circuit has affirmed the first of those dismissals to reach the appellate level. *See United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) (affirming dismissal and holding that Title III does not authorize DOJ's demand for Michigan's unredacted voter file). No court has granted the government's request for a State's unredacted voter registration list under the CRA or HAVA.

## II. The Court Should Not Interpret the CRA in a Manner That Chills and Burdens Constitutional Rights.

As all twenty-six district courts that have ruled on DOJ's efforts to compel the production of unredacted voter data have found, the plain text of the CRA does not authorize the Department's present demand. But even if this Court finds ambiguity, it should resolve that ambiguity against the Department, under the well-established principle that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the

intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Trades Council*, 485 U.S. 568, 575 (1988).

Courts have consistently applied that principle in the election law context, including with respect to the instant DOJ demand. In *Benson*, the Western District of Michigan held that to interpret the record maintenance provision of the NVRA "to require public disclosure of all private information submitted for voter registration purposes would potentially cause the statute to impose an unconstitutional burden on the right to vote guaranteed by the First Amendment." *See United States v. Benson*, 819 F. Supp. 3d 753, 761 (W.D. Mich.) (citing *Norman v. Reed*, 502 U.S. 279, 288 (1992)), *aff'd*, 179 F.4th 470 (6th Cir. 2026). Citing the constitutional avoidance canon, the Court then held that it was "disinclined" to interpret the NVRA provision to require unredacted disclosure of private information provided for voter registration purposes. That same logic extends to both the CRA and HAVA; to interpret those provisions to enable the pretextual capture of personal voter data would equally chill the right to vote.

### A. The Administration's Demand Must Be Understood As Part of Its Strategy to Centralize and Weaponize Voter Data Ahead of the 2026 Election.

The Department continues to assert that it needs the unredacted state voter files to ensure state compliance with HAVA. But the Administration has barely concealed its true intentions to use the data (1) to advance "unsubstantiated claims of non-citizen voting" through a "'fishing expedition'"; (2) to obtain "a tool for immigration enforcement"; and, ultimately, (3) "to create a nationwide voter-database, for potential weaponization in future elections." *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016, at *2 (W.D. Pa. June 27, 2026). Those wide-spanning, underlying goals provide critical context that magnify the burden of the demand on the right to vote.

***Asserting False Claims of Voter Fraud and Non-Citizen Voting.*** Voter fraud in American elections is vanishingly rare. *See, e.g.*, Ashley Lopez, *How We Know Voter Fraud Is Very Rare in U.S. Elections*, NPR (Oct. 11, 2024). Utah, for example, recently completed an audit of its voter rolls and found only 27 confirmed non-citizen voters, of whom only 13 have voted in any election since 2018 out of over 5 million votes cast across those elections. Matt Cohen, *Non-citizen Voting: Utah Finds*

*Just 13 Invalid Ballots out of Millions Cast*, Democracy Docket (May 28, 2026). Yet the President and leaders across the Administration continue to falsely assert that non-citizen voting has persistently corrupted and altered the results of U.S. elections. *See, e.g.*, Michael Gold, *Trump Leans on Congress to Address His False Claims of Voter Fraud*, N.Y. Times (Feb. 25, 2026) (describing President Trump's "often repeated—and equally often debunked—claims of widespread election fraud").

The Administration's lawsuit to obtain New Hampshire's voter rolls is part of that ongoing effort to assert widescale fraud and undermine confidence in elections. As early as September 2025, the *New York Times* reported that DOJ "is compiling the largest set of national voter roll data it has ever collected, buttressing an effort by President Trump and his supporters to try to prove long-running, unsubstantiated claims that droves of undocumented immigrants have voted illegally." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025).

After months of barely concealing the Administration's true intentions, the President said the "quiet part" out loud in his July 16, 2026, address to the nation. *See Schmidt*, 2026 WL 1850016, at *2.

