UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 26-1783

UNITED STATES OF AMERICA
Plaintiff - Appellant

v.

DAVID M. SCANLAN, NEW HAMPSHIRE SECRETARY OF STATE; THE STATE OF NEW HAMPSHIRE;
Defendants - Appellees

NEAL KURK; ROBERT PERRY;
LOUISE SPENCER; CHRISTOPHER COLE
Intervenors - Appellees

---

On Appeal from the United States District Court
for the District of New Hampshire

---

# BRIEF ON BEHALF OF THE DEFENDANTS – APPELLEES DAVID M. SCANLAN, NEW HAMPSHIRE SECRETARY OF STATE AND THE STATE OF NEW HAMPSHIRE

JOHN M. FORMELLA
NEW HAMPSHIRE
ATTORNEY GENERAL

and

ANTHONY J. GALDIERI
NEW HAMPSHIRE
SOLICITOR GENERAL

MARY A. TRIICK, Bar No. 1213543
Senior Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place, South
Concord, New Hampshire 03301
(603) 271-0447

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................ ii

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF ISSUES ........................................................ 1

STATEMENT OF CASE AND INTRODUCTION ......................... 2

STATEMENT OF FACTS ........................................................ 8

SUMMARY OF ARGUMENT ................................................... 17

ARGUMENT ........................................................................ 19

CONCLUSION ...................................................................... 40

CERTIFICATE OF COMPLIANCE .......................................... 42

CERTIFICATE OF SERVICE .................................................. 43

# TABLE OF AUTHORITIES

## Cases

*AHA v. Kennedy*, 164 F.4th 28 (1st Cir. 2026) ............................ 23

*Bellitto v. Snipes*, 935 F.3d 1192 (2019)........................................ 31

*Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.,* 963 F.3d 982 (9th Cir. 2020) .............................. 19

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019).................. 27

*Free v. Bland*, 369 U.S. 663 (1962)................................................ 23

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ...................... 26

*Kennedy v. Lynd,* 306 F.2d 222 n.6 (5th Cir. 1962).......... 20, 25, 26

*Pub. Int. Legal Found. v. Benson*, 136 F.4th 613 (6th Cir. 2025) ................................................................... 30, 31

*Purcell v. Gonzalez,* 549 U.S. 1 (2006) ........................................... 3

*United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897 (C.D. Cal. Jan. 15, 2026) ....................... 20, 23, 27

*United Steelworkers of Am., AFL-CIO-CLC v. Weber,* 443 U.S. 193 (1979).................................................................... 24

## Statutes

52 U.S.C. § 20701............................................................. 17, 37, 39

52 U.S.C. § 20702.................................................................... 38, 39

52 U.S.C. § 20703............................................................. 17, 19, 34

52 U.S.C. § 21083........................................................................ 39

52 U.S.C. § 21085 .......... 24

52 U.S.C. § 21111 .......... 11

N.H. RSA Chapter 33-A:3-a, CXLI .......... 6

N.H. RSA Chapter 654:31, II .......... 10

N.H. RSA Chapter 654:31, IV .......... 9

N.H. RSA Chapter 654:45, V .......... 23

N.H. RSA Chapter 652 - RSA Chapter 671 .......... 6

N.H. RSA Chapter 654:7 - RSA Chapter 654:24 .......... 5, 6

Other Authorities

*Black's Law Dictionary* (12th ed. 2024) .......... 20

N.H. Sec'y of State, *New Hampshire Election Procedure Manual* (2026) .......... 4, 6, 26, 40

Congressional Hearings

*Proposed Civil Rights Legislation: Hearing Before the S. Comm. on the Judiciary*, 86th Cong. 8 ("Mar. 28, 1960 AG Statement") (statement of William P. Rogers, Att'y Gen. of the U.S.) .......... 25

*Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary,* 86th Cong. 13-14 (1959) ("Mar. 20, 1959 Hearing") .......... 25

Executive Branch Publications

*H.R. Doc. No. 75, 86th Cong., 1st Sess. (1959)*, reprinted in *105 Cong. Rec.* 1922 (Feb. 5, 1959) ........................................ 25

U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights, 1959*, at 137–38 (Sept. 9, 1959)........................ 25

Congressional Documents & Reports

*H.R. Rep. No. 86-956, 86th Cong., 1st Sess. 1944 (1959)*, reprinted in *1960 U.S.C.C.A.N.* 1925......................................... 25

## JURISDICTIONAL STATEMENT

Secretary Scanlan and the State of New Hampshire accepts the jurisdictional statement of the intervenor – appellees as sufficient and correct.

## STATEMENT OF ISSUES

I. Whether New Hampshire's statewide voter registration list (SVRL) is subject to the preservation and production requirements of the Civil Rights Act.

II. Whether the demand letter sent by the United States Department of Justice to Secretary Scanlan on August 18, 2025, was sufficient to constitute a valid demand for records pursuant to the Civil Rights Act.

## STATEMENT OF CASE AND INTRODUCTION

This appeal arises from an order of the Federal District Court of New Hampshire granting a motion to dismiss filed by the Defendants, Secretary Scanlan and the State of New Hampshire, and a similar motion filed by the Intervenors. Appellant's Add. P.1-26. The court based its order on a number of conclusions including that a state's statewide voter registration list (SVRL) is not a record subject to the retention and production requirements of the Civil Rights Act (CRA) and, even if it were, the federal government's written demand failed to comply with the statutory requirement that it contain a statement of the basis for the demand. *Id.* These rulings are legally sound, consistent with the rulings of numerous federal courts across the country,[1] and should be affirmed by this Court.