There, the President purported to release information that "reveal[s] just how vulnerable our elections continue to be." *Address to the Nation on Election Security (transcript)*, Univ. of Va. Miller Ctr. (July 16, 2026), https://millercenter.org/the-presidency/presidential-speeches/july-16-2026-address-nation-election-security. He claimed that in a Department of Homeland Security ("DHS") review of "state voter rolls, and public records, they identified approximately 278,000 non-citizens who are registered to vote in federal elections. Since Democrat states refuse to share their voter files, the real number is actually much higher than that." *Id.* The President explicitly linked state provision of unredacted voter files to efforts to remove supposed ineligible voters from the rolls.

The Administration has also translated its unsubstantiated claims concerning non-citizen voting into concrete threats against nonpartisan state and local election administrators, purges of federal election officials, and retaliation against states challenging the voter file demands. On July 7, 2026, DOJ sent letters to election administration officials in all fifty States and the District of Columbia threatening prosecution for "aiding and abetting" non-citizen voting and demanding information on how they would remove non-citizens from voter lists. *See* Michael Kosnar

& Kyla Guilfoil, *DOJ Threatens Criminal Charges for State Election Officials over Noncitizen Voting*, NBC News (July 8, 2026). Two days later, President Trump ousted all three sitting commissioners of the Election Assistance Commission after the Commission rejected efforts to add a proof-of-citizenship question to the national voter-registration form. *See* Bill Barrow, *Donald Trump Ousts Election Commission Members in Latest Push to Reshape US Voting Process*, Associated Press (July 10, 2026).

The Administration's manufactured concerns notwithstanding, its government-wide full-court press to compel States to assist in meritless investigations of (virtually non-existent) non-citizen voting baselessly sows doubt in the integrity of elections and contributes to an environment of fear at the ballot box.

***Advancing Immigration and Criminal Enforcement Priorities.*** The Administration has also repeatedly admitted that it intends to repurpose the state voter file data to gain "a tool for immigration enforcement" and federal enforcement more broadly. *Schmidt*, 2026 WL 1850016, at *2. At a hearing concerning the demand for the Rhode Island voter file, the chief of the Department's Voting

Rights Section conceded that the "intent [of demanding the voter files] is to share state voter roll data with the Department of Homeland Security and run it through a DHS data system called SAVE to check for non-citizens and deceased individuals on the rolls." Jude Joffe-Block, *As DOJ Prepares to Share State Voter Data with DHS, a Key Privacy Officer Resigns*, NPR (Apr. 3, 2026); *see also* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. __ (May 12, 2026) (slip. op. at 1), https://www.justice.gov/olc/media/1440346/dl (acknowledging data-sharing with "DHS for the purpose of identifying illegal aliens who are ineligible to vote"). Internal DOJ documents confirm that the Department planned to "share [States' voter] lists with [DHS] . . . to identify illegal aliens who are ineligible to vote" and "refer [those individuals] for prosecution." 50 Op. O.L.C. __, slip. op. 5.

In March 2026, for example, major outlets reported that the Department and DHS were close to finalizing an agreement "that will allow the federal government to use sensitive voter registration data for immigration and criminal investigations." Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026).

***Centralizing Federal Control over Election Administration***. Integrally related to the goals of promoting false narratives of non-citizen voting and conducting immigration and criminal enforcement, the demand is a key instrument in the Administration's broader effort to exert centralized control over deciding who is eligible to vote. DHS has deployed Systematic Alien Verification for Entitlements ("SAVE")—a notoriously unreliable database used for verifying eligibility for certain public entitlements that routinely misidentifies United States citizens as non-citizens—to purge voters from the state voter files the Department has demanded. *See League of Women Voters v. DHS*, No. 25-cv-3501, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026), *stayed*, *DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (Sep. 25, 2026) (per curiam). That is even as DHS and the Department have recognized that "SAVE does not provide information regarding citizenship or immigration status at points of time other than at the time of the SAVE case response" and "may only be able to verify acquired U.S. Citizens in certain situations." *See* Memorandum of Agreement between DHS, USCIS, and DOJ re SAVE at CRT-31–32 (Jan. 2006), *in* Joint Appendix, *Common Cause v. DOJ*, No. 1:26-cv-01352 (D.D.C. May 7, 2026), Dkt. No.