The Federal Government has and continues to attempt to make it seem like this litigation is about finding voter fraud and

[1] Pages 12 and 13 of the Intervenors' brief contains a comprehensive list of the other federal courts that have issued decisions in cases brought by USDOJ as part of their coordinated effort to demand SVRLs from virtually all states. In not a single case has a federal judge ordered a state to produce the demanded copy of its SVRL.

about an alleged need for New Hampshire and other states to "clean up" their voting lists before this November's mid-term elections. *See*, *e.g.*, USDOJ Brief, P.64; Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1-6). The Federal Government has no evidence to back up these claims and the making of such allegations, without evidence, is unwise. *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (noting that even the perception of voter fraud drives honest citizens out of the democratic process and breeds distrust in the government). It also demonstrates a profound misunderstanding regarding the nature of New Hampshire's SVRL and the operations of New Hampshire's electoral system.

For example, the Federal Government claims before this Court that it "needs to examine both applications to register to vote and the final voting rolls, including the electronic SVRL," so it can know that "the applications are being properly processed and that reasonable list maintenance efforts have been practiced." U.S. Brief, P.31. This assertion is illogical as the Federal Government has access to all the information it needs to take such

actions without the demanded electronic copy of the SVRL. New Hampshire has and is willing to provide access to any or all voter registration applications should the Federal Government request to see those. The Federal Government is also free to examine New Hampshire's "final voting rolls," which take the form of marked checklists, are publicly available at the municipal level[2], and have been expressly offered to the Federal Government in an aggregate form by Secretary Scanlan so it does not have to make requests on a municipality-by-municipality basis. Apx. P.56.

The only item New Hampshire has refused to provide the Federal Government is a complete, unredacted copy of the SVRL, an interactive database used by New Hampshire to administer its elections, not its voting lists or its registration forms. *See* New Hampshire Secretary of State, *New Hampshire Election Procedure Manual*, EPM 2026, *available at* https://mm.nh.gov/files/uploads/sos/docs/nhsos-2026-epm-complete-book-remediated.pdf (last visited Sept. 18, 2026).

[2] The certified checklist is the official voter roll for each election. New Hampshire Secretary of State, *New Hampshire Election Procedure Manual*, EPM 2026, P.30, *available at* https://mm.nh.gov/files/uploads/sos/docs/nhsos-2026-epm-complete-book-remediated.pdf (last visited Sept. 18, 2026). They are publicly available. *Id.* at P.278.

This is not the first time in this litigation that the Federal Government has made statements which create an inaccurate picture of New Hampshire's election system and the documents which are and are not available for review. For example, the Federal Government alleged in its objection to Secretary Scanlan's motion to dismiss that "today many – and likely even most – voter registration applications are only in electronic form in the SVRL." Apx. P.112. While Secretary Scanlan and the State of New Hampshire do not take any position as to whether this assertion could possibly be true in other states, it is clearly untrue in New Hampshire. All voter registration forms in New Hampshire exist in paper form and are retained by local officials so long as the registrant remains on the list and for seven additional years thereafter.[3]

---

[3] New Hampshire does not allow individuals to register to vote online. *See* N.H. RSA 654:7 through N.H. RSA 654:24. New Hampshire does not have an automatic registration program, nor does it register individuals to vote through the DMV or public assistance offices. *Id.* New Hampshire requires individuals wishing to register to vote to complete a hard-copy standardized voter registration form mostly in person and with only limited exception for use of mail. *Id.* Visually impaired voters may complete the registration form on a computer, but the form must then be printed, and it is processed and maintained in the same manner as the hard-copy standardized forms. Specifically, all registrant's paper form is received and processed at the local level and the form must be retained securely in a municipal office under the

The State of New Hampshire takes voter fraud seriously and, as such, its state government has constructed a system of laws that takes all reasonable steps to ensure only eligible voters are registered, that minimizes duplication of records, that promptly removes voters who become ineligible subsequent to registering, and that prosecutes voter fraud in the rare cases in which it occurs. *See* N.H. RSA Chapter 652 through Chapter 671; New Hampshire Secretary of State, *New Hampshire Election Procedure Manual*, EPM 2026, *available at* https://mm.nh.gov/files/uploads/sos/docs/nhsos-2026-epm-complete-book-remediated.pdf (last visited Sept. 18, 2026). New Hampshire runs free, fair, and secure elections through a system that complies with federal law and ensures individual voters do not have to choose between their right to privacy and their right to vote.

This litigation is not about the Federal Government needing access to New Hampshire's voting rolls. Those are available. It is not about the Federal Government needing access to voting-

direction of the town or city clerk, so long as the individual remains on the voting rolls and for seven years thereafter. *Id.*; N.H. RSA 33-A:3-a, CXLI.

related paperwork including registration paperwork, absentee ballot requests, or the like. Such documents are all appropriately maintained and available. It is solely about whether New Hampshire must make an unredacted electronic copy of its database system and turn that electronic copy over in its entirety to the Federal Government. Federal law does not require this. State law expressly prohibits this. As such, the federal district court did not err in declining to order Secretary Scanlan to comply with the Federal Government's unprecedented, unreasonable, and unlawful demand.