45-1; *see also* U.S. Comm'n on C.R., *An Assessment* of *Minority Voting Rights Access in* the *United States* 148 (2018) ("SAVE is not a comprehensive list of U.S. Citizens" and "does not include derivative citizens born to U.S. parents outside the country"). The government has transformed SAVE into a "controversial citizenship lookup tool," incorporating data that States have provided from demands for voter files like the demand at issue. *See also* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025).

In June 2026, a federal court noted with respect to the modified SAVE system that certain federal agencies, including DHS and the Social Security Administration, had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable." *League of Women Voters*, 2026 WL 1784297, at *1. The court highlighted internal DHS memos warning that naturalized citizens would be at particular risk of having their registrations erroneously cancelled. *See id.* The evidence of errors from public reporting is overwhelming. In St. Louis and Boone Counties, Missouri, for example, 81% and 55% of registered voters SAVE flagged

as non-citizens were, in fact, citizens. Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes*, Tex. Trib. (Feb. 17, 2026). Even USCIS has acknowledged it initially provided incorrect information to at least five states through SAVE. *See* Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. Just. (July 21, 2025).

Meanwhile, the Administration has moved to entrench this flawed process through executive action. In a recent Executive Order, the Administration instructed the Director of United States Citizenship and Immigration Services to develop "State Citizenship List[s]." Those lists "shall be derived from Federal citizenship and naturalization records, SSA records, SAVE data, and other relevant Federal databases." *See* Exec. Order No. 14,399, §§ 1-3, 91 Fed. Reg. 17,125, 17,125–27 (Mar. 31, 2026) ("Citizenship EO"). And the Administration has directed the Postal Service to refrain from transmitting mail-in ballots to individuals not included on that federally compiled State Citizenship List. *See id.* § 3.

The Administration has also demonstrated it is willing to share voter data with non-government allies. In litigation over DOGE's access

to Social Security Administration ("SSA") data, the government disclosed that DOGE staff disseminated sensitive personal data and "secretly conferred with a political advocacy group about a request to match Social Security data with state voter rolls to 'find evidence of voter fraud and to overturn election results in certain States[.]'" Stephen Gowler & Jude Joffe-Block, *How DOGE Improperly Accessed and Shared Social Security Data*, NPR (Jan. 30, 2026); *see also AFSCME, AFL-CIO v. SSA*, 2026 WL 1842617, at *1–2 (D. Md. June 26, 2026) (granting preliminary relief to prevent SSA from sharing further information with DOGE) (currently stayed). A DOGE staff member later entered into a "Voter Data Agreement" on behalf of the SSA with an advocacy group, with the stated aim of finding evidence of voter fraud to overturn election results in targeted states. *See* Def.'s Not. Corrections R. 5, *AFSCME v. SSA*, No. 25-cv-00696 (D. Md. Jan. 16, 2026), Dkt. No. 197. Although the government has not confirmed whether data were ultimately transferred, the episode reveals that the demand may also be linked to private actions that stymie the right to vote.

The Department's effort to collate unredacted voter files is part and parcel of these three underlying objectives and the Administration's

overall strategy to surround the upcoming elections in a shroud of fear and doubt. And federal possession of unredacted voter files would not occur in isolation. It would input sensitive voting data into a broader data-sharing architecture across federal administrative agencies. *See* Exec. Order No. 14,243, 90 Fed. Reg. 13,681 (Mar. 25, 2025).

That context magnifies the demand's practical burden on the right to vote: voters may reasonably fear that their information will be aggregated, matched, repurposed, or used for enforcement purposes. The result risks driving millions of Americans to skip this election altogether. The Court should view the practical effects of the demand on the right to vote with this context in mind.

### B. The Demand Will Result in the Impermissible Chilling and Denial of the Right to Vote.

The demand's compelled disclosure of unredacted statewide voter registration databases—including addresses, dates of birth, driver's license numbers, and Social Security numbers—changes the practical conditions under which citizens decide whether to register or remain registered, denying the right to participate in elections for some and chilling the right to vote for others.