## STATEMENT OF FACTS

In late June 2025, the Federal Government through the U.S. Department of Justice sent New Hampshire Secretary of State Scanlan a two-page letter. Apx. P.34-42. The letter noted the fact that federal law, specifically the Help America Vote Act (HAVA), contained minimum standards for states with relation to "several key aspects of administration of federal elections[.]" *Id.* The letter then asked Secretary Scanlan to provide "information regarding the State's HAVA compliance" to the U.S. Department of Justice within thirty days in the form of responses to fifteen separate questions/requests for information. *Id.* For example, the letter requested that Secretary Scanlan:

> Describe the process by which any duplicate voter registrations are identified and removed from the statewide voter registration list under HAVA Section 303(a)(2)(B)(iii). Please include an explanation of how the State determines what constitutes a duplicate voter registration record.

*Id.* Additionally, the letter demanded Secretary Scanlan "send" the Federal Government a "current statewide voter registration list" including both active and inactive voters. *Id.*

Secretary Scanlan largely complied with the demands put forth in the Federal Government's letter, answering the majority of the questions in full. *See* Apx. P.44-51. For example, as to the duplicate voter registration question, Secretary Scanlan provided a summary of the process prescribed by New Hampshire law for identifying and removing duplicate voter registrations. *Id.* However, Secretary Scanlan also explained to the Federal Government that he would be unable to give full answers to some questions because he had legal obligations to protect information that would pose a cybersecurity risk if disclosed. *Id.*

As to the Federal Government's demand that Secretary Scanlan send a current statewide voter registration list, Secretary Scanlan explained that he was only permitted by law to provide the statewide list in limited circumstances not applicable here. *Id.*; *see also* N.H. RSA 654:31, IV (authorizing the Secretary of State to provide a statewide list with limited voter information to candidates, political parties, and political committees). Secretary Scanlan noted, however, that the Federal Government could obtain a copy of the public checklist, which serves as the official

voting roll for elections, from each municipality and provided a link to a list of all municipalities. *Id.*; N.H. RSA 654:31, II (requiring each municipality to provide a copy of the most recent public checklist to any person who requests it). Finally, Secretary Scanlan's letter made clear that the Federal Government should let him know if it needed any follow-up information in addition to what was being provided. *Id.*

The Federal Government responded with a letter discussing only its request for a copy of the statewide voter registration list. *See* Apx. P.53-54. No mention was made to any perceived deficiencies in the answers provided by Secretary Scanlan to the other fourteen questions and requests for information/documentation. *Id.* Instead, the Federal Government's second letter made a new claim: that the U.S. Department of Justice had "independent authority … to seek the State's [voter registration list]" under 52 U.S.C. § 21111. That statute provides that the U.S. Attorney General "may bring a civil action against any State" to seek declaratory or injunctive relief "as may be necessary to carry out the uniform and

nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. *Id.*

The Federal Government also claimed in this second letter to have authority to demand a copy of the statewide voter registration list under the Civil Rights Act of 1960. Apx. P.53-54. The letter asserted that the Federal Government's "purpose" for making its Civil Rights Act request was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA[.]" *Id.* Notably absent was any assertion that the Federal Government had reason to believe New Hampshire was out of compliance with federal law.

Finally, the letter expanded the prior request, now demanding that it be provided not just a "current statewide voter registration list," Apx. P.40-42, but instead a full, unredacted version of the SVRL, including "all fields" and "all identifiers, including the registrant's full name, date of birth, residential address, and the last four numbers of each registrant's social security number and the full state driver's license number," Apx. P.53-54. The Federal Government demanded this information be

provided within seven days and made clear that the Federal Government, while not intending to make the information public, would consider itself free to share the provided unredacted list with other "governmental agencies[.]" *Id.*

Secretary Scanlan responded by letter ten days later. Apx. P.56. He once again explained that production of an unredacted copy of New Hampshire's SVRL was prohibited by state law and that, having reviewed the purported authorities offered by the Federal Government, found no "provision under federal law that compels the production of voter registration data" that would supersede the prohibition put in place by state law. *Id.* Secretary Scanlan once again reminded the Federal Government that it could get copies of the municipal-level voter lists and even offered to directly provide copies of all the marked checklists from the 2024 general and primary elections so the Federal Government did not have to seek the same from each local municipality. *Id.*

Secretary Scanlan received no further communication from the Federal Government on these topics nor any acceptance of his offer to produce voting lists. Instead, about a month later in

September of 2025, the Federal Government filed its complaint initiating this legal proceeding.

The Federal Government's complaint contained two counts. Count I claimed that the State of New Hampshire violated the Civil Rights Act, 52 U.S.C. §§ 20701-20706, when it refused to provide the Federal Government with an electronic copy of its computerized statewide voter registration list (SVRL). Apx. P.34. Count II claimed that the State of New Hampshire violated The Help America Vote Act (HAVA), 52 U.S.C. § 21083, by: (1) failing to provide sufficient information to the Federal Government upon request; (2) failing to conduct list maintenance as required; (3) refusing to provide the Federal Government a complete computerized copy of its SVRL; and (4) failing to provide the Federal Government information about the process it uses to validate driver's license numbers and social security numbers submitted with voter registration applications. Apx. P.34-36.