The right to vote is "a fundamental political right, because [it is] preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), and "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (citation modified).

The disclosure of personal identifiers forces citizens to choose between exercising the franchise and exposing themselves to risks of data misuse or harassment. In *Greidinger v. Davis*, for example, the Fourth Circuit held that a state requirement to disclose Social Security numbers as a condition of voter registration imposed an unconstitutional burden on the franchise, emphasizing that the risk of identity theft and personal harm was neither speculative nor remote. 988 F.2d 1344, 1354–55 (4th Cir. 1993). Similarly, in *Buckley v. American Constitutional Law Foundation, Inc.*, the Supreme Court struck down a Colorado law requiring individuals who circulate ballot-initiative petitions to wear name badges, holding that the requirement imposed an impermissible burden on First Amendment-protected civic activity. 525 U.S. 182 (1999).

The Administration's demand for sensitive voter data threatens to deny the right to vote to millions of Americans at risk of being

erroneously purged from the rolls and chills the right to vote for others who will reasonably fear undue investigation, harassment, or retaliation by federal authorities. Those burdens cannot be sustained under the First and Fourteenth Amendments, and the CRA must be construed accordingly.

***Voter Purges.*** As described above, the Department intends to use disclosed voter data to run state voter files through DHS's SAVE system, flag registrants the government deems ineligible, and direct states to remove those individuals from their rolls. *See supra*, Section II.A. But SAVE is notoriously unreliable and routinely misidentifies United States citizens as non-citizens. *See* U.S. Comm'n on C.R., *supra*, at 148 ("SAVE is not a comprehensive list of U.S. Citizens"). The demand thus sets in motion a purge apparatus that will sweep up eligible citizens alongside any non-citizens it may identify—not merely chilling participation but affirmatively denying lawful voters the right to vote.

The Administration has entrenched this flawed process through executive action, directing federal agencies to compile a "State Citizenship List" derived from SAVE and other federal databases and transmit it to state election officials. Citizenship EO § 2. It has further

directed the U.S. Postal Service to withhold mail-in ballots from individuals not on the federally-compiled list, *id.* § 3, and DHS Secretary Mullin has confirmed that the agency will "scrub all election records" before and after the upcoming election, *see supra*, Section II.A. Those directives transform the demand from a one-time data request into the first step in a continuous, federal voter-removal program. The unprecedented scale of this undertaking means that the documented error rates will compound across millions of voter records nationwide.

The evidence that these purges produce widespread disenfranchisement of eligible voters is already overwhelming, *see supra*, Section II.A; *see also Pub. Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) ("[b]eing improperly identified as a noncitizen for such an oversight could have long-standing personal and professional repercussions"). Granting the Department's demand would thus produce the constitutionally intolerable result of denying eligible citizens the right to vote. In evaluating burdens on the franchise, courts must weigh "the character and magnitude of the asserted injury" against "the precise interests put forward by the [government] as justifications for the burden imposed by its rule."

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Here, the character and magnitude of the injury could not be more severe: the purge machinery the government has built will run state voter files through an error-prone federal database and then direct states to cancel the registrations of those it flags, denying eligible voters the franchise altogether without adequate notice or meaningful opportunity to be heard before the next election. That is not a speculative harm. It is the direct, foreseeable consequence of the demand itself. Without the unredacted voter file, the government cannot feed New Hampshire's voters into the SAVE pipeline; with it, erroneous purges are inevitable. *See United States v. Oregon*, 828 F. Supp. 3d 1092, 1108–09 (D. Or.), *appeal filed*, No. 26-1231 (9th Cir. 2026) ("The possibility that [the state's] voter registration list could be used to further these efforts . . . may very well lead to an erosion of voting rights and voter participation."). And the government's asserted justification—monitoring state compliance with HAVA—cannot sustain this burden because a point-in-time voter file reveals little about whether a State's list maintenance *procedures* produce accurate results. *See Dep't of Com. v. New York*, 588 U.S. 752, 782–84 (2019) (rejecting pretextual agency

justification). Because "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized," *Harper*, 383 U.S. at 667, the Court should not construe the CRA to authorize a demand that carries so direct a risk of unconstitutional disenfranchisement.