Based upon these two claims of statutory violations, the Federal Government's prayer for relief was in four parts. Apx. P.36-37. The first three were requests for declarations: that the

State of New Hampshire is out of compliance with Title III of the Civil Rights Act; that the State of New Hampshire is out of compliance with HAVA section 303; and that the State of New Hampshire law prohibiting disclosure of the SVRL except in limited circumstances is preempted by federal law. Finally, the Federal Government sought an order compelling the State of New Hampshire to provide the Federal Government with a current, unredacted copy of its SVRL.

Days after filing their complaint, a motion to stay further litigation was filed and granted due to the federal government shutdown. Apx. P.8-10. The stay remained in effect until the end of November 2025, and in early January the Appellee-Intervenors' motion to intervene was granted. *Id.* Thereafter cross-motions were filed; the Federal Government filed a Motion to compel Production of Records and both Secretary Scanlan/the State of New Hampshire and the Intervenors filed Motions to Dismiss. Apx. P.12-13.

The motion to dismiss filed by Secretary Scanlan and the State of New Hampshire explained that the Civil Rights Act did

not compel New Hampshire to comply with the Federal Government's demand as the SVRL is not a covered record and because the written demand did not have a sufficiently stated basis and purpose. Apx. P.61-75. Secretary Scanlan and the State also argued that the Federal Government's complaint should be dismissed as HAVA does not compel production of the SVRL and because the Federal Government's demand violated several federal laws, including the Privacy Act of 1974. Apx. P.76-85. Finally, Secretary Scanlan and the State addressed the cursory allegations regarding New Hampshire's HAVA compliance that appeared in the complaint. Apx. P.85-88.

After hearing argument by all parties, the federal district court granted New Hampshire's motion to dismiss and denied the Federal Government's motion to compel "because the Attorney General's demand did not comply with Title III of the Civil Rights Act of 1960 (CRA), and because he failed to allege a violation under the Help America Vote Act (HAVA)[.]" Appellant's Add. P.1. As to the CRA claim, the only one at issue in this appeal, the district court concluded that the SVRL was not a record subject to

production under the CRA and found that the Federal Government's demand was facially insufficient as it contained no statement of a basis therefore. Appellant's Add. P.7-20.

## SUMMARY OF ARGUMENT

The Civil Rights Act requires state election officials to "retain and preserve, for a period of twenty-two months … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. The Act then goes on to direct that the records so retained and preserved "shall, upon demand in writing by the Attorney General or his representative …, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." 52 U.S.C. § 20703. When making such a demand the Federal Government must provide "a statement of the basis and the purpose therefor." *Id.*

The Federal Government's demand for New Hampshire's SVRL was not a valid demand pursuant to 52 U.S.C. § 20703 for two reasons. First, the Federal Government's demand did not contain a sufficiently stated basis and purpose to be valid under the law. Second, an electronic copy of New Hampshire's

SVRL is not a record which must be retained and preserved under 52 U.S.C. § 20701 (and therefore not a record that must be produced under 52 U.S.C. § 20703).

# ARGUMENT

## I. THE FEDERAL GOVERNMENT'S DEMAND LETTER WAS FACIALLY INSUFFICIENT.

When the Federal Government makes a demand for election records from a state pursuant to their authority under the Civil Rights Act, that demand must be in writing and must "contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The plain language of the statute—in particular the use of the definite article "the" before both "basis" and "purpose"—creates a bipartite requirement. *See Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.,* 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'"). The bipartite nature of this requirement does not appear to be meaningfully contested by the Federal Government within this litigation. *See* USA's Opening Brief, P.36.

Accordingly, when seeking records under the Civil Rights Act, the Federal Government must state in writing both "the basis" and "the purpose," *i.e.*, both the objective or goal of the request and the underlying fact or condition giving rise to the

request. *See Black's Law Dictionary* (12th ed. 2024) (defining purpose as the "objective, goal, or end" and the basis as the "underlying fact or condition"). *See also Kennedy v. Lynd,* 306 F.2d 222*,* 229 n.6 (5th Cir. 1962) (finding the United States Attorney General to have articulated a sufficient statement of the basis and purpose of a request for documents when he explained that the demand was "based upon information" tending to show race based discrimination in voting and voter registration was occurring and that the "purpose of this demand" was to ascertain whether a violation of federal law was occurring); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *24 (C.D. Cal. Jan. 15, 2026) ("The DOJ is required to offer a written statement of *both* the purpose and basis for its demands to California.").

The Federal Government's demand letter sent to Secretary Scanlan on August 18, 2025, fails on both fronts. Its statement of purpose is insufficient and pretextual, and it contains no statement of the basis.

### A. The Federal Government's Demand Letter Did Not Contain the Required Written Statement of "the basis … therefor."

As outlined in the fact section above, the Federal Government's demand pursuant to 52 U.S.C. § 20703 purported to articulate a purpose, the insufficiency of which will be discussed in the following section. Apx. P.53-54. However, it made no statement whatsoever as to the basis for its request. *Id.* As such, the written demand was facially insufficient to constitute a legally valid Civil Rights Act demand.