***Disenfranchisement by Fear of Retaliation, Criminal Enforcement, and Harassment.*** The constitutional problem is not limited to voters who are formally removed from the rolls. DOJ's demand also risks chilling the right to vote through fear: against the backdrop of centralized federal data-sharing, voters may forgo participation rather than risk targeted investigation, harassment, retaliation, or enforcement. That deterrent effect is especially pronounced for voters whom the Administration's enforcement rhetoric has already singled out or placed under suspicion, such as recently naturalized citizens.

For example, when voter files are cross-referenced with immigration and naturalization records, eligible voters may reasonably fear that registration or voting will expose them—or their families—to unlawful immigration enforcement, particularly where the Administration has mobilized the whole of government to target supposedly unlawful non-citizen voting, despite its rarity. *See*

Citizenship EO §§ 1–3; *see also supra*, Section II.A. Minor data entry errors or inconsistencies may pull voters into immigration investigations or enforcement proceedings. *See supra*, Section II.A. In his July 17, 2026 speech, for example, Secretary Mullin warned that the government would "find" and "charge" any voter it determined had voted, or attempted to vote, unlawfully, "pursu[ing] maximum pressure" that could include "penalties up to 5 years in prison and up to $250,000 in fines." C-SPAN, *DHS Secretary Mullin Delivers Remarks on Election Security*, at 9:45–11:13 (July 17, 2026), https://www.c-span.org/program/news-conference/dhs-secretary-mullin-delivers-remarks-on-election-security/683081. Compliance will reasonably cause eligible voters to fear that voting will expose them to scrutiny, harassment, or baseless investigation. In that environment, fear becomes a barrier to the ballot for voters and the entities that assist and protect them. That chilling effect predictably falls most heavily on communities of color already disproportionately targeted by enforcement rhetoric and intimidation tactics.

The chilling effect also extends to the election officials and civic organizations that enable voter participation and are viewed as hostile to

the Administration's election agenda. The Administration has tied its voter data demands to a broader assertion of federal control over election administration. *See* Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 25, 2025); Citizenship EO § 2. The Citizenship EO, for example, threatens investigation and prosecution of entities "engaged in, or aiding and abetting" the distribution of ballots to ineligible voters. *Id.* That directive chills ordinary election administration or voter assistance work—the infrastructure through which eligible voters register, remain registered, and cast ballots. Recent enforcement actions against civic organizations, election administrators, and perceived political opponents make those fears not only reasonable but readily foreseeable. The Administration has also scrutinized nonprofits engaged in civil rights, immigration, and criminal justice advocacy, including raids, visits, funding freezes, and threatened audits. Elsewhere, congressional investigators have raised concerns that the IRS is compiling information on "left-leaning" tax-exempt organizations. *See* Press Release, *Democrats Launch Inquiry into Weaponization of IRS*, Congressman Lloyd Doggett (Apr. 14, 2026). The threats directed at Fulton County, Georgia election workers Ruby Freeman and Wandrea "Shaye" Moss—due to baseless

accusations of fraud that forced them to flee their homes—illustrate how quickly personal information tied to elections can be weaponized. *See Georgia Election Workers Ruby Freeman and Shaye Moss Describe Threats*, Wash. Post (June 21, 2022). Worse still, compliance with the demand will cause voters to fear targeting from ideologically motivated outside actors, as the episode involving DOGE's voter data agreement with private right-wing groups illustrates. *See supra*, Section II.A.