Throughout this litigation, the Federal Government has attempted to justify this glaring omission and facial insufficiency in a variety of ways. When filing its complaint, the Federal Government appeared not to contest the fact that the basis was not included, emphasizing the fact that the letter contained a statement of the purpose and nothing more. *See* Apx. P.32. Then, when Secretary Scanlan and the State of New Hampshire moved to dismiss the Federal Government's complaint on this ground, the Federal Government for the first time claimed the letter did contain a statement of the basis and alleging that it did so by

making "reference to the statutory basis for making the demand, namely the CRA[.]" USA's Apx. P.109-10. However, counsel for the United States effectively abandoned this argument at oral argument before the district court without explanation and shifted to claiming that the first sentence of the August 18 letter, which stated "[w]e are writing in response to your letter of July 25, 2025[,]" was the written statement of basis. USA's Apx. P.149-50.

Finally, when appealing to this Court, the Federal Government has once again shifted position, claiming that the August 18 letter satisfies the basis requirement because in the demand letter:

> the Department stated that "the purpose of [the Department's] request [for the unredacted SVRL] is to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. 21083(b)(4)(A) and (B)." Under any reasonable interpretation of this statement the basis for the [US]DOJ's written demand is clear—that New Hampshire's list maintenance program may violate HAVA—and thus the demand put Secretary Scanlan on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

USA's Opening Brief, P.38. This latest argument—that the written demand need not contain an express statement of the

basis for the demand so long as a basis could be inferred from the stated purpose—is both wholly inconsistent with the plain language of the statutory text (as explained above) and is also not preserved for appeal. *See generally AHA v. Kennedy*, 164 F.4th 28, 35 (1st Cir. 2026) (explaining that the federal government cannot advance a new or different argument for the first time on appeal).

Given the Federal Government's failure to offer a written statement of the basis for its record demand, the Federal Government's demand is statutorily insufficient under 52 U.S.C. § 20703. Secretary Scanlan therefore had no obligation to comply. In fact, Secretary Scanlan may well have been subject to criminal liability had he complied with the Federal Government's demand absent a valid obligation under federal law to do so. *See* RSA 654:45, V.[4]

[4] The State of New Hampshire is not attempting to challenge established preemption law. It is uncontested that when a state law "interferes with or is contrary to federal law," the state law must yield to the federal law. *Free v. Bland*, 369 U.S. 663, 666 (1962). That said, federal preemption is not to be found easily and when a state law "can coexist" with federal law, there is no preemption. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *39 (C.D. Cal. Jan. 15, 2026). Such is the case here as N.H. RSA 654:45, V is not only able to coexist with HAVA and the Civil Rights Act but is a statute New Hampshire passed at the direction of HAVA and in order to comply with HAVA. HAVA largely lays out general requirements and expressly leaves the chosen method of complying with those requirements up

### B. The Purpose Offered By the Federal Government's Written Demand Letter Was Insufficient and Pretextual.

In enacting the Civil Rights Act, Congress did not intend to give the executive branch of the Federal Government through the Attorney General in Washington roving and unbounded authority to request states' election records. *See generally United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979) ("It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'"). Instead, it was intended to give the Attorney General the tools necessary to protect American's civil rights. Specifically, when enacted in 1960, the Civil Rights Act sought to protect the "constitutional right of every American … to vote

---

to the states. 52 U.S.C. § 21085. New Hampshire's chosen method of adoption—for complying with federal requirements such as providing adequate security of New Hampshire's system as required by 52 U.S.C. § 21083(a)(3)—is (among other things) to significantly limit access to the SVRL. N.H. RSA 654:45 not only coexists with HAVA but is authorized by HAVA. Furthermore, as is discussed elsewhere in this brief, the SVRL itself as a computer system is not a record which must be retained and produced pursuant to the Civil Rights Act and, as such, N.H. RSA 654:45, V, can likewise coexist with the Civil Rights Act.

without discrimination on account of race or color."[5] To ensure this purpose could be realized, the law provided the Attorney General the "power to require the production of election records during any investigation of complaints that qualified persons have been denied the right to vote in violation of federal law," without which "assembl[ing] the necessary proof of discrimination [was] impracticable, if not impossible."[6]

When viewed in this context, the inclusion of "the basis and the purpose" requirement in 52 U.S.C. § 20703 is properly

---

[5] "Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960, https://tinyurl.com/3ses36xe.

[6] Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14 (Mar. 20, 1959), https://tinyurl.com/2caa3m27. *See also* Proposed Civil Rights Legislation: Hearing Before the S. Comm. on the Judiciary, 86th Cong. 8 (Mar. 28, 1960) ("March 28, 1960 AG Statement") (statement of William P. Rogers, Att'y Gen. of the U.S.) at 8, https://tinyurl.com/ydx2y9wd (reiterating the Election Records Provision was "essential to the effective enforcement of the Civil Rights Act of 1957"); U.S. Comm'n on Civil Rights, *Report of the U.S. Commission on Civil Rights, 1959*, at 137–38 (Sept. 9, 1959), https://tinyurl.com/24mddz2z (recommending Congress require states and localities to retain records and permit inspection to facilitate investigation of alleged voter discrimination); H.R. Doc. No. 75 (1st Sess. 1959), *reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959); H.R. Rep. No. 86-956 (Aug. 20, 1959), *reprinted in* 1960 U.S.C.C.A.N. 1925, 1944; *Lynd*, 306 F.2d at 228 (explaining that purpose of Title III is to allow for gathering of records "relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights" in order to allow Attorney General to fulfill "duties imposed upon him by the Civil Rights Act of 1957 and 1960").

understood as a requirement that the Attorney General disclose "the basis" it has to believe there has been a violation of an American's civil rights and "the purpose" for which the records will be used. *See generally Lynd,* 306 F.2d at 229 n.6 (finding sufficient a statement of the basis and purpose which explained the demand was based upon information tending to show race based discrimination in voting and voter registration was occurring and that the purpose of this demand was to ascertain whether a violation of federal law was occurring); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (finding valid statement of basis and purpose where it was explained that the Attorney General had information "tending to show that discriminations on the basis of race and color have been made with respect to registration and voting"); *Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (noting that statistical evidence in a CRA records-production proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry").