A federal government that controls a comprehensive, centralized voter file controls the raw material of every election: who is permitted to vote, whose registration is flagged, and whose ballot is transmitted or withheld. Combined with sustained threats of investigation and prosecution, that architecture threatens disenfranchisement in every practical sense: by removing eligible voters from the rolls, forcing others to risk government scrutiny as the price of voting, and deterring still others from participating at all. Courts around the country have recognized as much. *See, e.g.*, *United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) (recognizing that mailers threatening newly registered Hispanic voters with exposure of personal information to anti-immigration groups or immigration enforcement constituted voter

intimidation, in violation of California law); *LULAC v. Pub. Int. Legal Found.,* 2018 WL 3848404, at *2 (E.D. Va. Aug. 13, 2018) (holding that a nonprofit report accusing lawful voters of felony fraud and "alien invasion," while publishing their personal voter information, interfered with the right to vote by creating fear of harassment). That is not merely a privacy injury; it is an impermissible burden on the fundamental right to vote.

### C. To Avoid Serious Constitutional Issues, the Court Should Construe the CRA, HAVA, and NVRA Not to Authorize the Demand for Unredacted Voter Files.

Even if this Court concludes that the relevant statutes admit of some ambiguity, that ambiguity must be resolved in favor of the interpretation that avoids serious constitutional concerns. And the constitutional concerns here are not limited to the government's present, stated purposes. As discussed above, the scope of the data the Department demands is wholly disconnected from ensuring compliance with HAVA and the CRA. Rather, the demand is intended: (1) to advance "unsubstantiated claims of non-citizen voting" through a "'fishing expedition'"; (2) to obtain "a tool for immigration enforcement"; and, ultimately, (3) "to create a nationwide voter database, for potential

weaponization in future elections." *Schmidt*, 2026 WL 1850016, at *2; *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1185 (C.D. Cal. 2026) ("Representations by the DOJ itself show that their requests to states for voter roll data go beyond their purported compliance check with the NVRA[.]"); *United States v. Oregon*, 828 F. Supp. 3d at 1106-07. Those "quiet parts" reveal that voters need not speculate about misuse of their data—the government all but admits as much. And with the aid of modern technologies that make large-scale aggregation, analysis, and targeting increasingly feasible, (discussed further below), they extend to any number of uses by future administrations. It is not possible to construe the CRA and HAVA to permit the demand without introducing a concomitant burden on the right to vote.

The purpose of the constitutional avoidance canon further illuminates why the Court should employ it to construe the CRA and HAVA to not authorize the demand. The canon is rooted in "respect for Congress, which [courts] assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). "[C]onstruction of [a] statute that avoids invalidation best reflects congressional will." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (citing *Almendarez-Torres v.*

*United States*, 523 U.S. 224, 238 (1998)). The unconstitutional denial and chilling of the right to vote is *exactly* what the drafters of HAVA predicted would result and sought to avoid when they rejected centralizing election administration. They noted that "[t]he dispersal of responsibility for election administration…has made it impossible for a single centrally controlled authority to thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country." Help America Vote Act of 2001, H.R. Rep. No. 107-329, pt. 1, at 32 (2001). Avoiding construction of the CRA and HAVA to permit an unconstitutional demand "best reflects congressional will," *Almendarez-Torres*, 523 U.S. at 238, not only because the Court can *assume* that Congress "legislates in the light of constitutional limitations," but also because Congress expressly sought to avoid federal efforts to centralize election administration at the core of the demand. *Rust*, 500 U.S. at 191. For that independent reason, the Court should construe the CRA and HAVA to not authorize DOJ's demand for unredacted voter files.

### III. AI-Enabled Data Aggregation Heightens the Constitutional Burden of DOJ's Demand.

The Court should evaluate the burden of DOJ's demand in light of what centralized voter data enables today: AI-assisted matching, profiling, and automated enforcement at scale. Congress has repeatedly sought to rein in the dangers of large-scale government aggregation and secondary use of personal information. *See, e.g.*, Cong. Rsch. Serv., *Artificial Intelligence: Overview, Recent Advances, and Considerations for the 118th Congress* (2023), https:// perma.cc/JW5X-2RUP (discussing implemented procedural safeguards for agency data sharing under the Privacy Act and Computer Matching and Privacy Protection Act); Family Educational Rights and Privacy Act of 1974 ("FERPA"), Pub. L. No. 93-380, § 513, 88 Stat. 484, 571–74 (protecting sensitive educational data of students); Census Act, 13 U.S.C. §§ 9, 214 (restricting disclosure of identifiable census information). But as explained above, DOJ seeks to place New Hampshire's unredacted voter file into an interagency data-sharing environment already oriented toward voter-eligibility screening, immigration enforcement, and centralized control over election administration. *See supra*, Section II.A. AI makes that architecture faster, broader, less transparent, and more error-prone—turning a static