In this case, the Federal Government's written demand stated that the purpose therefor was "to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)." Apx. P.53-54. This is not a legally valid purpose.

1. The Federal Government's Stated Purpose Is Not Valid as the Government Has Admitted It Is Pretextual.

Federal courts are "not required to accept pretextual, formalistic explanations untethered to the reality of which the government has said outside the courtroom." *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 LX 40897, at *29-30 (C.D. Cal. Jan. 15, 2026) (citing *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019)). While courts are generally directed not to inquire into "the mental processes of administrative decisionmakers," this presumption need not hold where there is a "strong showing of bad faith or improper behavior" on the part of the governmental actor. *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (setting aside agency action due to pretextual

invocation of the Voting Rights Act). Such a strong showing can be made in this case.

The Office of Legal Counsel (OLC) within the United States Department of Justice issued a Memorandum Opinion which explained the series of events which lead to the Civil Rights Act demand letters being sent to nearly all states directing the states to turn over unredacted electronic copies of their SVRLs. Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 1-6). Within this Memorandum Opinion, the OLC explained that the true purpose behind the demands for the SVRL databases was to share this electronic data with other federal agencies in order to attempt to find individual voters who "may be voting illegally." *Id.* at 1. Specifically, the OLC explained that:

> In response to the President's order to identify those who may be voting illegally (whether by reason of alienage or otherwise), the Civil Rights Division … proposed to seek statewide voter lists, and then share the lists with Homeland Security Investigation … or another unit within DHS.

*Id.* The OLC also explained how the Civil Rights Division had followed through with this proposal by sending "states letters

demanding that they produce copies of their statewide voter registration lists." *Id.* at 5. And, ultimately, the OLC expressed a legal opinion that:

> The Department of Justice's Civil Rights Division has authority to seek statewide voter lists and share them with the Department of Homeland Security as part of its effort to identify individuals who are ineligible to vote, which other provisions of law do not limit.

*Id.*

The OLC attempts to gloss over this admission, that the purpose offered by the Civil Rights Division in their demand letters was pretextual, by implying that attempting to find individual instances of voter fraud by noncitizens is the same as checking a state's compliance with list maintenance requirements under NAVA or HAVA. *See id.* at 4-5 ("The Attorney General may wish to investigate whether illegal aliens are being removed from voter-registration lists as part of those lists' ordinary maintenance."[7]). This attempt fails for three reasons.

---

[7] While not directly relevant to the legal questions before this Court, New Hampshire feels obliged to point out that in making statements such as this the Federal Government is acting counter to its stated commitment to ensuring confidence in New Hampshire's electoral system. Equating the need to have in place systems to remove deceased individuals or felons from voter rolls on an ongoing basis with an assumed need to have in place similar

First, and most obviously, is the fact that New Hampshire has no federal-law-based list maintenance requirements. As explained sufficiently by the Intervenors' brief, New Hampshire is exempt from NAVA, and HAVA establishes no federal-law-based list maintenance requirements for such exempt states. Intervenors' Brief, P.38-40. Secretary Scanlan and the State of New Hampshire fully concur with this argument and incorporate it by reference herein.

Second, even for states subject to NAVA and HAVA's list maintenance requirements, those requirements direct states to have a system which makes reasonable efforts to remove ineligible voters from their lists. Such efforts are reasonable so long as they make "a serious attempt that is rational and sensible[.]" *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025). "[T]he

---

systems to remove noncitizens from voter rolls is irresponsible as it leaves readers of these statements with the impression that the Federal Government assumes states are regularly registering noncitizens to vote and placing them on their voting rolls in the first place. While Secretary Scanlan and the State of New Hampshire would not seek to speak for all state systems, as discussed earlier in this brief, New Hampshire's system is designed to ensure that only those eligible to vote at the time of registration are placed on the voting rolls in the first place. In other words, New Hamshire has systems to ensure non-citizens are not registered to vote obviating a need to remove their names from the system as part of ongoing list maintenance efforts.

attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Id.* The fact that a state's voter list may have one, or a hundred, or a thousand, or even tens of thousands of names of individuals who are ineligible to vote due to death or relocation yet to be removed does not establish a violation of NAVA's list maintenance requirements. *Id.* As such, checking a state's current list to see if any individual ineligible voters can be found is not the same as checking compliance with NAVA.

Third, states subject to NAVA are required to have a general program for list maintenance that makes a reasonable effort to remove only voters who have died or changed address. *Bellitto v. Snipes*, 935 F.3d 1192, 1199-1200 (2019). It permits, but does not require, that states have programs to address removal of voters rendered ineligible for other reasons such as a felony conviction or a finding of mental incapacity. *Id.* It is worth noting here that an individual's ineligibility due to his or her status as a non-citizen is even further removed from federal list maintenance requirements because a non-citizen does not *become* ineligible to vote. Such individuals are at no time eligible to vote and, absent active voter

fraud, will not be placed on New Hampshire's voting lists in the first place.