voter file into a tool for predictive profiles, eligibility flags, enforcement leads, and voter targeting.

The Administration's government-wide push to accelerate AI adoption makes those risks still more acute. *See* The White House, *America's AI Action Plan* 10–11 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf. Those policies increase the likelihood that centralized voter data will be analyzed, matched, or repurposed at scale, without safeguards adequate to the sensitivity of the information.

In this context, AI would magnify the demand's chilling effect in three ways:

***Erroneous Voter Flags and Purges.*** AI increases the risk of erroneous voter flags and purges by converting incomplete or mismatched data into predictive profiles, sweeping inferences, and seemingly authoritative eligibility determinations—sometimes based on inaccurate or hallucinated outputs. *See* Jennifer King & Caroline Meinhardt, *Rethinking Privacy in the AI Era*, Stanford Human-Centered AI (2024), perma.cc/6P82-QLCZ (discussing harms of AI-driven personal data collection to create "profiles" and make predictions about people,

including "discrimination in housing, employment, education, and other areas; surveillance and incarceration; denials of credit, differential pricing, and an overall narrowing of available choices; and harms to dignity due to bias or opportunity losses"); Cade Metz, *Chatbots May 'Hallucinate' More Often Than Many Realize*, *N.Y. Times* (Nov. 6, 2023), https://perma.cc/R5SP-D2RS.

In the voter-eligibility context, those risks are especially serious where "errors are inevitable," and "eligible voters can be wrongly flagged or removed." *See American Oversight Sues ICE and DOJ for Records on Sensitive Voter Data Collection and Sharing*, Am. Oversight (Mar. 10, 2026), https:// perma.cc/P44T-EM2K; *see also* Karl Manheim & Lyric Kaplan, *Artificial Intelligence: Risks to Privacy & Democracy*, 21 Yale J.L. & Tech. 106, 133–34, 152–60 (2019). The SAVE database, even before any AI overlay, has already produced serious errors that led to incorrect voter disenfranchisement. *See also* Jude Joffe-Block, *Trump's SAVE Tool*, *supra*. AI-driven matching would only increase the speed, scale, and opacity of such purges, especially when layered onto SAVE and other centralized federal databases.

***Targeted Suppression and Intimidation.*** AI also magnifies the risk that centralized voter data will be used for targeted suppression and intimidation. Generative AI can produce individualized political or eligibility-related messages optimized for persuasion, fear, or deterrence, while coordinated AI agents can mimic human behavior, fabricate consensus, and overwhelm democratic processes. *See* Almog Simchon, Matthew Edwards, & Stephan Lewandowsky, *The Persuasive Effects of Political Microtargeting in the Age of Generative Artificial Intelligence*, 3 PNAS Nexus 1, 1–4 (2024); Mekela Panditharatne, *Preparing to Fight AI-Backed Voter Suppression*, Brennan Ctr. Just. (Apr. 16, 2024), https://perma.cc/C2AD-H7SN; Daniel Thilo Schroeder et al., *How Malicious AI Swarms Can Threaten Democracy*, 397 Sci. 354, 354-57 (2026). An unredacted, identity-linked voter file would supply the raw material for those tactics, enabling suppression efforts directed at particular voters or communities based on perceived eligibility, citizenship status, language, geography, race, or political affiliation.