The Civil Rights Act requires record demands to be in writing with a statement of "the basis and the purpose[.]" This is not a particularly high standard. But if it is to mean anything it must at least require the Federal Government to cite actual applicable federal law and to inform states of its true intended purpose when demanding the production of records.

#### 2. The Federal Government's Stated Purpose, Even If It Were the Government's True Purpose, Is Not Legally Valid.

The Federal Government's stated purpose—"to ascertain New Hampshire's compliance with the list maintenance requirements of HAVA under 52 U.S.C. § 21083(b)(4)(A) and (B)[,]" Apx. P.53-54—is improper as it is wholly unrelated to the voting-related discrimination targeted by the Civil Rights Act.

As explained above, "the basis and the purpose" requirement in 52 U.S.C. § 20703 is properly understood as a requirement that the Attorney General disclose a basis and a purpose which relate to the Federal Government's obligations under federal law to

protect the civil rights, including voting rights, of American citizens. Understanding "the basis and the purpose" requirement as delineating this kind of a broad but existent boundary on the statutorily conferred authority is vital because, without it, the Executive Branch of the Federal Government, through the appointed Attorney General in Washington, would have limitless authority to demand that states turn over sensitive voter data for any reason, including a patently improper one. For example, the Federal Government could demand the State disclose confidential voter information in order to allow it to create a list of active voters affiliated with one particular party in order to initiate targeted tax audits.

It would be illogical to read the statutory language requiring the Attorney General to state in writing the basis and the purpose for his request before a state need comply as not also requiring that the basis and the purpose be non-pretextual and legally valid. In this case, the Federal Government is not seeking documents in connection with any investigation of, or allegations about, New

Hampshire's compliance with federal civil rights laws and, as such, it has not stated a valid Civil Rights Act record demand.

## II. THE SVRL DATABASE IS NOT A RECORD OR PAPER COVERED BY 52 U.S.C. § 20701'S RETENTION AND PRESERVATION REQUIREMENTS.

52 U.S.C. § 20701 directs state election officials to:

> retain and preserve, for a period of twenty-two months … all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20703 then requires that the records so retained and preserved:

> shall, upon demand in writing by the Attorney General or his representative …, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

New Hampshire's SVRL, an electronic database, is not a record which must be retained and preserved under 52 U.S.C. § 20701, and therefore it is not a record that must be produced under 52 U.S.C. § 20703.

As the district court found, only papers and records which "come into [an election official's] possession" are subject to the Civil Rights Act's retention and production requirements, and the plain meaning of this phrase covers papers and records which are *acquired* by the government official from an external source. Appellant's Add. P.9-10. A category of things that come into an official's possession is not as broad as a category of everything that is in an official's possession. As the district court explained:

> The language does not describe a static state of possession; rather, "come into" is a prepositional verb phrase that implies there was a prior state when election officials did not have the record or paper, and a transition that changed that. Because the court must "give effect to the phrase 'come into [their] possession' and prevent it from being surplusage," it interprets § 20701 as referring only to records that election officials obtain from outside sources—i.e. prospective voters—and not to records that they themselves have created and thus have always possessed.

*Id.*

This interpretation is not only compelled by the plain language of the statute but consistent with the statutory structure. It is consistent with the types of records covered by the statute – those "relating to any application, registration, payment

of poll tax, or other act requisite to voting in such election"—which are all actions voters take and records they create to register to vote.

It is also consistent with the statutory directive that election officials preserve and refrain from altering or destroying covered documents.

> This framework makes sense when applied to discrete records and papers submitted by voters and other outside sources but could produce absurd results when applied to a state's own evolving work product, like a database that is constantly being revised as election officials add, change, and correct voter data. … Reading § 20701 to encompass such a system would effectively require election officials to simultaneously preserve and modify the same record by creating a new, static version of the database with every single edit, which per the state, would be "impractical to the point of impossible."

*Id.* at 10-11.

Recognizing that the statutory language—which covers only papers and records which come into election officials' possession—must mean something, the Federal Government argues that the phrase should be understood to create a temporal limit, denoting the imposition of the retention and preservation obligations as starting at a specific point in time. *See* App. P.112-15. This

interpretation is again inconsistent with the plain language of the statute, which provides:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for [federal office] are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election[.]

52 U.S.C. § 20701 (emphasis added). The retention period is clearly set by the statute and is measured from the date of the election in which the voter who is applying, registering, or engaging another act requisite to voting is seeking to vote. The phrase concerning documents coming into the possession of election officials does not set a temporal retention time limit as that is already set.