The risk is concrete: election-denial groups have already used voter-roll tools such as EagleAI to generate mass complaints, burden election officials, and intimidate voters. *See* Alice Clapman & Andrew Garber, *A*

*New Antidemocracy Tool*, Brennan Ctr. Just. (Sep. 5, 2023). Similar tactics were deployed during the 2024 election cycle to direct racist and intimidating text messages at voters of color nationwide, including messages telling recipients they had been "selected" to report to a plantation to "pick cotton." *See* Jacob Ritondo, *Black Students Receive Racist Text Messages After Trump's Win, Part of Apparent Nationwide Trend*, Crimson White (Nov. 6, 2024); Blair Shiff & Stephanie Johnson, *Racist Text Messages Sent Out Following Presidential Election*, WCNC (Nov. 7, 2024). AI would make those tactics cheaper, faster, more personalized, and more scalable—amplifying the potential to weaponize identity-linked voter data to intimidate voters, suppress participation, burden election officials, and erode confidence in elections.

***Dragnet Surveillance and Investigation.*** DOJ has routinely asserted that the voter file data might be obtained through the CRA disclosure provision to investigate potential violations of other statutes, including "for the purpose of investigating *voter fraud*." Off. of Legal Counsel, *Authority of the Department of Justice to Demand State Voter Registration List Records Under the Civil Rights Act of 1960*, at 6 (2026), https://www.justice.gov/olc/media/1440346/dl (emphasis added). That

asserted justification echoes a familiar refrain the Administration has deployed when targeting perceived political adversaries. *See, e.g.*, *Memorandum on Addressing Risks from Chris Krebs and Government Censorship*, 2025 Daily Comp. Pres. Doc. 465 (Apr. 9, 2025) (instructing the Attorney General to investigate former head of the Cybersecurity and Infrastructure Security Agency for "inappropriately . . . dismissing" purported reports of "widespread election malfeasance and serious vulnerabilities with voting machines").

Combined with centralized voter data, AI makes that asserted investigative authority especially dangerous. It can transform a static voter file into an automated tool for continuous surveillance, cross-database matching, and scalable investigation in ways that were previously impossible.

Those risks implicate core First Amendment principles. "Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation . . . at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (citation omitted). That

principle has special force where the government seeks identity-linked voter data that can be aggregated, analyzed, and used to expose, profile, or investigate individuals based on civic participation or perceived political affiliation. The use of AI to stifle political dissent and prosecute opponents is a well-established blueprint in autocratic governments. Albert Cevallos, *How Autocrats Weaponize AI—and How to Fight Back*, J. Democracy Online Exclusive (2025), https://perma.cc/F7VT-KFS. That constitutionally intolerable risk confirms that the CRA and HAVA should not be construed to authorize the Department's demand for New Hampshire's unredacted voter file.

## CONCLUSION

The Department's demand for New Hampshire's unredacted voter registration list is contrary to law. No statute authorizes it; the demand would chill the fundamental right to vote; and its pretextual and unbounded scope threatens the very electoral processes that the CRA and HAVA were enacted to protect. This Court should affirm the district court's judgment dismissing the complaint and denying the Department's motion to compel.

Dated: October 9, 2026

Respectfully submitted,

/s/ Samuel T. Ackerman
Lanny A. Breuer
Thomas Perrin Cooke
Hassan Ahmad
Samuel T. Ackerman
*Counsel of Record*
Joshua M. Schenk
Basundhara Mukherjee
Evan Chiacchiaro
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202-662-6000

Edward G. Caspar
Robert Weiner
Leah Frazier
Gillian Cassell-Stiga
Catherine Meza
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW
Ninth Floor
Washington, DC 20005
(202) 662-8600

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the word limit of Federal Rules of Appellate Procedure 5(c), 29(a)(5), and 29(b)(4) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,414 words. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32, and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO Version 2606 in 14-point Century Schoolbook font for the main text and footnotes.

Dated: October 9, 2026

*/s/* Samuel T. Ackerman
Samuel T. Ackerman
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Samuel Ackerman, an attorney, hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on October 9, 2026.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: October 9, 2026

*/s/* Samuel T. Ackerman
Samuel T. Ackerman
*Counsel for Amici Curiae*