The interpretation offered by the Federal Government also serves to exemplify the earlier made observation that it would be illogical to apply the Civil Rights Act's retention and preservation requirements to a state-created relational database like the SVRL. The SVRL is not a static record or paper that can be retained and preserved, without alteration. It is a database into which users

are consistently adding, changing, and correcting data, as is required by federal law. To retain and preserve the SVRL as a record at every temporal moment when the SVRL could be said to "come into" the possession of an applicable state official would effectively require states to save a new, static copy of the database every time a change of any sort was made by any user within the database, therefore creating a new and different record. Such a requirement would be impractical to the point of impossible and patently absurd.[8]

This leads to the State's final point, which is that even if some government generated work-product—such as those discussed on pages 27 and 28 of the Federal Government's brief—could be considered a "record[] and paper[]" that "come[s] into" a government official's "possession," the SVRL as a relational

[8] The Federal Government claims that this impracticality is not dictated by their reading of the statute because an election official retains, preserves, and maintains the SVRL in compliance with the CRA by accurately updating it in compliance with HAVA. *See* U.S.A.'s Brief, P.32-33. This, like many of the Federal Government's arguments, ignores the plain language of the statute which criminalized the willful destroying, mutilating, or *altering* any record on paper covered by the CRA's retention and preservation requirements. *See* 52 U.S.C. § 20702. It may be that one can be said to maintain a dynamic document while allowing corrections and modifications to be made. But it cannot be said that the document is preserved without alteration.

database is not such a record or paper because it is not a record that can be "retained and preserved." 52 U.S.C. § 20701.

The Civil Rights Act retention and preservation requirements are significant, and they come with significant consequences for anyone who does not comply. *See* 52 U.S.C. § 20702. Specifically:

> Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

*Id.* When § 20701's retention and preservation requirements are read in context with § 20702's criminal penalties, it is clear that the phrase "records and papers" refers to static documents and not relational databases. Records and papers may be electronic, but they must be static. Federal law (HAVA) requires states to create a database system that "serve[s] as the single system for storing and managing the official list of registered voters throughout the State." 52 U.S.C. 21083(a)(1)(A)(i). The data within this system is perpetually altered with new and corrected information entered and then the database is used to print official voting lists at each

election. *See* New Hampshire Secretary of State, *New Hampshire Election Procedure Manual*, EPM 2026, *available at* https://mm.nh.gov/files/uploads/sos/docs/nhsos-2026-epm-complete-book-remediated.pdf (last visited Sept. 18, 2026). Whether these voting lists so produced are records covered by the Civil Rights Act is beside the point in this litigation as they are publicly available in New Hampshire, and Secretary Scanlan is ready, willing, and able to provide the same to the Federal Government. The relevant question is whether the system for storing and managing the official list is itself a covered record or paper that must be retained and preserved without alteration pursuant to the Civil Rights Act. And, as has been found by every federal court to consider the question, it clearly is not.

## CONCLUSION

The Civil Rights Act's retention, preservation, and production requirements do not cover a state's SVRL as it is the database system used to store and manage the state's official list of register voters, it is not itself a record or paper that comes into the possession of election officials related to an act requisite to

voting. Further, even if the SVRL were a covered record, the Federal Government's demand letter is clearly insufficient to meet the simple statutory requirement that it contain a written statement of the basis therefor. As such, Secretary Scanlan and the State of New Hampshire respectfully request this Court affirm the order of the district court granting their motion to dismiss.

In the event this Court does not rule in Secretary Scanlan's and the State's favor, remand for further proceedings is necessary. Specifically, the district court should be given the opportunity to rule in the first instance of the question of the applicability of the Privacy Act as the Federal Government concedes in their brief before this Court that at least some of the information they have demanded is protected by the First Amendment and not properly collected under the Privacy Act. *See* U.S. Brief, P.54.

Respectfully Submitted,

DAVID M. SCANLAN, NEW HAMPSHIRE SECRETARY OF STATE

*and*

THE STATE OF NEW HAMPSHIRE

By their Attorneys,

JOHN M. FORMELLA
ATTORNEY GENERAL

ANTHONY J. GALDIERI
SOLICITOR GENERAL

October 16, 2026

*/s/ Mary A. Triick*
Mary A. Triick, Bar No. 1213543
Senior Assistant Attorney General
New Hampshire Dept. of Justice
1 Granite Place, South
Concord, New Hampshire 03301
Mary.A.Triick@doj.nh.gov
(603) 271-0447

## CERTIFICATE OF COMPLIANCE

This document complies with Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 7,599 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared with a proportionally spaced typeface using Microsoft Word in 14-point Century font.

October 16, 2026

*/s/ Mary A. Triick*
Mary A. Triick, No. 1213543

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF filers and will be served via the CM/ECF System:

Christopher Chen-Hsin Wang, Bridget I. Davidson, Raphael Katz, Andrew Braniff, David N. Goldman, Kiersten Jennifer Korczynski, John Casali, Paul J. Twomey, Steven J. Dutton, Christopher D. Dodge, Elisabeth C. Frost, David Robert Fox, Walker Roy McKusick, Branden D. Lewiston, Robin D. Melone, Daniel J. Freeman, Gilles R. Bissonnette, Henry R. Klementowicz, Theresa J. Lee, Sophia Lin Lakin, Maura Eileen O'Connor, William Miles Hughes, Sejal S. Jhaveri, Jonathan Rosenberg, James Joseph Armillay Jr., Noah Bokat-Lindell, Jeremy D. Eggleton, Daniel Michael Kobrin, Aaron M. Frey, Nicholas W. Brown, Daniel E. Hall, Stacey Bucci, Rodkangyil Orion Danjuma, Jared Fletcher Davidson, Gregory Clarick, David Kumagai

October 16, 2026

*/s/ Mary A. Triick*
Mary A. Triick, No. 1213543